Of Counsel:
CRONIN, FRIED, SEKIYA,
  KEKINA & FAIRBANKS

L. RICHARD FRIED, JR.        0764-0
JOHN D. THOMAS, JR.          1415-0
GEOFFREY K. S. KOMEYA        6056-0
600 Davies Pacific Center
841 Bishop Street
Honolulu, Hawaii  96813
Telephone:  (808) 524-1433
Facsimile:  (808) 536-2073
E-mail:      rfried@croninfried.com
             jthomas@croninfried.com
             gkomeya@croninfried.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARITES CAMPANO and RAPHAEL CAMPANO, Individually and as the Court-Appointed *Next Friend* for the Minor Children R.M.B.C, R.B.B.C., and M.R.B.C., <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | CIVIL NO. _____ <br> (FTCA - Medical Malpractice) <br><br> COMPLAINT; SUMMONS |

## **COMPLAINT**

Plaintiffs above named, by and through their attorneys, Cronin, Fried, Sekiya, Kekina & Fairbanks, for claims for relief against Defendant above named, allege and aver as follows:

## COUNT I

1.      At all times relevant herein, Plaintiff Marites Campano ("Marites") was domiciled in, and a citizen of, the City and County of Honolulu, State of Hawaii.

2.      At all times relevant herein, Plaintiff Rafael Campano was domiciled in, and a citizen of, the City and County of Honolulu, State of Hawaii.

3.      At all times relevant herein, plaintiff R.M.B.C., a minor, was domiciled in, and a citizen of, the City and County of Honolulu, State of Hawaii.

4.      At all times relevant herein, plaintiff R.B.B.C., a minor, was domiciled in, and a citizen of, the City and County of Honolulu, State of Hawaii.

5.      At all times relevant herein, plaintiff M.R.B.C., a minor, was domiciled in, and a citizen of, the City and County of Honolulu, State of Hawaii.

6.     Marites and Rafael Campano are wife and husband.

7.     Marites and Rafael Campano are the natural and legal parents of minor children R.M.B.C., R.B.B.C., and M.R.B.C.

8.     Rafael Campano is the duly appointed Next Friend for minor children R.M.B.C., R.B.B.C., and M.R.B.C.

9.     This is a medical malpractice and personal injury action to recover damages which arises from negligent acts and/or omissions of employees of the Government of the United States of America, while acting within the scope of their office and/or employment, under circumstances where the Government of the United States of America, if a private party, would be liable to plaintiffs.

10.     Jurisdiction is conferred on this Court by Title 28, United States Code § 1346.

11.     Pursuant to Title 28, United States Code, §§ 2671, et seq., administrative claims on behalf of plaintiffs were filed on or about September 8, 2014 with the Department of the Army.

12.     The administrative claims were received by the Department of the Army on or about September 10, 2014.

13.     More than six months have elapsed without final disposition of the administrative claims.

14.    At all times relevant herein, Defendant United States of America (hereinafter "Defendant") operated a medical care facility in the City and County of Honolulu, State of Hawaii, known as Tripler Army Medical Center (hereinafter "TAMC"), through the Department of the Army.

15.    On July 22, 2013, Marites, a 37-year-old woman was admitted to TAMC for induction of labor to deliver her third child.

16.    Upon admission at 1140, Marites' vital signs included blood pressure 122/66, pulse 84 and temperature 98.2.

17.    Her white blood cell count on admission was 11,200 with an elevated neutrophil count of 8.8.

18.    Her platelet count was 223,000.

19.    At 1320 Marites reported feeling hot and weak.

20.    Marites appeared pale and clammy to touch on her face and neck.

21.    Vital signs at that time included blood pressure of 122/66, pulse 83 and temperature 98.0.

22.    At 1700 Marites' blood pressure was 100/59, pulse 89, and axillary temperature 97.0.

23.    Marites was administered an epidural anesthetic at 2110.

24.    Vital signs at that time included blood pressure 116/64, pulse 107 and repeat vital signs of blood pressure 129/60 and pulse 121.

25.    At 2139 Marites had a pulse of 130 and her temperature was 98 degrees.

26.    Marites reported her heart was racing.

27.    TAMC nursing documentation indicates Marites had a heart rate as high as 150.

28.    At 2202 Marites had a blood pressure of 99/51 and a heart rate of 141.

29.    Oxygen and additional intravenous (IV) fluids were given to Marites.

30.    Marites' vital signs at 2220 included blood pressure 88/58 and pulse 110.

31.    At 2255 her pulse was 121.

32.    Marites had a spontaneous vaginal delivery of a girl on July 23, 2013 at 0110.

33.    After delivery Marites continued to demonstrate persistent tachycardia.

34.    At 0150 her pulse was 126.

35.    At 0300 on July 23, 2013, Marites' pulse was recorded at 117.

36.    At 0300 on July 23, 2013, Marites' temperature was recorded at 101.3.

37.    At 0300 on July 23, 2013, Marites' blood pressure was recorded  at 117/61.

38.    At 0345 on July 23, 2013, Marites' pulse was recorded at 130.

39.    At 0345 on July 23, 2013, Marites' blood pressure was recorded at 119/57.

40.    Marites was given Tylenol 975 mg and Motrin 800 mg for analgesia.

41.    At 0401 on July 23, 2013, Marites' pulse was recorded at 116.

42.    At 0401 on July 23, 2013, Marites' temperature was recorded at 99.2.

43.    At 0401 on July 23, 2013, Marites' blood pressure was recorded at 112/55.

44.    At 0730 on July 23, 2013, Marites' pulse was recorded at 118.

45.    At 0730 on July 23, 2013, Marites' temperature was recorded at 99.2.

46.    At 0730 on July 23, 2013, Marites' blood pressure was recorded as 96/51.

47.    At 0906 on July 23, 2013, Tylenol 650mg was given to Marites.

48.    At 1023 Marites reported headache, dizziness and tachycardia.

49.    At 1117 on July 23, 2013, Marites' pulse was recorded at 120.

50.    At 1117 on July 23, 2013, Marites' blood pressure was recorded as 76/45.

51.    At 1130 Marites' blood pressure was 78/48 and her pulse 123.

52.    Additional IV fluids were ordered.

53.    Laboratory tests were obtained indicating leukocytosis with a white count of 29,700, with 90% polys and 30% bands.

54.    Marites' platelet count was 163,000.

55.    At 1200 Marites had an episode of diarrhea.

56.    At this time her blood pressure was 81/53 and her pulse 123.

57.    Fluids were again given to Marites.

58.    At 1220 Marites was evaluated by Dr. Farmer.

59.    Blood and urine cultures were ordered at this time.

60.    No antibiotics were ordered or started when the blood cultures were ordered.

61.    Marites' increased heart rate was consistent with sepsis.

62.    Marites' decreased blood pressure was consistent with sepsis.

63.    Marites' elevated WBC count was consistent with sepsis.

64.     Marites' increased percentage of band cells and polys was consistent with sepsis.

65.     The first set of blood cultures was drawn nearly three hours later, at 1510.

66.     Urinalysis indicated elevated glycosuria and urobilinogen.

67.     Tylenol 650 mg was given to Marites at 1600.

68.     A repeat complete blood count (CBC) at 1632 indicated a hemoglobin of 11.5 and a white count of 23,000 with 94% polys.

69.     Marites' platelet count was low at 146,000 at this time.

70.     Her blood sugar was noted to be 132 mg/dl.

71.     Marites was given Tylenol with hydrocodone for analgesia after evaluation by Dr. Farmer at 1843.

72.     A differential on the CBC was reported back at 1930, indicating 50% bands and 46% polys.

73.     At 2006 Marites was noted to have a decline in her mental status, responding only to commands.

74.     Her blood pressure was 79/47, pulse 108 and temperature 97.6.

75.     At 2120 her blood pressure was 86/54, pulse 90.

76.     Tylenol with hydrocodone and Motrin were given.

77.     At 2333 Marites' blood pressure was 82/46, pulse 113, respirations 20, oxygen saturation 99% and temperature 97.5.

78.     Marites was again noted to have decreased mental status.

79.     At 0359 on July 24, 2013, Marites' blood pressure was 72/38, pulse 124, oxygen saturation 96% and temperature 97.9.

80.     Tylenol 650 mg was given to Marites.

81.     A repeat CBC at 0400 indicated a drop in hemoglobin to 9.4, a white count of 12,300 with 93% polys, a platelet count of 103,000 and a low bicarbonate level of 19.

82.     IV fluids were again given to Marites.

83.     At 0500 her urine output was noted to be low, producing only 7 ml of bloody urine over the previous two hours.

84.     Marites' blood pressure was 72/52 at 0545, with a pulse of 124, respirations 20 and a declining oxygen saturation of 95%.

85.     At 0619 the lab notified Marites' care providers of the finding of a positive blood culture, consistent with gram-positive cocci in pairs and chains.

86.     At that time orders were given to begin IV antibiotics with Cafepime and for Marites to be transferred to the ICU at approximately 0724.

87.   Lab studies indicated a hemoglobin of 8.8.

88.   Blood gasses indicated a low PO2 of 68, a low PCO2 of 28 and a low bicarbonate of 18.

89.   Nursing notes indicated that Marites was suffering frank deterioration over the previous several hours, reporting increasing abdominal pain and shortness of breath.

90.   Around 0724 on July 24, 2013, Marites was started on broad spectrum antibiotics Vancomycin and Zosyn.

91.   A chest xray at 0835 showed a left-sided pleural effusion and left-sided basilar density.

92.   Marites was given a blood transfusion of two units of packed red blood cells and one unit of platelets.

93.   Her white count at this time was 6,500.

94.   Marites was intubated on July 24, 2013 for respiratory failure.

95.   On July 24, 2013, Marites underwent a CT scan with IV contrast.

96.   IV contrast is damaging to kidneys.

97.   The use of IV contrast in Marites' July 24, 2013 CT was contra-indicated.

98.     A CT at 0955 of Marites' abdomen and pelvis revealed renal cortical necrosis, ascites and bilateral pleural effusions.

99.     Marites was intubated and maintained on ventilation.

100.   Marites underwent dialysis on July 24, 2013 at approximately 2000.

101.   On July 25, 2013, final blood culture results identified Streptococcus pyogenes.

102.   On July 25, 2013 at 0952 Clindamycin was ordered to be administered to Marites.

103.   Clindamycin was not administered until 1400 on July 25, 2013.

104.   Marites subsequently suffered an extraordinarily complicated course as a result of Group A strep septicemia.

105.   A nephrology consult indicated acute tubular necrosis and renal cortical necrosis.

106.   Marites suffered pulmonary failure and metabolic acidosis.

107.   An infectious disease consult for Marites identified septic shock due to Group A Strep septicemia.

108.   Marites suffered hepatic dysfunction, chemical pancreatitis, acalculous cholecystities, abnormal EEG studies, possible pituitary hemorrhage, duodenal ulcer, and progressive encephalopathy.

109.   Marites suffered permanent kidney damage requiring dialysis.

110.   Rafael assisted with Marites' care during her stay at TAMC.

111.   Rafael was vigilant at Marites' bedside throughout her hospital stay at TAMC.

112.   On August 15, 2013, it was recommended that Marites "avoid usual nephrotoxins."

113.   Marites was discharged on August 24, 2013.

114.   Marites' discharge medications included Motrin 800mg to be taken 1 tablet every 8 hours as needed for pain.

115.   Motrin is not indicated for patients with reduced kidney function.

116.   Due to severe kidney damage Marites required ongoing hemodialysis.

117.   Marites suffered renal hypertension, depression, anxiety, hyperlipidemia, renal hyperpara thyroidism, chronic anemia, weakness and fatigue.

118.   Marites' gallbladder was surgically removed.

119.   Marites eventually qualified for a renal transplant which was performed on March 25, 2015.

120.  Defendant, by and through its agents, servants and employees, negligently examined, evaluated, tested, diagnosed, medicated, sedated, resuscitated, cared for and otherwise treated Marites.

121.  Timely and appropriate diagnosis and treatment of Marites's infection would have prevented Marites' septic shock and all related complications, including her multi-organ injuries and complications and severe kidney damage.

122.  As a direct, legal and/or proximate result of the carelessness, negligence, actions and omissions of Defendant as aforesaid, Marites suffered permanent kidney damage requiring dialysis and subsequently kidney transplant, as well as septic shock, multi-organ injury, multiple injuries and complications.

123.  As a further direct, legal and/or proximate result of the carelessness, negligence, actions and omissions of Defendant as aforesaid, Marites suffered, and will continue to suffer, great physical pain, suffering, discomfort, permanent bodily injuries, disfigurement, severe psychological and emotional injuries and distress, mental anguish, and other disabilities.

124.  As a further direct, legal and/or proximate result of the carelessness, negligence, actions and omissions of Defendant as

aforesaid, Marites has suffered, and will suffer in the future, loss of enjoyment of life, and she has been and will be unable to pursue activites including hobbies, human and family relations, and other endeavors.

125.   As a further direct, legal and/or proximate result of the carelessness, negligence, actions and omissions of Defendant as aforesaid, Marites has incurred medical and miscellaneous expenses, and will incur such medical and miscellaneous expenses in the future, and will incur future costs in amounts that will be shown at trial.

126.   As a further direct, legal and/or proximate result of the carelessness, negligence, actions and omissions of Defendant as aforesaid, Marites has sustained loss of earnings and will sustain future wage loss and/or impairment of earning capacity, in amounts that will be shown at trial.

127.   As a further direct, legal and/or proximate result of the carelessness, negligence, actions and omissions of Defendant as aforesaid, Marites has suffered, and will continue to suffer in the future, serious mental anguish and emotional distress, and has been permanently injured; and Plaintiffs are entitled to recover damages therefor.

128.   As a further direct, legal and/or proximate result of the carelessness, negligence, actions and omissions of Defendant as

aforesaid, Rafael Campano has suffered, and will continue to suffer in the future, pecuniary injury, loss of financial support, loss of love and affection, society, companionship, comfort, consortium, protection, spousal care and attention, and other benefits of his wife, for which Plaintiffs are entitled to recover damages, and in addition, Rafael Campano has suffered, and will continue to suffer in the future, serious mental anguish and emotional distress and has been permanently injured.

129.  As a further direct, legal and/or proximate result of the carelessness, negligence, actions and omissions of Defendant as aforesaid, B.M.B.C. has suffered, and will continue to suffer in the future, pecuniary injury, loss of financial support, loss of love and affection, society, companionship, comfort, consortium, protection, parental care and attention, and other benefits of his mother, for which Plaintiffs are entitled to recover damages, and in addition, B.M.B.C. has suffered, and will continue to suffer in the future, serious mental anguish and emotional distress and has been permanently injured.

130.  As a further direct, legal and/or proximate result of the carelessness, negligence, actions and omissions of Defendant as aforesaid, R.B.B.C. has suffered, and will continue to suffer in the future, pecuniary injury, loss of financial support, loss of love and affection,

society, companionship, comfort, consortium, protection, parental care and attention, and other benefits of his mother, for which Plaintiffs are entitled to recover damages, and in addition, R.B.B.C. has suffered, and will continue to suffer in the future, serious mental anguish and emotional distress and has been permanently injured.

131.   As a further direct, legal and/or proximate result of the carelessness, negligence, actions and omissions of Defendant as aforesaid, M.R.B.C. has suffered, and will continue to suffer in the future, pecuniary injury, loss of financial support, loss of love and affection, society, companionship, comfort, consortium, protection, parental care and attention, and other benefits of her mother, for which Plaintiffs are entitled to recover damages, and in addition, M.R.B.C. has suffered, and will continue to suffer in the future, serious mental anguish and emotional distress and has been permanently injured.

## COUNT II

132.   The allegations contained in paragraphs 1 through 131 are realleged and incorporated herein by reference.

133.   At all times relevant herein, the employees, agents, servants and representatives of TAMC who examined, diagnosed, cared for and

treated Marites were acting within the course and scope of their employment, agency and service with TAMC and therefore with Defendant.

134. Defendant is liable to Plaintiffs for the tortious conduct of the above-mentioned employees, agents, servants and representatives as set forth in this Complaint under the doctrine of respondeat superior and/or agency principles.

## COUNT III

135. The allegations contained in paragraphs 1 through 134 are realleged and incorporated herein by reference.

136. Defendants and their employees, agents, servants and representatives failed to inform Plaintiffs of the information a reasonable patient needs from health care providers to allow the patient and/or the patient's guardian or legal surrogate to make an informed decision regarding proposed treatment.

137. As a direct, legal and/or proximate result of Defendants' failure to provide Plaintiffs said information Plaintiffs have suffered, and will continue to suffer, the injuries and damages as set forth herein.

## COUNT IV

138. The allegations contained in paragraphs 1 through 137 are realleged and incorporated herein by reference.

139.   At all times relevant herein, Defendant and its employees, agents, servants and representatives did hold themselves and their health care provider employees, agents, servants and representatives out to members of the general public and to Plaintiffs as possessing that degree of care and skill ordinarily possessed and exercised by like health care providers, employees, agents, servants and representatives.

140.   At all times relevant herein, Defendant impliedly and/or expressly warranted to Plaintiffs that it and its employees, servants, agents and representatives would provide competent care and appropriate treatments and/or services.

141.   Defendant breached its warranties to Plaintiffs.

142.   As a direct and legal and/or proximate result of Defendant's breaches of warranties, Plaintiffs have suffered, and will continue to suffer, the injuries and damages as set forth herein.

WHEREFORE, Plaintiffs demand judgment against Defendant as follows:

a.   For general and special damages in amounts that will be proven at trial; and Plaintiffs further state that the amount of their damages as asserted herein falls within the jurisdictional requirements of this Court;

b.      Interest as allowed by law;

c.      Plaintiffs' costs of suit and attorneys' fees; and

d.      Such other and further relief as this Court deems just and

proper.

DATED:  Honolulu, Hawaii, October 20, 2015.


    /s/ John D. Thomas, Jr.
L. RICHARD FRIED, JR.
JOHN D. THOMAS, JR.
GEOFFREY K. S. KOMEYA
Attorneys for Plaintiffs