Of Counsel:
CRONIN, FRIED, SEKIYA,
  KEKINA & FAIRBANKS

L. RICHARD FRIED, JR.        0764-0
JOHN D. THOMAS, JR.          1415-0
GEOFFREY K. S. KOMEYA        6056-0
600 Davies Pacific Center
841 Bishop Street
Honolulu, Hawaii  96813
Telephone:  (808) 524-1433
Facsimile:  (808) 536-2073
E-mail:      rfried@croninfried.com
             jthomas@croninfried.com
             gkomeya@croninfried.com

Attorneys for Plaintiffs

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARITES CAMPANO and RAPHAEL CAMPANO, Individually and as the Court-Appointed *Next Friend* for the Minor Children R.M.B.C, R.B.B.C., and M.R.B.C.,<br><br>            Plaintiffs,<br><br>      vs.<br><br>UNITED STATES OF AMERICA,<br><br>            Defendant. | CIVIL NO. 15-00439 KSC<br>(FTCA - Medical Malpractice)<br><br>**PLAINTIFFS' TRIAL BRIEF**;<br>DECLARATION OF L. RICHARD FRIED, JR.; EXHIBITS "1" – "13"; CERTIFICATE OF SERVICE<br><br><br><br><br>**TRIAL:**<br>Date:        June 5, 2017<br>Judge:      Hon. Kevin S. C. Chang |

# **TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................   1

     A.   A Post-Partum Mother Has A Weakened Immune
          System ..............................................................................   1

     B.   Infection, Sepsis and Septic Shock ....................................   2

     C.   The Standard of Care Required Antibiotics no Later
          Than 0300 on July 23 ........................................................   3

     D.   There Were Multiple Missed Opportunities To Diagnose
          and Treat Marites's Sepsis ................................................   4

     E.   Marites Suffered Severe Septic Shock and Multi Organ
          Failure ...............................................................................   5

II.  LIABILITY ...............................................................................   6

     A.   The Doctors and Staff Missed Multiple Opportunities to
          Diagnose and Treat Mrs. Campano's Sepsis .....................   7

     B.   Tripler System Failures ......................................................   7

     C.   The Infectious Diseases Perspective of Standard of Care
          Violations ...........................................................................   8

     D.   The Obstetric Perspective ..................................................   12

     E.   The Nephrology Perspective ..............................................   13

          1.   Required ICU Care Was Negligently Delayed ............   15

          2.   IV Contrast Is Nephrotoxic and Contributed to
               Kidney Injury. ...........................................................   16

          3.   Nephrology Consult Was Negligently Delayed ...........   17

        4.    The Physicians Negligently Prescribed Motrin at
            Discharge ...................................................................... 18

III.    THE CARE PROVIDERS ADMIT LIABILITY ............................. 19

    A.    Marites' Primary Doctors Were Totally Inexperienced ....... 20

        1.    Dr. Bastawros ................................................................ 20

        2.    Dr. Boledovich ............................................................... 20

        3.    Dr. Crowder .................................................................. 22

        4.    Dr. McCartin ................................................................. 23

        5.    Dr. Hill ......................................................................... 24

    B.    Signs and Symptoms of Sepsis Were Present From
        Admission ............................................................................ 25

        1.    The First Abnormal CBC.............................................. 26

        2.    Initial Clinical Symptoms of Sepsis .............................. 27

        3.    Tachycardia Begins at 2113 and Persists Until
            Mrs. Campano "Crashed" ........................................... 28

        4.    The 101.3 Fever at 0300.............................................. 30

        5.    No Physician Evaluated Mrs. Campano's Fever.......... 31

    C.    Neither Dr. Bastawros Nor Dr. Crowder Knew That
        Tachycardia and Fever Together Required Investigation
        of Sepsis ............................................................................ 34

        1.    All The Physicians Now Know, and Admit, That The
            Standard of Care Required Antibiotic Therapy In
            Response to Tachycardia and Fever at 0300 ............. 35

            a.    Dr. Bastawros ...................................................... 35

b.    Dr. Crowder ........................................................... 36

     (1)   Dr. Crowder's Post-Case Research
          Established Empiric Antibiotic Therapy as
          the Standard of Care ..................................... 37

c.    Dr. McCartin ........................................................... 39

     (1)   Even Dr. McCartin, the Staff Physician,
          Changed Her Practice to Immediately Start
          Antibiotic Therapy in Compliance With the
          Standard of Care ........................................... 39

D.   The Providers Admit That Marites Was Infected at 0300
On July 23rd ........................................................................ 40

   1.   Dr. Bastawros ............................................................. 41

   2.   Dr. Crowder ................................................................. 42

   3.   Dr. McCartin ................................................................ 42

E.   Inexperience and Failure to Communicate Contributed to
Multiple Missed Opportunities to Diagnose and Treat
Marites' Progressive Sepsis ............................................... 43

   1.   There Were Multiple Failures of Communication
Between Marites' Physicians and Staff ....................... 46

   2.   There Was No Communication That Marties Had Not
Responded to the Fluid Bolus ..................................... 49

     a.   Dr. Crowder Admitted the Failure to Order
Closer Monitoring and Communication ............... 50

   3.   The Failure to Recognize Hypotension Was
Caused By Marites' Sepsis Was a Sixth Missed
Opportunity ................................................................. 51

4.   The Inexplicable Decision Not To Give Antibiotics
     in Response to an Elevated White Blood Count,
     Left Shift and Bandemia Was a Seventh Missed
     Opportunity ................................................................   52

     a.   Dr. Crowder and Dr. McCartin Both Knew at
          1145 that Infection Was The Most Likely
          Diagnosis ...........................................................   53

     b.   Dr. McCartin's Chart Note Referenced The
          Wrong CBC Results ...........................................   54

     c.   Antibiotic Therapy Was Not Started Even
          Though That Was The Safer Course ...................   55

     d.   Dr. McCartin Claims She Wanted Dr. Hill To Tell
          Her If She Should Start Antibiotics.  Dr. Hill
          Claims She Would Not Have Recommended No
          Antibiotics .........................................................   56

     e.   Neither Physician Had an Accurate
          Understanding of Mrs. Campano's Clinical
          Presentation ......................................................   58

     f.   Failure to Improve in Response to Fluid Boluses
          Should Have Raised A Major Concern For
          Infection .............................................................   59

5.   No One Monitored Marites to See If She "Declared
     Herself," an Eighth Missed Opportunity; Failure to
     Appreciate Decreasing Circulation and Increasing
     Bandemia Were Ninth and Tenth Missed
     Opportunities ............................................................   61

     a.   No One Communicated Worsening CBC Results
          At 1632 to The Staff Physicians .........................   62

6.   Delay to Activating the Rapid Response Team (RRT)
     For Nearly 24 Hours Was an Eleventh Missed
     Opportunity ................................................................   63

7.   Marites' Clinical Presentation Required RRT
     Activation From 1117 on July 23rd Until She
     Crashed  ....................................................................   66

     a.   Understaffing Prevented the RRT Nurse From
          Timely Recognizing Marites' Peril  .......................   67

     b.   Tripler's Hospital Staff and Physicians Were
          Inadequately Trained and Instructed Regarding
          RRT Activation  .....................................................   69

8.   Dr. Boledovich's Failure to Appreciate the Severity of
     Marites's Condition at Report at 1800 Was a Twelfth
     Missed Opportunity  ....................................................   70

9.   The Postpartum Unit Was Understaffed, Resulting in
     Marites' Primary Nurse Being Diverted From Care of
     Marites  .......................................................................   73

     a.   Additional Staffing Was Requested But Not
          Received  ..............................................................   76

     b.   Tripler Did Not Then, But Now Has, a Call
          System to Provide Additional Required
          Staffing  ................................................................   77

     c.   Nurse Gallardo's Additional Duties Left Marites
          Without Nursing Care And Supervision at a
          Critical Time  .........................................................   78

10.  There Was Inadequate Physician Staffing As Well  .....   79

11.  The Inability of Marites' Nurse to Get a Doctor to See
     Marites Was a Thirteenth Missed Opportunity  ............   82

12.  Dr. Boledovich Essentially Ignored the Requests
     of Nurse Gallardo and Dr. Bastawros for
     Intervention ................................................................   83

F.  No Defense Experts Defend the Primary Care in
    This Case ............................................................   86

    1.  Dr. Friedman's Report Does Not Refute Primary
        Negligence and Confirms Causation  .........................   87

    2.  Defendant's Radiologist Dr. Yeoh Agrees That
        Marites' Kidneys Were Irreversibly Damaged by the
        Time IV Contrast Was Given  ......................................   88

    3.  The Evidence Does Not Support Dr. Yeoh's Claim
        That No Additional Contrast Was Given to Examine
        the Kidneys .................................................   89

IV.  FACTUAL SUMMARY  .................................................   91

V.   GENERAL DAMAGES  ...............................................   97

    A.  Family/Personal Background.  ............................   97

    B.  The Pregnancy With M.R.B.C. and the Birth at Tripler. ......   101

    C.  Marites's Horrendous Septic Course at Tripler. .................   103

        1.  Marites's Condition Founders in Waves of Pain and
            Increasing Deterioration on the Post-Partum Unit.  .....   103

        2.  The Intervention by the Rapid Response Team and
            the Ridiculously Belated Escalation of Marites's Level
            of Care. .......................................................   112

        3.  The Extended and Excruciating ICU Course.  .............   116

        4.  Problems Continue and Escalate in the Progressive
            Care Unit. ....................................................   129

        5.  Abnormal Liver Function Leads to Encephalopathy
            and Altered Mental Status. ..........................................   138

        6.  The Slow Crawl Toward Discharge From Tripler. .......   145

D.   The Cascade of Problems and Suffering in the
     Aftermath. ....................................................................   149

     1.   The Second Hospitalization for Peritonitis and
          Gallbladder Removal.   ................................................   149

     2.   Ascites Fluid Accumulations, Paracentesis Drainage,
          and Intestinal Ileus Blockages.   ..................................   155

     3.   Depression, Anxiety, Post-Traumatic Stress Disorder,
          and Psychiatric Treatment.   .........................................   161

     4.   The Road Toward a Kidney Transplant, and an
          Anxious Third Hospitalization at Tripler.   .....................   167

     5.   The Kidney Transplant and a New Host of Risks and
          Concerns.   ..................................................................   172

     6.   The Ruptured Ovarian Abscess and a Fourth
          Hospitalization at Tripler.   ...........................................   179

     7.   Aneurysm of the AV Fistula and a Fifth
          Hospitalization. ...........................................................   180

E.   Permanent Disfigurement ..................................................   182

F.   Complex Medical/Psychiatric Evaluation by Robert C.
     Marvit, M.D. ......................................................................   185

G.   Psychiatric Evaluation and Ongoing Treatment by
     Danilo E. Ponce, M.D. .......................................................   188

H.   The Effect on the Family.   ..................................................   199

     1.   Rafael ........................................................................   199

     2.   R.M.B.C., R.B.B.C., and M.R.B.C. ...............................   206

VI.   ECONOMIC DAMAGES  ............................................  211

    A.   Past Medical Expenses  ......................................  211

    B.   Marites's Future Prognosis and Care Needs. ...................  214

        1.   Nephrology – Keith L. Klein, M.D.  ...............  214

        2.   Life Care Planning - Karen L. Klemme, R.N. /
           Susan Riddick-Grisham, R.N.  ....................  215

           a.   Nephrology Needs - Keith L. Klein, M.D.  ............  216

           b.   Psychiatry Needs - Danilo E. Ponce, M.D.  ..........  234

           c.   Home Care Needs  ...............................  242

           d.   Equipment Needs  ...............................  251

    C.   Economic Analysis  ............................................  255

VII.   RETORT TO DEFENSE DAMAGES CONSULTANTS'
     OPINIONS  .................................................  256

    A.   Kidney Transplant Functional Life, Replacement Interval,
      and Costs.  ...........................................  257

        1.   No Dispute As to Life Expectancy.  ..............  257

        2.   Relative Agreement on Transplant Cost.  ...................  258

        3.   Disagreements on Transplant Functional Life and
           Replacement Interval.  .................................  260

    B.   Hemodialysis Costs.  ...........................................  263

        1.   Defendant's Damages Consultants Ignore the Actual
           Bills for the Actual Hemodialysis that Mrs. Campano
           Actually Received and Instead Rely on Costs Based
           on Collateral Sources for Their Opinions.  ...................  263

2. Defendant's Statisticians' Belated Supplemental Report Continues to Ignore the Actual Bills for the Actual Hemodialysis that Mrs. Campano Actually Received. ................................................................. 278

VIII. CONCLUSION ............................................................ 281

## TABLE OF AUTHORITIES

## CASES                                                                PAGES

Barham by Barham v. Rubin, 72 Haw. 308, 312, 816 P.2d
965, 967 (1991) ...........................................................   276

Brandon HMA, Inc. v. Bradshaw, 809 So.2d 611, 619
(Miss.2001) .................................................................   277

Bynum v. Magno, 106 Haw. 81, 86–89, 101 P.3d 1149,                 275, 276,
1154–57 (2004), as amended (Dec. 2, 2004) ............................   277, 278

Cates v. Wilson, 321 N.C. 1, 361 S.E.2d 734, 737–38
(1987) .......................................................................   276, 277

Children's Hosp. & Health Ctr. v. Belshe, 188 F.3d 1090,
1093–94 (9th Cir. 1999) ...............................................   276

Ellsworth v. Schelbrock, 235 Wis. 2d 678, 611 N.W.2d
764, 767-68 (Wis. 2000) ...............................................   276, 277

Haselden v. Davis, 353 S.C. 481, 579 S.E.2d 293,
294 n. 3 (2003) ...........................................................   277

Kometani v. Heath, 50 Haw. 89, 95, 431 P.2d 931, 936
(1967) .......................................................................   276

Reinhardt v. County of Maui, 23 Haw. 524, 527 (1916) ..............   275

Sam Teague, Ltd. v. Hawai`i Civil Rights Comm'n,
89 Hawaiʻi 269, 281, 283, 971 P.2d  1104, 1116 (1999) .............   276, 277

Sato v. Tawata, 79 Hawaiʻi 14, 18, 897 P.2d 941, 945
(1995) .......................................................................   277

Shaw v. U.S., 741 F.2d 1202, 1205 (9th Cir. 1984);
28 U.S.C. § 1346(b)(1) ...............................................   275

Suhor v. Lagasse, 770 So.2d 422, 424 (La. Ct. App. 2000) .......   276

<u>Thoreson v. Milwaukee & Suburban Transp. Co.</u>,
56 Wis.2d 231, 201 N.W.2d 745, 752 (Wis.1972) ....................... 277

<u>Walsh v. Chan</u>, 80 Hawaiʻi 188, 193, 907 P.2d 774, 779
(App.), <u>rev'd on other grounds</u>, 80 Hawaiʻi 212, 218,
908 P.2d 1198, 1204 (1995) ....................................................... 276

## **<u>RULES</u>**                                                    **<u>PAGES</u>**

Hawaii Revised Statutes § 386–8 ................................................. 277

## **<u>TREATISES</u>**                                               **<u>PAGES</u>**

Restatement § 920A(2) ................................................................. 277

Restatement § 920A cmt. c .......................................................... 277

## <u>PLAINTIFFS' TRIAL BRIEF</u>

## I.   <u>INTRODUCTION</u>

Child birth is the ultimate joy for a mother.  On July 23, 2013 child

birth became the ultimate nightmare for Marites Campano.  To this day, the

presence of Marites' daughter symbolizes the devastating, life-altering

injuries suffered by Marites as a direct result of the grossly negligent

post-partum care by Marites' many care providers at Tripler Army Medical

Center (TAMC).

That medical care was so egregious that Defendant USA has not

attempted to defend it.  The medical reports submitted in support of

Defendant USA's defense neither address nor refute the primary violations

of the standard of care identified by Plaintiffs' experts.  Defendant USA is

essentially conceding liability.

### A.   <u>A Post-Partum Mother Has A Weakened Immune System</u>

Pregnancy causes a weakened immune system for both the pregnant

and post-partum mother.  As a result, medical providers treating pregnant

and post-partum mothers must have a heightened awareness for the

presence of infection.  Providers must also treat infection as early as

possible to assist the mother's weakened immune response in preventing

significant injury.

Basic medical principles guide the diagnosis and treatment of infection. The clinical signs and symptoms of sepsis are well known. Marites demonstrated signs and symptoms of early sepsis shortly after her admission to TAMC at 1140 on July 22, 2013. Her signs and symptoms of infection, sepsis and septic shock were overlooked by multiple providers for an extended period of time, causing a significant delay in the initiation of antibiotic therapy. Her physicians missed multiple opportunities to respond to obvious clinical and laboratory signs and symptoms of infection and sepsis. As a result, Marites suffered from an increasingly severe continuum of infection progressing to SIRS (systemic inflammatory response syndrome) to sepsis, severe sepsis to septic shock, and finally to multi-system organ failure, including permanent damage of her kidneys.

**B.** **Infection, Sepsis and Septic Shock.**

Infection is the presence of pathogens in body tissues, causing local cellular injury. Sepsis is the body's response to infection, resulting in inflammation (SIRS) and/or end-organ damages (septic shock). Septic shock is a profound hemodynamic and metabolic disturbance due to failure of the circulatory system to maintain adequate perfusion of vital organs. It is the body's response to protect its most vital organs, the heart and the

brain, by shunting circulation to them and away from organs such as the kidneys and liver.

The clinical and laboratory diagnostic signs and symptoms of infection and sepsis are well-recognized:  fever defined as a temperature of 100.4 or greater; a heart rate greater than 90 (tachycardia); a respiratory rate of 21 or higher (tachypnea); altered mental status; a systolic blood pressure under 90; a white blood cell count greater than 12,000 (leukocytosis); and a complete blood count with greater than 10% immature forms (bandemia) and/or a "left shift."

Two or more of these signs and symptoms together require an investigation of sepsis.  The presence of these symptoms indicates the body's systemic inflammatory response to the presence of infection.

### C.    The Standard of Care Required Antibiotics no Later Than 0300 on July 23

Marites was admitted to TAMC on July 22, 2013 at 1140 for induction of labor.  Marites delivered her infant daughter at 0110 on July 23rd. Marites became persistently tachycardic at 2113 on July 22 and at 0300 on July 23 spiked a fever to 101.3.  The standard of care in response to this concerning constellation of symptoms required that blood and urine cultures be drawn to identify a specific infectious organism and that

presumptive antibiotic therapy be started to treat infection at its earliest stage.

Plaintiffs' experts have identified the standard of care from the medical specialty perspectives of infectious diseases, obstetrics and nephrology.  Marites' care providers have admitted in deposition testimony that the standard of care required these interventions at 0300.  No defense expert refutes this standard of care.  Nor does any defense expert refute that timely intervention would have prevented any injury to Marites.

### D.   There Were Multiple Missed Opportunities To Diagnose and Treat Marites's Sepsis.

In the hours following 0300 Marites became hypotensive with a systolic blood pressure below 90; her white blood cell count was 29,700 at 1208; her bandemia was 30%; blood and urine cultures were ordered to be drawn at 1434, yet empiric antibiotic therapy was not started; in the evening hours of July 23rd Marites' urine output nearly stopped despite hydration with fluid boluses; throughout this time she was in increasing pain.  Her condition steadily worsened overnight yet her progression to severe septic shock to multi-organ dysfunction went unrecognized by her doctors.

Marites finally "crashed" at 0600 on July 24th.  Antibiotic therapy finally started at 0644.  It was far too late.  The more than 27 hour delay in

appropriately treating Marites resulted in catastrophic injuries to Marites

and has devastated the lives of Marites and her family forever.

### E.   Marites Suffered Severe Septic Shock and Multi Organ Failure.

Marites was finally transferred to the ICU at 0724 on July 24th.  She

was admitted there for Group A strep toxic shock syndrome and multiorgan

failure.  Aggressive resuscitation was started with IV fluids and blood

products necessary for treatment of sepsis-related disseminated

intravascular coagulation (DIC), a condition characterized by both the

systemic activation of blood coagulation leading to microvascular thrombi in

various organs, and excessive bleeding from depletion of platelets and

clotting factors.  Broad-spectrum IV antibiotics were started to treat the

streptococcal bacteremia.  Vasopressors, a powerful class of drugs that

induce vasoconstriction, were required to maintain her blood pressure and

perfusion.

The delay in antibiotics caused ongoing organ dysfunction that was

preventable and resulted in, among other injuries, permanent renal injury.

Due to the length of the delay in initiating appropriate treatment, the kidney

damage could not be reversed due to her cortical necrosis injury to both

kidneys.  Beginning the evening of July 24, 2013, Marites was started on

dialysis for oliguric renal failure caused by her sepsis-related acute kidney

injury.  Marites was ultimately required to undergo outpatient hemodialysis

three times a week, with weekly epogen injections for anemia, for nearly

one and one half years.  On March 25, 2015 Marites received a 24 year-old

deceased-donor renal transplant which continues to function well.

## II.   LIABILITY

The TAMC medical care so violated the standard of care that liability

is essentially uncontested in this case.  Nonetheless, it is important to

review the multiple violations of the standard of care here because they

directly inform the damages to be awarded as a consequence of that

negligence.

The structure of standard of care violations is built upon the failure of

Tripler doctors to know, understand and apply basic medical principles.

The clinical signs and symptoms of infection, and the accepted algorithms

for the diagnosis and treatment of infection, are basic to any physician in

any medical specialty.  This fact is clearly reflected in the expert reports of

Plaintiffs' provided from three separate medical specialties, obstetrics and

gynecology, infectious diseases and nephrology.  Each expert has

identified from his respective medical specialty, essentially the same

failures by Ms. Campano's medical providers, reflecting the fact that these

are basic medical principles which were unrecognized, overlooked and
ignored.

### A.     The Doctors and Staff Missed Multiple Opportunities to Diagnose and Treat Mrs. Campano's Sepsis.

Secondly, liability is aggravated because Ms. Campano's medical
care providers missed multiple opportunities in the presence of clear and
compelling clinical and laboratory findings to appropriately diagnose and
treat Ms. Campano's infection.  Ms. Campano exhibited clinical signs and
symptoms of infection within two hours of her admission to TAMC at 1140
on July 22nd.  In the absence of diagnosis and treatment, Ms. Campano's
clinical signs and symptoms progressed, as her untreated condition was
allowed to escalate from simple infection to sepsis, to septic shock, to
multi-organ failure, to disseminated intravascular coagulopathy, to
irreversible permanent injury.  Each step of that progression afforded
opportunity for the care providers to identify and treat that progressive
infection.  Ultimately, Ms. Campano was in the hospital for approximately
44 hours before her infection was finally diagnosed and treated with
appropriate antibiotic therapy.

### B.     Tripler System Failures.

Thirdly, events specific to the time of Ms. Campano's hospitalization
at TAMC, including understaffing, failure of communication, computer

program failures and placing responsibility for primary medical care

decisions in the hands of inadequately trained and inexperienced resident

physicians, without appropriate supervision, all contributed to the easily

avoidable outcome here.

### C.    The Infectious Diseases Perspective of Standard of Care Violations.

Dr. Jose Montoya is Professor of Medicine, Division of Infectious

Disease and Geographic medicine at Stanford University School of

Medicine.  In addition to his academic and research responsibilities as a

faculty member of that division, he provides academic support for the

Obstetrics and Gynecology Department in the training of their fellows

pertaining to the infectious diseases component of their curriculum.  This

combination of responsibilities makes Dr. Montoya uniquely qualified to

address the diagnosis and treatment of infection in a postpartum patient

such as Ms. Campano.

Dr. Montoya additionally serves as a committee member of the

Quality Assurance and Control Task Force to Improve Management of

Patients with Sepsis at Stanford.  He has been a panel member for more

than 15 years on the National Comprehensive Cancer Network for the

prevention and treatment of infection in cancer patients in the United

States.

A copy of Dr. Montoya's August 1, 2016 report is attached as

Exhibit "1."  This report is quoted at length here as it provides a succinct yet

comprehensive evaluation of the mismanagement and standard of care

violations which occurred at TAMC.

> My review of Ms. Campano's medical records raised several concerns regarding the care and treatment provided in response to her streptococcal infection, caused by the presence of *Streptococcus pyogenes* or Group A Strep in her blood, leading to severe and life-threatening sepsis and multi-organ dysfunction and damage. Specifically, Ms. Campano exhibited signs of early sepsis shortly after her admission on July 22, 2013.  Her signs and symptoms of infection were overlooked by multiple providers for an extended period of time, causing a significant delay in the initiation of antibiotics, 18 hours at a minimum, based upon early signs of sepsis on the day of admission. Blood cultures were drawn and antibiotics initiated at times that are significantly outside of what is considered standard of care.  As a result, Ms. Campano suffered from an increasingly severe continuum of symptoms, signs and laboratory abnormalities, from sepsis to septic shock and finally to multisystem organ failure, including permanent damage of her kidneys.

> Review and Opinion

> Ms. Campano was admitted to TAMC at 11:40 am on July 22, 2013. On admission her WBC count was slightly elevated.  At 1:20 pm, Ms. Campano reported feeling hot, flushed and weak.  Throughout the remainder of the day and into the evening, Ms. Campano had episodes of tachycardia and hypotension requiring IV fluid and fluid boluses.  **These signs and symptoms should have been recognized by the providers as potentially early signs of sepsis,** and prompt them to drawing blood cultures and to consider initiating empiric antibiotics.

> On July 23, 2013 at 1:10 am, Ms. Campano's daughter was delivered.  The placenta was noted as being intact.  Following the birth, Ms. Campano was transferred to the post-partum unit where

she continued to have increasing episodes of tachycardia and hypotension despite the continuous IV fluids and fluid boluses.  At 3:00 am she had a fever with a temperature of 101.3.  Her pulse was tachycardic at 117, further increasing 45 minutes later to 130 F. Her providers were notified and ordered Tylenol and fluid boluses: **these signs and symptoms again should have been recognized as early signs of sepsis. Diagnostic evaluation with blood cultures and giving of empiric antibiotics at this time was clearly indicated and well within the standard of care**.  Ms. Campano's symptoms continued to escalate by 11:17 am with dizziness, hypotension at 76/45, decreased temperature to 97.7, and tachycardia at 120.  At 12:08 a stat WBC returned at 29.7 (nl 3.5-11.0).

Given Ms. Campano's combined symptoms, her medical providers should have been considering the possibility of infection and sepsis as early July 22, 2013 at 1:20 pm., and certainly by 3:00 am on July 23, 2013, with her first temperature spike to 101.3 F.  The presence of fever, chills, leukocytosis, left shift of neutrophils, hypotension, tachycardia, and development of otherwise unexplained organ dysfunction (e.g., renal failure) are specific indications for drawing blood for cultures in an attempt to identifying treatable bacterial organisms at the microbiology laboratory. Blood cultures should be taken as soon as possible after the onset of fever or any constellation of clinical and laboratory abnormalities suggestive of early sepsis. These were windows of opportunity for early intervention and treatment, that were unfortunately missed in the care of Ms. Campano.

Further, early administration of fluids and antibiotics is the foundation in the management of patients with early sepsis, severe sepsis, and septic shock.  Delays in the administration of fluids and antibiotics are known to increase the risk of long-term complications and death in patients with sepsis.  Warm, flushed skin may be present in the early phases of sepsis. As sepsis progresses to shock however, the skin may become cool to the touch due to redirection of blood flow to core organs. Additional signs of hypoperfusion include tachycardia >90 per min, neurological changes (e.g. alterations in mentation), and oliguria or anuria.  By 12:08 pm on July 23, 2013, when Ms. Campano's WBC returned significantly elevated at 29.7, combined with her other

symptoms of hypoprofusion and sepsis: **from even the most conservative standpoint it was an absolute violation of the standard of care to fail to draw blood cultures and give antibiotics by 12:00 pm on July 23, 2013.**

Continuing on through the afternoon of July 23, 2013, Ms. Campano's signs and symptoms of progressive sepsis and septic shock continued, now including severe abdominal pain and cramping, decreased cognition, and oliguria. Interventions included IV fluids and lab tests.  Blood cultures were finally drawn on July 23, 2013 around 3:00 pm. **After the blood cultures were obtained however, no further medical interventions were provided.  Quite surprisingly, antibiotics were not initiated at this time either, despite that with the obtaining of blood cultures the possibility of sepsis had finally entered in their differential diagnosis.**  Additional lab results at 4:32 pm included a WBC at 23.0 with 50% bands, and a subsequent urine output was 85 cc/hr.

**Failure to provide antibiotics in the face of suspected infection and symptoms of sepsis/septic shock was an inexplicable and egregious breach of the standard of care**.  Broad spectrum antibiotics should have been started within 1 hour of the blood cultures being drawn. Early recognition of life threatening infection and rapid initiation of appropriate antimicrobial therapy was a critical element in reducing the extent and severity of Ms. Campano's multi-organ insults. In addition, when the fluid challenges failed to restore an adequate arterial pressure and organ perfusion, therapy with vasopressor agents should have been started. From this point in time, Ms. Campano's infection was not diagnosed or treated for another 15 hr.

Throughout the remainder of July 23, 2013 and into the following day, Ms. Campano's condition worsened.  By the morning of July 24, 2013, she was unable to compensate for the overwhelming infection and septic shock, and multi-organ dysfunction was evident with a minimal bloody urine output, irregular pulse, shortness of breath, and tachypnea.  During this same time period, her providers were notified of the preliminary culture results indicating a streptococcal bacteremia (Streptococcus pyogenes).

At 6:44 am on July 24, 2013, in response to being notified of the culture results, Cefepime 2g intramuscularly (IM) was ordered.  This was another breach in the standard of care.  An intramuscular route of administration of antibiotics is grossly inappropriate for the emergent resuscitation of a patient in septic shock.  Broad spectrum IV antibiotics should have been initiated immediately.  This order for Cefepime delayed the proper administration of antibiotics for over another 30 minutes.

Ms. Campano's medical providers repeatedly put her at risk of dying. The delay in blood cultures and antibiotics caused ongoing organ dysfunction that was preventable and resulted in, among other things, permanent renal injury.  Unfortunately, due to the length of the delay, the damage could not be reversed.  Had antibiotic therapy been timely administered Ms. Campano's infection more likely than not would have been treated without injury to her kidneys, multi-organ damage, or any permanent and/or significant complications.

D.      **The Obstetric Perspective.**

Dr. Gary Blake is Medical Director of the Obstetrics and Gynecology

Department at Linda Vista Health Care Center in San Diego, California.  He

has been continuously board certified in obstetrics and gynecology since

1982 and in maternal/fetal medicine since 1983.  Dr. Blake's report is dated

August 1, 2016.  A copy is enclosed as Exhibit "2."

Dr. Blake summarized his opinions as follows:

It is my opinion that the various health care providers responsible for the obstetrical management of Marites Campano fell below the Standard of Care in two principle ways.  The providers failed to recognize the clinical signs of early sepsis, beginning as early as 1320 on 7/22/13, when the patient was noted to be pale and clammy. Hypothermia was documented at 1609, with a maternal temperature of 97.0.  Leukocytosis with a left shift was noted as early as admission on 7/22/13.  Repeat white count at 1135 on 7/23/13

showed a dramatic increase in white count, with an even more dramatic left shift and marked increase in bands.  Tachycardia was noted on 7/22/13, as early as 2120.  Fever was noted on 7/23/13 at 0300.  Hypotension was documented at 1117 on 7/23/13, accompanied with headache and dizziness.  Decreased platelets were identified at 1632 on 7/23/13.  Decline in mental status was noted at 2006.  Oliguria was noted at 0500 on 7/24/13.  Hypoxemia was present, as well, based on a low oxygen saturation reading.  **It is clear that the various health care providers failed to notice a sequential cascade of all of the traditional signs and symptoms of deteriorating sepsis.  As a result, appropriate clinical and laboratory evaluation was not performed in a timely manner, and initiation of therapy was delayed.  The Standard of Care required that the patient be suspected of impending sepsis and that she have blood and urine cultures ordered not later than 0300 on 7/23/13.  Finally, initiation of antibiotics was required by the Standard of Care as early as 0300 on 7/23/13, if not earlier**.  With regard to causation, given that this patient had Group A Strep septicemia and that this organism is sensitive to conventional antibiotics, including Ampicillin, had appropriate antibiotics been initiated in a timely fashion as required by the Standard of Care, it is my opinion that the subsequent complications of sepsis would not have occurred.  As a result, the patient would have had a mild course of endometritis, rapidly responding to antibiotic therapy and that the various multi-organ system complications would have clearly been avoided.

## E.    The Nephrology Perspective.

Dr. Keith Klein is clinical professor of medicine at UCLA, an attending physician at Cedars Sinai Medical Center and UCLA Medical Center, and a private practitioner in internal medicine and nephrology.  He is board certified by the American Board of Internal Medicine with a subspecialty in nephrology.  He is a member of the Medical Executive Committee at Cedars-Sinai Medical Center and Director of the Metabolic Support Team

in charge of inpatient total parenteral nutrition at Cedars Sinai for the past 20 years.

Dr. Klein's report is dated August 15, 2016.  A copy is enclosed as Exhibit "3."

Dr. Klein's report concentrated upon the relationship between Ms. Campano's progressive deterioration in response to her untreated sepsis and her resulting irreversible kidney injury.  In addition to the delayed diagnosis and treatment of Ms. Campano's infection, Dr. Klein noted violations of the standard of care relating to the delay in transferring Ms. Campano to the intensive care unit (ICU) for emergent treatment, the use of IV contrast which caused additional renal injury, and the prescription of Motrin which due to its nephrotoxicity also violated the standard of care.

It is these latter two issues with which Dr. Friedman and Dr. Yeoh take issue.  Interestingly, part of the response by the defense to these violations of the standard of care is that they made no difference, that irreversible kidney injury had already occurred as a result of the delayed diagnosis and treatment of Ms. Campano's infection.  As such, these defense reports conclusively establish that Marites' kidney injury was caused by the Defendant's negligence.

Dr. Klein stated:

It is my opinion that Mrs. Campano was exhibiting classic signs of early sepsis: hypotension, tachycardia, weakness, pale and clammy skin, and feeling hot/flush, within hours of her arrival at TAMC on July 22, 2013.  These early indicators that something may require investigation went completely unrecognized by her multiple providers. Continuing signs and symptoms of sepsis were not investigated and/or acted upon until much too late.

Mrs. Campano's sepsis progressed to septic shock without intervention and as a result, she suffered renal injury throughout the period leading up to her transfer, as indicated by the oliguria/anuria and hematuria.  Evidence of early onset oliguria associated with septic shock is known to be associated with the development of acute kidney injury and the need for renal replacement therapy. Mrs. Campano's oliguria/anuria and hematuria had been ongoing for at least five hours by the time of transfer.

As noted here, shock is a physiologic continuum that progresses through several stages.  The early stages are more amenable to therapy and therefore more likely to be reversible, while progressive shock leads to irreversible organ damage.  Timely diagnosis and treatment were therefore critical and the delay of care and treatment resulted in permanent damage to Mrs. Campano's kidneys.

At the time of transfer, Mrs. Campano had severe abdominal pain, hypotension, tachycardia and tachypnea. BP 97/61, HR 122, Resp. 28 and SaO2 96% with O2 started at 4L via nasal cannula.  On July 24, 2013 at 7:50 am, almost immediately after arrival to the PCU, Mrs. Campano was transferred to the Intensive Care Unit.

### 1. <u>Required ICU Care Was Negligently Delayed</u>.

Mrs. Campano's providers still failed to recognize the seriousness of her condition at the time of transfer, and ordered that she be transferred to the *Progressive Care Unit* (PCU) which is intended for patients not sick enough to be in the *Intensive Care Unit*.  On arrival to the PCU, the emergent nature of Mrs. Campano's condition was immediately evident and she was transferred to the ICU.

This decision, to send Mrs. Campano to the PCU, extended her ongoing septic/DIC-related thrombotic and ischemic renal damage and delayed treatment by almost another hour.

On presentation to the Intensive Care Unit, Mrs. Campano was admitted for GAS toxic shock syndrome and multi-system organ failure.  Aggressive resuscitation was started immediately with IV fluids and blood products necessary for treatment of sepsis-related disseminated intravascular coagulation ("DIC"), a condition characterized by both the systemic activation of blood coagulation leading to microvascular thrombi in various organs, and excessive bleeding from depletion of platelets and clotting factors.  Broad-spectrum IV antibiotics were started to treat the streptococcal bacteremia, and vasopressors, a powerful class of drugs that induce vasoconstriction, were required to maintain her blood pressure and profusion.

A known complication of vasopressor therapy includes hypoperfusion as a result of vasoconstriction, often affecting the kidneys. The combination of vasopressor medications, severe and prolonged periods of hypotension and ischemia from the shock, and bacterial toxins, resulted in severe acute kidney injury, requiring dialysis.  If Mrs. Campano's sepsis had been timely diagnosed and treated she would not have suffered any kidney injury.

At 9:55 am, an IV contrast-enhanced CT scan of the abdomen and pelvis was performed.

Prior lab results on July 24, 2013 at 9:20 am included a normal GFR – 102.2 (>60 nl) and Creatinine .75 (.57-1.25).

### 2.   IV Contrast Is Nephrotoxic and Contributed to Kidney Injury.

The use of IV contrast, a known nephrotoxic agent, resulted in additional iatrogenic renal injury that was predictable.  Additional renal injury from the use of contrast was confirmed immediately with a progressive elevation of her previously normal creatinine level from 1.32 at 4:28 pm; to 1.63 at 7:29 pm, and 1.83 at 9:45 pm.

Additionally, hemodynamically unstable patients on vasopressors with renal dysfunction are known to be at a significantly higher risk of

- 16 -

contrast induced nephrotoxicity, with the magnitude of the risk directly associated with the severity of renal dysfunction. Acute kidney injury, resulting in subsequent acute tubular necrosis and cortical necrosis, may occur.

**It was a violation of the standard of care to order and perform a CT scan of the abdomen and pelvis using IV contrast before first performing a CT without contrast, ultrasound and/or MRI to try and obtain the necessary diagnostic evaluation thus avoiding the use of contrast**.

**In addition, because of the serious and permanent risks associated with a contrast CT, standard of care required consultation between a nephrologist and patient/family prior to the performance of this test.  The physicians here failed to provide informed consent.  There is no indication in the chart that the patient or her husband were informed about the risks of using IV contrast for the CT scan of the abdomen and pelvis. There is no indication that alternative treatment options were discussed**.

Results of the contrast-enhanced abdominal/pelvic CT revealed an irregular contrast enhancement pattern in both kidneys consistent with sepsis/DIC-related bilateral renal cortical necrosis, and probable ischemic acute tubular necrosis.

Post-operatively on July 24, 2013, despite ongoing treatment, Mrs. Campano's symptoms of sepsis continued with tachycardia to 104, fever to 101.7, oliguria/anuria, labored tachypnea on ventilation, and hypotension (e.g., 69/45, 71/16).  On review, her antibiotic regimen was changed.

### 3.   <u>Nephrology Consult Was Negligently Delayed</u>.

**In the evening of July 24, 2013, a Nephrology consult was obtained for the first time.  Mrs. Campano was started that evening on dialysis for oliguric renal failure caused by her sepsis-related acute kidney injury.  There was an unreasonable delay in requesting the nephrology consult, a further violation of the standard of care.**

Over the days ahead, Mrs. Campano developed additional complications associated with her profound septic shock and multi-system organ failure.  After several weeks however, her condition slowly improved

Significantly, despite no prior evidence of renal recovery, on August 21, 2013 a Renal Ultrasound showed good cortical thickness of 1.6cm on the left kidney and a lack of echogenicity bilaterally which was potentially encouraging.  Additionally, Mrs. Campano's urine output increased closer to a normal level with 355 ml/24 hr.  Similar small signs of renal recovery were seen over the next few days.  Although Mrs. Campano remained dependent on intermittent hemodialysis, her urine output increased to 200−400ml/day.

### 4.  The Physicians Negligently Prescribed Motrin at Discharge.

On August 24, 2016, she was discharged home.  Mrs. Campano's discharge orders included, among other things, an order for "Motrin 800mg: 1 tablet every 8 hours as needed for pain."

**Motrin is a well known nephrotoxin.  Although the potential for renal recovery was remote, the prescription directing the taking of motrin destroyed any last possibility of renal recovery that may have existed.  Even intermittent use of motrin can cause kidney damage in a patient with reduced function, and no "safe" dose or duration has been defined.  It was a serious violation of the standard of care to prescribe motrin for this patient.**

Mrs. Campano was ultimately required to undergo outpatient hemodialysis 3x/week, with weekly epogen injections for anemia, for about 1.5 years.  Mrs. Campano later received a 24 year-old deceased-donor renal transplant in March 2015, which continues to function well.

## III.   THE CARE PROVIDERS ADMIT LIABILITY

The deposition testimony of Ms. Campano's primary physician and nursing providers not only validates but reinforces the standard of care violations on July 23rd and 24th identified by Plaintiffs' experts.  These depositions, additionally, explain the complete absence of recognition of Ms. Campano's evolving septic shock and appropriate and timely intervention.

Tripler is, of course, a teaching hospital.  Primary medical care is provided by doctors in training, presumably with close supervision of experienced medical staff.  Ms. Campano delivered her baby M.R.B.C. at 0110 on July 23rd.  At 0200 standard orders were issued to transfer Ms. Campano and her infant from the labor and delivery unit to the mother-baby unit (post-partum unit).  Physical transfer to the post-partum unit did not occur until approximately 0500.  The labor and delivery unit is on the 6th floor of the hospital; the postpartum unit is on the 5th floor of the hospital.

For the resident physicians, the night shift runs from 1800 to 0645. The day shift begins at 0600 and finishes at 1800.

## A.    Marites' Primary Doctors Were Totally Inexperienced.

### 1.    Dr. Bastawros

Dr. Nancy Bastawros (now Vaughns) and Dr. Michelle Boledovich (now Stegenga) were the two physicians primarily responsible for Ms. Campano's care during the night shift at TAMC from 1800 on July 22nd until 0645 on July 23rd.  Bastawros Depo, 40:19-24.  Dr. Bastawros was a first year intern in her third week of internship.  Bastawros Depo, 15:14-19. As a new intern Dr. Bastawros admittedly had no knowledge of puerperal sepsis in particular but only a general understanding from medical school of SIRS criteria.  Bastawros Depo, 14:3-11.  Before July 22, 2013, Dr. Bastawros had never been involved with the treatment of a post-partum patient experiencing SIRS.  She had never been involved with a post-partum patient whose SIRS progressed to toxic shock syndrome. Bastawros Depo, 24:23 – 25:6.

### 2.    Dr. Boledovich

On July 22nd Dr. Boledovich was beginning her fourth year of residency training.  Dr. Stegenga Deposition, p. 39.  She had been stationed at TAMC since July 2011 when she began her second year of residency.  Dr. Stegenga Depo, p. 39.

Since completing residency training in 2014, Dr. Boledovich has twice applied for and twice failed the written test for board certification by the American College of Obstetrics and Gynecology.  As a result of failing the written testing, Dr. Boledovich has not qualified to undertake the oral examination for board certification.  Dr. Stegenga Depo, 9:1-18.

It was generally recognized at TAMC that Dr. Boledovich had deficiencies in her medical knowledge.  These deficiencies were identified by the medical staff in the ob/gyn department at TAMC and were reflected in Dr. Boledovich's poor scores on residency program examinations and her failing performance on board certification testing.

Dr. Jason Patzwald was at TAMC from 2011 until May 2016 as a resident physician within the department of obstetrics and gynecology.  Dr. Patzwald Depo, 9:4-17; 27:19-23.  Dr. Patzwald noted that in reference to Dr. Boledovich "there was a general opinion from staff that she had some academic deficiencies but not necessarily procedural deficiencies from a surgical skill standpoint."  In addition, "some staff felt that she was not as knowledgeable on the subject matter that she should be, given her training level, and that's reflected by her poor scores on our residency end process exams.  It's reflected on her inability to pass the written boards about residency."  Dr. Patzwald noted that Dr. Boledovich was perceived to

be weak in "general ob/gyn related knowledge."  Dr. Patzwald Depo,

159:7-24.

### 3.   Dr. Crowder

During the dayshift of July 23rd, Dr. Amber Crowder became the

physician primarily responsible for Mrs. Campano.  Dr. Crowder was a

second year resident.  Dr. Crowder had been on maternity leave for six

weeks beginning May 29, 2013.  As a result, she had missed the last

month of her first year of residency and the first two weeks of her second

year of residency which had started July 1, 2013.  Dr. Crowder Depo,

47:14 - 48:4.  As of July 23, 2013, Dr. Crowder had never been exposed to

the concept of SIRS.  Dr. Crowder had not learned about the diagnosis and

treatment of SIRS in medical school nor during her residency training at

TAMC.  Dr. Crowder Depo, 14:2 – 15:3; 15:21 – 16:10.

While Mrs. Campano was still in the hospital, but after

Mrs. Campano's "crash" on July 24, 2013, Dr. Crowder reviewed the

medical literature regarding SIRS "to broaden my knowledge of it as it was

a new topic to me."  Dr. Crowder Depo, 12:14 – 13:15.  Upon completing

her literature review, Dr. Crowder felt better equipped to treat patients with

SIRS; she felt that the information that she learned about SIRS would have

assisted her during the time that she was taking care of Mrs. Campano.
Dr. Crowder Depo, 24:22 – 25:4.

Dr. Bastawros learned about the diagnosis and treatment of
puerperal sepsis and toxic shock syndrome in the same way, through
independent review of the medical literature.  Dr. Bastawros Depo, 8:12-24.
Dr. Bastawros used that literature review as the basis for a presentation in
2015 to her co-residents at TAMC.  Her presentation included the signs,
symptoms and management of SIRS and toxic shock.  Dr. Bastawros
Depo, 8:25 – 9:1; 10:8-10.  Dr. Bastawros was unaware of this information
as of the time that she was providing care to Mrs. Campano in July 2013.
Dr. Bastawros Depo, 14:3-11.

### 4.   Dr. McCartin

Dr. Tamarin McCartin was a staff attending obstetrician/gynecologist
at TAMC in July 2013.  Dr. McCartin Depo, 22:15-21.  On July 23rd, around
1130, Dr. Crowder asked Dr. McCartin to see and evaluate Mrs. Campano,
which she did.  Dr. McCartin Depo, 36:7-22.  Dr. McCartin had limited
experience with sepsis; Dr. McCartin testified "I don't have enough
experience with sepsis to tell you [whether early initiation of appropriate
empiric IV antibiotics prevents the progression of sepsis to septic shock].
"I can tell you what I read, but I can't tell you from experience."

Dr. McCartin Depo, 88:3-12.  Within days of her involvement in the

Campano case, Dr. McCartin changed her personal practice as a result of

this case to always provide a post-partum patient with a fever with empiric

antibiotic therapy.  Dr. McCartin Depo, 76:24 – 78:4; 100:23 – 101:9.

Dr. McCartin had no experience at all with group A strep before July

2013; Mrs. Campano was the first group A strep patient that she had been

actively involved in treating.  Dr. McCartin Depo, 101:10-15.

Due to her limited experience with sepsis, the afternoon of July 23rd

Dr. McCartin consulted with maternal fetal medicine staff physician at

TAMC, Dr. Christine Hill, "because she's a subspecialist with more

experience than me, and I thought maybe she would have an idea as to

other places that I should look or additional tests I should add."

Dr. McCartin Depo, 85:6-14.

### 5.   Dr. Hill

As will be discussed further below, Dr. Hill essentially provided no

independent assistance or assessment of Mrs. Campano to Dr. McCartin.

On July 23rd Dr. Hill received a phone call from Dr. McCartin about

Mrs. Campano.  Dr. Hill concluded that in this context "I didn't have direct

responsibility for the patient."  Dr. Hill Depo, 40:6-10.  Dr. Hill concluded

that because Dr. McCartin did not ask for a formal consultation,

Dr. McCartin did not need substantial help in managing the patient.  "I feel my responsibility was more to Dr. McCartin because it would seem to me if Dr. McCartin felt that she couldn't manage the patient or needed substantial help she would have asked for a consultation: …"  Dr. Hill Depo at 37:25 – 38:7.

Dr. Hill did not see Mrs. Campano.  Dr. Hill did not examine Mrs. Campano.  Dr. Hill Depo, 15:12-15.  Dr. Hill does not believe she accessed the computer record to review Mrs. Campano's medical record. Dr. Hill Depo, 13:5-15.

Based upon their phone call, Dr. Hill did not feel that Dr. McCartin was unable to handle Mrs. Campano's presentation.  Dr. Hill Depo at 40:22 – 41:4.  Dr. Hill understood the "gist" of the conversation "was 'Would you do anything different?'".  Dr. Hill Depo, 41:5-11.  As a result, Dr. Hill offered no independent advice or suggestions regarding the treatment of Mrs. Campano.

The phone call lasted three minutes .  Dr. Hill Depo, 11:17-20.

**B.    Signs and Symptoms of Sepsis Were Present
        From Admission**

The inexperience and inattention of Mrs. Campano's medical providers must be evaluated in the context of the weakened immune system common to pregnant patients and the resulting higher index of

suspicion required for the diagnosis and treatment of sepsis.

Mrs. Campano demonstrated both clinical signs and symptoms, and

laboratory abnormalities, suggestive of infection virtually from the time of

her admission to TAMC on July 22, 2013.

Mrs. Campano was placed in her labor and delivery room at

11:40 a.m.  TAMC2 3669.  A peripheral IV was placed and labs drawn at

1150.  TAMC2 3669.  Orders were issued for Mrs. Campano to be given

lactated ringers IV at a rate of 125 milliliters per hour.  A stat CBC with auto

differential was ordered by first year intern Dr. Leanna Gordon.  TAMC2

5503.

### 1.   The First Abnormal CBC

The complete blood count (CBC) was collected at 1155 and resulted

at 1253.  The CBC results indicated mild sepsis.  The white blood cell count

was slightly elevated at 11.2 (normal 3.5 – 11.0).  Neutrophils were

elevated at 8.87 (normal 1.5 – 7.5). Granulocytes were elevated at 79.3%

(normal 42.2 – 75.2%).  TAMC Labs 1380.

These values demonstrate leukocytosis and an early left shift.  The

granulocyte percentage increase and the increased numbers of neutrophils

suggest that the bone marrow was producing more white blood cells and

releasing them into the blood before they are fully mature, the body's

immune response in reaction to infection or inflammation.  The CBC result at 1253 should have heightened the providers' awareness of sepsis and resulted in closer monitoring of Mrs. Campano.

Instead, there is no suggestion in the medical record of any concern with, or discussion of, potential sepsis nor any steps taken in response to this concern.

### 2.    Initial Clinial Symptoms of Sepsis

A few minutes later, at 1320, Mrs. Campano reported feeling hot and flushed.  TAMC2 3670.  A late entry nursing note entered at 1320 states: "Patient reports feeling hot and weak, palor [sic] noted on her face and the patient is clammy to the touch on her face and neck.  Extremities warm and dry.  …"  TAMC2 4469.  Mrs. Campano's providers failed to recognize these symptoms, particularly in combination with the leukocytosis with a left shift on the CBC result, as potentially early signs of sepsis.
Mrs. Campano's presentation should have prompted the providers to draw blood cultures and consider initiating empiric antibiotic therapy.

Instead, Mrs. Campano was provided with juice in response to a low blood glucose level of 65 (normal 70-105).  TAMC2 4469; TAMC Labs 1379.  A late entry nursing note at 1400 states: "upon reassessment, patient reports symptoms have subsided and reports feeling better at this

time.  Patient warm and dry to the touch and palor [sic:  pallor] has

subsided.  Will continue to monitor patient closely."  TAMC2 4469.

### 3. Tachycardia Begins at 2113 and Persists Until Mrs. Campano "Crashed"

Beginning at 2113, Mrs. Campano's heart rate became persistently

tachycardic.  Tachycardia is defined as a heart rate greater than 90 beats

per minute.  Tachycardia is one of the four primary clinical signs of

Systemic Inflammatory Response Syndrome (SIRS).  The initial heart rate

elevation was to 98 beats per minute; subsequent tachycardic heart rates

included rates of 121 at 2130 and 130 at 2139.  TAMC2 3676.

A late entry nursing note at 2157 was more concerning.  "pt [patient]

stated that she felt as though her 'heart racing and it is going to come out of

my chest' pulse ox checked, HR up to 150s with resolution to 70-80s.

Recurrent spikes in HR.  I pushed nurse call light.  Dr. Gaccetta, Charlie

Price, CRNA, Mrs. Nakata, RN, stacy RN in room to assess."  TAMC2

4469.  It is unclear how the nurse concluded that Mrs. Campano's heart

rate resolved to the 70s to 80s.  The last recorded heart rates at that time

were 77 at 2030 and 83 at 2100.  Thereafter, Mrs. Campano was

persistently tachycardic and remained so until she crashed.  TAMC2 3674.

More concerningly, at 2038 Mrs. Campano received a fluid bolus of

1,000 milliliters of lactated ringers in preparation for her epidural.

TAMC2 3674.  A fluid bolus would tend to lower a patient's heart rate and raise a patient's blood pressure.  The fluid bolus at 2038 had no positive effect whatsoever upon Mrs. Campano's subsequent tachycardic heart rate which became elevated shortly after the fluid bolus was completed.

There is no indication that Mrs. Campano's providers at this time gave any consideration to, or in any way recognized that, Mrs. Campano's clinical presentation was consistent with suspected sepsis.

Further clinical signs appeared at 2220 when Mrs. Campano became briefly hypotensive with a blood pressure of 88/58.  TAMC2 3677.  A decrease in systolic blood pressure to 90 or below is indicative of hypotension.  Patients with suspected or documented sepsis typically present with hypotension, tachycardia, fever and leukocytosis.  At this time Mrs. Campano had demonstrated leukocytosis, tachycardia and hypotension.

Mrs. Campano's tachycardia persisted despite a second fluid bolus of 1,000 milliliters of lactated ringers started at 2206.  TAMC2 3677.  This second fluid bolus had no positive effect upon Mrs. Campano's tachycardia, nor upon her short period of hypotension at 2220.

This episode of hypotension resolved at 2226 when Mrs. Campano's blood pressure increased to 112/68.  TAMC2 3677.  However, her

tachycardia persisted.  At 0110 Mrs. Campano spontaneously vaginally delivered her daughter.  TAMC2 3680.

### 4.    The 101.3 Fever at 0300

At 0300 on July 23rd, Mrs. Campano developed a temperature of 101.3.  TAMC2 3681.  A temperature of 100.4 or higher is suggestive of SIRS.  SIRS is clinically recognized by the presence of two or more of the following:  temperature greater than 38 degrees Centigrade (100.4 Fahrenheit); tachycardia (heart rate greater than 90 beats per minute); a respiratory rate greater than 20 breaths per minute (tachypnea); or a white blood cell count greater than 12,000 or more than 10% bands (immature forms) in a complete blood count differential.

At 0300 SIRS was required to be clinically recognized by Mrs. Campano's providers because of the presence together of her fever and her tachycardia.  The earlier signs and symptoms of infection during her clinical presentation, including the leukocytosis identified in her initial CBC, her episode of hypotension and her warm, flushed skin should also have alerted the providers to the presence and progression of Mrs. Campano's sepsis.  Although it was appropriate as a result of Mrs. Campano's earlier presentation to draw blood cultures and begin empiric antibiotic therapy much earlier than 0300 in response to her clinical signs

and symptoms of sepsis, the standard of care at 0300 on July 23rd

absolutely required diagnostic evaluation with blood cultures and institution

of empiric antibiotics.

### 5.   No Physician Evaluated Mrs. Campano's Fever

Remarkably, there is no indication in the medical record that any

physician evaluated Mrs. Campano in response to her fever of 101.3.  At

0345 Mrs. Campano received 975 milligrams of Tylenol pursuant to an

order issued by J. Terpenning, CNM (Certified Nurse Midwife).  TAMC2

3200; TAMC2 3233.  In addition, Mrs. Campano received 800 milligrams of

Motrin, both medications being given to Mrs. Campano by nurse Lynette

Murray.  TAMC2 3233.

Dr. Boledovich was the fourth year resident responsible for

overseeing labor and delivery and post-partum patients during the night

shift of July 22nd to July 23rd.  Dr. Stegenga Depo, 39:18 – 40:16; 42:7-17.

Dr. Boledovich was not asked at any time during her shift to provide any

care to Mrs. Campano.  Dr. Stegenga Depo, 46:18-24.  During her shift,

Dr. Boledovich had no direct interaction with Mrs. Campano.  Dr. Stegenga

Depo, 68:5-8.

Dr. Boledovich testified that "at some point after the fact" she

received notice that Mrs. Campano had "a one-time fever.  I don't recall

the value.  But then I did receive report that follow-up temperatures were normal."  Dr. Stegenga Depo, 71:23 – 72:5.  Dr. Boledovich indicated that the report of fever was not made directly to her but took place in the area where she was sitting.  Dr. Stegenga Depo, 72:11 – 73:8.

Dr. Boledovich testified that she did not do anything in response to the fever of 101.3 because "at that point it had already resolved and was normal."  Dr. Stegenga Depo, 73:9-11.

Dr. Boledovich's understanding that Mrs. Campano's fever had resolved and was normal is incorrect.  Mrs. Campano had received both Tylenol and Motrin at 0345.  TAMC2 3233.  Both of those medications have the effect of suppressing fever.  Mrs. Campano's temperature after 0300 was next measured at 0401 and was 99.2.  TAMC2 3681.  99.2 is not a normal temperature, it is elevated.  The temperature would have been significantly higher in the absence of the antipyretic effect of Tylenol and Motrin.  Mrs. Campano remained febrile at 0401, her fever had been suppressed by medication.  Dr. Boledovich admitted in her deposition that she did not know if a patient with a fever of 99.2 after receiving Tylenol and Motrin would still be febrile.  Dr. Stegenga Depo, 79:10 – 81:20.

Either Dr. Boledovich was misinformed that Mrs. Campano had a normal temperature at 0401, or there was inadequate understanding and

experience that the temperature of 99.2 represented a febrile temperature

masked by the antipyretic effects of the combination of Tylenol and Motrin

medication.

This failed communication or understanding was critical to

Mrs. Campano's future course.  Dr. Boledovich testified that she would

expect to be notified if a patient had two episodes of fever; more

importantly, two episodes of fever would require intervention and treatment.

> The number we use would be 100.4 and higher.  Not 100.  And
> if it was a one-time finding that then resolved, then that might
> not be reported.  If it was an ongoing times two temps, two is
> what would be required to take notice of to then take action on
> generally, so then that would have a different course.  So, yes,
> that would be reported.  Dr. Stegenga Depo, 66:11-18.

Dr. Boledovich indicated that the response to two febrile episodes

would require a full fever work up, including a CBC, a CMP, blood cultures,

urine culture and chest x-ray.  Dr. Stegenga Depo, 88:3-11.  Dr. Boledovich

then testified that if she had done a full fever work up, because of two

abnormal temperatures, if the patient continued to have persistent fever

and vital sign abnormalities, she would start empiric antibiotics.

Dr. Stegenga Depo, 91:17-22.

This is precisely the course of action required by the standard of care

as identified by Plaintiffs' experts.

In this time frame there were critical failures in communication between Mrs. Campano's nurse and Dr. Boledovich.  Dr. Boledovich testified that if a post-partum patient was persistently tachycardic, as Mrs. Campano was, Dr. Boledovich would expect to be notified of such by the person taking care of the patient.  Dr. Stegenga Depo, 66:19 – 67:8. Dr. Boledovich was not informed of Mrs. Campano's persistent tachycardia, thus she was unaware that Mrs. Campano's clinical presentation of fever and tachycardia clinically documented the SIRS response to sepsis.  The fever work up in response to the recognition of SIRS would have led to the drawing of blood cultures and the initiation of empiric antibiotic therapy, in accordance with the standard of care.

### C. Neither Dr. Bastawros Nor Dr. Crowder Knew That Tachycardia and Fever Together Required Investigation of Sepsis.

Neither Dr. Bastawros nor Dr. Crowder were aware at the time they were responsible for Mrs. Campano's care that the combination of fever and tachycardia indicated the presence of SIRS.  As a result, Ms. Campano's sepsis progressing to toxic shock went unrecognized and untreated in the hours following 0300.

### 1. All The Physicians Now Know, And Admit, That The Standard of Care Required Antibiotic Therapy in Response to Tachycardia and Fever at 0300

With their after-acquired knowledge of this basic medical principle, all of Mrs. Campano's care providers admitted that the standard of care required administration of empiric antibiotic therapy in response to Mrs. Campano's fever at 0300.

### a.   Dr. Bastawros

Dr. Bastawros identified the SIRS criteria, responsive treatment and timing of treatment.

Q.  Identify for us, if you would, please, the signs and symptoms commonly associated with sepsis progressing to toxic shock?

A.  So SIRS criteria are four:  Tachycardia; tachypnea; white blood cell count greater than 14 or less than 4; and hypothermia or fever less than 36 degrees Celsius or greater than 38 degrees Celsius.

Q.  Greater than 38 degrees would be what in - -

A.  About - -

Q.  - - Fahrenheit?

A.  - - 100.4 Fahrenheit.

Q.  And two or more of those would suggest sepsis, is that correct?

A.  <u>Two or more of those meet SIRS criteria</u>.  You have to have an identifiable source for someone to have sepsis.

So when two or more SIRS criteria are present, you would go about finding a source.  And when you have SIRS criteria present, you

should initiate, one, source control - - identifying source - - source control, and, two, treatment.

Q.  What are the treatment algorithms that you discussed with the co-residents in your talk?

A.  <u>Aggressive fluid hydration and initiation of broad-spectrum antibiotics</u>.

. . .

Q.  Suppose you have a puerperal - - can never say that - - patient like Mrs. Campano who has delivered, is demonstrating tachycardia, is demonstrating a fever in excess of 100.4 and from whom blood cultures had been drawn, would you initiate empiric antibiotic therapy?

A.  <u>So in a hypothetical patient who is postpartum, who had fevers and tachycardia and blood cultures were already drawn, I would initiate antibiotic therapy</u>.

Dr. Vaughns Depo, 11:03 – 13:08.  (Emphasis added)

The description of Mrs. Campano as a postpartum patient with fever and tachycardia is precisely Mrs. Campano's clinical presentation at 0300. Standard of care treatment requires drawing blood cultures at that point in time, immediately followed as soon as possible by administration of empiric antibiotic therapy.

### b.    **Dr. Crowder**

Dr. Crowder acknowledged that as of July 23, 2013 she was totally unaware that the combination of fever and tachycardia suggested SIRS but learned that to be the case after her care of Mrs. Campano.

Q.  Were you aware, as of this point in time, the morning of July 23, 2013, that the combination of symptoms of fever and tachycardia are suggestive of SIRS?

A.  At that time, no.

Q.  From what you know now, is what I have stated correct, that the combination of fever and tachycardia is, in fact, suggestive of SIRS?

A.  It can be, yes.

Q.  As of the morning of July 23, 2013, were you aware that the combination of fever and tachycardia is suggestive of sepsis?

A.  I was not, no.

Q.  You are now?

A.  Correct, yes, it can be.

Q.  It is correct that that combination is, in fact, suggestive of sepsis? That's true?

A.  It can be, yes.

Dr. Crowder Depo, 60:24 – 61:16.

### (1)   Dr. Crowder's Post-Case Research Established Empiric Antibiotic Therapy as the Standard of Care.

Dr. Crowder in her post-case research learned the standard

treatment for SIRS which validates the standard of care as identified by

Plaintiffs' experts.

Q.  When you conducted research into infection after the Campano case, what did you learn about SIRS?

A.  I learned the criteria for SIRS as well as the treatment for SIRS.

Q.  What do you understand the criteria to be?

A.  The criteria typically is an elevated heart rate, an elevated white count, tachypnea.  That's all I am recalling right now.

Q.  And what did you learn about treatment?

A.  That treatment is resuscitative with aggressive hydration.  And if an infectious source can be identified, treatment is with antibiotics.

Q.  Did you learn as well that there is empiric treatment with antibiotics before a specific organism is identified?

A.  Yes, I did.

Q.  What did you learn about that?

A.  Could you clarify or be more specific?

Q.  Yes.  What did you learn or come to understand about the term "empiric antibiotics?"

A.  "Empiric antibiotics" would mean broad-spectrum antibiotics are started before a specific organism and if a specific organism is identified, the antibiotics are tailored at the time.

Q.  To the specific organism, correct?

A.  That is correct.

Q.  What did you learn about the timing as to when empiric antibiotic therapy would be started?

A.  As soon as possible.  I don't remember the specific timing of it.

> Q. Your understanding was that empiric antibiotic therapy would be
> started as soon as possible once a SIRS syndrome or reaction was
> considered for a particular patient; is that correct?
>
> A. Yes, that's correct.

Dr. Crowder Depo, 16:11 – 17:21.  (Emphasis added)

### c.   **Dr. McCartin**

Mrs. Campano's clinical presentation of persistent tachycardia and a

fever at 0300 on July 23rd clearly placed infection within the differential

diagnosis for hersymptoms. Dr. McCartin, the staff physician, identified the

standard infection work up which should have occurred for Mrs. Campano.

> Q. My question very simply, Dr. McCartin, is how would you
> investigate the potential of infection in response to a fever above
> 100.5?
>
> A. In a patient that just delivered?
>
> Q. A patient like Ms. Campano at three in the morning.
>
> A. I would do a physical exam, check a complete blood count, blood
> cultures, and likely urine culture as well.

Dr. McCartin Depo, 47:10 – 47:18.

> **(1)   Even Dr. McCartin, the Staff Physician,
>        Changed Her Practice to Immediately Start
>        Antibiotic Therapy in Compliance With the
>        Standard of Care.**

As of July 23, 2013, Dr. McCartin would not have immediately started

empiric antibiotic therapy unless Mrs. Campano's fever persisted.

However, following Mrs. Campano's case, Dr. McCartin almost immediately changed her practice procedure and recognized that immediate empiric antibiotic therapy was required by the standard of care.

Q.  It would be your practice to follow ACOG standards; that's true?

A.  <u>Since this case, if a woman is in labor or immediately postpartum and has a fever, I treat her</u>.

Q.  <u>Including with blood cultures and empiric antibiotics, correct</u>?

A.  <u>If they are postpartum, yes</u>.

Dr. McCartin Depo, 48:10 – 48:16.  (Emphasis added)

Each of Mrs. Campano's medical providers in this critical time period now acknowledge that Mrs. Campano's clinical presentation at 0300 required blood cultures to be drawn and empiric antibiotic therapy to be started.  This is precisely the standard of care identified by Plaintiffs' experts.  The provider testimony clearly establishes the standard of care violations identified by Plaintiffs' expert physicians.

**D.    The Providers Admit That Marites Was Infected at 0300 On July 23rd.**

Each of these providers verifies that Mrs. Campano's infection which progressed to sepsis and septic shock was, in fact, present at 0300 on July 23rd and was the actual cause of her clinical presentation at that time.

### 1.  Dr. Bastawros

When Dr. Bastawros inquired about Mrs. Campano's hospital course

after the morning of July 24th, she learned that Mrs. Campano was in

severe septic shock.

Q.  What did you learn?

A.  That she was in severe sepsis; that she had had - - was in severe
septic shock.

Q.  Was it your understanding from what you learned that it was a
life-threatening situation?

A.  Absolutely.

Q.  Was there any discussion at that point with anyone as to, "Wow,
how did this happen?"

A.  There is always a discussion.  I mean, as physicians we always
reflect on our bad outcomes and try to figure out why - - or at least I
would hope we do.

Q.  What was discussed?

A.  Whether her infection - - whether her infection was present before
it was - - before treatment was initiated for it.

Q.  Is there any question about that now, that it was present long
before treatment was started?

A.  No.

Q.  That's indisputable, right?

A.  Yes.

Q.  <u>Is it your understanding that the infection was present most likely as of the time of the fever spike at 0300 on the 23rd of July?</u>

A.  <u>Yes.</u>

Q.  And probably present before then as well?

A.  There's no way to know with certainty that it was present before that; just that at that time she was already showing signs of an infection.

Dr. Vaughns Depo, 94:04 – 95:07.  (Emphasis added)

## 2.   **Dr. Crowder**

Dr. Crowder agrees:

Q.  . . .

Clearly, she had an infection the 23rd and 24th of July, 2013, correct?

A.  Correct.

Dr. Crowder Depo, 85:02 – 85:07.

## 3.   **Dr. McCartin**

Dr. McCartin shares this opinion as well.

Q.  In your opinion, is it likely that she was infected as of 0300 the morning of July 23, 2013?

[Objection omitted]

BY MR. THOMAS:

Q.  Go ahead.

A.  <u>So knowing what I know now, she likely was infected at 3:00 a.m.</u>

Dr. McCartin Depo, 60:23 – 61:08.  (Emphasis added)

### E.   Inexperience and Failure to Communicate Contributed to Multiple Missed Opportunities to Diagnose and Treat Marites' Progressive Sepsis.

The first missed opportunity to successfully treat Mrs. Campano's infection occurred shortly following her admission on July 22 in response to her CBC results and hot, flushed skin with pallor.  The second missed opportunity followed later in the evening on July 22nd when Mr. Campano's heart was racing and she experienced an episode of hypotension.  The third missed opportunity occurred at 0300 on July 23rd when Mrs. Campano was febrile and persistently tachycardic.  The fourth missed opportunity followed at 0545 on Dr. Bastawros' morning rounds.

Dr. Bastawros was the first physician to see Mrs. Campano after the 0300 fever.  When Dr. Bastawros rounded on Ms. Campano at approximately 0545 the morning of July 23rd, Dr. Bastawros was completely unaware that Mrs. Campano had a fever at 0300 and had received Tylenol and Motrin which had the effect of suppressing her temperature as of the time of morning rounds.  Dr. Bastawros stated that had she been aware of the fever it would have led to the drawing of blood cultures and prescription of empiric antibiotics.

Q.  But my question is had you gone back to review her chart, or had you reviewed her chart going back to her course throughout the early morning?

A.  No, probably not, because I had - - I had probably assumed that she just got to the ward and nothing of significance happened.

Q.  Did you have any understanding at the time you assisted with this note that she had spiked a fever of 101.3 at 0300?

A.  No.

Q.  Was that brought to your attention at all while she was still in the labor and delivery floor?

A.  No.

Q.  Would a concern with fever have been brought more likely to the second-year resident?

A.  Yes.

Q.  Were you involved in any discussion regarding that fever at 0300?

A.  No.

Q.  Were you aware that she had been given Tylenol and Motrin at 0345 that morning?

A.  No.

Q.  Did you have any understanding as of July 23, 2013, that Tylenol would act as a fever suppressant?

A.  Yes.  It's an antipyretic.

Q.  How long does that antipyretic effect last?

A.  Four to six hours.

Q.  Does Motrin have antipyretic qualities as well?

A.  Yes.

Q.  And how long do the antipyretic qualities of Motrin last?

A.  About eight hours.

Q.  Were you aware that at 0410, despite the administration of Tylenol and Motrin at 0345, that Mrs. Campano was still febrile at 99.2?

A.  Technically, that's not a fever.

Q.  But it is an elevated temperature, correct?

A.  Yes.

Q.  And it would be affected by the Tylenol and Motrin which had been administered roughly a half hour earlier?

A.  Yes.

Q.  Were you aware of that at the time?

A.  No.

Q.  Were you aware that Mrs. Campano was remaining persistently tachycardia [sic] throughout the time after delivery?

A.  I had seen that her heart rate was 124, so I was aware of that.

Q.  If you had been aware of the fever, or medication administration, and the persistent tachycardia, what would your assessment have been?

[Objection omitted]

Q.  Go ahead.

A.  Had I known she had a fever in addition to the tachycardia, I would have considered - - my differential diagnosis would have probably been a little different.

Q.  What would it have included?

A.  Infection more likely.

Q.  More at the top of the list?

A.  Yeah.

Q.  That would have prompted you to, I'm sure, confer with other physicians?

A.  Yes.

Q.  Would that have led you to consider obtaining cultures?

A.  Yes.

Q.  And once cultures were obtained, considering empiric antibiotic therapy?

A.  Yes.

Dr. Vaughns Depo, 66:05 – 69:04.

### 1.    There Were Multiple Failures of Communication Between Marites' Physicians and Staff.

The absence of training and experience led directly to multiple

failures of communication amongst Mrs. Campano's medical providers

during this critical time.

The fifth missed opportunity occurred shortly thereafter, when

Dr. Crowder became responsible for Mrs. Campano's care.

At 0730 Mrs. Campano's temperature remained elevated at 99.2.

TAMC2 3682.  Dr. Crowder was notified by nurse April Williams about

- 46 -

Mrs. Campano's tachycardic heart rate and her temperature.  TAMC2

4470.  Dr. Crowder examined Mrs. Campano in this time frame.  Her chart

note timed at 0751 on July 23rd identified Mrs. Campano's fever of 101.3 at

0300 and its "resolution" with Tylenol and Motrin.  Dr. Crowder noted that

Mrs. Campano had been tachycardic persistently.  Mrs. Campano's

symptoms had progressed.  Mrs. Campano reported lightheadedness with

standing and she required assistance with walking secondary to her

lightheadedness.  In addition, Mrs. Campano was mildly diaphoretic.

Dr. Crowder ordered a fluid bolus due to concern for dehydration.  TAMC

3502

At this time Mrs. Campano's clinical presentation was most

concerning for infection.  Dr. Crowder, knowing what she knows now,

concedes Ms. Campano's clinical presentation should have led to

investigation of infection and initiation of empiric antibiotics.

Q.  Knowing what you know now, do you feel that anything should
have been done at 0700 that morning to further investigate infection.

A.  I may have drawn labs that morning if they hadn't already been
drawn.

Q.  Were there any morning labs that were drawn?

A.  I don't recall.

Q.  Knowing what you know now, is it your assessment, Dr. Crowder,
that labs should have been drawn at this time in the morning?

A.  If she didn't respond to the fluid bolus, yes.

Q.  How long would you give her to respond to the fluid bolus?

A.  Maybe 30 minutes.

Q.  Was there any positive response to the fluid bolus that was given to her that morning?

A.  I don't recall.

. . .

Q.  As it turns out, there was no positive response.  Her pulse at 0520 was 124.  At 0730 it was 118.  At 1117, it was 120.

All of those remained persistently tachycardic if that's correct, correct?

A.  I don't have those vitals in front of me, but I believe so, yes.

Q.  That would suggest no positive response to the positive fluid bolus, true?

A.  That is correct.

Q.  It's your understanding that if that had been the case the morning of July 23rd, you would have ordered labs.  Those labs would have included what?

A.  A CBC to evaluate for white blood count, a hematocrit and hemoglobin.  Would have most likely ordered a comprehensive metabolic panel to evaluate her electrolytes.  And then, given what I know now, I would have probably ordered a lactate as well to look for lactic acid in the blood.

. . .

- 48 -

Q. If, Dr. Crowder, you had ordered a CBC the morning of July 23rd and it had returned with an elevated white blood count, what would you have done in response?

A. I would have notified my attending right away.

Q. Would you have ordered blood cultures?

A. Yes.

Q. Would you have ordered urine cultures?

A. Yes.

Q. Would you have recommended starting empiric antibiotic therapy?

A. With what I know now?

Q. Yes.

A. Most likely, yes.

Dr. Crowder Depo, 75:18 – 79:23.

### 2. There Was No Communication That Marites Had Not Responded to the Fluid Bolus.

The fluid bolus ordered by Dr. Crowder was given to Mrs. Campano at 0745. That bolus was complete at 0815. TAMC 3682. There was no communication to Dr. Crowder regarding Mrs. Campano's lack of positive response to that fluid bolus. In fact, vital signs were being monitored only every four hours at that point in time; no current vitals were taken after that fluid bolus until 1117. TAMC2 3841.

### a.   Dr. Crowder Admitted The Failure to Order Closer Monitoring and Communication

Dr. Crowder admitted that more timely monitoring of Mrs. Campano was required to evaluate Mrs. Campano's response to the fluid bolus.

> Q.  In order to determine if there was a decrease in her tachycardia that would require monitoring close in time to the administration of the IV fluid bolus, correct?
>
> A.  That is correct.
>
> Q.  So you would need to change the algorithm of vital sign monitoring every four hours in order to know if there was a positive result, true?
>
> A.  That is correct.

Dr. Crowder, Depo, 76:16-24

No additional monitoring of Mrs. Campano was ordered or performed to timely follow her response to the fluid bolus.  Vital signs were recorded at 0730, the fluid bolus finished at 0815, vital signs were not repeated until 1117.  TAMC2 3684, TAMC2 3682.  No timely communication was made that Mrs. Campano had not responded to the fluid challenge.

There is no doubt that a CBC drawn at 0815 would have been markedly abnormal.  The CBC later drawn at 1145 showed a white blood cell count of 29.7 (normal 3.5 – 11.0), a marked left shift and bandemia of 30 (normal 0-15).  TAMC2 5686.  A CBC three and a half hours earlier

would have led directly to drawing of blood and urine cultures and initiation of empiric antibiotic therapy.

### 3.    The Failure to Recognize Hypotension Was Caused By Marites' Sepsis Was a Sixth Missed Opportunity.

Mrs. Campano's care providers missed a sixth opportunity to diagnose and treat progressive sepsis before noon on July 23rd.  At 1117 Mrs. Campano's blood pressure dropped to 76/45.  TAMC2 3684.  A systolic blood pressure 90 and below requires immediate assessment and intervention.  As discussed below, a systolic blood pressure 90 and below requires intervention of the Rapid Response Team (RRT) for evaluation and assistance.  The RRT was not activated as required.

Nurse Williams notified Dr. Crowder who responded to examine Mrs. Campano at 1135.  TAMC2 3684.  Dr. Crowder now knows, but did not know at the time, that that hypotensive blood pressure reflected hemodynamic instability associated with sepsis.

Q.  Just from the information that you received from the nurse, what concerns did you have?

A.  That her blood pressure had gone lower.

Q.  What did that suggest to you?

A.  At the time, I didn't know.

Q.  Based upon what you now know, what does that suggest to you?

A.  It suggests definitely a worsening clinical picture.  Again, the differential could be hypovolemia, occult bleed, infection.

Q.  You understand now that hypotension can reflect hemodynamic instability associated with infection?

A.  At this time, yes.

Q.  That was not an understanding that was known to you as of July 23, 2013, correct?

A.  I don't remember it being an understanding at that time, no.

Dr. Crowder Depo, 96:04 – 96:21.

Mrs. Campano remained hypotensive with systolic blood pressure below 90 from 1117 on July 23rd until resuscitative measures were undertaken between 0600 and 0700 on July 24th.  Despite the persistent severe hypotension the RRT was never initiated and Mrs. Campano never received antibiotics until the morning of July 24th.

> **4.    The Inexplicable Decision Not To Give Antibiotics in Response to an Elevated White Blood Count, Left Shift and Bandemia Was a Seventh Missed Opportunity**

In response to her examination, at 1139, Dr. Crowder ordered laboratory tests, including a stat CBC.  TAMC2 5505.  The CBC was drawn at 1145 and reported back at 1208.  The CBC results demonstrated overwhelming infection.  Mrs. Campano's white blood cell count was

29,700 (normal 3.5 – 11.0).  Her bands were 30% (normal 0 to 15%).

There was a left shift.  TAMC 5685-5686.

In response to Mrs. Campano's deteriorating clinical presentation,

Dr. Crowder conferred with her attending staff physician, Dr. McCartin.

Dr. Crowder Depo, 104:25 – 105:14.  Dr. McCartin came to examine

Mrs. Campano.  Dr. Crowder Depo, 106:15-23.  Despite the clear indication

of significant infection, the decision was consciously made to not begin

empiric antibiotic therapy.  This decision was made in response to a

telephone consultation between Dr. McCartin and maternal fetal medicine

specialist Dr. Christina Hill.

> **a.   Dr. Crowder and Dr. McCartin Both Knew at 1145 That Infection Was the Most Likely Diagnosis**

Dr. Crowder has testified that the "very high white count" suggested

either infection or a significant inflammatory response (Crowder Depo at

110:2-8).  Based upon the CBC results with the highly elevated white blood

count, left shift and bandemia, Dr. Crowder agrees that the most likely

diagnosis at this time on July 23rd was infection.

> Q.  That makes infection the most likely of the differential diagnoses as of 11:45 on July 23rd; do you agree with that?

> A.  Given this information, yes.

Dr. Crowder Depo, 115:11 – 115:14.

Dr. McCartin consulted with Dr. Hill as a result of concern for infection

based upon the CBC results.

Q.  What prompted you to consult with Dr. Hill?

A.  I was concerned that this patient had an infection; however, my physical exam wasn't productive of an etiology.  I was concerned about the white blood cell count.

I specifically wanted to know from Dr. Hill if she had any other suggestions for work up, and I specifically asked her if she thought I should start antibiotics on this patient.

Dr. McCartin Depo, 65:16 – 65:24.

### b.    Dr. McCartin's Chart Note Referenced The Wrong CBC Results

In her initial consult note at 1243 Dr. McCartin incorporated the CBC

results from the day before, July 22 at 1253, Tripler Labs 1380, which

showed mild leukocytosis.  Dr. McCartin did not reference the CBC results

drawn at 1145 on July 23, near the time that Dr. McCartin examined

Mrs. Campano, which showed a severe leukocytosis.  TAMC 5685-5686.

Dr. McCartin's note references the earlier temperature of 101 but states

"however has been afebrile since."  TAMC 3456-3457.  Dr. McCartin

appeared to be unaware that Mrs. Campano had received Tylenol at 0345,

Motrin at 0345 and Tylenol again at 0906 which had the effect of

suppressing Mrs. Campano's temperature.  TAMC2 3233.

The consultation with Dr. Hill was by telephone.

Q.  Was in that - - did you have just the one phone conversation with Dr. Hill?

A.  Yes.

Q.  Was it in that phone conversation that Dr. Hill suggested it was unnecessary to start antibiotic therapy?

A.  Yes.

Q.  Do you have any understanding as to Dr. Hill's thought process for not starting antibiotic therapy?

[Objection omitted]

A.  I can just tell you that she told me to give the patient time and see if she declared herself.

BY MR. THOMAS:

Q.  What did you understand "declared herself" to mean?

A.  Manifest a fever, have some uterine tenderness, abnormal vaginal discharge or some other sign or symptom of localized area of infection.

Dr. McCartin Depo, 68:17 – 69:19.

### c.    Antbiotic Therapy Was Not Started Even Though That Was The Safer Course

After consultation with Dr. McCartin, and after Dr. McCartin and

Dr. Hill talked by phone, Dr. Crowder at 1439 ordered a urine culture and

blood cultures to be drawn "ASAP."  TAMC2 5507-5508.  Dr. Hill, the

maternal-fetal medicine physician, testified that the <u>safer course</u> for

Mrs. Campano was to start antibiotics once the cultures were drawn.

> Q.  When there is a question whether a patient has an infection significant enough to draw urine and blood cultures, to investigate for that infection is the safer course for the patient the initiation of empiric antibiotic therapy?
>
> A.  After you obtain them so as to not confound your results.
>
> Q.  Yes?
>
> A.  Yes.
>
> Q.  In other words, you would draw the cultures first and then start the empiric antibiotic therapy, correct?
>
> A.  Yes.

Dr. Hill Depo, 78:19 -79:6.

> **d.    Dr. McCartin Calims She Wanted Dr. Hill To Tell Her If She Should Start Antibiotics.  Dr. Hill Claims She Would Not Have Recommended No Antibiotics**

There was a complete failure of communication between

Dr. McCartin and Dr. Hill.  Dr. McCartin testified Dr. Hill stated it was

unnecessary to start antibiotics.  Dr. Hill denied making such a

recommendation.

> Q.  Are you aware that Dr. McCartin was asked at her deposition:  "What prompted you to consult with Dr. Hill?
>
> "ANSWER:  I was concerned that this patient had an infection.  However, my physical exam wasn't productive of

an etiology.  I was concerned about the white blood cell count.
I specifically wanted to know from Dr. Hill if she had any other
suggestions for workup and I specifically asked her if she
thought I should start antibiotics on this patient."

Have you been advised of that?

A.  Yeah.  Yes.

Q.  Is Dr. McCartin accurate in that statement?

A.  I cannot speak to that, her - - because that's a statement I
couldn't tell you

Q.  But this ties in - -

A.  Yes.

Q.  - - directly with Dr. Crowder's note and strongly suggests
that you said no to antibiotic therapy.  But you disagree with
that?

A.  I do.  I don't typically recommend against plan therapy.

Q.  Did you in your conversation with Dr. McCartin tell her to
withhold empiric antibiotic therapy until the patient, quote
declared herself, close quote?

A.  I don't believe so.

Q.  So that to the extent Dr. McCartin tells us that's what you
said, Dr. McCartin is incorrect?

A.  Correct, as far as my recollection because, again, I typically
am in concurrence with recommended plans.

Dr. Hill Depo, 79:11 – 80:16  (Emphasis added)

### e.   Neither Physician Had an Accurate Understanding of Mrs. Campano's Clinical Presentation

Dr. Hill did not have an accurate understanding of Mrs. Campano's clinical course.  Dr. Hill never saw the patient.  Dr. Hill never examined the patient.  Dr. Hill Depo, 15:12-15.  Dr. Hill does not believe she accessed Mrs. Campano's medical record when Dr. Hill spoke with Dr. McCartin. Dr. Hill Depo, 13:8-15.

Dr. Hill does not remember if she had been informed by Dr. McCartin that Mrs. Campano had been febrile earlier in the morning; that she had a temperature elevation to 101.3; that she had been persistently tachycardic. Dr. Hill Depo, 57:23 – 58:12.

Dr. Hill was told by Dr. McCartin that Mrs. Campano "looked good." Dr. Hill does not believe she was told that Mrs. Campano had been mildly diaphoretic during the morning nor that she was dizzy upon standing and required assistance walking to the bathroom.  Dr. Hill testified those symptoms were inconsistent with Mrs. Campano "looking good" and would have led Dr. Hill to ask more questions if she had been aware of them.

> Q.  Were you advised that Mrs. Campano had been mildly diaphoretic in the morning of July 23rd?
>
> A.  No.  I don't - - I definitely don't think so because that wouldn't make sense.  I guess with Dr. McCartin mentioning

how good she looked is not consistent with diaphoretic so I would say no.

Q.  Were you advised that Mrs. Campano was experiencing dizziness upon standing and required assistance to ambulate to the bathroom because of that dizziness?

A.  No.

Q.  Do you find that to be inconsistent with appearing good?

A.  Yes.

Q.  If you had been advised at the time of this phone call with Dr. McCartin on July 23rd, 2013, that there had been the diaphoresis and that the patient was suffering from dizziness upon standing, would that have changed your evaluation?

A.  I think that's difficult to say.  It may - - I mean, it may have led to more questions on my part.

Dr. Hill Depo, 58:13 – 59:8.

> **f.      Failure to Improve in Response to Fluid Boluses Should Have Raised A Major Concern For Infection**

Dr. Hill does not believe she was informed that Mrs. Campano's

tachycardia and hypotension had not improved in response to fluid boluses.

Dr. Hill would be concerned about that failure to improve because infection

would be "a major concern."

Q.  Were you advised in that phone call about fluid administration given to the patient?

A.  I think so.

Q.  Were you advised that fluid boluses had been given earlier in the morning and again around noontime, yet there had been no change either in the patient's hypotension or persistent tachycardia?

A.  I don't know.  I don't think so again, yeah, because I - -

Q.  Would that have been concerning to you that you have a patient that's hypotensive, persistently tachycardic, had received fluid boluses and there had been no improvement?

A.  That's concerning.  That can be concerning.

Q.  What would you be concerned about?

A.  Why is she not responding to fluids.

Q.  What would be your differential diagnosis?

A.  Well, you know, infection, bleeding.

Q.  Infection would be a major concern.  True?

A.  Yes.

Dr. Hill Depo, 59:24 – 60:18.

Strikingly, Dr. Hill does not remember if she was advised of the CBC results reported at 1208.  Dr. Hill Depo, 60:19-21.  Dr. Hill agrees the CBC results "are highly elevated values suggestive of infection."  Dr. Hill Depo, 61:18-20.  Given that Dr. McCartin noted only the July 22nd CBC results in her assessment note at 1253, it is likely that Dr. Hill was not informed about the 1208 CBC results.

Dr. Hill's "recommendations" were handicapped by a sense of no direct responsibility to the patient, a lack of information and inaccurate information, all leading to no antibiotic therapy starting at 1200 or close thereto on July 23, even though Dr. Hill admits that starting antibiotic therapy was "the safer course."

Dr. Hill admits that Mrs. Campano was severely septic at the time that Dr. Hill spoke to Dr. McCartin.  Dr. Hill also admits that renal failure was the outcome of Mrs. Campano's sepsis.  Dr. Hill Depo, 62:2-7.

The decision not to start antibiotic therapy at this time is inexplicable.

> **5.     No One Monitored Marites to See If She "Declared Herself," an Eighth Missed Opportunity; Failure to Appreciate Decreasing Circulation and Increasing Bandemia Were Ninth and Tenth Missed Opportunities**

Dr. Hill's direction that the patient should be monitored until she "declared herself" required that Ms. Campano be monitored and that the physicians communicate as to any changes in her presentation.  Here, again, there was a complete failure of communication between Mrs. Campano's responsible physicians in monitoring Mrs. Campano's condition and following additional laboratory results.

At 1434 Dr. Crowder ordered blood and urine cultures to be drawn as soon as possible (ASAP).  TAMC2 3191.  Blood was not collected until

sometime around 1510.  TAMC2 5880-5881.  Dr. Crowder stated in her physician's note at 1715 that "pt [patient] was a hard stick" so that "RRT [Rapid Response Team] was called to obtain blood cultures."  TAMC 3459. There is no additional record confirming RRT response; such a record would be expected if there was an RRT response.

The reference to "hard stick" mean Mrs. Campano's nurses had a difficult time finding a vein from which to draw the requested blood specimen.  This indicates that Mrs. Campano's hemodynamic instability was worsening and her circulating volume decreasing.  It is unknown when Dr. Crowder learned Mrs. Campano was a hard stick.  It is clear that no communication of Mrs. Campano's further deteriorating condition was communicated directly to a staff physician or acted upon.  This was a ninth missed opportunity to diagnose and treat infection.

### a.   No One Communicated Worsening CBC Results At 1632 To the Staff Physicians

Equally importantly, the CBC results collected at 1618 were returned at 1632.  Mrs. Campano's white blood cell count had decreased slightly to 23,000, however, her bands had increased to 50%.  Tripler Labs 1374-1375.  Together, these laboratory values established that the ability of Mrs. Campano's immune system to respond to her infection was being overwhelmed by its progression.  In addition, Mrs. Campano's platelet

count decreased to 146,000 (normal 150-440) indicating that

Mrs. Campano was in the early stage of development of disseminated

intravascular coagulopathy (DIC).  Failure to again recognize lab values

diagnostic of infection and sepsis was a tenth missed opportunity to

diagnose and treat infection.

With these laboratory values, Mrs. Campano was clearly declaring an

overwhelming infection progressing to septic shock. Nonetheless, these

results were not communicated to Dr. McCartin or to Dr. Hill.  No

appropriate intervention resulted as required.  This was a tenth missed

opportunity to intervene to appropriately treat Mrs. Campano.

### 6.    Delay in Activating the Rapid Response Team (RRT) For Nearly 24 Hours Was an Eleventh Missed Opportunity.

An eleventh missed opportunity occurred earlier at 1117 when

Mrs. Campano's blood pressure was reported by her nurse to Dr. Crowder

because Mrs. Campano was hypotensive with a blood pressure of 76/45.

TAMC2 3684.  That blood pressure was repeated for confirmation at 1130

and remained hypotensive at 78/48.  TAMC2 3684.

Tripler has a Rapid Response Team (RRT).  One purpose of the RRT

is to allow specially trained ICU nurses to be put in contact with patients

whose vital signs suggest deterioration, so that timely intervention may result and prevent complete deterioration.  R.N. Sewell Depo, 28:6-25.

The Tripler protocol in effect on July 23, 2013 required that the RRT be notified any time a patient's blood pressure dropped blow a systolic level of 90.  Depo of R.N. Sewell, 73:5-7.  Not only did Mrs. Campano's hypotension beginning at 1117 serve as a clear warning sign of continued deterioration, it also served as a signal to activate the RRT.  From this time forward until 0545 the morning of July 24th, Mrs. Campano remained hypotensive with a systolic blood pressure consistently below 90, meaning multiple opportunities to activate the RRT and initiate appropriate intervention in response were repeatedly missed.  Each time a hypotensive blood pressure was recorded, RRT should have been activated but was not.

R.N. Sophia Sewell was the ICU nurse designated as the night shift Rapid Response Team nurse for July 23 to July 24.  Nurse Sewell wrote an RRT note regarding her involvement responding to Mrs. Campano the morning of July 24.  TAMC 3542-3544.  Nurse Sewell acknowledged in this note and in her deposition that the RRT should have been activated for Mrs. Campano during the nearly 24-hour period from 0730 on July 23 to 0600 on July 24.

Q.  Okay.  Let's go on to your actual note.  It's on the next page, page 3543, Exhibit 1 to your deposition.  You note in the beginning of your situation/background portion of your note that, during the 24-hour period between 07:30 on July 23, '13 to 06:00 on July 24, 2013, patient has been having a systolic blood pressure ranging between 72 to 88 and a heart rate ranging between 108 and 124 with no RRT notification.

Do you see that?

A.  Yes.

Q.  Just so I understand it, during that time period, that 24-hour time period that you denote in your note, she met RRT activation criteria, true?

A.  True.

Q.  Actually, the systolic blood pressure of less than 90 alone was enough to activate the RRT, true?

A.  True.

Q.  Based on what you know and your experience with the RRT system at Tripler, the RRT should have been notified within that 24-hour time period between 0:30 on 7/23 and 06:00 on 7/24, true?

A.  True.

R.N. Sewell Depo, 72:14 – 73:12

This continuous failure to activate the RRT resulted in multiple

missed opportunities to appropriately diagnose and treat Mrs. Campano.

### 7.   Marites' Clinical Presentation Required RRT Activation From 1117 on July 23rd Until She Crashed.

The timely activation of the Rapid Response Team program would

have greatly facilitated earlier detection and treatment of Mrs. Campano's

progressive septic shock.  A 2011 article in the New England Journal of

Medicine succinctly describes the purpose and function of the RRT.

> Rapid-Response teams have been introduced to intervene in the care of patients with unexpected clinical deterioration.  These teams are key components of rapid-response systems, which have been put in place because of evidence of "failure to rescue" with available clinical services, leading to serious adverse events.  A serious adverse event may be defined as an unintended injury that is due in part to delayed or incorrect medical management and that exposes the patient to an increased risk of death and results in measurable disability.  Rapid-response systems aim to improve the safety of hospital-ward patients whose condition is deteriorating.  These systems are based on identification of patients at risk, earlier notification of an identified set of responders, rapid intervention by the response team, and ongoing evaluation of the systems' performance in hospital-wide processes of care.  Rapid-response systems have been implemented in many countries and across the United States.
>
> Rapid-response teams differ from traditional code teams in a number of **ways (Table 1).  They assess a greater number of hospitalized patients at an earlier stage of clinical deterioration, with the aim of preventing serious adverse events such as cardiac arrests and unexpected deaths.  Thus, rapid-response teams assess patients in whom respiratory, neurologic, or cardiac deterioration develops rather than patients who have already had a respiratory, or cardiac arrest**.

Rapid-Response Teams, New England Journal of Medicine 2011;

365:139-46 (emphasis added).

In Mrs. Campano's case, all of her care providers, physicians and nurses alike, failed to activate the RRT as required by Tripler's own RRT criteria. Those criteria include a systolic blood pressure below 90. Based upon these criteria the RRT should have been activated no later than 1117 and continuously thereafter.

The RRT may be activated in one of two ways: First, by direct notification by a patient's care provider to the RRT ICU nurse on duty; or (2) directly by the RRT ICU nurse who has access to a computer program which allows monitoring and assessment of the vital signs of all hospital inpatients.

### a.   Understaffing Prevented the RRT Nurse From Timely Recognizing Marites' Peril.

Nurse Sewell testified that her shift was so busy that she was unable to find the time to utilize the RRT computer monitoring system until 0540 the morning of July 24th, approaching the end of her shift. R.N. Sewell Depo, 36:19 – 37:15. The RRT computer program, if working properly, highlights in color vital sign readouts which qualify for RRT activation. During her shift on July 23 to July 24, 2013, that colorized warning system was inoperable (and apparently had been for at least a few days before July 24th). R.N. Sewell Depo, 38:5-15.

Three issues present themselves with reference to the RRT:
(1) nursing staff and providers were inadequately trained and/or instructed regarding RRT notification, as RRT notification was clearly required in Mrs. Campano's case and notmade; (2) as of July 23, 2013, the RRT program was inadequately staffed inasmuch as the RRT nurse was unable to complete the hospital surveillance of patients on a timely basis due to other duties; and (3) the colorized surveillance warning system was inoperable and should have had an alarm or other system which would prompt timely notification to the RRT of requiredactivation.

To her credit, at 0545 nurse Sewell identified Mrs. Campano as a patient for whom an RRT response was required when she reviewed the RRT surveillance program.  At 0545 nurse Sewell called the postpartum unit requesting an update regarding any patients of concern and was advised that Mrs. Campano was hypotensive and had been continuously hypotensive throughout the evening shift.  As a result, nurse Sewell and the RRT team were activated and responded to Ms. Campano.  TAMC 3542-3544; RN Sewell Depo, 73:13-20; 76:4-10.

**b.      Tripler's Hospital Staff and Physicians Were Inadequately Trained and Instructed Regarding RRT Activation.**

Nurse Sewell's response record is highly instructive in directly identifying both Mrs. Campano's progressive deterioration in the 24 hours before the RRT was called and in identifying the failure of Mrs. Campano's providers to recognize that deterioration and activate the RRT.

> Situation/Background:  Pt.  was Post Partum Vaginal Delivery Day #1.  Pt. arrived to 5b2 at 0730 23 JUL 2013 and during the 24 hour period between 0730 23 JUL 2013 to 0600 24 JUL 2013, Pt. has been having SBP ranging between 72-88, and HR ranging between 108-134 with no RRT notification.  At 0545, called 5b2 to ask for updates in regards to having any patients of concern, and RN Cody stated that Pt. Campano has been having Hypotension with the latest being 82/60 manual cuff at 0515.  Asked to speak with RN in charge of the patient.  RN Gallardo stated that pt. has been having SBP ranging between 72-86 throughout the evening shift.  RN Gallardo stated that the OB team was notified in regard to pt's hypotension and tachycardia and that they were made aware. However, RRT call was never initiated throughout the night shift nor yesterday's shift in regards to patient's status.
>
> . . .
>
> Recommendation/Result:  Pt. transferred from PCU to ICU. **Educated nursing staff of 5B2 that regardless of notifying OB MD of pt's unstable status, and [sic: an] RRT call must always be placed if they fit RRT parameters**.

(Emphasis added).

Although somewhat understated in her criticism in this note, as would be expected, at her deposition nurse Sewell was highly disappointed and

angered by the lack of response by the care providers to Mrs. Campano's

clearly progressively deteriorating condition.  R.N. Sewell Depo,

89:19 - 90:6.  Only nurse Sewell's insistence that Mrs. Campano be

transferred as soon as possible to a higher level of care in the ICU

prevented the providers' failure to respond from being fatal.  Even then,

Mrs. Campano was negligently transferred to the progressive care unit

(PCU), not arriving in the ICU until an hour after the initial transfer.

TAMC 3543; R.N. Sewell Depo, 83:16 – 84:18; 88:5-18.

### 8.   Dr. Boledovich's Failure to Appreciate the Severity of Marites's Condition at Report at 1800 Was a Twelfth Missed Opportunity.

At 1800 on July 23rd Mrs. Campano's care was handed off to the

night shift residents and nursing staff.  The only physicians involved in

Mrs. Campano's care thereafter until her "crash" at 0600 the morning of

July 24th were the first year intern Dr. Bastawros and Dr. Boledovich.

Upon beginning her shift Dr. Boledovich received report from

Dr. Crowder regarding Ms. Campano.  Dr. Boledovich Depo, 92:20 – 93:3;

Dr. Crowder Depo, 126:10-15.  At that time Dr. Crowder had a very serious

concern about Mrs. Campano's condition and fully briefed Dr. Boledovich

as to the patient's current status.

Q.  After entering this note at 1715, did you have any further
interaction regarding this patient before you went off shift?

A.  Other than giving check-out, no.

Q.  To whom did you give off-going report?

A.  To Dr. Boledovich.

Q.  What did you tell her about Ms. Campano?

A.  I reviewed with Dr. Boledovich Mrs. Campano's initial exam when I saw her first thing that morning.  And I reviewed with her that I had been called by the nursing staff for her blood pressure.  And I reviewed with her my second exam findings in that I went to Dr. McCartin and that we went and saw the patient together.  I reviewed the lab results with her, from what I remember, as well as her vital signs.  If I remember right, we briefly spoke with anesthesia at that time, asking if there was any reason why the epidural would still be causing tachycardia, and they assured us that the medication would have worn off by then.

Q.  You spent time with Dr. Boledovich giving quite a bit of information for this patient, correct?

A.  That's correct.

Q.  That reflected a very serious concern about her condition, true?

A.  That's true.

Q.  What comments or assessment, if any, did you receive from Dr. Boledovich?

A.  I don't remember, in particular, what Dr. Boledovich said.

Q.  Did you discuss at all with Dr. Boledovich the decision to not start empiric antibiotic therapy earlier that afternoon?

A.  Yes, I believe we covered that, yes.

Q.  What was her response?

A.  I don't remember her - - I don't' remember her response to that.

. . .

Q.  Was it reported to Dr. Boledovich by you at off-going report that the CBC had come back and these were the results?

A.  I believe so, yes.

Q.  All that information would have been available to Dr. Boledovich through the electronic record, correct?

A.  Correct.

Q.  Was Dr. Boledovich accessing the chart at the time you gave report?

A.  I don't believe so.

Dr. Crowder Depo, 126:10 – 129:11.

Dr. Boledovich examined Mrs. Campano as reflected in her chart note timed 1850.  TAMC 3520.  Dr. Boledovich referenced in this note that Mrs. Campano "has continued to complain of light headedness with low BPs and leukocytosis."  The note identified tachycardia with a heart rate of 124.  Dr. Boledovich incorrectly interpreted the drop in Mrs. Campano's white blood cell count from 29,7000 at 1145 to 23,000 at 1618 as a positive sign.  "Pt [patient] did have a febrile episode earlier today with leukocytosis to 29.7 which is now down trending to 23k with no intervention."  TAMC 3520.

Dr. Boledovich took no action to treat Mrs. Campano's progressive

septic shock.  She admits in her deposition that antibiotic therapy was

required at this time.

> Q.  Knowing what you know today about the diagnosis and
> treatment of infection, if you were presented today with this
> presentation, which is reflected here in this notes [sic], is it not
> overwhelmingly likely that you would start presumptive
> antibiotic therapy under these circumstances?
>
> A.  Likely I would.

Dr. Stegenga Depo, 110:10-16

### 9.    The Postpartum Unit Was Understaffed, Resulting in Marites' Primary Nurse Being Diverted From Care of Marites.

Nurse Jury Gallardo was Mrs. Campano's primary nurse on the

postpartum unit during the night shift.  Nurse Gallardo also served as the

charge nurse for that shift which required her to assist other nurses with

other patients.  R.N. Gallardo Depo, 78:6-19; 82:24 – 83:7.  Two other

R.N.s worked with nurse Gallardo on the postpartum unit that shift;

however, both of those R.N.s were new to Tripler, had just completed

orientation, and as a result were unauthorized to access the computer to

admit new patients to the unit and execute orders issued by the doctors for

their patients.  These responsibilities fell upon nurse Gallardo.  The result

was that the postpartum unit was grossly understaffed during this shift.

R.N. Gallardo Depo, 77:19 – 82:11; 83:16 – 84:20.

Nurse Gallardo in her deposition described the staffing issues which prevented her from spending as much time with Mrs. Campano as she would have liked.

Q.  How many beds were full?

A.  The occupied beds, about nine.

Q.  Was that considered a slow night?  Medium night?  Heavy night?

A.  It's [sic] started out medium night.  Then we had admissions.

Q.  And then it becomes a heavy night?

A.  (Witness nods head up and down.)

Q.  Yes?

A.  Yes.

. . .

Q.  How many additional registered nurses were helping you staff the mother-baby unit for the evening shift the evening of July 23rd to the morning of July 24th?

A.  Two.

. . .

Q.  Was there any other non-physician staffing for the mother-baby unit for your evening shift, evening of July 23rd to the morning of July 24th, in addition to yourself, the two R.N.s and the medic?

A.  That's it.

Q.  You started with nine beds full; correct?

A.  Yes.

Q.  That's mothers plus infants?

A.  No, just the mothers.  So multiplied to 2 with the babies.  So three moms on each nurse, and then three - - nine moms, nine babies.  They stay in one room, the same room, mom and baby.

. . .

Q.  So when you started your shift, it was one nurse for each three patients, and calling a patient mother plus baby?

A.  Yeah, one nurse for six because - -

Q.  Three moms, three babies?

A.  Yes, sir.

Q.  By the time your shift finished, how many rooms were occupied?  How many new admissions did you have?

A.  We got three new admissions, C-sections and SVDs.

Q.  How many of the three new ones were C-sections?

A.  One.

Q.  The C-section patient would require a little bit more care because it's a surgical patient?

A.  Yes, sir.  But not necessarily just because the surgical.  Some babies require more help, especially if they are having hard time breathing.

Q.  Were there any infants on the unit that night that required additional care?

A.  Yes, sir.

Q.  How many?

A.  My admission plus my other nurse's baby that she also admitted.

Q.  So two of the admissions had infants who required additional assistance with breathing?

A.  Yes, sir.

Deposition of Jury Gallardo, R.N., September 14, 2016, 77:19 – 82:11.

### a.  Additional Staffing Was Requested But Not Received.

Nurse Gallardo requested but did not receive additional staffing help.

R.N. Gallardo Depo, 82:20 – 83:15; 88:3 – 88:22.

Q.  In that situation, are you able to call for additional staffing help?

A.  Unfortunately, the shift charge before me tried, and we are short entire - - for our entire floor.

Q.  Why did the shift before you try and get help if there were just nine patients plus babies on the floor?

A.  Because I as a charge nurse has Marites Campano also.  And I have two new nurses.  The two new nurses that I have don't have access with a certain part of computer admissions.  I have to do it so that they can - - we can implement the doctor's order with a transfer.

Q.  But my question is, you've indicated that the shift before yours, the day shift for the July 23rd, tried to get additional nurse staffing for the mother-baby unit; correct?

A.  Yes, sir.

Q.  Why?

A.  So that I can be free to help everyone around as a charge nurse.

Nurse Gallardo Depo, 82:20 – 83:15.

### b.    Tripler Did Not Then, But Now Has, a Call System to Provide Additional Required Staffing.

No additional staffing was available because Tripler was short-staffed hospital wide and did not have an on-call system to supplement staff, which it now has in practice.

Q.  So at some point before midnight on July 24th during your shift, the bed manager came.  You asked for additional staffing assistance - -

A.  Just verbally.

Q.  - - and the response was we're short handed hospital-wide; we can't get anybody else to help you.  Is that right?

A.  Yes.

Q.  Were you aware if you had any other options besides talking to the bed manager in order to get assistance?  Was there anyone else you could have talked to?

A.  We didn't have on-calls then.  That's why they started implementing it after that fact.

Q.  What started afterwards?

A.  Whenever - - when we were short hospital wide.  It's not during my time.  But when I came back with that five months, they started - -

they - - not started, but they have implemented putting on-call nurses. So it's overtime.

Nurse Gallardo Depo, 88:3 – 88:22.

**c.    Nurse Gallardo's Additional Duties Left Marites Without Nursing Care and Supervision at a Critical Time.**

Nurse Gallardo further explained the additional responsibilities she had to assume because she was working with two new nurses on the floor.

Q.  Ideally, what should be the staffing ratio on the floor for you to be free to help everyone?

A.  Ideally, the charge nurse should only have maximum of one to two patients and no admission.

Q.  No new admissions; correct?

A.  Yes, sir.

Q.  You instead ended up being responsible for four patients - -

A.  Because I have two new nurses that just got off of orientation.

Q.  Now, what problems does that cause for you when you have new nurses?  What are they - - what problems does that cause for you?

A.  It takes additional time for me to carry out the orders of the doctor and look at their - - doctors' orders and what their patients needed and access to the computer.

Q.  so these new nurses weren't able to do what?

A.  They cannot activate orders.

Q.  So you have to be the one, for all nine patients on the unit, to activate the orders?

A.  The new admissions and whatever needs to be followed up on their other patients, like they need to look labs in the CHCS then, because, at that time, we don't have communicating CHCS and ALTA.  It just started.

Q.  So a good portion of your time was spent worrying about the patients of these other nurses in addition to your own patients?

A.  Basically.

Nurse Gallardo Depo, 83:16 – 84:20.

### 10.   There Was Inadequate Physician Staffing As Well.

There was inadequate physician staffing for the night shift as well.

From nurse Gallardo's perspective, she contacted Dr. Boledovich to

request assistance with Mrs. Campano's management both to order lab

tests to investigate infection and to start empiric antibiotic therapy.

However, Dr. Boledovich was engaged in deliveries in the labor and

delivery unit and, despite requests from nurse Gallardo, did not come to

examine Mrs. Campano until shortly before Marites crashed at 0600.

R.N. Gallardo Depo, 74:2 – 77:10; Dr. Stegenga Depo, 150:7 – 151:1;

TAMC 3539; R.N. Sewell Depo, 77:7-19; TAMC 3542-3544.

Q  Have you ever examined yourself, Ms. Gallardo, what you were doing and how you treated the patient and asked yourself, "What could I have done differently to make a different outcome"?

A.  Always.

Q.  What conclusions have you reached when you ask yourself that question?

A.  If there was an available doctor that can - - I can reach aside from what were available that night, that would have been good.

Q.  Explain what you were referring to, please.

A.  I don't have access for certain orders.  We have limitations as a nurse.  So it would have been wonderful if we had doctor on the floor where we can reach just like in the - - with the babies that we have, they are on the floor.  So you can easily access them.

. . .

Q.  What you're saying is that you wished there was a medical doctor who was available to you to answer questions or concerns about how to take care of the mother?

A.  To be able to put the orders right away.

Q.  What orders did you want?

A.  Aside from labs, you know, the antibiotic that she has to put in. But it is their choice and it is their level to order it.

Q.  What labs did you want to order?

A.  The ones she did.

Q.  And the she you're talking about is Dr. Boledovich?

A.  Yes, sir.

Q.  Did you talk to her about starting antibiotics?

A.  She told me the moment we got - - by the time we were talking, she said she's going to put in the order.

Q.  What time were you talking?

A.  We were - - we've been conversing, and I've been trying to reach her all through the night.  And by the 2 o'clock time, when I cannot get the patients to pee enough, we progressed more on that conclusion.  But she has - - she's the one who concludes what to give.  Dr. Boledovich concludes on what to give.

. . .

Q.  You also suggested, Ms. Gallardo, that you were trying to reach Dr. Boledovich for some time and were unable to?

A.  There are times we - - we had deliveries that night.  So she's in the deliveries, and the patients come down.  And I'm with those new patients too.  So we work through it through the night, communicating.

Q.  So as you look back at this situation, your wish is that you could have spent more time directly with Ms. Campano and had a doctor there for immediate access to assist you in getting lab tests earlier and antibiotic therapy started earlier?  Is that what I understand?

A.  I spent the time I needed with Marites.  I wanted more time with the doctor.

Q.  And the reason you wanted more time with the doctor was to start earlier the process of the lab tests and the antibiotic therapy; correct?

A.  Yes, sir.

Q.  And the reason you understand that Dr. Boledovich was unavailable was because she was delivering babies?

A.  Yes.

Nurse Gallardo Depo, 74:02 – 77:10.

### 11.   The Inability of Marites' Nurse to Get a Doctor to See Marites Was a Thirteenth Missed Opportunity.

Nurse Gallardo testified that when she was unable to have Dr. Boledovich examine Mrs. Campano, she considered communicating instead to the RRT ICU nurse.  Nurse Gallardo does not appear to have understood that Ms. Campano's vital sign values required that she have already communicated with the RRT; instead, she appeared to be seeking another means of assistance.  In any event, the postpartum unit short-staffing required nurse Gallardo to respond to additional requests which distracted her from notifying the RRT.  R.N. Gallardo Depo, 104:13 – 105:16.

> Q.  Did you, when you were having difficulty getting a response from Dr. Boledovich, give any consideration to making a call to the Rapid Response Team for assistance?
>
> A.  I did.  But I got interrupted trying to take care of those two babies.
>
> Q.  The new admissions?
>
> A.  Yeah.  And by the time she called, I felt like it's a blessing that she called, and I ask her please come.
>
> Q.  And that's Dr. Boledovich?
>
> A.  No.  That was RRT.
>
> Q.  Okay.  Explain to me what - - how that sequence worked, then.
>
> A.  So Dr. Boledovich cannot come down because she was busy, but she said she's coming down.  And then I wanted to go back to my

patient, and I got interrupted with other needs that I need to meet. And then I got a phone call from RRT, and so I said - - she saw the screen, the vitals.  And so I said please come, and she did.

Q.  You're assessing Ms. Campano?

A.  Yes.

Q.  You feel this doesn't look good.  You can't get the doctor.  You want to call the RRT?

A.  I had Dr. Bastawros come down.  So after I talked to Dr. Boledovich, Dr. Bastawros was around, came down.  And then I had a call from RRT, I was wanting to do all along.  And then I ask her please come.

Nurse Gallardo Depo, 104:13 – 105:16.

As stated in the RRT note, the phone communication between the

RRT ICU nurse, nurse Sewell and the postpartum unit, did not occur until

0545.  TAMC 3542-3544.  This timing confirms that there was no physician

intervention for Mrs. Campano until just before her crash.

### 12.   Dr. Boledovich Essentially Ignored the Requests of Nurse Gallardo and Dr. Bastawros for Intervention.

Despite Nurse Gallardo's urgency in seeking physician intervention

for Mrs. Campano, that urgency was not in any way reciprocated by

Dr. Boledovich.  Dr. Bastawros shared that urgency to get assistance from

Dr. Boledovich.  Dr. Bastawros performed her postpartum morning rounds

on Mrs. Campano at approximately 0530.  She received a response from

Dr. Boledovich similar to that received by Nurse Gallardo.  Dr. Bastawros

went to talk to Dr. Boledovich.  Despite Dr. Bastawros' concern expressed

to Dr. Boledovich that Mrs. Campano was pretty sick, Dr. Boledovich made

no direct response nor acted to help.  Dr. Bastawros Depo, 78:10 – 82:6.

Q.  Okay.  Have you learned from any source whether there had
been any overnight communication with Dr. Boledovich?

A.  Yes.

Q.  What have you learned?

A.  Well, after I saw Ms. Campano on the 24th, I went up to speak with
Dr. Boledovich because Dr. Crowder wasn't in the hospital yet, and
she's the person who co-signs the notes, and I said that I - - that
Ms. Campano is tachycardic and that her blood pressures were soft.
And Dr. Boledovich said she was aware, because she had gotten
paged about her overnight, and not to worry about it.

I don't know if those were her exact words, but she definitely
indicated that she had been paged overnight and that she was aware.

. . .

Q.  What was Dr. Boledovich doing?

A.  She was in the pit.  I don't know what - - I don't remember what
she was doing.

Q.  Was she with a patient?

A.  No.

Q.  What did you tell Dr. Boledovich?

A.  I don't remember my exact words.  I said that I saw her and that
she was tachycardic and that I was worried that she was developing
an infection or - - I mean, something like that.

Q.  What was Dr. Boledovich's response?

A.  She said she was aware of the patient, and she had gotten paged on her overnight.

. . .

Q.  Did you suggest to Dr. Boledovich that Mrs. Campano looked pretty sick?

A.  Yes.

Q.  You were concerned about her?

A.  Yes.

Q.  What was Dr. Boledovich's response, if any, to your expressed concern that she looked - - Mrs. Campano looked pretty sick?

A.  She said that she was aware of her.

Dr. Bastawros Depo, 78:10 – 82:06.

Based upon this interaction and other experiences, Dr. Bastawros

has a low opinion of Dr. Boledovich as a physician.  Dr. Bastawros Depo,

84:25 – 85:17.

Q.  Your previous experience with Dr. Boledovich before the 24th of July, was she generally responsive to requests?

A.  I had very little experience with Dr. Boledovich prior to the 24th of July.

Q.  Did she have a reputation?

A.  Not - - not that I - - I - - I had very little experience with her before the 24th of July.

Q.  From what you've learned since then?

A.  In what I've learned since then, perhaps she was not the strongest resident during her time here.

Q.  And what forms the basis of that impression?

A.  Her clinical knowledge, performance at a.m. report, and, also, I'm sure this is public knowledge or - - but she had to retake her specialty board examination a couple times.

Dr. Bastawros Depo, 84:25 – 85:17.

Understaffing, inadequate communication, inexperience, indifference, lack of supervision, and a lack of basic medical knowledge regarding the diagnosis and treatment of infection, sepsis and SIRS all contributed to Marites' tragic outcome.

## F.   **No Defense Experts Defend the Primary Care in This Case.**

It is evident that the Defendant cannot, and more importantly, is not, defending this case on liability.  Even though liability has not been admitted, the Defendant does not have any expert opinion testimony or reports stating that the care provided to Mrs. Campano complied with the standard of care.  No reports were submitted from an infectious diseases expert, from an obstetric expert or from any other medical expert to refute the standard of care violations identified by Plaintiffs' infectious disease expert, Dr. Montoya or by Plaintiffs' obstetric expert, Dr. Blake.

### 1.   Dr. Friedman's Report Does Not Refute Primary Negligence and Confirms Causation.

A report has been submitted from a nephrologist, Dr. Stuart Friedman, who like Plaintiffs' expert nephrologist Dr. Klein, works at Cedars Sinai.  Dr. Friedman makes no effort in his December 10, 2016 report to refute any standard of care violations occurring before Mrs. Campano's crash at 0600 on July 24, 2013.  Not only does Dr. Friedman not dispute negligence, Dr. Friedman validates the causative relationship between that care and the development of Mrs. Campano's end-stage renal disease and complications.  Dr. Friedman states in his December 10, 2016 report:

> Ms. Campano, a 37-year-old female developed septic shock resulting in acute kidney injury requiring hemodialysis in July 2013.  She never recovered renal function and developed end-stage renal disease requiring 3 times weekly hemodialysis.

Dr. Friedman, 12/10/16 at 1.

Dr. Klein, in his report, was critical of the use of contrast in an abdominal CT scan performed on Mrs. Campano mid-morning on July 24th. IV contrast is nephrotoxic and injurious to dysfunctional kidneys such as Mrs. Campano had on July 24th.  Dr. Klein, 8/15/16 at 3-4.  Dr. Friedman essentially defends the use of contrast upon the basis that Mrs. Campano's kidneys were no longer salvageable at that point in time anyway.

As the radiologist noted in their [sic] report Ms. Campano's kidneys already showed signs of cortical necrosis at the time that IV contrast was administered.

No specific therapy has been shown to be effective in patients with cortical necrosis.  Most patients require dialysis and do not recover significant renal function and therefore go on to develop end-stage renal disease requiring dialysis or transplantation.

Upon discharge from the hospital Mrs. Campano was prescribed

Motrin for pain.  Dr. Patzwald Depo, 146:1-11.  Motrin is also nephrotoxic,

contraindicated in patients with dysfunctional kidneys, and its prescription

was clearly a violation of the standard of care.  Dr. Klein, 8/15/16 at 4.

Dr. Friedman again defends this malfeasance from the perspective that no

further injury could occur to Ms. Campano's already damaged kidneys.

In addition, I disagree with Dr. Klein regarding the effect of Motrin, prescribed on discharge, on renal recovery.  The potential for Ms. Campano to recover renal function at that time was remote and extremely unlikely as described above.

Dr. Friedman, 12/10/16 at 2.

## 2. Defendant's Radiologist Dr. Yeoh Agrees That Marites' Kidneys Were Irreversibly Damaged by the Time IV Contrast Was Given.

Defendant's retained radiologist, Dr. Jeffrey Yeoh, also defends the

CT with contrast upon the basis that irreversible kidney injury had already

occurred:

As for Plaintiffs' nephrology expert's opinion that the iodinated contrast caused the acute renal injury, the CT images of the kidneys

show that the kidneys were already in very poor condition, showing both very limited blood flow to the kidneys (little if any enhancement), and no significant renal function at that time (no concentrated IV contrast in the collecting systems of the kidneys, even on the 9 minute delayed images of the kidneys.)  In other words, the kidneys were already not functioning before the CT scan.

Dr. Yeoh, undated report at 1-2.

Dr. Klein is clearly not suggesting that the CT contrast itself was the primary cause of Mrs. Campano's kidney injury, simply that the use of contrast was negligent and additive to the effect upon the kidneys.

Dr. Klein, 8/15/16 at 3.

### 3. The Evidence Does Not Support Dr. Yeoh's Claim That No Additional Contrast Was Given to Examine the Kidneys.

Dr. Yeoh's report appears to suggest that not much IV contrast actually extravasated to the abdomen and pelvis:  "There does not appear to be additional IV contrast present in the images of the abdomen and pelvis."  Dr. Yeoh, undated report at 1.  Dr. Klein pointed out in his deposition, however, that contrary to what Dr. Yeoh stated in his undated report, Mrs. Campano in fact received additional contrast to examine the abdomen and pelvis.

Q.  BY MR. YEE:  Back on the record.  So my question is, does this change your opinion?  Reviewing these two attachments to the scans of 9:55 a.m. of July 24, 2013, does this change your opinion as to whether or not Mrs. Campano suffered a nephrotoxic injury as a result of the contrast that was given from the these CT scans?

A.  I'm actually shocked at reading this report.  Because it doesn't change my opinion on that, but what it shows is that your experts apparently did not have this or made some assumptions that the abdominal CT was an add-on and no additional contrast was needed. And that is in some of the reports from your experts, Mr. Yee.

And this clearly shows that add-on CT of the abdomen, in fact, they gave an extra amount of dye, of - - I'm getting confused which one is which.

Q.  I don't really have a way of telling which one is which.

A.  One here they gave - - no, this is the pulmonary.  They gave 50 millimeters of the dye in 105 cc of normal saline.  I had assumed from reading your experts' report that they just took a picture of the abdomen and they didn't give any extra dye.

But this shows that they gave another 67 mls of dye in 30 cc of normal saline.  So in fact your experts were wrong.  They misrepresented it.

So to answer your question, I don't think it made a big deal of difference in her course of renal failure, but what I find disturbing is not only does he misquote the literature, that he says, oh, there was no extra dye involved.

Deposition of Keith L. Klein, M.D., January 14, 2017, 38:14 – 39:20.

These corollary standard of care issues may be minor points in the scheme of overall injury and resulting damages, but they do impact adversely the credibility of Defendant's individual experts and their overall defense of this case.

## IV.   **FACTUAL SUMMARY**

Mrs. Campano was a 36 y.o. G.4, P.2, AB 1 female with an EDC of

7/29/13.  Her past medical history was complicated by rheumatic heart

disease at age 15 and occasional cardiac palpitations.  Echocardiography

performed in 2011 was normal.  The patient also had a history of anxiety

and depression since 2012.  Her prenatal care was uncomplicated.  Her

last prenatal visit was on 7/18/13, at 38 weeks gestation.  At that time, her

blood pressure was 114/69 and her pulse was 84.  She was afebrile at that

time.  Due to concerns about advanced maternal age, she was admitted for

induction of labor at Tripler Army Medical Center.  She was admitted at

1140.  Vital signs at that time revealed a blood pressure of 122/66,

pulse 84 and temperature 98.2.  Her white blood cell count on admission

was 11,200 with an elevated neutrophil count of 8.8.  Her platelet count

was 223,000.  At 1320, Mrs. Campano complained of feeling hot and weak.

She appeared to be pale and clammy to touch on her face and neck, as is

documented by the labor nurse.  She was evaluated by Dr. Edward

Watson.  At that time, her vital signs indicated a blood pressure of 122/66,

pulse 83 and temperature 98.0.  Shortly thereafter, the patient felt better

and her flushing resolved.  At 1700, her blood pressure was 100/59,

pulse 89, axillary temperature 97.0.  After the initial dose of Cytotec,

cervical examination at 1716 revealed a cervix that was 3cm dilated, 50%

effaced and -2 station.  She was started on Pitocin augmentation at 1722.

At 2036, her cervix was 5cm dilated, artificial rupture of the membranes

was performed with clear fluid noted by Dr. Gaccetta.  She was

administered an epidural anesthetic at 2110.  Her vital signs at that time

revealed a blood pressure of 116/64, with a pulse of 107, and 129/60 with a

pulse of 121.  At 2139, she was noted to have a pulse of 130.  Her

temperature was 98 degrees.  She complained of her heart racing.  Nursing

documentation indicates the patient had a heart rate as high as 150.  At

2202, her blood pressure was 99/51, heart rate 141.  She was administered

oxygen and additional IV fluids.  At 2220, her blood pressure was 88/58,

pulse 110.  At 2255, her cervix was 8 cm dilated, pulse 121.  At 0052 on

7/23/13, her cervix was completely dilated with a vertex at +2 station.  At

0110, she had a spontaneous vaginal delivery of a healthy female infant,

Apgars 8/9, performed by Dr. Bastawaros.  Postpartum, she continued to

demonstrate persistent tachycardia.  At 0150, her pulse was 126.  At 0300,

her temperature was noted to be elevated at 101.3.  Her pulse at that time

was 117.  At 0345, her pulse was 130, with a blood pressure of 119/57.

She was administered Tylenol 975mg and Motrin 800mg for analgesia.  At

0715, her blood pressure was 96/51, with a pulse of 118 and a temperature

of 99.2.  She was evaluated by her physician and was administered Tylenol

650mg once again at 0906.  At 1023, she complained of headache,

dizziness and tachycardia.  Her physician was notified.  At 1117, her blood

pressure was 76/45, pulse 120.  At 1135, her blood pressure was 78/48,

pulse 123.  She was evaluated once again by her physician.  Additional IV

fluids were ordered.  Laboratory tests were obtained indicating leukocytosis

with a white count of 29,700, with 90% polys and 30% bands.  Her platelet

count was 163,000.  At 1200, she experienced an episode of diarrhea.  Her

blood pressure at this time was 81/53, pulse 123.  Fluids were once again

administered.  At 1220, she was evaluated by Dr. Farmer.  Blood and urine

cultures were ordered at this time.  The first set of blood cultures were

drawn at 1510.  Urinalysis indicated elevated glycosuria and urobilinogen.

Tylenol 650mg was given at 1600.  A repeat CBC at 1632, indicated a

hemoglobin of 11.5, white count of 23,000, with 94% polys.  Her platelet

count was low at 146,000.  Her blood sugar was noted to be 132mg/dl.

She was evaluated by Dr. Farmer at 1843.  Tylenol with hydrocodone was

administered for analgesia.  A differential on the CBC was reported back at

1930, indicating 50% bands and 46% polys.  At 2006, she was noted to

have a decline in her mental status, responding only to commands.  Her

blood pressure was 79/47, pulse 108 and temperature 97.6.  At 2120, her

blood pressure was 86/54, pulse 90.  Tylenol with hydrocodone and Motrin

were given.  At 2333, her blood pressure was 82/46, temperature 97.5,

pulse 113, respirations 20, oxygen saturation 99%.  She was once again

noted to have decreased mental status.  On 7/24/13 at 0305, she

complained of generalized muscle aches.  Her blood pressure at 0359 was

72/38, temperature 97.9, pulse 124, oxygen saturation 96%.  Tylenol

650mg was given.  She was evaluated by Dr. Boledovich.  Repeat CBC at

0400 indicated a drop in hemoglobin of 9.4, a white count of 12,300 with

93% polys, platelet count of 103,000 and a low bicarbonate level of 19.

She was once again administered IV fluids.  At 0500, her urine output was

noted to be low, producing only 7ml of urine in the previous 2 hours.  Her

blood pressure at 0545 was 72/52 with a pulse of 124, respirations 20 and

a declining oxygen saturation of 95%.  Her physician was notified at this

time.  Bladder catheterization provided only 7ml of bloody urine over the

previous 2 hours.  At 0619, the lab notified the practitioners of finding of

positive blood culture, consistent with gram-positive cocci in pairs and

chains.  The nurse notified Dr. Farmer and Dr. Boledovich.  At that time,

orders were to begin IV antibiotics with Cefepine and for the patient to be

transferred to the ICU at approximately 0724.  Her lab studies indicated a

Hgb of 8.8, blood gasses indicated a low P02 of 68 and a low PC02 of 28

and a low bicarb of 18.  Nursing notes indicate that the patient was

experiencing frank deterioration over several hours prior, complaining of

increasing abdominal pain, and shortness of breath.  Chest x-ray revealed

a left sided pleural effusion and left sided basilar density.  She was

administered 2U of packed red blood cells and 1U of platelets.  Lab studies

for coagulation parameters were all found to be abnormal, consistent with

disseminated intravascular coagulation.  Her lactate level was also

elevated.  Her white count at this time was 6,500.  CT of her abdomen and

pelvis revealed renal cortical necrosis, ascites, bilateral plural effusions.

There was no evidence of pulmonary embolism.  She was subsequently

intubated and maintained on ventilation.  Dilatation and curettage

procedure was performed by Dr. McCartin at 1428, due to a postpartum

hemorrhage secondary to atony.  A Backri balloon and Cytotec were also

administered to achieve hemostasis.  Pathology revealed degenerating

decidua with chronic inflammation, small fragments of endometrium and

myometrium.  The patient subsequently experienced an extraordinarily

complicated course as a result of Group A Strep septicemia.  Nephrology

consult indicated acute tubular necrosis and renal cortical necrosis.  She

also experienced pulmonary failure, metabolic acidosis.  Infectious disease

consult was consistent with septic shock due to Group A Strep septicemia.

The remainder of her patient course was complicated by hepatic dysfunction, chemical pancreatitis, acalculous cholecystitis, abnormal EEG studies, possible pituitary hemorrhage, duodenal ulcer, and progressive encephalopathy.  She ultimately survived and was discharged on 8/24/13. However, due to severe kidney damage, she required ongoing hemodialysis.  Subsequently, her course was complicated by renal hypertension, depression, anxiety, hyperlipidemia, renal hyperpara thyroidism, chronic anemia, weakness and fatigue.  She ultimately underwent a cholecystectomy procedure and eventually qualified for a renal transplant, which was performed in 2015.

## V.   GENERAL DAMAGES

### A.   Family/Personal Background.



Marites and Rafael Campano

Marites Bumanglag Campano was born in 1976 in Ilocos Norte, Philippines.  She is the youngest of eight children and has four brothers and two sisters who all still live in the Philippines with the exception of one sister who lives in Canada.  Two of Marites's sisters died in childbirth. Marites received an Associate's Degree in Computer/Secretarial Science from the Divine Word College of Laoag in Laoag City, Philippines in 1997, and a Certified Nursing Assistant certification from Healthcare Training and Career Consultants, Inc. in Honolulu in 2010.  Prior to the incident, she had

been employed as a full-time Certified Nursing Assistant at The Plaza at

Mililani, an Assisted Living/Memory Care/Respite Care facility since 2010.

Marites's husband Rafael Castro Campano was also born in 1976 in

Ilocos Norte, Philippines, exactly one month before his wife.  Rafael has

received three advanced degrees beyond high school: (1) an Associate's

Degree in Automotive Mechanics from the Mariano Marcos State University

Institute of Technology in Laoag City, Philippines in March 1996, a

Bachelor of Science in Physical Therapy from the Mariano Marcos State

University in Batac City, Ilocos Norte, Philippines in March 2001, and a

Bachelor of Science in Nursing from the Hawaii Pacific University in

December 2013.  Rafael came to Hawaii sponsored by his mother in

September 2004 and worked for a short while as a maintenance worker at

a condominium in Pearl City, then as a physical therapy assistant.  Rafael

enlisted in the U.S. Navy on 10/4/05 and currently is a Lieutenant Junior

Grade.  He is up for full Lieutenant in December 2017.  Rafael is currently

working as a Staff Registered Nurse at the Pearl Harbor Makalapa Family

Practice Clinic.

Marites and Rafael were married in 2005, but had been together

since 1997-98 and had two sons together.  Their oldest son is R.M.B.C.

R.M.B.C. is currently a senior at Mililani High School, was a star wrestler,

and has his sights on attending the U.S. Air Force Academy with aspirations to become a pilot.

Marites and Rafael's younger son is R.B.B.C., who is a sophomore at Mililani High School, is doing well in school, and plans to attend college but does not have any definite plans yet.  Both R.M.B.C. and R.B.B.C. were born in the Philippines.



The Campanos on Their Wedding Day
(L-R:  R.M.B.C., Marites, Rafael, and R.B.B.C.)

Marites and Rafael's youngest child is daughter M.R.B.C., who was born during the incident at Tripler.  She is currently three years old.



M.R.B.C., Rafael and Marites

The five Campanos all live together in their home in Mililani with Marites's mother Romana Bumanglag and Rafael's brother Paquito Campano.



The Campanos in 2014
(L-R:  Marites, R.M.B.C., M.R.B.C., R.B.B.C., Rafael)

## B.   <u>The Pregnancy With M.R.B.C. and the Birth at Tripler</u>.

Marites and Rafael got pregnant with M.R.B.C. in late 2012.

Marites's estimated due date was 7/24/13.  Her pregnancy was rated as

uncomplicated by her obstetricians, Marites reported active fetal movement

and, other than the fact that at age 37, Marites was considered of

advanced maternal age, there was no indication that there was any

problem with Marites or M.R.B.C. or that there would be any problems with

the birth.  During her last prenatal visit with her obstetrician on 7/18/13,

there were no abnormalities indicated, M.R.B.C.'s fetal heart tones and

fundal height were appropriate for her gestational age, and the pregnancy was, as predicted, completely uncomplicated.

As noted above, Marites presented to Tripler at 11:40 a.m. on 7/22/13 and was admitted to the labor and delivery ward.  Because M.R.B.C.'s fetal heart tones had become non-reassuring, Marites's physicians decided to induce labor.  Within hours of arrival, Marites was noted to be clammy and pale.  Shortly after, she began having intermittent episodes of hypotensive low blood pressure (e.g. 99/51, 88/58) and an elevated tachycardic heart rate in the 120s with recurrent spikes up to the 150s.  Late in the evening of 7/22/13, Marites's nurse noted that:

> Patient reports feeling "heart racing and it is going to come out of my chest."  Pulse oximetry check, heart rate up to 150s with resolution to 70-80s.  Recurrent spikes in heart rate.

The nurse pushed the call light and Marites was assessed by the obstetrics resident and the CRNA.  Marites was given multiple fluid boluses and an IV at 125 cc/hr, but no improvement in her symptoms was noted.

M.R.B.C. was born at 1:10 a.m. on 7/23/13.  Marites was transferred to the postpartum unit and had repeated and increasing episodes of hypotension and tachycardia.  As noted above, Marites's clinical picture was increasingly and obviously one of a very sick woman headed for

sepsis and septic shock, and her medical management was a textbook

example in aggravatingly repeated incompetence.

**C.** **Marites's Horrendous Septic Course at Tripler.**

**1.** **Marites's Condition Founders in Waves of Pain and Increasing Deterioration on the Post-Partum Unit.**

Marites's course at Tripler was not only characterized by aggravated

medical error, it was one of extended pain and distress.  From shortly after

the birth, Marites was in a great deal of pain related to her increasingly

septic condition and the concomitant organ damage and failure she was

experiencing as the infection worsened and spread through her body.

Marites's medical chart is rent with entries regarding Marites's pain and the

measures taken to attempt to alleviate that pain:

| 07/23/13 0227 | OB/GYN Order (Nancy Bastawros, MD): #00196 - Ibuprofen 800 mg 0600/1400/2200 qd prn (for L&D only) – q8h prn, **pain not relieved by Tylenol prn q8**. *(cancelled 7/23/13 @0438)* --(for L&D only)  **q4h prn pain** and/or temp 100.4 or greater prn q4h) --(for PostPartum Unit only – **prn pain/fever prn q4h**) | TAMC2 5503 |
| 07/23/13 0300 | Medication Admin Rcd: 20u oxytocin 0.02u/ml IVB by LMM (*Lynnette Murray, RN*) **Pain 4/10N, abd, intermittent.  Positioning, analgesic, no improvement**. | TAMC2 3232 |
| 07/23/13 0345 | Medication Admin Rcd: **Tylenol 975 mg STAT by LMM, Motrin 800 mg by LMM** (*notation that "for L&D Only – **q8h prn pain not relieved by Tylenol**"*) | TAMC2 3233 |

| | | |
|---|---|---|
| 07/23/13<br>0350 am | Order:  J. Terpenning, CNM [cert. nurse midwife]<br>**Tylenol  975 mg po x 1** | TAMC2<br>3200<br>TAMC<br>1419 |
| 07/23/13<br>0415 | Medication Admin Rcd:<br>**Pain 3/10N, abd, intermittent**.  Positioning.  Effective. | TAMC2<br>3233 |
| 07/23/13<br>0520 | Medical Admin Rcd:<br>**Pain 3/10N, abd, intermittent.**  Warm/cold packs, quiet<br>environment.  Effective. | TAMC2<br>3233 |
| 07/23/13<br>0730 | Medication Admin Rcd:<br>**Pain 5/10N, abd, intermittent.**  Warm/cold packs, quiet<br>environment.  Effective. | TAMC2<br>3233 |
| 07/23/13 | Flowsheet:<br>7:30 am  <u>96/51, pulse 118, T 99.2°</u>, resp 20, 02 sat 99%.<br>7:38 am  Provider @bedside.<br>7:45 am  IV bolus 500 cc LR started.<br>8:15 am  Bolus complete.<br>8:25 am  Pt up to void w/hubby assist.<br>**9:06 am  Pain assmt, 6/10.** | TAMC2<br>3682-<br>3684,<br>3841,5<br>060<br>TAMC<br>2060 |
| 07/23/13<br>0906 | Nurse's Annotation (April Williams, RN):<br>**Given Tylenol 650 mg po at this time.** | TAMC2<br>4470<br>TAMC<br>1118 |
| 07/23/13<br>0906 | Medication Admin Rcd:<br>**Tylenol 650 mg**, Colace 100 mg, by AKW (*April K. Williams,<br>RN).*<br>**Pain 6/10N**, perineum, constant.  Warm/cold packs. | TAMC2<br>3233 |
| 07/23/13<br>1000 | Flowsheet:<br>**Pain re-assmt, 3/10.** | TAMC2<br>3684,<br>3841<br>TAMC<br>2060 |
| 07/23/13<br>1335 | Order (Nancy Bastawros, MD) –<br>#07186-**(Ibuprofen 800 mg) prn pain**/fever prn q4 – entered<br>by pharmacist Brainard Ordonez (for PostPartum Unit only).<br>#07196-**Ibuprofen 800 mg 0600/1400/2200** qd prn x15 days<br>starting 7/23/13 - entered by pharm Brainard Ordonez – (for<br>PostPartum Unit only) – **pain prn q8.** | TAMC2<br>5506-<br>5507 |

| 07/23/13 1340 | Medication Admin Rcd:<br>**Motrin 800 mg** by YCO (Yumi Okazaki, RN).  **Pain 6/10N**, uterine cramping, intermittent. | TAMC2 3234 |
|---|---|---|
| 07/23/13 | Flowsheet:<br>**1:40 pm  Pain 6/10**, intermittent uterine cramping.  Analgesia.<br>**2:40 pm  Pain 3/10**, intermittent uterine cramping.  Warm/cold packs. | TAMC2 3234, 3685 TAMC 2061 |
| 07/23/13 1800 | #11422 – OB/GYN Order by Dr. M. Boledovich for **Roxicet 5/325 mg x1 for 1 day, starting 7/23/13.  (**contains acetaminophen – do not exceed 4g/day in adult)**. | TAMC2 5508 |
| 07/23/13 1900 | MD Order: (M. Boledovich, DO)<br>**Oxycodone/apap (Roxicet) 5 mg/325 mg [contains Tylenol]** | TAMC2 3200 TAMC 1419 |
| 07/23/13 2006 | Nurse's Annotation (Christoher Evans, Medic):<br>*(Pain) 5/10 N, nurse notified.* | TAMC2 4474 |
| 07/23/13 **2006** | Flowsheet: (Christopher Evans, Medic):<br>**BP 79/47, T 97.6°, HR 108**, R 18, 02sat 98%.  Sedation score 3 [easy arousable, responds to commands only]**, pain 5/10 aching**, uterine cramping intermittent.  Repositioned.  RN notified. | TAMC2 3687,4 474 TAMC 2063, 1122 |
| 07/23/13 2006 | Medication Admin Rcd:<br>**Pain 5/10N**, uterine cramping, aching, intermittent.<br>Positioning. (Christopher Evans, Medic; Jury Gallardo, RN) | TAMC2 3235 |
| 07/23/13 **2020** | Medication Admin Rcd:<br>**Pain Tolerable.  K-Dur 20 meq** – by J. Gallardo, RN | TAMC2 3235 |
| 07/23/13 | Nurse's Note (Jury Gallardo, RN):<br>8:20 pm  HR 100, PR-90 RRR.<br>9:20 pm  **Pain 6/10** perineum/uterine cramping, intermittent. **Analgesia**.<br>9:36 pm  86/54  manual BP. HR 90, sedation 2 [cooperative, oriented, tranquil] | TAMC2 3844-3845 4474-4475 TAMC 2064, 1122 |

| 07/23/13 2120 | Medication Admin Rcd (Jury Gallardo, RN): **Roxicet 5 mg/325 mg x1** by JJG. **Pain 6/10N**, perineum/uterine cramping, aching, intermittent. **Analgesia**. Note: Contains acetaminophen. Do not exceed 4g acetaminophen per day. | TAMC2 3236 |
|---|---|---|
| 07/23/13 2220 | Medication Admin Rcd (Jury Gallardo, RN): **Pain Tolerable**, uterine cramping, aching, intermittent. Warm/cold packs. | TAMC2 3236 |
| 07/23/13 2245 | Medication Admin Rcd (Jury Gallardo, RN): Motrin 800 mg by JJG. **Pain 7/10N**, uterine cramping, aching, intermittent. Warm/cold packs, analgesic. | TAMC2 3237 |
| 07/23/13 2335 | Nurse's Annotation (Christopher Evans, Medic): *(Pain)* **7/10N**, nurse notified. | TAMC2 4475 |
| 07/23/13 2335 | Medication Admin Rcd (Jury Gallardo, RN): **Pain 7/10N**, uterine cramping, **aching, constant**. Intervention: "brp." | TAMC2 3237 |
| 07/23/13 | Flowsheet: (Christopher Evans, Medic): 10:20 pm  Breastfeeding. **Intermittent uterine cramping**. Warm/cold packs. IV: LR @125 cc/hr. Urine output 250cc.  10:45 pm. **Pain 7/10**, intermittent uterine cramping. Warm/cold packs, analgesia.  11:35 pm  BP 82/46, T 97.5°, HR 113, R 20, SaO2 99. Cooperative. **Pain 7/10**, cont cramping. Nurse notified. Urine output 250cc.  11:45 pm  **Pain 7/10,** cont uterine cramping. Warm/cold packs. Arousable, sedation score 3. | TAMC2 3688, 4475  TAMC 2064-2065; 2507, 1123 |
| 07/23/13 2345 | Medication Admin Rcd (Jury Gallardo, RN): **Pain 7/10 FL**, uterine cramping, **aching, constant**. Warm/cold packs. | TAMC2 3237, 4618 |
| | **07/24/13** | |
| 07/24/13 0045/ 0125/ | Medication Admin Rcd (JJG): **Pain intolerable, same location, quality, duration**. Warm/cold packs. | TAMC2 3238,4 618 |

| | | |
|---|---|---|
| Wed<br>07/24/13 | Flowsheet:<br>12:45 am  Warm/cold packs.<br>1:00 am  Saline – locked.<br>**1:25 am  Pain acceptable.**<br>**2:00 am  BRP. Pain tolerable**.<br>3:05 am  General muscle aches, intermittent.  Analgesia. Wgt:<br>61.6 kg<br>Urine output: 0000-0200 = 150+ cc. (50/100/+one BR) | TAMC2<br>3689,4<br>618<br>TAMC<br>2065-<br>2066<br>1908-<br>09 |
| 07/24/13<br>0305 | Medication Admin Rcd (Jury Gallardo,  RN):<br>**Tylenol 650 mg** by JJG.  **Pain intolerable**, gen muscle<br>aches, aching, intermittent.  Analgesic. | TAMC2<br>3238 |
| 07/24/13<br>0359 | Medic Annotation (Christopher Evans, Medic):<br>72, nurse notified.  *(Pain)* **6/10N**, nurse notified. | TAMC2<br>4475,4<br>619 |
| 07/24/13<br>0359 | Medication Admin Rcd:<br>**Pain 6/10N** (CSE) | TAMC2<br>3238 |
| 07/24/13<br>0359 | Flowsheet:<br>BP 72/38, HR 124, R 18, T 97.9.  **Pain 6/10N**. | TAMC2<br>3689,4<br>619 |
| 07/24/13<br>3:59 am | Medic Note (Christopher Evans, Medic):<br>BP 72/38, T 97.9°, HR 124, R 18, SaO2 96.  Nurse notified<br>BP sys 72.  **Pain 6/10**, nurse notified. | TAMC2<br>3689,4<br>475<br>TAMC<br>1123 |
| 07/24/13 | Flowsheet:<br>0515:  Bolus completed.  BP 84/60.<br>0525:  Amb to BR/att to void.  **Pain 3/10**, intermittent.  Uterus<br>firm, fundus loc U, lochia SC, laceration Ø. | TAMC2<br>3690,4<br>619 |
| 07/24/13<br>0525 | Medication Admin Rcd (Jury Gallardo, RN):<br>**Pain Intolerable** (JJG). | TAMC2<br>3238 |

Marites testified in her own words during her deposition regarding her

pleas for help to the Tripler staff regarding her pain:

> Q.   Okay.  Do you remember if Mr. Campano had to help you
> use the bathroom?

> A.   (Shaking head.)

Q.   You can't shake your head.  You have to answer verbally.

A.   I couldn't remember.  **The only thing I remember is I keep telling that I'm in pain**, I was bleeding, and --

Q.   And this was how long after you delivered?

A.   Like, 10:00 in the morning.  No, no, no.  Like, 7:00, 6:00 -- 7:00, 6:00 in the morning I'm telling them.

Q.   Okay.  Do you remember who you told?

A.   The nurse, but I don't know the name.

Q.   Okay.

A.   But around -- around 12:00 in the afternoon, one of the aide -- or I don't know if aide or nurse.  A black, I'm sorry, a black lady, **I told them I was in pain, totally pain**, and she told me that "I'm worried about your blood pressure.  Your blood pressure went down." And then after that I keep telling them that I'm in pain.

Q.   Okay.  So going back to 3:45 a.m. the morning of the 23rd, do you remember getting Motrin or Tylenol a couple hours after you delivered?

A.   I couldn't remember.

Q.   Okay.  **But you remember you were in pain?**

A.   **Yes.**

Q.   **And you were in pain from the time you  delivered until the time you were just talking about now, which was 7:00 --**

A.   **Yes.**

Q.   **-- in the morning?**

A.   **Uh-huh.**

Q.   **And you told this to the nurses?**

A.   **Yes.**

Q.   Did any doctors come see you?

MR. THOMAS:  You want to be more specific as to time?

MR. YEE:  Between 3:00 a.m. and 7:00 a.m.

A.   There's a lot of doctors, nurses around me at 3:45.

BY MR. YEE:
   Q.   **Okay.  Do you remember telling any of the doctors you were in pain?**

A.   **Yes.**

Q.   Did they do anything?

A.   I forgot.

Q.   Did they give you pain medication?

A.   I don't know if that's pain medication.  I don't know.  I forgot.

Q.   **Do you remember taking some kind of medication?**

A.   **Of course.**

Q.   **But that didn't help?**

A.   **No.**

Q.   Do you remember sleeping at all after you delivered --

A.   How can I --

Q.   -- at 1:00 a.m. until --

A.   **How can I sleep?  I'm in pain.  Super pain**.

Q.   So your answer is you did not sleep at all?

MR. THOMAS:  I don't think we ever established a time frame. You said after 1:00 a.m., but we're talking about at least two days. So I think you need to clarify and be a little bit more specific.

MR. YEE:  Okay.

BY MR. YEE:
Q.   So from 1:00 a.m. to 7:00 a.m. on the morning of the 23rd do you recall sleeping at all?

A.   I don't know.

Q.   Was Mr. Campano there the whole time?

A.   Yes.

Q.   Did he say anything?  **Did you tell him that you were in pain?**

A.   **Yes**.

Q.   And did he say anything to the nurses or doctors?

A.   **Yes.  He keeps reminding them, telling that I'm in pain**.

Q.   And Mr. Campano is a nurse, right?

A.   He's not certified yet as a nurse.

Q.   So how many times do you think you told --

A.   A couple times.  A lot.  Every time they check on me or -- I mean, I'm --  **I asked my husband to call the nurse, telling them I'm in pain**.

Q.   And you specifically called the nurse to tell the nurse that you were in pain?

A.   Yes.

Q.   You remember that?  You remember that?

A.   I'm sorry?

Q.   You remember specifically calling the nurse?

A.   No.  My husband.

Q.   Okay.

A.   **I talk to my husband, "Can you tell them that I'm in pain?**"

Q.   Okay.  And --

A.   -- have fever at around noon on the 23rd.

Q.   **What happened at noon on the 23rd?**

A.   **I was having pain, fever, bleeding.**

Q.   This is noon on the 23rd, and you told Mr. Campano to call the nurse?

A.   Uh-huh.

Q.   Before noon on the 23rd, do you remember the nurses coming in and taking your blood pressure, taking your temperature?

A.   **Every time they check me, I keep telling them I'm in pain.**

. . . .

Q.   Okay.  Do you remember if that doctor asked to have urine samples?

A.   I don't know.  **I can't focus on that time, because I was in pain**.

Q.   Okay.  And did that doctor give you anything for the pain?

A.   I don't know.  **The only thing I remember is when the -- they changed the shift, the 7:00 to, I don't know, around between 8:00 to 10:30 I was crying, telling them that I was in pain.  I got a hard time to go to the bathroom, and I couldn't sleep.**  My husband doesn't have sleep too.  But one nurse came to our -- because I was crying, and one nurse came to our -- to our room. She's trying to help us to take a nap and take a rest.  She took our baby.  I don't know how long.

**Then my husband taking rest, sleeping, and trying to take a nap, but I can't.  I'm trying to go to the bathroom, and I made it, but the pain is too -- I pulled the cord, and one of the nurses came and helped me, and I'm telling them, "I can't pee.  I got -- I get hard time to pee."**

Marites (Exhibit "4") at 46:17 - 51:02; 55:06 - 56:05 (emphasis added).  As noted by Marites, because her kidneys were failing, she was not producing urine.  She was therefore catheterized at least eight times to drain her bladder with a straight catheter during the two-day period she languished on the post-partum ward, an extremely uncomfortable procedure.

**2.    The Intervention by the Rapid Response Team and the Ridiculously Belated Escalation of Marites's Level of Care.**

By 5:45 a.m. in the morning on 7/23/13, the Tripler Rapid Response Team had independently taken notice of Marites's desperate condition

even despite the incompetence of the nursing and OB/GYN care teams in their failure to activate the Rapid Response Team.  By the time the Rapid Response Team had intervened on Marites's behalf, Marites had been in essentially constant pain for nearly 48 hours and her condition had deteriorated into full-blown sepsis.  She required immediate escalation of care and acute intervention.  However, administrative and political red tape delayed Marites's admission to the intensive care unit (ICU) for another two hours.  By the time she was finally admitted to the ICU, Marites's blood tests indicated she was in metabolic acidosis with accompanying compensatory respiratory alkalosis, indicating that Marites's kidneys were already damaged and not removing enough acid from her bloodstream; this caused her respiratory rate to increase to try to compensate for the increased acidosis which in turn led to a decreased level of carbon dioxide in her bloodstream.  The Rapid Response Team note details Marites's critical condition:

**Rapid Response Team Call Rcd (Sophia Sewell, RN/CCNS)**:

10:20 a.m. stored, 9:17 a.m. note timed.
**Time of call 5:45 a.m., arrival 5:53 a.m.  No RRT call initiated. Call from staff, noticed pt required incr'ing O2 demand between 4-6L NC, sats 93-95%.  Pt stated SOB, difficult time breathing. HR has been ranging between 120s-128s**.

At time of arrival:  RR 29, SpO2 95% on O2 2L NC.  A&Ox3/lethargic.
Monitor rhythm sinus tachy.  HR 128, BP 82/45.  IV access 18g L
wrist pre-existing, placed by RRT.  IVF 2000 ml LR & NS.

RRT Problem ID:  Tachycardia, hypotension, tachypnea, sepsis
protocol.

Interventions:  O2 4-6L/min NC, NRBM 15L/min.
Diagnostics:  DCG, ABG.

Summary of Response:
Pt post partum vaginal delivery Day #1 – arrived to 5B2 at 07:30 on
7/23/13, having systolic blood pressures **(SBPs) ranging between
72-88, and HR between 108-124 w/no RRT notification.**  At 05:45,
called 5B2 to ask for updates re any concern and RN Cody stated
that pt has been having hypotension w/latest being 82/60 manual cuff
at 05:15.  Asked to speak w/RN in charge of pt.

RN Gallardo stated **pt has been having SBP ranging between
72-86 throughout evening shift.  RN Gallardo stated that OB
team was notified re pt's hypotension and tachycardia and they
were made aware.  However, RRT call was never initiated
throughout the night shift nor yesterday's shift re pt's status**.

Assessment:
Arrived at 5B2 at 0553 w/BP 82/55, HR 120, RR 29, SpO2 93-95 on
2L NC.  A&O x3 but lethargic and states she has been having
intermittent episodes of HAs and feeling lightheaded/dizzy every time
she gets OOBTC or going to the BR.  Pulses palpable throughout,
and able to move all extrems.  As time progressed, pt contd to
become more tachypneic w/RR ranging 20-30s, and c/o difficulty
breathing.  Pt placed on 6L NC, sats between 93-96%.  Lungs were
clear and diminished at bases.  No signs of crackles, congestion or
coarse sounds detected.

Conts to be tachycardic w/HR ranging between 115-130s.  SBP
ranging 80s-90s, w/MAPs 55-63.  Pt given 1L bolus LR at 0515 and
another 1L bolus NS at 0600 w/min effect re raise SBP 88-90, bu
tachycardia still present between 120-130.

OB MD Boledovich performed vaginal exam.  Pt w/distended soft abd, BS hyperactive.  Pt having min bloody disch soaking peripad.  OB and RRT nurse notified MD Boledovich about saturated pad.  Pt conts to be hypotensive and tachycardic in spite of 2L fluid bolus.

Also, pain conts to increase around abdominal region per pt, and she continues to remain tachypneic.

Recommended to OB team if we could transfer pt to higher level of care to have closer monitoring of pt.  Pt transferred to Progressive Care Unit at 0700.

Shortly during transfer from 5B2 to PCU, pt started to c/o incrd SOB and difficulty breathing.  Incrd O2 requirement from 4 to 6L, w/pt saturating between 93-96%.  MD Boledovich stated pt should go to ICU instead.  Asked if OB team could first talk to ICU team prior to pt transferring to ICU.  Stated that RRT would monitor pt in PCU for time being until transfer to ICU would take place.

Pt arrived in PCU at 0705 w/BP 93/61, HR 120, RR 28, SpO2 95% on 6L NC.  ABG drawn w/metabolic acidosis w/compensatory resp alkalosis w/pH 7.425, CO2 27.7, PO2 68, BE -6, HCO3 18.1, SO2 94% on 4L NC.  Foley and EKG completed.

ICU and OB teams later reassessed pt and started prep for ICU transfer.  At 0750, due to pt c/o difficulty breathing and becoming more lethargic, pt placed on 15L NRB during transfer.  At 0755, pt transferred to ICU.

Pt transferred from PCU to ICU.  **Educated nursing staff of 5B2 that regardless of notifying OB MD of pt's unstable status, an RRT call must always be placed if they fit RRT parameters**.  Will cont to monitor and follow RRT parameters.

BP 93/60, HR 120, RR 32, SpO2 100% on 15L NRB.  A&O x3/lethargic.

TAMC 3477-3479 (emphasis added).

### 3.   The Extended and Excruciating ICU Course.

Because of her inability to breathe normally, Marites was also

intubated after she got to the ICU.

| 07/24/13 2008-2015 | Dr's Note (Christopher Squires, DO): Late entry.  Eval'd pt in ICU around 1200 on 7/24, pt on NRM for O2 and contd to have vaginal bldg, bed sheets w/blood, had just been changed.  Talked to pt who **stated she was not feeling well and her abd hurt a lot.  Upon exam, abd very distended and taut, min blood on new chux that had been placed.** **Discussed pt's cond w/ICU team and they were concerned it was worsening and pt may need to be intubated at some point.**  At that time, pt was receiving blood products. Discussed w/ICU team, plan to take pt to OR for D&C vs. exp laparotomy w/possible hysterectomy.  **They felt she was stable enough for surgery at that time although there was concern that she was in DIC.  Started paperwork to proceed to OR to incl consent forms.  However, when I returned, pt was being intubated due to worsening resp distress, so consent was obtained through her husband, and final preps made to take pt to OR.** | TAMC 3604 |

In the afternoon of 7/24/13, the OB/GYN team had a concern for

vaginal bleeding and it was decided that Marites should undergo a dilation

and curettage ("D&C") procedure where the internal lining of Marites's

uterus is physically scraped with a sharp curet bladed tool to ensure that no

sources of bleeding (and infection) were present in Marites's uterus.  At

7:26 p.m., Drs. McCartin and Patzwald took Marites to the operating room

and performed the D&C procedure, but did not identify any sources of

bleeding or infection.  However, both Dr. Patzwald and Dr. McCartin

specifically noted Marites's critical condition:

| 07/24/13 1926-1929 | Post-Op Note (Jason Patzwald, D.O.) S/p sharp/suction curettage.  **Acute renal failure and DIC presumed to be secondary to sepsis.**  Pt currently sedated & intubated.  VSS, abd firm & distended, uterus at U.  Bakri balloon output 50 cc since end of surgery. Plan:  routine ICU care.  Pt currently under care of ICU team. | TAMC 3599 |
|---|---|---|
| 07/24/13 1505-1934 | OB/GYN Brief Op Note (Tamarin McCartin/Jason Patzwald, DO): Pre-Op Dx:  Retained products of conception. Post-Op Dx:  SAA Operation:  Uterine curettage, placement of Bakri balloon. Indwelling foley catheter. **Condition:  Critical.** | TAMC 3581-3582 |

During the D&C procedure, Drs. Patzwald and McCartin also

consulted with gynecologic oncologist Dr. Whitcomb who came to the

operating room to assess Marites's uterine bleeding as well.

Dr. Whitcomb's evaluation of Marites's condition was similarly grim:

| 07/24/13 1536-1655 | GYN Oncology Intra-Op Consult (Bradford Whitcomb, MD): 37 y/o G4P3 s/p SVD ~36 hrs ago w/persistent tachycardia, hypotension, tachypnea, oliguria/anuria this a.m., transferred to ICU, intubated, started last night on broad spectrum abxs. + blood culture w/GPC.  Pt w/uterine bldg and taken to OR this afternoon for EUA of vagina/cervix and D&C which revealed mod bldg, possible sm amt placental tissue/membranes.  Uterine tone improved and Bakri balloon placed per Dr. McCartin w/diminished bldg. | TAMC 3583 |

| | **Pt also in DIC.**  I was called to eval w/Dr. McCartin and assisted w/visualization of cervix and performed bimanual exam.  Uterine fundus firm at U+1.  Cervix and vagina w/no lacerations bldg.  **Recommended trying to avoid exploratory abd surgery if at all possible due to pt's coagulopathy and apparent overwhelming sepsis.  She is also in renal failure (Acute Tubular Necrosis (ATN) likely secondary to hypotension from blood loss and septic shock).  Recommend ICU care w/replacement of blood products/vent mgmt/Nephro eval and close observation for further hemorrhage.**  IV abx, SCDs, serial labs. | |

As noted by her surgeons, Marites's condition was also complicated by disseminated intravascular coagulation ("DIC"), a critical condition caused by her septic infection where her body's ability to regulate the coagulation of its blood is disrupted and both bleeding and clotting can occur uncontrolled at any time or at the same time.  This is not only an obviously life-threatening condition that is difficult to treat, its presence is also a clear indication that Marites had been septic for quite some time for her condition to progress to DIC.

During the night of 7/24/13, Marites was evaluated by nephrologist Dr. Das, who concluded that Marites had suffered permanent and irreversible kidney damage as a result of the sepsis and the prognosis for Marites to regain independent renal function was "very grim."  He ordered that Marites be placed on continuous renal replacement therapy ("CRRT"), or kidney dialysis.  Dr. Das noted:

| | | |
|---|---|---|
| **07/25/13**<br>1632 | Nephrology Note (Nealanjon Das, MD):<br><br>4:32 pm Initial note – delayed entry.  Pt seen & examined last night, Chart reviewed and discussed w/Dr. Bacomo prior to initiation of CRRT last night.<br><br>37 y/o s/p IOL and SVD on 7/23 for AMA and NRFHT who developed fever, tachycardia, postural HTN, hypotension, anuria, tachypnea, hypoxia, leukocytosis and abd pain in 24 hr period ~12 hrs post-partum. [~1pm 7/23/14]<br><br>**Prolonged PT/PTT, thrombocytopenia, elevated D-dimer and hypofibrinoginemia suggested DIC, either from sepsis (early gram+ coccemia present) or less likely post-partum hemorrhage.**  Given lge volume isotonic fluid resuscitation, broad-spectrum IV abxs.  IV-contrast enhanced CT of chest, abd and pelvis w/no abscess or PE, and no bilat renal cortical contrast enhancement.<br><br>Intubated yesterday afternoon for hypoxemic resp failure due to pulmonary edema, transfused PRBCs, FFP and plts, and taken to OR for D&C for retained intrauterine products of conception, but no major obstetrical hemorrhage.<br>CRRT initiated last night for refractory hypervolemia and severe metabolic acidosis.<br><br>**Clinical picture of DIC in setting of no significant OB hemorrhage, but SIRS, gram+ coccemia, and absent bilat renal cortical contrast enhancement consistent w/bilat renal cortical necrosis due to combined factors of DIC and hypotension/ischemia originating from septic shock.**<br><br>**Blood cultures now + for GAS, and overall picture is Toxic Shock Syndrome and puerperal sepsis.**<br><br>Initiation of CRRT is appropriate for indications given.<br>**Prognosis for recovery of dialysis-indep renal function is very grim given the generalized cortical necrosis on imaging, hypotensive/microangio-thrombotic insult, and addl iatrogenic IV contrast insult.** | TAMC2<br>2993-<br>2999<br><br>TAMC<br>454 |

| | Impression:<br>  o **Puerperal sepsis w/Grp A Strep Toxic Shock Syndrome.**<br>  o **Anuric AKI (KDIGO Stage 3), due to DIC-asso. renal cortical necrosis (definite), ischemic ATN (likely), iatrogenic IV contrast nephropathy (likely).**<br>  o **Metabolic acidosis.**<br>  o **Acute Respiratory Distress Syndrome w/vent-dependent hypoxemic resp failure.**<br><br>Recommendations:<br>  o Agree w/CRRT and target UF of -1L/24h.<br>  o Renally dose meds for CRRT.<br>  o **Renal Prognosis guarded; best supportive care, avoid usual nephrotoxins** | |

An Infectious Disease consult confirmed that Marites's sepsis was

related to a festering group A strep infection leading to bacteremia, Toxic

Shock Syndrome, and puerperal sepsis:

| 07/25/13<br>1706 | Infectious Disease Consult Note (Terry Shin/Gunther Hsue, MD):<br>Pt intubated and sedated.  37 y/o **presented to ICU in septic shock. Approx 15 hrs [~4pm 7/23/14] after uncomplicated SVD, developed symptomatic hypotension w/BP in 70s/50s w/complaints of lightheadedness, tachycardia and tachypnea.**  Given bolus 2L on ward w/o improvement.  CBC noteable for leukocytosis 29.7 and febrile episode day earlier.  Blood cultures + for gram+ cocci.  Transferred to ICU for severe sepsis and started on Vanco/Zosyn.<br><br>During monitoring in ICU, developed incr resp distress and underwent RSI w/ET placement.  Hgb downtrended from 11.5 to 9.4 and labs consistent w/DIC suspected from sepsis or retained products of conception.  Given PRBCs, FFP and plts. | TAMC2<br>2999-<br>3001<br><br>TAMC<br>460-462 |

Subsequently taken to OR and underwent D&C.  TTE performed, unremarkable for gross valvular abnls.  **CT abd/pelvis noteable for bilat cortical necrosis suspected from profound circulatory shock.  Nephrology consulted and initiated CRRT for acute oliguric renal failure.  Pt w/persistent hypotension that required norepinephrine and vasopression for hemodynamic support.**

PMH rheumatic heart dz at age 15 y/o.
No ETOH, tobacco.

Cultures/Studies:
- o  7/1/13 – Vag/rect – Grp B strep neg.
- o  7/23/13 – UA culture neg.
- o  **7/23/13 – Blood culture 4/4 + Grp A strep.**
- o  7/23/13 – UA culture – no growth.
- o  **7/23/13 – L/R hand – Grp A strep 2.2 bottles.**
- o  7/24/13 – Blood cultures x2 – pending.
- o  7/25/13 - WBC 42.8 [11:15am], Vanco 42, creat 1.75, lactate 5.2, HCO3 17.

7/24/13 TTE – Nl valve morphology and fxn, no evid of rheumatic heart dz.

**7/24/13 CT abd/pelvis** –
- o  **Kidneys w/irregular contrast enhancement w/no evid of contrast excretion on renal delay series. Finding highly suspicious for renal cortical necrosis.  Nephrology consult recommended.**
- o  No evid of active intra-abd bleeding, as queried.
- o  Simple-appearing ascites and bilat pleural effusions.
- o  Nl post-partum appearance of uterus.

7/24/13 CT angio – No pulmonary embolism.  Bilat small layering pleural effusions w/asso. compressive atelectasis.

Impression:
- o  **Group A strep bacteremia.**
  **Group A strep Toxic Shock Syndrome secondary to Group A strep bacteremia.**
  **Puerpural sepsis.**

Discussion:

37 y/o presents w/**acute onset Group A Strep Toxic Shock Syndrome (GAS TSS).**  Pt meets definitive case criteria for GAS TSS per Working Group on Severe Strep infx guidelines w/isolation of GAS in blood culture, severe hypotension, renal failure requiring CRRT, resp failure req intubation, and coagulopathy (DIC).

No evid of skin/soft tissue necrotizing infx.  Exact source of entry of GAS in pt unknown at this time, but possible portals of entry incl skin, throat and vaginal areas.

Pt covered for GAS infx w/Zosyn and Vanco but based on GAS bacteremia w/overwhelming sepsis, will plan to narrow coverage to specifically target and limit toxin production w/PCN and Clindamycin, respectively.

Recommendations:
- o  D/c Vanco and Zosyn.
- o  Initiate Clindamycin 900 mg IV q8h.
- o  Initiate PCN 12 ml U cont infusion x24h.
- o  Repeat BCx x2 in am

Pt does not have any med allergies**.**

Addendum by Dr. Hsue:

Pt seen and examined, chart, labs, cultures, imaging studies reviewed and case discussed w/house staff as well as ICU team and OB attending.  Concur w/assmt/recommendations outlined.

Pt w/**Grp A Strep bacteremia w/severe/aggressive septic clinical course requiring ICU level life support.  Plan to tailor her abx therapy to address her GAS bacteremia and toxin suppression.**  Will cont to follow closely.

Marites continued to have a difficult and critical course in the ICU.

She was heavily sedated due to the intubation and her condition was dire.

She had an abnormal heart rhythm, her lungs were compromised by the infection, and her mental status was agitated and disoriented.  On 7/27/13, in a fit of disorientation, Marites pulled her endotracheal tube out by herself and was put on oxygen by mask.

Her laboratory and radiology studies were persistently abnormal, a testament to the severity of her infection and overall critical condition.  Of notable concern was her respiratory and kidney function.  She was on full dialysis, and her mental/cognitive function was compromised:

| 07/29/13 1200-1456 | Nursing Note (M. Adams, LPN) **Pt remains slightly obtunded, intermittently answers yes/no questions by shaking head no, but makes no attempt to verbalize thoughts, pain, etc**. Cont. on BiPAP. RR remains in 30−low 40s and oxygenation remains >92%. . . .Pt's abd became a bit firmer- bladder pressure 11. MDs made aware of bladder pressure and abd firmness, no intervention done. Presently, abd is soft again, still round and slightly distended. Lasix 80mg was administered at 1000, minimal urine output noted.  Pt remains in sinus tach with HR 110−120s; at times jumping up into 130s. … husband at bedside. | TAMC2 2557  TAMC 18 |
| --- | --- | --- |
| 07/29/13 | ICU Progress Note (L. Gordon, DO) POD 5 from D&C **in septic shock. She self extubated two days ago and has remained off the ventilator over the last 24 hours. Maintained sat on O2 mask until this morning when she became more tachypneic and was noted to have increased work of breathing. Placed on CPAP then to BiPAP. She has had a gradual decline in mental status since yesterday afternoon.** CT of the head negative. Bilirubin incr. since yesterday along with incr. jaundice. | TAMC2 2557-2560  TAMC 18-21 |

Acute Problem List:
- **Hypoxic Respiratory Failure**
−**Circulatory Shock s/t toxic shock**
−**Acute Kidney Failure**
−**Septic Shock**

Assessment
−Neuro/Psych/Pain: **Decline in mental status since yesterday afternoon. She has been more confused and less responsive to stimulation. She is awake and seemingly alert, but cannot determine orientation. She has received her PRN pain and sedation meds twice overnight, and while they seem to calm her agitation, she has not slept in several days.** −Fentanyl 50mcg PRN q2hr for pain control.

−Respiratory: **Self extubated yesterday and remains off the ventilator. Incr tachypnea early this morning and placed on CPAP. She cont'd to be tachypneic with incr work of breathing and was quickly transitioned to Bipap. Maintaining sats on Bipap though continues to be tachypneic into the 40s−50s.** Blood gases show a respiratory alkalosis, improving

−Continue to monitor blood gases and assess need for reintubation

−CV: Tachycardic with reg rhythm. Elevated BPs into the 150s systolic.

−GI/Nut/Met/Endo: Pt is NPO at this time until mentation improves. Liver enzymes beginning to trend down with incr. bili. Abdomen remains soft, nontender with incr. distention today. Pt has worsening jaundice today.

-Will place NG tube and start pt on tube feedings and oral meds

−Renal/Fluids/Elect: **Pt is in acute renal failure s/t toxic shock. No urine output today. On continuous renal**

| | | |
|---|---|---|
| | **replacement therapy. CT abd/pelvis showed renal cortical necrosis.  Cont. renal replacement therapy**<br><br>−Hem/Coag: Pt has mild anemia. WBC down to 33 from 42.8 yesterday. PT/PTT elevated but stable. Platelets stable from yesterday.<br><br>−ID: **Pt in septic shock from group A strep toxemia causing respiratory failure, circulatory shock, and acute kidney injury.** WBC trending down. Cont Abx.<br><br>−Continue to follow ID recommendations, perhaps can d/c Clinda in a few days.<br><br>ATTENDING ADDENDUM (E. Osborn, MD)<br>**Shock improved but renal, respiratory, coagulation, liver dysfunction still present. Intubated today after a prolonged trial of high level support on BIPAP and 2L of fluid removal on CRRT.  Etiology of respiratory failure uncertain; temporal relation to blood transfusion suggestive of TRALI in absence of clinical signs of infection and improving chest x-ray this morning.  CXR after intubation w/bilat fluffy infiltrates that did not improve w/fluid removal.**<br><br>Pt to rest overnight, low volume low pressure vent, cont fluid removal, start renal tube feeds, wake in a.m. for sedation holiday.  RUQ US did not reveal any liver problem.  Consider bronch vs. chest CT tomorrow. | |

Marites's respiratory compromise did not tolerate her self-extubation, and her oxygen saturation continued to decline.  After a desaturation event into the mid-80s while still on BiPAP respiratory assistance, a decision was made to reintubate Marites, and she was heavily sedated once again:

| 07/29/13 | Nurse's Note (Molly Adams, RN):<br>19:00-20:19  Small BM at 1800, **when laid flat for turning and cleaning, desat'd into mid 80s on BiPAP w/70% FiO2.  Sats remained low despite repositioning.  Incrd FiO2 back up to 100% and notified ICU team, who decided to reintubate pt at this time.**<br><br>**Pt successfully reintubated, OG tube placed at 52 cm, both placement verified by confirmatory CXR.**  Meds adm'd for procedure were Fentanyl 75 mcg IFP, Propofol 100 mg IVP, Rocuronium 50 mg, Alb 25% 50 ml IVP and Phenylephrine 600 mcg IVP.  SBP dropped into 70s and was quickly tx'd w/use of phenylephrine and Alb IVP.  Sedation started w/Fentanyl 25 mcg/hr, Propofol used for short time until Precedex arrived and started at 1.4 mcg/kg/hr using dry wt of 55 kg.  SaO2 currently above 95% on AC/VC+, PEEP 12, tv 300, FiO2 70% and rate 28.  BP maintaining w/o pressors, and HR dropped down into 100s.  No further issues at this time.  Rpt given to RN Jolly to assume care. | TAMC2<br>2563 |

A nephrology assessment on 7/30/13 indicated no evidence of renal recovery, and Marites was continued on dialysis.  She also had increasing bilirubin levels, indicative of liver injury related to the sepsis, and she became jaundiced.  In addition, Marites's gallbladder also returned abnormal results and symptoms indicative of sepsis-related injury as well. She was also noted to have conjuntival edema of her right eye, and her abdomen was swollen and distended.  Her DIC continued to complicate her treatment:

| 07/30/13 | ICU Progress Note  (L. Gordon, DO) | TAMC2 |
|---|---|---|
| | **Pt reintubated last night after increasing tachypnea and desaturation. Cont. to have incr. bilirubin, tachycardic with HRs 110s−130s yesterday, hypotensive since being intubated.  Sedated on ventilator.** CXR today shows improving B/L pl. effusions. Appears comfortable w/o pain. Started on tube feeding overnight. | 2573-2578

TAMC 35-38 |
| | **Liver enzymes beginning to trend down w/ incr. bili. Abd. soft, non tender w/ incr. distention today, worsening jaundice.  Pt in acute renal failure s/t toxic shock. No urine output today. She is on CRRT. CT abd/pelvis showed renal cortical necrosis.** RUQ US yesterday was normal. H/H stable since 2 units PRBC transfused. Pt in septic shock from group A strep toxemia causing respiratory failure, circulatory shock, and acute kidney injury. | |
| | Lines/Devices:
−L femoral 3 lumen day 7
−Foley catheter day 7
−Arterial line L radial day 7
−Dialysis cath R IJ day 7
−ET tube 7.5 day 2
−OG tube day 2 | |
| | E. Osborn, MD, Attending:
**Persistent multi−organ failure following group A Strep toxic shock syndrome.** Her gas exchange improved today and she is no longer on injurious settings. She followed commands and moved all 4 limbs this morning. Her R eye conjunctival swelling has improved. She is now off vasopressor support and is perfusing well. Her coagulopathy and hyperbilirubinemia are worsening, and she has a chemical pancreatitis (lipase 900 today). **CT showed bilateral infiltrates and her clinical lung syndrome is consistent with the exudative phase of mild ARDS.** Her improved gas exchange today is encouraging. BAL showed a neutrophilic alveolitis which is non-specific but suggestive of an underlying infectious process. Antibiotics were broadened to Levaquin today, appreciate ID input. **Treatment of her** | |

| | **coagulopathy is best accomplished by treating her underlying systemic disorder, which is the sequela of the inflammatory avalanche started by her initial infection.** We will revisit the role for IVIG tomorrow if she is not improved. Vit K started to help with liver synthetic function, and her transaminases are improved today. Continue supportive care. Monitor carefully for signs of bleeding, sedation holiday in AM for neuro exam and consider SBT if her gas exchange continues to improve. Removed 1L today and plan to remove 500ml more as tolerated. | |

All of this turmoil with Marites's desperate medical condition was also wreaking havoc on Rafael and the family.  Rafael maintained a constant vigil by Marites's side and was unable to work or continue his studies to become a nurse.  They rapidly fell into financial stress.  The social worker's note detailed the situation:

| 07/30/13 1602 | Social Work Note (Donna Ando, LCSW):<br>Pt 37 y/o dependent spouse of USN AD SM Rafael who delivered infant daughter via induction and is currently septic, intubated and receiving HD.<br><br>**Met w/husband who has been vigilant at her bedside.** Husband shared that he and pt have 2 sons – ages 11 and 13, and newborn [M.R.B.C.].  They reside in Mililani w/their mother-in-law Romana, age 72, who was petitioned to HI from the Philippines a yr ago.  Husband stated mother Flora, age 79, and brother Paquito have been rendering care to [M.R.B.C.] and her brothers while he has been staying over to provide support to pt.  He went home last night to spend time w/his children and acquired good solid sleep.  **He plans to stay over w/pt tonight because she looks for him when she awakens.** | TAMC2 2868-2869<br><br>TAMC 329-330 |

Husband Rafael added that he has 2 sisters in CA, 2 brothers on Oahu and a sister Carola in Australia.  Carola will be arriving on Oahu on 8/5, and will stay for 2 wks to help w/child care needs.

**Pt's sons have resumed schooling and they have not seen pt in her current cond because pt does not want them to see her at the present time.  Likewise, pt's mother Romana has not visited w/pt as family members are concerned that she has high BP.**

Rafael stated that he has good support from his Chief, adding he has been in school studying nursing @HPU.  He had courses planned for the summer w/the expectation that he would graduate after this summer.  He has clinicals on weekends w/obligations as he needs to be present for pt.

**According to Rafael, pt is enrolled in the WIC program, but he believes he needs to enroll [M.R.B.C.].  He added that pt has an appt w/WIC scheduled for 8/7.**  Conferred w/Michele Murakoshi, Pediatric LCSW, and she noted it is important that Rafael inform WIC that [M.R.B.C.] was born, and to possibly go to the 8/7 appt, since it is oftentimes difficult to reschedule.  Will advise Rafael to contact the WIC program that pt has been working with.

**Inquired whether Rafael has been having financial concerns and he stated he had to pay for his summer tuition expenses on his own and had to use his credit card.  Will therefore consult Semper Fi Fund re whether family may be eligible for grants.**

### 4. Problems Continue and Escalate in the Progressive Care Unit.

Marites remained in critical condition in the ICU for another week until she was finally transferred to the Progressive Care Unit ("PCU") on 8/4/13.

The transfer summary from the ICU to the PCU was a sobering litany of

serious and debilitating problems and conditions:

| 08/04/13 1634 | Physician Progress Note:  P. Hitchcock, MD | TAMC2 2629- 2631 |
|---|---|---|
| | **PROBLEMS:** | |
| | **1. Toxic Shock Syndrome** | TAMC |
| | **2. Acute Renal Failure** | 90 |
| | **3. Abdominal Discomfort/Distention** | |
| | **4. Acute Hepatic Dysfunction** | |
| | **5. Circulatory Shock** | |
| | **6. Hypoxic Respiratory Failure** | |
| | **7. Hemolytic Anemia** | |
| | **8. Nutrition** | |
| | | |
| | RECENT EVENTS | |
| | ON/Today: Pt was stepped down from the ICU today in stable condition. No acute events overnight. S: Pt c/o mild abd pain this afternoon, mostly R−sided. Also reports intermittent chills and night sweats. No CP or SOB. | |
| | | |
| | Comfortable, NAD, A&O x3 | |
| | Chest/Lungs: Coarse breath sounds bilaterally, upper>lower lung fields. | |
| | Heart: Tachycardic, sinus rhythm | |
| | Abdomen: Mild TTP diffusely, R>L. Softly positive rebound tenderness. Appears mildy distended. Patches of ecchymosis appreciated on skin likely 2/2 to heparin injs. BS present. | |
| | Ext.: Mild pitting edema in LE bilaterally. | |
| | | |
| | RADIOLOGIC DATA: | |
| | #1 04Aug2013: CXR | |
| | 1. Enteric tube has been removed. R int. jugular catheter unchanged. | |
| | 2. R-sided PICC overlies the right atrium. Consider repositioning. | |

3. Multifocal airspace opacities stable. The upward movement of the minor fissure, suggests right upper lobe atelectasis.
4. Small bilateral pleural effusions remain.

OTHER TESTS:
#1 04Aug2013:
− Na 130, K 4.1, Cl 96, HCO3 23, BUN 48, Cr 3.32, Glu
− Ca 8.9, 1.9, Ph 3.2
− WBC 20.9, 8.4, 23.8, Plt 189
− Alb 2.1, Prot 4.9, T.Bili 8.3, AST 217, ALT 180, AP 211

03Aug2013:
− pH 7.45, pCO2 41, pO2 42, HCO3 28.6

ASSESSMENT AND PLAN
#1 37F s/p SVD on 23Jul, complicated by Group A Strep TSS w/ D&C on 24Jul for removal of retained POC, who has been stabilized in the ICU over ~12 days and stepped down to the PCU on 4Aug2013.

**1. TOXIC SHOCK SYNDROME:** Pt developed MSOF 2/2 to Group A Strep TSS and has remained on penicillin since 24Jul. Her WBC was 20.9 today, down from 23.4, but reports cont intermittent chills/night sweats despite remaining afebrile over >48hrs. Will continue ABX regimen started in ICU and further details regarding other issues are below.
− penicillin G 6000000U ivpb q12 hrs (started 24Jul)
− levaquin 500mg ivp q2D
− f/u 31Jul BCx

**2. ACUTE RENAL FAILURE:** Pt is HD dependent at this time (3−4x/wk) 2/2 DIC−asst'd renal cortical necrosis and likely ischemic ATN + iatrogenic IV contrast nephropathy. Still no signs of resolution as of yet, and pt's Cr has incr from 1.78 to 4.01 over ~24hrs and remains anuric with 19cc output over 48hrs. Her K has incr from 4.1 to 5.1 in 12 hrs today and she is scheduled to have IHD tomorrow morning. Because her lab values are rapidly worsening, we will keep ICU panels q12hrs, and get K at midnight tonight + give the NF

instructions on appropriate measures to take if continued increase.
− if K>5.5 at next draw, get EKG and give Ca−gluconate; if pt symptomatic, consider giving insulin and schd immediate CRRT vs HD w/ nephrology
− IHD tomorrow morning
− q12hr ICU panel
− readjust dosing of meds/antibiotics for CrCL <10 on intermittent HD
− maximally concentrate all drips
− pt has foley catheter (since 24Jul)

**3. ABDOMINAL DISCOMFORT/DISTENTION:** Upon evaluation today, pt had a mildly distended abdomen and complained of abd pain R>L. She was mildly TTP and was softly positive for rebound tenderness. Her pain incr t/o the afternoon, and a KUB was ordered ~1900hrs. Some concern for peritoneal signs, but symptoms likely 2/2 constipation or possible cont illeus following recent systemic shock.  Will f/u w/ KUB.
− f/u KUB
− NPO for now
− mylicon 40mg PO qid/meals

**4. ACUTE HEPATIC DYSFUNCTION:**  Bili decr. to 10.2 from 12.7 yesterday and her AST/ALT/AP remain stable around 217/180/211. Will cont. to monitor LFPs q am and expect cont'd improvement w/ cont'd circulatory stabilization and recovery from TSS.

**5. CIRCULATORY SHOCK:** Pt BPs have been stable; however, she still has sinus tachycardia. Etiologies include cont vasodilation 2/2 to systemic inflamation w/ cardiac compensation vs intravascular volume depletion. She has not required pressors since ~28Jul, but has had tachycardia since then. D/t her ARF, we will be careful with fluid admin., will cont. to monitor vitals in PCU. Will also continue weaning off of steroids originally given 2/2 refractory vasopressor−dependent shock.

− hydrocortisone 15mg IV qday (dose started on 4Aug)
− continue 5mg decr. in dose q3 days

**6. HYPOXIC RESPIRATORY FAILURE:** Pt resp. status much improved over past couple of days and currently sats >96% on RA. CXRs stable and cont. to show interval improvement. Pt likely suffered from ARDs 2/2 systemic shock/inflammation and expect cont'd improvement as she cont to recover.

**7. HEMOLYTIC ANEMIA:** Pt likely developed MAHA 2/2 TSS asst'd DIC, as seen by previously measured incr. fibrin D−dimer, PT/PTT, and dec'd haptoglobin. Pt is s/p 4U PRBCs on 24Jul, 2U on 28Jul, and 2U on 3Jul. She received 1U platelets on 24Jul as well. Pt's CBC has been stable since yesterday, with values of 20.9>8.4/23.8<189 today. Will continue to monitor for acute changes and give PRBCs if needed.

**8. NUTRITION:** Pt pulled NG tube on 3Aug and s/p trial of pureed foods today. She was tolerating OG feeds previously, and was tolerating PO intake today; however, she is now experiencing abd distention/discomfort. Pt has been made NPO, will reeval diet pending KUB and symptom progression/regression.

DISPOSITION: Pt still requires intensive monitoring at this time + IHD.
Discharge date is uncertain at this time.

It was suspected that Marites had developed an ileus, or blockage in her gastrointestinal tract during her extended and difficult ICU course and was not allowed food by mouth.

On 8/5/13, Marites's liver function tests continued to be abnormal and her bilirubin levels remained high, indicative of sepsis-related liver injury.

The same day, Marites's nephrologist noted that Marites "remains without renal recovery thus far.  Creatinine elevated, 4.57, **not due to new/worsening renal injury, merely tip of the iceberg reflection of the severity of original cortical necrotic injury** and removal of creatinine directly from the blood by dialysis."  TAMC2 3030-32 (emphasis added).

The same day, 8/5/13, sonogram and ultrasound studies indicated that Marites likely had gallstones that would require surgical attention, but because of her compromised condition, Marites would not be able to tolerate a surgical procedure.  But Marites was experiencing intense 10/10 pain in her abdomen related to her gallbladder and stones:

| 08/05/13 2000/ 2226 | Nurse's Note (Jamie Cuizon, RN): Pt, husband requesting pain med, **c/o abd pain 10/10, aching exacerbated w/movement..."last 2 days."**  A&O x3, responsive, follows commands.  Generalized weakness, LEs weaker than UEs.  OOB w/assist.  Skin jaundiced.  Abd w/sl distention, tender to light palp.  BS+ in all quads.  Labia swollen, sm open wounds in vulva area, healing post vag delivery, 7/22.  Dialysis MWF, contd for MMPs s/p TSS.  R side of neck w/HD catheter, RUE PICC.  Infusing PCN drip and IV abxs, bruising noted in abd area, rash on back/arms/chest – Med team aware of rash.  2 mg Morphine IVP adm'd at 1930.  **At 2000, pt yelling uncontrollably in pain.**  Dr. Sprowl notified and came to assess. | TAMC2 4037-4041 |
|---|---|---|

This pain continued for the next two solid days and required enormous doses of powerful pain medication to even be tolerable:

| | | |
|---|---|---|
| 08/06/13<br>0120 | Nurse's Note (Jamie Cuizon, RN):<br>**Pt c/o incr'ing RUQ abd pain, not relieved w/2 mg morphine IVP given at 1930.** Dr. Sprowl notified and came in w/ICU and Surgery team. Pt recvd total 1.5 mg Dilaudid IVP and 25 mcg Fentanyl IVP for RUQ pain w/relief. Warm packs also applied to abd. Transported to **Radiology for RUQ US w/results worse, w/acalculus cholecystitis. Pt currently undergoing HIDA scan.**<br><br>Tmax 100.2 prior to transport for HIDA, cont tachy, BPs stable. Will collect blood for STAT lipase upon rtn. | TAMC2<br>2655 |
| 08/06/13<br>0518 | Dr's Note (Gregory Sprowl, MD):<br>At ~2000, **called to bedside for intractable abd pain, focused primarily at RUQ, although both upper quadrants involved.** PE w/+ Murphy's sign, distended abd but soft w/+ fluid wave, no BS. **Pt in severe pain, 10/10, controlled by 1.5 mg Dilaudid w/25 mcg fentanyl for breakthrough pain.** Called MOD and asked SOD to see pt. RUQ ordered, w/findings concerning for acalculous cholecystitis. F/u HIDA w/no radioactive uptake in CBD, bowel or GB. Recommend referral to GI and/or IR for drainage. | TAMC2<br>2656-<br>2657 |
| 08/06/13<br>0650 | Dr's Note (Amir Karimian, MSIV/Phillip Hitchcock, MD):<br>Pt c/o worsening abd pain over upper quadrants (R>L), and TTP over RUQ. **Given 25 mg fentanyl, 2.5 mg hydromorphone, and 2 mg morphine overnight for pain control. Also rpts severe itching over face and UE.** PT/PTT 24.3/72 w/INR 2.2, given 1u FFP, and scheduled to receive 2u PRBCs this a.m.<br><br>Upon exam, mildly jaundiced, mild anasarca through UEs and thorax. Tachycardia, HR 114. Abd tense w/guarding, mildly distended, BS x4, + rebound over RUQ/LUQ. LEs w/1+ edema. Jaundiced through abd, head and neck.<br><br>CT 8/5/13 w/bilat pleural effusions R>L, GB enlargement w/heterogenous density in GB, decr in mild ascites. HIDA 8/5/13 w/no uptake in GB. *(8/5, 8/6 labs noted)* | TAMC2<br>2657-<br>2660 |

Assmt/Plan:

- o **Acute acalculus cholecystitis – Given CT/HIDA scan results and uptrending bili, pt will need further diagnostic and potentially therapeutic intervention. Given elevated bili, HIDA scan result is unreliable, but obstruction is still a possible etiology for at least some of pt's sxs.  Gnl Surgery consulted and deferred to GI, given pt's current health state.  GI and IR have been contacted and awaiting guidance for definitive diagnostic and therapeutic approaches.**  Considering MRCP vs.  ERCP vs. perc drain placement.  Will likely undergo ERCP today.  Npo until status reassessed after GI procedure.

- o Hepatic dysfunction – Not all hepatic sxs explained by acute acalculus cholecystitis – possibly ascending cholangitis or other infectious source could be causing dysfunction.  Synthetic fxn (PT/PTT/INR) is uptrending. AST/ALT downtrending today.  T protein stable at 4.8, WBCs 21.2 but stable x72h.  Tbili incrx to 15.8.  RUQ, jaundice, but no fever.  Will cont to trend PT/PTT/INR, LFTs.  FFP and 2u PRBCs given this a.m.

- o Group A strep sepsis – Pt w/MSOF 2° Group A Strep TSS and has remained on PCN-G since 7/24.  WBC stable at 21.2.  Recent BAL and BCx neg.  Cont abx regimen started in ICU.  Zosyn 3.375 q12h/day.

- o ARF – likely due to ischemic ATN.  Pt is HD-dependent at this time (3-4x/wk) 2° DIC renal cortical necrosis and likely ischemic ATN & iatrogenic IV contrast nephropathy.  Still no signs of resolution, had HD this a.m.  Cont to monitor lytes q12h for now until further stabilization.  Readjust dosing of meds/abxs for CrCl 0, on intermittent HD.

- o Anemia – possibly hemolytic vs. MAHA vs. unknown source of internal bldg.  Contd H/H decline likely contributed by frequent lab draws. PT/PTT more concerning for hepatic dysfxn.  Plt sl incrd to 301,

making ongoing DIC less likely.  No signs of active bldg, no tx necessary at this time but will cont to monitor.

Pt likely developed MAHA 2° TSS DIC, as seen by previously measured incrd fibrin D-dimer, PT/PTT and decrd haptoglobin.  Pt is s/p 4u PRBC on 7/24, 27 on 7/28, 2u on 7/3 and 2u on 8/6.  Also recvd 1u plts on 7/24 and 1u FFP on 8/6.

o  Circulatory Shock – remains tachycardic while BPs remain stable.  Cont weaning off hydrocortisone, originally started 2° refractory vasopressor-dependent shock.

Etiologies incl contd vasodilation 2° systemic inflammation w/cardiac compensation vs. intravascular volume depletion.  Has not required pressors since 7/28, but w/tachycardia since then.  Due to ARF, will be careful w/fluid admin and cont to monitor her vitals in PCU.

o  Hypoxic Resp Failure – Resp status remains stable on RA.  Mucomyst, albuterol inhalation q6h.
Nutrition – Abd and distention are concerning, pt remains npo for now.  Will cont to monitor and consider alternative modes of nutrition if needed in near future.

o  Still requires intensive monitoring at this time, + IHD.  Discharge date uncertain at this time.  Will re-eval after intervention for acalculus cholecystitis.

On 8/6/13, an ERCP procedure to stent Marites's biliary duct was performed in an effort to address Marites's abdominal pain.  The ERCP procedure also revealed that Marites had a large duodenal ulcer.

Marites's abdominal pain persisted despite the stenting procedure.

She had also developed a rash over most of her upper body.

### 5.    Abnormal Liver Function Leads to Encephalopathy and Altered Mental Status.

The next day, 8/7/13, Marites started to hallucinate and her mental

status became unstable, indicative of elevated bilirubin levels from her liver

and gallbladder conditions, which can lead to brain injury:

| 08/07/13 0618 | Nurse's Note (Grace Wong, RN): **A little hallucinated, per husband.** Still having pain to abd, but rash on body better. IV NS @50 cc/hr started. Foley intact w/no UOP. Cont npo. | TAMC2 2676 |
|---|---|---|
| 08/07/13 | Surgery Note (Terri Carlson/Andrew Schlussel, DO): 8:00 am  Doing well after ERCP yesterday, found to have lge duodenal ulcer and hemobilia for which stent placed. However, **having incrd confusion this morning, does not know who husband is or where she is, which is a change from earlier in evening.  Some hallucinations per husband.** Pt w/min speaking this morning when asked if she is having pain.  Transfused 2u PRBC and 2u FFP yesterday.<br><br>Oriented x1, **does not know husband or his name, but knew her name.** Tachycardic, lungs w/decrd bibasilar. RUQ tender to percussion, no diffuse peritoneal signs.<br><br>37 y/o w/critical illness, s/p ERCP w/lge duodenal ulceration and hemobilia s/p stent placement, and PRBC and FFP. Now w/**worsening bilirubin and mental status changes this morning, concerning for blockage of stent possibly due to clotting.**<br><br>Discussed concern w/Medicine this am, and recommend talking w/GI this am  if unable to repeat ERCP/drain endoscopically, then recommend IR for PTC. | TAMC2 3852-3853<br><br>TAMC 504-505 |

| | Want to avoid potentially lge and morbid operation in this tenuous pt, and recommend every possible minimally invasive option first.  Cont Zosyn.  Cont to follow closely.<br><br>**Discussed case w/Dr. Kenny due to concern for elevated bilirubin today, felt this is most likely cholestatic and w/stent in place there should be some drainage. Concern for clot in stent, but it should still allow drainage.  Discussed utility of PTC but it was felt at this time that it would not be effective.  Will follow closely.  If bili worsens, will rediscuss stent vs. interrogation of biliary stent in place.**  Discussed w/Dr. Lin. | |

Confusion was rampant about Marites's condition, particularly her liver injury, and outside physicians were consulted and a transfer to Queen's Medical Center was sought because her Tripler physicians believed she may need a liver transplant.  However, after a consult with the Queen's transplant surgeon, Marites was rejected because it was believed that Marites's condition was all related to her gallbladder.

| 08/07/13 1222 | GI Note (Patrick Kenny, DO):<br>**Did well after her procedure but appears acutely altered this a.m.  Alert but not answering questions. Follows some commands.  Per Nursing, still c/o 8/10 RUQ pain.**  VSS.  **Communicates minimally w/husband.**  Persistent LE rash and jaundice.  Breath sounds diminished at bases bilat.  Tachycardic.  Abd mildly distended, min TTP in RUQ, although given recent analgesia.<br><br>    o **Cholestatic liver injury – likely secondary to GAS-TSS and resulting sepsis.  No indication of extrahepatic obstruction.**  There is no indication for perc biliary drainage, esp given successful placement of 2 internal biliary drains yesterday.  Her bump in bili is likely due to placement of the stents. | TAMC2 3855-3857 |

| | | |
|---|---|---|
| | **Case reviewed by QMC transplant surgeon Dr. Wong and she does not feel transfer to QMC is appropriate at this time as there seems to be a reasonable explanation for pt's cholestatic liver injury, no evid of toxic/irreversible injury and no evid of worsening synthetic dysfynction.  She suggests that if we are unsure that pt's liver injury is all due to her septic picture vs. an alternative dx, we can consider a liver biopsy to differentiate.  CT abd w/IVC may cause irreversible renal failure and is not recommended at this time.  For now, recommend cont'ing supportive care w/IVF, pain control, appropriate abx coverage and resuming oral nutrition as tolerated.**<br><br>○ **Probable acute pancreatitis – also secondary to TSS.**  Cont supportive care.<br><br>○ Duodenal ulcer – cont Protonix 2x/day for now.<br><br>○ Will follow. | |
| 08/07/13 1431 | Attending Note (Ravinder Shergill, MD):<br>Reviewed and examined case w/Hospitalist, GI, Nephro and pt's husband.  **Consulted today because it was felt that pt's mentation was worse today.  Upon exam, sitting in chair, comfortably responding to husband appropriately, but slow (which is worse than last couple of days).**  Hemodynamically stable.  **Has clear jaundice w/signs of hepatic encephalopathy.**  Has decr'ing WBC/AP, stable INR but worsening bili.  It is dominantly conjugated which suggests that liver is still working to some extent.  No evid of hemolysis.  Think CT of abd/pelvis would be helpful.  **Spoke to Dr. Kenney who is looking into getting pt to QMC for listing for transplant if things worsen.  This is a reasonable approach rather than waiting for the last minute.**  Spoke to Nephro about giving contrast for abd/pelvic CT, he is ok w/it so far and can dialyze her afterwards. | TAMC2 2686-2687 |

| | | |
|---|---|---|
| | **When I got back to the hospitalist, learned that Dr. Wong rejected the pt w/the belief that it is just cholestasis**. Suggest we give abxs per ID rec.  Make sure there is nothing from OB standpoint they need to do, ie. pelvic/vaginal US, to confirm there is no source of infx.  Panculture pt, keep a close eye.  She does not need to be in ICU at this point.  **Still believe she is better off in a place where there is transplant capability, if she needs one.** | |

By late in the evening on 8/7/13, Marites's condition had devolved

and her mental status was clearly compromised.  She was alert and

oriented only to herself, and was uncooperative with nursing assessments.

Marites's extenuated condition also took its toll on Rafael and the kids:

| 08/07/13 2127 | Nurse's Note (Cherie Corpuz, RN): **A&O to self only, verbalizes very little, mainly nods head yes or now, slow to respond.  Nodded head no when asked if she knew where she was, and if she knew month and year.  Will not follow some comands, will not allow me to test strength in extrems, stated, "stop it,"** but able to move all extrems, able to track, pupils round, equal & reactive to light.<br><br>**Verbalizes, "I'm going to die."  Became more clingy w/husband, not cooperating w/us changing her linen, puts her arms in his shirt so he is unable to move.  Not interacting much w/visitors and her 2 sons.  Sons crying at bedside this afternoon.**  Per husband, put was pulling on foley and trying to take drsg off IJ.  Scan vaginal bloody drainage.  Conts to be jaundiced.  Will cont to monitor closely.  Side rails upx 4, wheels locked and bed in lowest position. | TAMC2 2692 |

| 08/08/13 0110 | Nurse's Note (Tasha Newman, LPN): **Around midnight, husband notified nursing staff of mental status change.  Pt does not know who she or husband is.  Not oriented to self, place, time or event.** MD notified.  VSS, afebrile.  Labs drawn, awaiting results at this time.  Will cont to monitor. | TAMC2 2692-2693 |
|---|---|---|

By 2:30 a.m. on 8/8/13, Marites's medical team decided to place

Marites in wrist restraints because she continually attempted to pull out her

nasogastric feeding tube.

| 08/08/13 0300 | Nurse's Note (Stephen Aycock, RN): **At 0206, bilateral wrist restraints ordered and applied at 0230.  Pt awake & alert but does not follow commands, not able to speak appropriately or understand instructions or teachings.**  Dr. Sprowl and Layman in room to perform indepth assmt w/tx plan involving NGT and infusion of lactulose q1h GI tract.  Importance of med and tx plan relayed to husband who is at bedside.<br><br>NGT placed, check by PCXR.  **Pt immediately attempted to pull out NGT, even after constant teaching before insertion and reinforcement after insertion.**  Awaiting results of XR before infusion of med.  Notified bed mgr and Supercharge of order and need for restraints.  SPC Neuman is nurse for this pt and is aware of all responsibilities assoc'd w/restraints.  All questions answered to bed mgr and Supercharge satisfaction.  Dr. Sprowl made aware of physician responsibilities as it applies to restraints.  Assmt ongoing. | TAMC2 2693-2694 |
|---|---|---|

It was obvious that Marites's globally decreased neurological status

was related to encephalopathy, or swelling of the brain, related to her liver

injuries.  Oral medication was started to attempt to address the condition:

| 08/08/13 0408 | Dr's Note (Gregory Sprowl, MD): At ~2330, called bedside to eval worsening mental status. **Husband states pt no longer knows who she is, combative at times and mumbling nonsensical phrases. Pt appears to be staring blankly, not responding to my questions.**  This was also noted by Dr. Farmer from Surgery, and MOD Dr. Layman, who I called to assist in eval. | TAMC 2694-2695 |
|---|---|---|
| | BP 119/69, HR 101, R 23, SaO2 99% RA, T 97.9.  **Pt lying in bed, holding husband's hand, staring blankly at random objects in room.**  Pupils equal and reactive to light, scleral icterus.  Heart regular, lungs clear.  Abd soft, distended, does not wince or c/o pain upon palpation. **Uncooperative, does not consistently respond verbally, says "my name is Tina," when asked about pain. Possible mild asterixis w/wrist dorsiflexion (had to put pt's wrist in this position), will not move w/request.** | |
| | Assmt/Plan: **Pt's globally decrd neuro status is concerning for encephalopathy, most likely hepatic in origin.**  Despite serum ammonia in nl range, literature search indicates that hepatic encephalopathy is a clinical dx that can be made w/o elevated serum NH3.  Therefore, in consult w/MOD, an NG tube was placed and lactulose 30 ml/hr started.  **Restraints were necessary due to pt pulling at devices.**  Admin 100 mg thiamine and started banana bag, as pt is likely nutritionally deficient since beginning of her hospital course, although understand she recvd some tube feeds prior to her acute abd pain.  PE not consistent w/Wernicke's presentation, but felt it was worthwhile to admin anyway since pt is unable to fully comply w/exam.  Referenced labs w/improvement from previous day, note 2 SIRS criteria.  If pt does not improve w/lactulose, further exploration for sepsis may be warranted despite abx coverage in place. | |

Because other neurological causes for Marites's neurological

abnormalities could not be clinically ruled out, a lumbar puncture was

performed to analyze Marites's cerebrospinal fluid to check for other

causes like meningitis.  The results were not consistent with meningitis.  An

EEG was also performed with inconclusive results because Marites

constantly kept her eyes open.  Her affect changed from distant and

random stares to incessant chattiness:

| 08/09/13 0017/ 0400 | Nurse's Note (Aubree Hanks, RN): Lumbar puncture done at bedside, results called to this RN from Micro that no organisms seen, and 1+ epithileal cells.  New orders for IV abx to treat empirical meningitis, blood cxs from 2 sites collected.  Spouse and pt's sister at bedside resting.  **Pt conts to have eyes open all the time and chatty.  Has not spoken anything in English, sister rpts pt says "the world is sick," "you are the same measurements," repeatedly.**  Pt also recalls things from her past.  Lights off and quiet in room to allow restful state.  IV abx and dexamethasone now infusing.   Tolerating TFs well w/no residual.  VSS.  0400  HR elevated 119-125 at 0300 pt soiled.  Pericare completed but HR not resolved.  Dr. Sprowl aware.  Head CT ordered and Radiology notified.  **Family at bedside, concerned for pt as she is sl agitated.  Pt has not closed eyes.  MD to order eye drops.  Pt looked at this RN but then mostly stares up and conts mumbles.**  Labs sent. | TAMC2 2705 |

The next day, on 8/10/13, Marites switched from keeping her eyes

open constantly to keeping her eyes closed constantly:

| 08/10/13 0052 | Nurse's Note (Gazelle Crayon, RN): **Episode of spontaneous eye opening at midnight but remains nonverbal, still disoriented, conts to not participate in neuro exam, now conts to have eyes closed.  Bilat wrist restraints remain in place as pt will have occas episodes of attempting to grab at NC or NGT** | TAMC2 2720 |

| | | |
|---|---|---|
| | **on face.** Husband at bedside. Tolerating tube feeds well w/o residuals. Foley conts to drain sm amts bright red hematuria. | |
| 08/10/13 0052/ 0112 | Nurse's Note (Gazelle Crayon, RN): **Nonverbal, eyes remain closed, unable to assess neuro status. No spontaneous eye opening to verbal stimuli, occas responds to painful stimuli. Eyes rolled back at time of assmt, unable to fully assess range of pupils. Bilat wrist restraints in place, pt noted attempting to remove NC or NGT from face several times.** On O2 4 lpm NC, Nepro TF. | TAMC2 4079- 4084 |
| 08/10/13 0423 | Nurse's Note (Gazelle Crayon, RN): O2 2 lpm NC. At 0200, pt noted to be alert w/spontaneous eye opening, able to nod yes/no to simple questions, but A&O to self only. Liquid BM x1 over x4h. **At 0400 neuro check, eyes remain closed but pt responding to verbal stimuli, remains A&O to self only but answering some questions.** Husband @bedside overnight. Foley w/no output noted. | TAMC2 2721 |

On 8/10/13, an MRI study was taken showing increased reactivity in the pituitary gland suspicious for a lesion or hemorrhage. However, given Marites's clinical course, her altered mental status was most likely due to bilirubin encephalopathy related to her liver and biliary compromise.

### 6.   The Slow Crawl Toward Discharge From Tripler.

Over the next five days, Marites's mental status slowly improved but her medical conditions continued to plague her. She continued to have a bleeding duodenal ulcer, gallstones that likely would require removal of the gallbladder, and most of all, she showed no recovery of her renal function,

indicating end-stage renal disease that would require lifelong periodic

hemodialysis and kidney transplant if available.

On 8/15/13, Marites was referred for a permanent catheter placement

to facilitate her hemodialysis.

On 8/17/13, Marites was transferred from the PCU to the Mother

Baby ward.  She had been in the ICU/PCU for 24 days.  Preparations were

made for a discharge in the near future, but Marites required arrangements

for hemodialysis three times a week in the community.

Six days later on 8/23/13, exactly one month from her birth, M.R.B.C.

was finally allowed to visit with Marites.

The next day, after a 32-day hospitalization, Marites was discharged

from Tripler.  Her Tripler Record of Inpatient Treatment tells the harrowing

tale of her nightmarish course there, with 62 problems/diagnoses, and

20 procedures:

| 08/24/13 *(approx)* | TAMC Record of InPt Tx: Adm 7/22/13 – 8/24/13 Diagnoses: 1. Elderly multigravida, delivered. 2. Acute respiratory failure. 3. Shock w/o mention of trauma. 4. Acute kidney failure w/lesion of tubular necrosis. 5. Defibrination syndrome. 6. Septicemia. 7. Puerperal sepsis, delivered w/post-partum complication. 8. Streptococcal septicemia. | TAMC2 2321- 2327 |
|---|---|---|

9.   Severe Sepsis.
10. Septic shock (manifestation).
11. Cardiogenic shock.
12. Toxic Shock Syndrome.
13. Peripartum cardiomyopathy, delivered w/post-partum complication.
14. Acute kidney failure following labor & delivery, delivered w/post-partum complication.
15. Acute pancreatitis.
16. Obstruction of bile duct.
17. Chronic/unspecified duodenal ulcer w/hemorrhage, w/o mention of obstruction.
18. Hepatic encephalopathy.
19. Acidosis.
20. Alkalosis.
21. Pulmonary congestion and hypostasis.
22. Post-partum coagulation defect, delivered w/post-partum complication.
23. Delayed & secondary post-partum hemorrhage, delivered w/post-partum complication.
24. Unspecified pleural effusion.
25. Pulmonary collapse (atelectasis).
26. Paralytic ileus.
27. Intestinal infx due to clostridium difficile.
28. Acquired hemolytic anemia.
29. Cholangitis.
30. Delirium due to conditions classified elsewhere.
31. Hyperosmolality and/or hypernatremia.
32. Acute cholecystitis.
33. Cerebrovascular disorder in puerperium, delivered w/post-partum complication.
34. Acute, but ill-defined, cerebrovascular dz.
35. HTN complicating pregnancy, delivered w/post-partum complication.
36. Mother w/single liveborn.
37. 2° perineal laceration, delivered.
38. Tachycardia
39. Hypopotassemia.
40. Leukocytosis.
41. Abnl in fetal heart rate/rhythm, delivered.

42. Current cond in mother complicating pregnancy, delivered w/post-partum complication.
43. Tachypnea.
44. Bacterial infx in conditions classified elsewhere.
45. Thrombocytopenia.
46. Anemia in mother complicating pregnancy, delivered w/post-partum complication.
47. Retention of urine.
48. Hypoxemia.
49. Fluid overload.
50. Trunk blister w/o infx – groin.
51. Complication of puerperium, delivered w/post-partum complication.
52. Cholecystitis.
53. Rash and nonspecific skin eruption.
54. Bacterial infx due to H. pylori.
55. Edema.
56. Flatulence/eructation/gas pain.
57. Dysphagia.
58. Sequelae of chronic liver dz.
59. Dermatitis due to drug and medicine taken internally.
60. Anemia in chronic kidney dz.
61. Chronic kidney dz.
62. PCN causing adverse effects in therapeutic use.

Procedures:
1. Repair of current OB laceration – 7/23/13, Tamarin McCartin
2. Aspiration curettage following delivery post-delivery – 7/24/13, Jason Patzwald
3. Medical induction of labor – 7/23/13, Tamarin McCartin.
4. Genitourinary instillation – 7/24/13, Jason Patzwald.
5. OB tamponade of uterus or vagina – 7/24/13, Jason Patzwald.
6. Arterial catheterization – 7/24/13, Ferdinand Bacomo.
7. Transfusion of packed cells, plts, serum  – 7/24/13, Tamarin McCartin.
8. Venous catheterization for renal dialysis – 7/24/13, Ferdinand Bacomo.

|   | 9.  Cont invasive mechanical vent for 96 consecutive hrs +<br>- 7/24/13, Ferdinand Bacomo.<br>10. Hemodialysis – 7/25/13, Nealanjon Das.<br>11. Insertion of ETT – 7/29/13, Ferdinand Bacomo.<br>12. Closed (endoscopic) bronchial biopsy – 7/30/13,<br>Erik Osborn.<br>13. Lavage of bronchus & trachea – 7/30/13, Erik Osborn.<br>14. Endoscopic insertion of stent (tube) into bile duct –<br>8/5/13, Atam Mehdiratta.<br>15. Spinal tap – 8/8/13, Mark Woodward.<br>16. Removal of T-tube, bile duct tube, liver tube – 8/14/13,<br>Patrick Kenny.<br>17. Endoscopy of small intestine – 8/14/13, Patrick Kenny.<br>18. Other fetal monitoring – 7/22/13, Amanda Gaccetta.<br>19. Artificial ruture of membranes – 7/22/13, Amanda<br>Gaccetta.<br>20. Venous catheterization – 8/24/13, Edward Watson.<br><br>Attending provider – Edward Watson, Jr., MD |   |

## D.    The Cascade of Problems and Suffering in the Aftermath.

### 1.    The Second Hospitalization for Peritonitis and Gallbladder Removal.

But discharge from Tripler did not equate with a terminus for Marites's

problems.  To the contrary, they were just beginning.  Marites's suffering

from the conditions caused by the substandard care she received at Tripler

continues to this day.

On 9/4/13, Marites went to the emergency department at Tripler with

intense abdominal pain similar to that experienced while she was inpatient

in the PCU.  Radiological studies indicated that Marites continued to have

symptomatic cholecystitis (gallstones) but she also had ascites, or a large

collection of fluid in the abdomen, suspicious for a peritonitis infection of the abdomen.  She was immediately admitted to the PCU again and scheduled for a paracentesis procedure where the fluid would be drained from her abdomen.  She was also placed on IV antibiotics.  It was suspected that Marites's symptomatic gallbladder was the root cause of her peritonitis.

Blood cultures returned positive for bacterial peritonitis, but because of her acute condition, the doctors were hesitant to subject Marites to a gallbladder removal procedure or another paracentesis.  As a compromise, on 9/7/13, a percutaneous cholecystostomy was performed where a drainage catheter is inserted into the gallbladder lumen under radiologic guidance to provide temporary relief from accumulated fluid and sludge until definitive surgical treatment can be performed.

Marites immediately felt improvement in her symptoms after the percutanous cholecystostomy procedure, but over the next ten days, her condition deteriorated again until 9/17/13 when Marites's increasing abdominal pain prompted an ultrasound which revealed several foci of ascites in Marites's abdomen yet again.  On 9/18/13 it was decided that Marites's condition would not amenable to percutaneous drainage again, and a full-blown diagnostic abdominal laparotomy and washout surgery

along with a surgical cholecystectomy (gallbladder removal) was

recommended.

Marites was taken to the operating room for her cholesystectomy and

laparotomy.  Her abdomen was a mess and the surgery was converted to

an open procedure.  Two liters of ascites fluid was drained from Marites's

abdomen:

| 09/18/13 | **Operative Rpt (Andrew Schlussel, DO):**<br>10:26 – 15:28<br>Operation:<br>   o Diagnostic laparoscopy.<br>   o Exploratory laparotomy<br>   o Lysis of adhesions.<br>   o **Cholecystectomy.**<br><br>Indication:<br>37 y/o female w/hx of TSS complicated by hepatic and renal failure which resulted in development of cholecystitis.  Due to liver failure, she developed ascites and secondary bacterial peritonitis.  Cond initially improved w/perc cholecystostomy tube.  Abd US showed mult loculated fluid collections in abd due to ongoing infx as well as new loculated fluid collections, and op exploration and possible cholecystectomy recommended.<br><br>Findings:<br>   o **Mult intra-abd murky fluid collections, drained 2L ascites**.<br>   o **Mult small bowel adhesions requiring extensive lysis of adhesions consisting of >50% of case**.<br>   o **Inflamed friable gallbladder bleeding during dissection resulting in rapid conversion to open procedure**.<br>   o Cystic duct was oversewn. | TAMC2 9-11, 314-316, 417, 7631-7633<br><br>TAMC 3023-3025, 3094-3095<br><br>MAKAL APA 1231-1233 |

| | o On-Q pain pump placed below & above anterior fascia filled w/400 ml of 25% Marcaine.<br><br>Infection Classification:  III<br>EBL 250 ml.<br>Material Forwarded to Lab:<br>o Peritoneal fluid fresh for cytology.<br>o Gallbladder.<br>o Peritoneal fluid for cultures.<br><br>Dx:<br>**Cholecystitis and secondary bacterial peritonitis.** | |

Marites tolerated the procedure and showed initial signs of improvement, but over the next three days her condition declined yet again. She had developed an ileus in her intestine and was not able to take food by mouth.  A HIDA hepatobiliary scan to check on her gallbladder site revealed that Marites had a bile leak in her common bile duct likely due to an intraoperative laceration.  After much red tape, Marites underwent an ERCP procedure to install a biliary stent to correct the bile leak on 9/23/13. She was scheduled to have the stent removed about a month later, on 10/21/13.

Post-operative attempts to return Marites to food by mouth were unsuccessful, resulting in persistent nausea and vomiting.  Marites remained inpatient at Tripler for another ten days and was finally discharged on 10/3/13.  She had been in the hospital for a full month.

| 10/03/13 | **Discharge Summary** (Jacob Mathew, DO/Julie Jones, MD): **Adm 9/5/13, Disch 10/3/13**. 37 y/o w/1-day hx of worsening abd pain.  Onset of abd pain evening 9/4. Pain described as diffuse abd tenderness to any type of palpation or movement.  Rptd elevated temp 100.1, but no recent episodes of chills or other s/s.  Rpts pain severe, not improved by anything, in spite of receiving mult doses of IV fentanyl in ED.  Pain level 10/10.  W/u in ED revealed lge amt of ascitic fluid per CT w/o contrast, in addition to diffuse gallbladder thickening suggestive of possible cholecystitis. | TAMC2 21-40, 172-191 TAMC 3027-046, 3068-3087 |
| --- | --- | --- |
| | PMH staph toxic shock syndrome complicated by multiorgan system failure incl renal failure and significant hepatic dysfunction. | |
| | Recently seen @Harbor Clinic for eval of nonproductive cough, but not given any abx as pt did not appear to have any signs suggestive of infx. | |
| | Admitted and started on broad spectrum abx.  CT and HIDA scans showed evid of worsened acalculous cholecystitis, but cholecystectomy not performed due to incrd operative risk in this pt w/cholestatic liver dz and dialysis-dependent renal failure.  Pt's abd became more distended w/incrd abd pain over first 48h of adm.  Blood and peritoneal fluid cultures grew vanco-resistant Enterococci and she was started on IV Daptomycin. | |
| | On Hosp Day #2, percutaneous drain placed to drain gallbladder for source control of infx.  Pain and abd distention initially improved and she remained afebrile and very stable post procedure. | |
| | On Day #3, she c/o recurrent abd distention and bloating.  Bedside US w/no lge pocket of ascites that could be aspirated.  KUB showed distended bowel loops, pt had not been moving bowels regularly, so s/s were thought to be due to ileus.  S/s initially improved w/bowel regimen, but again started to have incrd abd pain and distention.  H/H started to | |

slowly downtrend and WBC slowly trending up.  Pt restarted on Cipro/Flagyl for gram-negative coverage, given her suspected gallbladder perforation and worsening leukocytosis.  Mult bedside US w/no finding of ascites pocket that could be aspirated.

S/s, anemia and leukocytosis did not improve, and abd ascites US and CT found lge loculated fibrous fluid collection and abd and pelvis consistent w/hemoperitoneum.  This was subsequently managed w/laparotomy w/washout and cholecystectomy. Post-op course complicated by suspected bile leak and ileus.

Initial HIDA scan w/no evid of leak, but repeat scan confirmed leak and ERCP performed w/placement of transpapillary biliary stent. WBC downtrended to nl, and pt w/no fevers >1 wk prior to disch.  Abx for 10 days.

Ileus managed w/NG tube and bowel rest, then suppositories and advancement of diet to low fat renal.

Repeat CT abd/pelvis w/oral contrast w/no evid of infx and w/overall improvement in ascites.  JP removed on day of disch.

Pt followed by Nephrology and underwent HD every T/Th/Sat.  Given 3000 IU Epo w/sessions to improve anemia, along w/3 txs of IV iron.  Mag3 scan showed poor but improving renal fxn.  Pt to f/u w/Nephrology on outpt basis.

Dx:
- o **Vancomycin-resistant Enterococcal (VRE) bacteremia.**
- o **Acalculous cholecystitis s/p percutaneous cholecystostomy and open cholecystostomy, LOA washout.**
- o **Secondary bacterial peritonitis w/VRE.**
- o **AKI due to DIC-associated renal cortical necrosis.**
- o **Post-op biliary leak s/p stent and ERCP stent placement.**

| | | |
|---|---|---|
| | o **Sinus tach.**<br>o **Metabolic acidosis secondary renal failure.**<br>o **Post-op ileus.**<br>o **Hx of duodenal ulcer + H. pylori.**<br>o **Proteinuria.**<br>o **Anasarca w/bilat pleural effusions and ascites.**<br>o **Hx GAS TSS due to retained POC, s/p SVD c/b MSOF.**<br>o **Normocytic anemia secondary to renal failure.**<br>o **Pituitary apoplexy.**<br><br>Plan:<br>o F/u for need for ERCP for stent removal.<br>o PT consult for home eval for safe ambulation.<br>o Admin EPO w/HD.  Hopeful pt may have renal recovery, pls monitor. | |

### 2.   Ascites Fluid Accumulations, Paracentesis Drainage, and Intestinal Ileus Blockages.

Marites was set up with private nephrologist Noah Solomon, who arranged for Marites to receive her outpatient dialysis three times a week at Pearlridge Dialysis beginning on 8/27/13.  Interrupted by her second hospitalization, Marites returned home and continued her outpatient hemodialysis three times a week.  In the weeks that followed, she had difficulty adjusting to her condition and having to be a new mother to a baby daughter.  She was wheelchair and four-wheeled walker bound which, in a small multi-level townhouse living with six other people, proved to be especially challenging.  Marites slipped into depression and insomnia.

She was anxious about her condition and that she would relapse into acute illness at any time.

On Christmas Day 2013, Rafael took Marites to the Pali Momi emergency department because Marites was experiencing intermittent severe dizziness.  It was determined to be vertigo, but Marites was upset by the development.  Over the next few weeks, she also started to develop increasing ascites fluid buildup in her abdomen again.  Upon consultation with her gastroenterologist, it was determined not to be hepatic biliary fluid but likely related to volume overload due to renal failure and hemodialysis.  On 1/16/14, a repeat paracentesis was performed and two liters of fluid was removed.

Marites had also been plagued by skin rashes and irritations related to her antibiotic therapy.  On 1/17/14, she presented to the Makalapa Clinic for pain at her permacath site and was given more antibiotics to cover for community-acquired MRSA.  She was also determined to have cellulitis at the catheter insertion site.  It was suggested that given her lack of return of renal function, she should be considered for installation of an arteriovenous ("AV") fistula to facilitate her hemodialysis.

Marites continued to develop fluid ascites that fostered abdominal distention and affected her nutritional intake because of a false sense of

satiety.  On 2/19/14 Marites was subjected to yet another paracentesis

which was unsuccessful likely due to adhesions in the abdomen that had

developed from the sepsis and all the subsequent surgical/procedural

interventions since:

| 02/19/14 | Pulmonary Note (Matthew Aboudara, MD):<br>1:30 pm.  Pt here for 2nd paracentesis, last seen ~1 mo. Ago.  States last paracentesis resulted in significant improvement.  Pt w/+ pain in RUQ when lying down, nausea and early satiety.  Explained not able to remove all fluid from abd.  Goal should be symptomatic improvement w/anticip. that dialysis, recovery of renal fxn, and resolution of ascites should be the goal.<br><br>Have a sl impression that they want all fluid removed, that this will result in a complete resolution of pt's s/s, of which I expressed doubt.  On US, presence of a 10 cm pocket of free flowing fluid in RUQ.  Fluid in LUQ tracks under rib cage.<br><br>Abd w/lge transverse incision in RUQ, mildly tender to palpation in LLQ and RUQ, distended, no rebound.<br><br>**Localized 10 cm pocket of fluid at R flank via US, prepped and guided centesis needle into peritoneal space w/return of straw-colored fluid.  Drainage exceedingly slow.  Used thoracentesis catheter to enter pleural space, straw-colored fluid aspirated and advanced into space but minimal to no fluid aspirated.  Given 2 unsuccessful attempts at isolated 10 cm pocket of fluid, elected to abort procedure.**<br><br>**Fibrous strand around pocket in question, suggesting adhesions which could be impairing ability to drain fluid.** | TAMC2 7048-7052<br><br>TAMC CHRON 231-236<br><br>MAKAL APA 652-656 |

| | Explained the above to pt & husband.  Believe the safest thing to do is abort the procedure, allow for re-accumulation of larger amt of fluid before reattempting another paracentesis.  F/u w/PCM and/or in Pulmonary Clinic. | |

Because of her young age and healthy pre-incident status, Marites

was a good candidate for a kidney transplant, and she was sent to the

Queen's Medical Center transplant program for evaluation of candidacy.

On 2/28/14, Marites was evaluated by several disciplines and was

accepted into the program:

| 02/28/14 | QMC Transplant Candidate Assessment – RN Progress Note<br>Pt and husband seen for new kidney transplant eval. . .<br>Patient given lab slip and Chest xray ordered. Pap smear in Jan., will need EKG, Echo, and surgeon appt. Dental clearance to be completed. . .  Pt reports ongoing ascites that is slowly improving, reports LFTs are currently normal.<br>PMH:<br>•Chronic kidney disease stage V requiring chronic dialysis<br>•HTN<br>•Depression<br>•Gastroesophageal reflux disease<br>•Nausea<br>•S/P laparoscopic cholecystectomy 2013<br>•Shock liver<br>•Insomnia<br><br>Past Hosp: TAMC from 7/2013 - 10/2013 for complications of toxic shock<br>syndrome after child birth.  PRBC x3-5 at TAMC per patient's husband.<br><br>Pt and Spouse attended Pre-transplant Education | QMC 120, 131, 139-148, 163 |

**Social Support**

Social Support: Pt's mother is 77 years old and resides with pt and her family. Mother helps provide childcare and is supportive. Pt's father died at the age of 50 and had a history of HTN. Pt has 5 siblings who are alive and well living in the Philippines.

Transportation: family/caregiver (drove independently previously)

Relationship status: married (for 9 years, together for 16 years, 3 children)

Religion: Christian, has postive spiritual supports thru church.

Primary caregiver: Rafael Campano (spouse) Works full time as a nurse, but is able to take time off and is able to drive. Husband states he was just commissioned as a nurse so he is less likely to be deployed.

Secondary caregiver: Diogenes Campano (brother in law)

Pt & spouse aware she will need caregiver assistance 24 hours a day, 7 days a week, for a minimum of one month post transplant. Pt accepted a list of caregiver requirements to reference.

. . . .

**Compliance/Understanding of medical situation**

Hx of medical conditions or disabilities: yes (Renal failure following post delivery complications including septic shock, respiratory failure, & hepatic encephalopathy. Pt has a lengthy hospitalization and continues to slowly regain her strength. Pt reports she has ascites which she has had tapped twice so far. Spouse states pt can have fluid removed on a PRN basis and the hope is that it will slowly decrease as she continues to recover. Pt has been on dialysis since July 2013 and reports good adjustment to her outpatient dialysis schedule. Spouse and his brother provide transportation to and from dialysis appointments and all medical follow up appointments.

Potential living donors? – yes, spouse will first discuss with his commander

Compliance – yes. Pt denies ever missing or cutting treatments short.

Diet – renal diet

Exercise – No, but is slowly incr. activity and endurance.

Motivation for transplant – Yes, wants to "fight to live", "for my children".

**Functional Status / Environment**
# of adults in household – 3 pt, spouse and her 72 yo mother
# of children – 3 14, 12 and 7 mo daughter.
Functional status: limited mobility (ambulatory, but slowly regaining strength, uses glasses). Has started to cook more and tries to do more home chores and child care.
Hobbies/interest: taking care of her childen

**Cognitive Function**
+ Memory deficits - improving since hospitalization
Cognitive changes – yes, difficulty concentrating following lengthy hosp.

**Mental Health/Coping**
Diagnosed mental illness?: No, but admits to depression and anxiety following her complicated hospital course. Pt reports she was completely healthy and did not expect complications after her delivery. Pt describes being tearful, asking "why me," and having difficulty accepting what has happened. Pt states she wanted to avoid going back to Tripler for f/u as the association with her experience was so traumatic, but reports she complied with follow up care. Pt states it took her about 6 mo. to feel emotionally ready for the transplant evaluation as she continued to cope with her health circumstances. Pt states she relies heavily on her spouse, who she feels she can turn to for emotional support, even if it means waking him up in the middle of the night. Pt reports difficulty sleeping and staying asleep but denies excessive worry keeping her awake. She takes Ambien with good effect 1-2 times per week as needed and is worried about dependency. She states she is able to take short naps as needed. She states her baby has also been a significant source of motivation and emotional comfort for her. She states her love and desire to take care of her daughter has helped her cope and accept what has happened and face what she needs to do to regain her health. She denies any current or previous suicidal or homicidal ideations and appears to have adequate coping

mechanisms and supports in place. Pt feels capable of obtaining additional supports if needed.
Abuse issues?: none
Psychiatric hospitalizations: no
Suicidal/Homicidal ideation: no
Current treatment/meds: no
Coping: good (relies on spouse for emotional support)
High risk behaviors: none

**RECOMMENDATION:**
Low, no psychosocial issues were identified that may impact transplant.
**Patient clearance: pt is cleared (as a renal transplant candidate) from a psychosocial perspective**.

Meds:
Multivits w/ minerals 1 tab QD
Ambien 10 mg prn HS
Nexium EC 40 mg QD

### 3.    Depression, Anxiety, Post-Traumatic Stress Disorder, and Psychiatric Treatment.

Marites continued to experience abdominal issues related to her recurrent ascites and ileus, as well as her depression and insomnia.  She also started having bouts of hypertension.  Marites's nephrologist Dr. Solomon suspected that her insomnia was related to her depression and PTSD stemming from her course at Tripler and recommended psychiatric treatment for Marites:

| 03/14/14 | Dialysis Note – N. Solomon, MD<br>Meds:<br>  Colace prn<br>  Lunesta 3 mg HS prn<br>  Nexium 20 mg QD<br>  Renetabs 1 tab QD<br>No Complaints.  Ms. Campano reports that she has been feeling OK, but weak in general. Her chief complaint is insomnia. She has difficulty falling asleep and then awakens frequently. Her appetite is poor. She has been undergoing intermittent paracentesis for ascites with associated discomfort and shortness of breath. She is seeing Dr. Parker of GI at TAMC.<br>Orders<br>**I suspect she has depression and possible PTSD as the underlying cause of her insomnia.  Rec. consultation with psych. for evaluation and treatment.**<br>HTN: Suboptimal control. Double amlodipine dosage (pt unsure of dosage--if 5 mg QD, will take 10 mg QD, but if 10 mg QD, will increase to 10 mg BID. | NOKS 53-54, 188-9 |

Dr. Solomon also recommended that Marites have an AV fistula installed by a vascular surgeon due to the extended time of her need for dialysis and the lack of any indication that she will recover any appreciable renal function.  He certified his opinion in a letter to Marites's primary care physicians:

| 03/14/14 | Letter from Dr. Solomon<br>Dear Dr. Kellicut and Dr. Goins<br>I have evaluated Marites Campano and have determined that **it is extremely unlikely that she will regain enough renal function to discontinue dialysis. Her eGFR is currently ~7 and she has been dialysis dependent for nearly 8 mo.**<br>I have advised her to proceed with AVF creation, as this is in her best interest. She will simultaneously pursue a renal transplant, but this will take quite some time. | NOKS 55, 190 |

On 3/19/14, on Dr. Solomon's recommendation, Marites's primary care doctor Dr. Goins agreed to refer Marites to psychiatric treatment:

| 03/19/14 | Clinic Note (Jeremy Goins, MD): Recurrent nephrotic ascites w/incr. R-sided abd tension. RUQ solid mass representing hepatomegaly vs. other etiology.  US only w/reaccumulation of ascitic fluid.  Labs reveal rising AST and bili.  Will consult GI for possible long term solution for ascitis fluid – now thought to be nephrotic origin, although not resolving on dialysis...also w/worsening LFTs.<br><br>**Pt w/ongoing depression and anxiety.  Recvd fax from pt's nephrologist [Dr. Solomon] recommending possible psych referral – which he labeled PTSD, but unclear that this can be dx'd at this time.  Pt had a significant traumatic hospitalization and recent hx.  Believe it is reasonable to refer her to Psychiatry at this time for further eval and possible initiation of SSRI vs. further counseling.** | TAMC2 7029-7031<br><br>TAMC CHRON 211-213<br><br>MAKAL APA 633-635 |

On 3/27/14, Marites saw the psychiatrist for the first time, who provisionally diagnosed her with chronic PTSD related to her injuries and illness at Tripler.  She asked to see a psychologist who was not at Tripler because Tripler was a source of extreme anxiety for her.  It was also sadly revealed that M.R.B.C. herself was a source of depression and anxiety for Marites because Marites associated M.R.B.C. with the horrific events she experienced at Tripler.

| | | |
|---|---|---|
| 03/27/14 | Psych Note (Kenneth Dunstone, MD):<br>**Provisional Dx:  Chronic PTSD.**<br>37 y/o spouse of ADN Ensign w/mult med problems incl ESRD on dialysis and liver damage secondary to DIC and multi-organ failure following birth of daughter in '13.  Spent >2 mos at TAMC and since that time, describes ongoing intrusive and avoidant s/s asso. w/ her traumatic illness and hospitalization, as well as negative alterations in cognition and mood, hyperarousal and reactivity, currently meeting criteria for PTSD (DSM-5).  **Will have Med Mgmt through TAMC Outpt Psychiatry, but desires and would benefit from skilled psychologist assist in processing traumatic experience.  Pt would likely benefit from network referral, due to anxiety every time she has to come to TAMC for tx and monitoring.**<br><br>Pt generally able to express herself well in English, but may benefit from native Tagalog provider. | TAMC 3099-3100 |
| 03/27/14<br>*(written/ signed 4/17/14)* | Psych Note (Kenneth Dunstone, MD):<br>Pt 37 y/o Filipina spouse here for **depression w/anxiety. PCM and nephrologist recommended possible psych referral for eval of ongoing depression and anxiety in light of her significant traumatic hosp w/possible initiation of SSRI vs. counseling.**  Discussed limits of confidentiality w/pt prior to initiation of eval.  The contents of this rpt are considered medically privileged and should be kept private.  Contents may be revealed if failing to do so would endanger pt or others, or in specific situations of child or elder abuse covered by this jurisdiction.<br><br>Session #1<br>Seen for initial intake w/addl med mgmt.  Pt w/no significant psych hx.  Pt w/recent and traumatic medical hx following birth of daughter 8 mos ago.  She began to hemorrhage following delivery and went into DIC, followed by multi-organ failure.  There were points during her experience when she was not expected to live.  Greatest damage was to her kidneys and liver, and she currently carries an ESRD dx w/likely need for dialysis w/in the next several wks.  She will also likely be put on the kidney transplant list as her renal fxn | TAMC2 7016-7020<br><br>TAMC CHRON 200-204 |

has not improved.  EEG during the course of her illness suggested possible anoxic/hypoxic injury to the cerebral cortex, although she feels she has regained most of her cognitive fxn.

**Since her initial med crisis, she began to have nightmares and difficulty falling asleep.  She conts to be justifiably worried about her survival.  Any time she comes to Tripler for tx, she gets worried and scared, and has a strong desire to avoid even seeing or thinking about the hospital.  This feeling is magnified when she has to visit the OB Dept.**

**She also had a very distressing problem in Nov/Dec '13, when she found she could not spend time with or even look at her daughter w/o feeling she was reliving her traumatic med episode.  She says that while she knows there are good physicians @Tripler, she has difficulty trusting any provider given her experience.  She remains in a persistently fearful and anxious state.  She and her husband have been arguing more about family and childcare, which pt says is not like her. She also has some difficulty w/concentration and significant sleep disturbance, all >1 mo.  Mood anxious.**

Re PTSD, pt w/traumatic medical experience 8 mos ago, meeting criterion A-H.  No prior psych hx.  Rpts hx of sertraline for 1 month in 2012, which helped her feel less anxious and depressed.  She also tried zolpidem and eszopiclone w/o significant benefit.  Does not want to take any psychotropic for a significant length of time for fear of addiction or dependence.

Family hx – mother w/anxiety.

Developmental/Social Hx:
Born & raised in Philippines w/6 siblings, of which she is the youngest.  One sibling lives in Canada, and the rest remain in the Philippines.  Pt is married to an ADN medic/nurse (E-6/POI), they have 2 older sons and a daughter 8 m/o.

They have been in HI for 6 yrs, and plan to PCS to San Diego in Sept '14.  They have a Baptist faith background, and pt finds prayer a great help when she feels anxious and depressed.  Pt's mother has stayed w/the family in HI helping care for the baby, but has her own medical issues.  Mother will not go w/family for 2 yrs during their upcoming stay in San Diego. Due to mother's medical issues, she is not always able to care for the couple's children on her own.

MSE:
Thin, answers questions appropriately, mood "anxious," affect mildly restricted, mild psychomotor agitation, some skin picking noted.  Speech w/ethnic accent.  Judgment fair, no SI/HI, delusions or paranoia.  A&O x4.

Assmt:
Pt biologically w/possible genetic loading for anxiety.  **More significant med hx w/traumatic post-partum course following birth of daughter 8 mos ago, to incl multi-organ failure and current ESRD w/pending dialysis.  Pt w/profound chronic illness w/strong association to depression, anxiety.**

**Psychologically, pt denies most depressive s/s, but meets full criteria for PTSD, given her medical experience.  Socially, w/supportive husband and mother, but pending PCS is a significant stressor, and loss of parental support in the household and childcare duties.**

Pt currently denies depressed mood or SI, has supportive family, Behavioral Health f/u, no hx of significant mental illness.  Her chronic illness and PTSD are risk factors, but risk of acute SI is low at this time.

Pt would likely benefit from group and/or individual therapy, to incl support group w/goal of reducing PTSD s/s.  She may also benefit from pharmacotherapy targeted to sleep, anxiety and depressive s/s, w/extreme caution for renal and hepatic interactions and impairment.

**Assmt:**
**DSM 5 – PTSD, parent-child relational problem**
**(improved), ESRD and hepatic impairment.**

Plan:
- o  F/u in 3-4 wks in ABHOS Clinic.
- o  Consult placed to Psych for PTSD talk therapy.
- o  Start mirtazapine 7.5 mg qhs.  Discussed SE, and fact that med is not addictive and does not cause physiologic dependence.
- o  Pt to call in 2 wks w/update on med's efficacy, or sooner if any questions or concerns.
- o  Avoid ETOH, caffeine, all illicit drugs.
- o  Practice good sleep hygiene, exercise reg., eat a well-balanced diet.
- o  Will discuss pt w/Dr. Levy during supervision.
- o  Pain addressed by other svcs and is not a focus of this tx plan.
- o  Pt's primary language is not English but she & husband indicated understanding during session.
- o  Pt educated on dx and tx, and verbalized understanding.
- o  See no indication for referral to Care Mgmt.

### 4.    The Road Toward a Kidney Transplant, and an Anxious Third Hospitalization at Tripler.

On 3/31/14, Marites was evaluated by surgeon Dr. Yamaguchi for a kidney transplant and, given Marites's young age and relative lack of any comorbidities, Dr. Yamaguchi opined that Marites would be an excellent surgical candidate for kidney transplantation and recommended she complete the standard transplant work-up.

On 4/24/14, Surgeon Dwight Kellicut installed an AV fistula in Marites's right arm at Tripler.

On 5/14/14, Marites was informed that she was approved for active listing status on the United Network for Organ Sharing kidney transplant waitlist.

Prior to her delivery of M.R.B.C., Marites had planned to have her tubes tied after giving birth.  Because she was so ill immediately after birth and proceeded down the horrendous medical course she experienced, Marites did not have her tubes tied.  After she suffered the serious medical complications in the incident, Marites was advised that getting pregnant carried a serious risk both to her and her baby's life.  As a result, Marites had an intrauterine contraceptive device (IUD) installed.

On approximately 5/25/14, Marites experienced sharp abdominal pain in her left lower abdomen.  She went to the Pali Momi emergency department and radiologic studies of her abdomen showed that she had an ovarian cyst on her left.  Her gynecologist opined that the cyst was caused by the IUD.  She was placed on pain medication and serial radiologic surveillance to monitor the cyst.  Her IUD was removed on 7/10/14 and she was put on the Nexplanon implant contraceptive on 8/28/14.

On 6/10/14, surgeon Dr. Kellicut cleared Marites's AV fistula for use in her hemodialysis, and on 6/23/14 Marites's dialysis permacath was removed because the catheter tip was infected.  She was placed on antibiotics yet again.

In September 2014, Marites was worked up to prepare for a kidney transplant.  She had a cardiac workup, including an electrocardiogram, a transthoracic echocardiogram, and a treadmill stress test, which were all clear.

Around the same time, Marites and Rafael expressed interest in home hemodialysis, and nephrologist Dr. Solomon sent them to training starting in November 2014, with home treatment to follow.  They started home hemodialysis on 12/4/14.  Because the home hemodialysis was not as comprehensive as the dialysis performed at a dialysis center, Marites had to have home hemodialysis five days a week instead of three.  The schedule was killing Rafael, as he would return from a full days' work and have to stay up to complete Marites's dialysis at home during the night until the wee hours of the morning, sleep for a bit, then get up and go back to work the next morning.

In February 2015, Marites was reassessed for a kidney transplant, including by psychosocial, pharmacological, and financial metrics and was cleared.

On 3/1/15, Marites went to the Pali Momi emergency department with a sore throat, fever, and a yellowish/white discharge from her AV fistula site.  She was transferred to Tripler and immediately admitted to the Progressive Care Unit.  Marites was terrified at being back at Tripler again.

| 03/01/15 | H&P (Harry Aubin/Dwight Kellicut, MD):<br>38 y/o female transferred from Pali Momi to TAMC ER for acute onset of RUE disch at brachiocephalic AVF x1 wk. Disch initially clear but has become more yellow/white. Husband performs home dialysis every T/R/S and accesses the same "button hole" site.  Husband noted disch yesterday, last pm temp elevated at 99.9 w/chills and scratchy throat.  At Pali Momi, labs, Vanco 1g, gentamycin 40 mg.<br><ul><li>RUE brachiocephalic AVF access site cellulitis, likely secondary to repeated use of same access site. Although AVF is native vessel and there is low risk of developing pseudoaneurysm from infx and rupture, there is concern that this could occur due to open draining pustule.  Because of this, pt requires adm for observation and planning for optimal access site. Since she recvd both vanco and genta at Pali Momi ER, these abxs will provide coverage for the foreseeable future, given her ESRD.</li></ul>Admit to PCU.  Consult Nephro in a.m.  Consider RUE US in a.m. to r/o abscess, although no signs of this upon exam. Repeat wound cx, blood cx x2.  NV/AVF checks q2h.  Hold abx due to receiving vanco/ gent @Pali Momi.  Bacitracin/Telfa to RUE AVF access site.  Hold heparin due to bldg risk. | TAMC2 6064-6068 |

| | | |
|---|---|---|
| | o  Hx HTN – stable, cont home amlodipine.<br>o  Hx ESRD on T/R/S IHD – will need other access site to allow cellulitis to heal.  No sticks to AVF.  Consult Nephro in a.m.  Cont home phos binder and other dialysis meds.<br>o  Hx duodenal ulcer – cont PPI.<br>o  **Situational anxiety – pt visibly emotional when told of recommendation for adm.  Understandable, considering her long complicated hospital course.** Reassured her and offered Ativan for anxiety as she feels this helps at times.  Rx Avitan 0.5 mg q6h prn anxiety.  Situation discussed w/Drs. Goldon and Kellicut. | |
| 03/02/15<br>0457 | Lead RN Note (Thales Lopes, RN):<br>**Pt w/anxiety about hospitalization.**  More consults and f/u in a.m. | TAMC2<br>6172 |
| 03/02/13 | Nurse's Note (Aubree Hanks, RN):<br>**Pt w/some anxiety due to previous traumatic stay** but remains calm and able to discuss concerns. | TAMC2<br>6084 |
| 03/03/15 | Nurse's Note (Bobbi Murray, RN):<br>**Pt asking if she will be leaving today after HD.**  SI from cordis placement, L neck, pain radiating up to ear (4/10), c/o feeling throbbing/fullness on ear.  PICC LUE patent, no s/sx of infx, drsg c/d/i.  Urinates w/o difficulty, actively menstruating.  Ambulates w/o difficulty.<br><br>**Pt anxious about stay due to past poor outcomes from hospital stays.**  Spouse @bedside.  **Per rpt, pt previously tearful.  Ineffective coping w/stay.**  Stated Ativan did not help w/sleep, asked for Ambien if staying another night.  Plan to disch home w/IV abx.  HD today, prn pai mgmt.  Awaiting cx results, abx tx. | TAMC2<br>6145-<br>6150 |
| 03/04/15<br>0125-<br>0227 | Lead RN Note (Jeremias Johnson/Caroline Quibol-Alpin, RN):<br>Husband works on 6B1, hospital priv to go outside w/husband.  Ativan not given tonight, Ambien given at bedtime for sleep.  Husband in room, educated on fall precautions.  **Pt has anxiety r/t poor outcomes from previous hospitalizations.** | TAMC2<br>6180-<br>6183 |

| | Pain tolerable, no request for prn pain meds.  Conts on IV abx.  Cultures w/presumed staph aureus. | |
|---|---|---|

Marites was discharged from Tripler on 3/5/15 after a four-day stay.

**5.    The Kidney Transplant and a New Host of Risks and Concerns.**

On 3/24/15, Marites was informed that there was a kidney transplant

available from out of state.  She and Rafael met with Queen's transplant

surgeon Makoto Ogihara, M.D.:

| 03/24/15 | H&P (Makoto Ogihara, MD):<br>38 y/o w/ESRD secondary to episode of TSS (secondary to retained POC) and critical illness after birth of most recent child.  Started renal replacement therapy on 7/24/13, and currently dialyzed 5 days/wk at home.  Husband is an RN and cannulates pt.  Pt still makes ~500-600 ml urine daily.  Pt has had difficult HD access and hx of cath infx and bacteremia, recently tx'd @TAMC for cellulitis of R arm native AVF w/home IV abxs via PICC.  Also L IJ Permacath placed to rest arm.  Pt approaching end of her 3 wk abx regimen and feels well.  Sensitized w/99% cPRA.  Blood group B.<br><br>PMH:<br>  o  Acute liver injury when critically ill w/TSS.<br>  o  HTN.<br>  o  TSS<br>  o  Ascites, thought to be secondary to kidney fxn.  Last paracentesis in Jan '14, and ascites slowly resolving.<br>  o  HD accessed by catheter.  R IJ Permacath.<br>  o  Cholecystectomy, lap converted to open.<br><br>Pt gets tired after HD, but doing and feeling much better than immediately after episode of critical illness.  Previously required wheelchair to get around, but can now walk up a flight of stairs or walk a block w/o trouble. | QMC 552-554 |

Assmt:

**Pt presents for discussion of renal transplant surgical options.  Kidney transplant, incl planned operation and expected post-op course discussed, along w/risks of operation and long-term immunosuppression. Discussed both living and deceased donor options, and pt encouraged to pursue any known living donor options.  Husband, here w/pt, interested in pursuing kidney donation.  Given pt's age, as well as her relative lack of co-morbidities, pt was not encouraged to pursue extended criteria donor (ECD) kidneys.  Possibility of elevated antibody levels (mult pregnancies, blood transfusions, critical illness) discussed. Recommendation to pursue ECD kidneys could change depending on antibody level.  Also discussed paired donor exchange, options of mult listing, DCD high risk donors and DCD donors.**

**Pending completion of transplant w/u, as well as further input from multi-disciplinary transplant team, pt appears to be an excellent surgical candidate for kidney transplantation.**

Plan:

**A 24 y/o brain-dead male donor kidney (KDPI 24$) became available from out of state and is being offered to pt as a primary candidate due to her high PRA.  Donor is a CDC high risk, but probability of transmissible dz is very low because of avail serology results.  Pt is aware of these, and wishes to proceed, which is transplant team's recommendation. Final crossmatch and rpt of organ anatomy pending.  Assuming all acceptable, pt will be adm'd to undergo deceased kidney transplant. Induction immunosuppression w/ATG will be necessary.**

The next day, on 3/25/15, Dr. Ogihara installed Marites's new kidney.

As is standard in kidney transplant surgery, Marites's kidneys were left in

place, and the donor kidney was installed in Marites's lower right abdomen

and grafted into service so she actually has three kidneys in her body.

Marites had good function in the donor kidney and she was monitored

inpatient for the next five days until she was discharged from Queen's by

Dr. Ogihara on 3/30/15:

| 03/30/15 | Discharge Summary (Makoto Ogihara, MD):<br>Adm 3/25/15, Disch 3/30/15.  PCP Jeremy Daniel Goins.<br>Consultant:  Arksarapuk Jittirat.<br>Discharge Dxs:  ESRD resolved w/deceased kidney transplant, HTN, GERD.<br>Operation:  Deceased kidney transplant w/back table accessory artery reconstruction and transplant ureteral stenting.<br><br>Hx:<br>38 Filipino female w/ESRD due to episode of TSS at time of recent childbirth, started on HD in 2013.  Pt sensitized w/99% cPRA, blood group B.  CMV IgG +.  **24 y/o brain dead male donor kidney (KDPI 24$) became avail from out of state and imported.  This was a CDC high risk donor, but probability of transmittable dz considered very low in view of negative serology results.**  Final crossmatch compatible and pt adm'd to undergo deceased kidney transplant.<br><br>Hospital Course/Tx:<br>Imported kidney was L kidney w/an accessory upper pole renal artery, that was transected at time of procurement, repaired on back table.  Kidney implanted to R iliac fossa in standard fashion.  Double-J stent placed over ureteral anastomosis.  Allograft kidney w/excellent immediate function w/brisk diuresis.<br><br>**Because pt at high risk for acute cellular rejection, immunosuppression was intensified w/four 1.5 mg/kg** | QMC 490-492 |

|  | **doses of ATG in addition to standard steroid taper, tacrolimus and mycophenolate.  Adm creat was 3.5, disch creat 0.8.  Due to acute on chronic peri-op anemia, 2u PRBC transfused.  PermCath removed upon disch. Removal of ureteral stent will be arranged as outpt.  Pt will need 6 mos of Valcyte.** <br><br> **Disch Meds:  Tacrolimus 5 mg 2x/day, CellCept 750 mg 2x/day, Prednisone 25 mg/day & standard taper, Valcyte 450 mg/ady, double strength Bactrim M/W/F, Phospha Neutral 3x/day, Coreg 6.25 mg 2x/day, Vicodin prn. Cont home meds:  Nexium, multivitamin, Norvasc.** Diet as tolerated, no heavy lifting.  F/u w/Dr. Jittirat & coordinator at Transplant Clinic as scheduled. |  |

Marites and Rafael were so happy about the successful kidney transplant and not needing to undergo dialysis any longer.  But as Dr. Ogihara's note makes clear, they were now subject to an entirely new set of risks, problems, and worries.

Because the body views the transplanted kidney as a foreign invader, the body's immune system defenses attack the new kidney.  To curtail this attack, Marites is required to take powerful immunosuppressive drugs for as long as she has the transplanted kidney.  The dangerous -- and life-changing -- side effect is that she also will be at high risk for acquiring and developing infections due to a compromised immune system.  As a result, Marites has gone from constant anxiety regarding kidney failure to constant anxiety about contamination and potential infection.  She obsessively sanitizes everything, is apprehensive about interpersonal

contact, is meticulous about food safety and choices, and categorically avoids places where pathogens like viruses and bacteria are prevalent, like doctor's offices, hospitals, and care facilities.

This situation also has essentially eliminated her ability to return to work at the Plaza care facility even if she was physically capable to doing the job, due to the high incidence of illness and infections in the patient population there.



Marites (3rd from left) and Her Plaza Co-Workers in Happier Times

Plaintiffs' nephrology expert Keith L. Klein, M.D. is a Clinical Professor of Medicine at the David Geffen School of Medicine at the University of California at Los Angeles, an Attending Physician at Cedars-Sinai Medical Center and UCLA Medical Center, and a private practitioner in Internal Medicine and Nephrology in Los Angeles.  Dr. Klein received his M.D. degree from USC in 1971, did an internship at Johns Hopkins from 1971-1972, a residency at Los Angeles County-USC Medical Center from 1974-1976, and a Fellowship at USC from 1976-1978. Dr. Klein is certified by the American Board of Internal Medicine with a subspecialty in Nephrology, holds memberships in several medical/professional societies and has been a member of the Medical Executive Committee at Cedars-Sinai Medical Center and Director of the Metabolic Support Team and in charge of inpatient total parenteral nutrition at Cedars for the past twenty years.

Dr. Klein explained the risks and concomitant life changes associated with a kidney transplant and illustrated what Marites's life will be like as a transplant patient in his expert report, which provides in relevant part:

Transplant Risks

Renal transplant is the treatment of choice for the majority of patients with end-stage renal disease, such as Mrs. Campano.  As a result of her March 25, 2015 renal transplant, Mrs. Campano no longer has to endure the long hours on dialysis each week (~12 hours/week),

needle sticks, care of her fistula, or careful monitoring of her fluid intake.  **Her renal transplant, however, is not without its own risks and burdens**.

**In order to reduce the risk of transplant rejection, patients are required to maintain a strict routine of immunosuppressant medications that must be taken on time, and as prescribed. These medications weaken the patient's immune system and increase their susceptibility to infection, malignancy, and other diseases**.  As a result, transplant patients are required to maintain very close medical follow-up after a transplantation.  For Mrs. Campano this will mean frequent medical office visits and routine laboratory tests.

**Nephrotoxic agents, including decongestants, many antibiotics, radiocontrast media, and nonsteroidal anti-inflammatory agents such as motrin, should also be avoided**.

**Respiratory infections, urinary tract infections, flu and other infections will be a common and constant threat the rest of her life.  As a mother with young school-age children, Mrs. Campano will be at even greater risk. Recommended strategies for minimizing infections include: limiting contact with anyone who has a cold or infection; avoiding going outside barefooted, or gardening (because of the bacteria in soil); not touching items that have had contact with human or animal feces (e.g., diapers, bedpans, toilets, and litter boxes);  and, avoiding crowded areas such as malls, movie theaters, and planes**.

Transplant patients also have an **increased susceptibility to other diseases**, for which monitoring is recommended:

- **Diabetes mellitus** occurs at increased rates post-transplant with an ongoing risk for the life of the patient and transplant. Mrs. Campano will likely have annual screenings recommended with a fasting blood glucose.

- **Cancer** is more common in transplant recipients. Routine cancer screenings are recommended with self-exam skin

cancer screenings done monthly and total body skin exams conducted every six months to yearly by a dermatologist.

- **Bone disease** is also common following renal transplantation. Mrs. Campano will require regular monitoring for hyperparathyroidism, vitamin D deficiency, hypocalcemia, and hyperphosphatemia.

Dr. Klein Expert Report at 4 - 5 (emphasis added). Dr. Klein's expert report is attached as Exhibit "3." Marites will be on these immunosuppressive drugs and be subject to these risks and precautions for as long as she has her kidney transplant(s).

### 6. The Ruptured Ovarian Abscess and a Fourth Hospitalization at Tripler.

Marites continued to struggle with her ovarian cysts, which would cause her extreme pain during menstruation. She required treatment in the emergency department for pain essentially monthly since her transplant. This would send Marites into a tailspin because she was so concerned for infection. Finally, on 8/2/15, Marites presented to the Queen's emergency department with 10 out of 10 pain in her lower abdomen. Marites had a septic abdomen and radiology was suspicious for a ruptured tubo-ovarian abscess, a life-threatening condition. After about four hours of observation, she was taken to surgery by OB/GYN Donn Tokairin who excised the cyst, drained the ruptured abscess, and lysed the adhesions in the surrounding

area.  She was kept inpatient for the next four days and discharged on 8/6/15 on antibiotics and pain medication.

However, three days later on 8/9/15, Marites returned to Queen's with increasing abdominal pain and a fever and was admitted.  Diagnostic testing indicated that she had a urinary tract infection that led to sepsis. She also had a severe and painful genital rash.  She remained at Queen's for the next three days and was discharged on 8/12/15.

Marites continued to live a life of constant vigilance against infection for the next year.  She tries to get back into life and family but cannot escape the specter of what happened to her at Tripler and the seemingly endless parade of life-changing problems that followed in its wake.

### 7.   Aneurysm of the AV Fistula and a Fifth Hospitalization.

Most recently, Marites's AV fistula developed an aneurysmal dilation or pseudoaneurysm and swelled bigger than a golf ball.


Marites's Swollen AV Fistula

Marites was feeling painful sensations up and down her arm, especially when lifting things, washing dishes, or carrying M.R.B.C.  She would also experience tingling, shocking neurological type symptoms stemming from the fistula site.

Marites consulted with her vascular surgeon at Tripler, Dr. Killicut, who assessed the situation, but given Marites's post-transplant status, ultimately deferred to Marites's transplant surgeon at Queen's, Dr. Ogihara, for the decision on how to proceed with the aneurysm associated with

Marites's fistula.  After evaluation and radiologic assessment, on 1/6/17,

Dr. Ogihara operated on Marites and repaired and relieved the aneurysm.

Although it was thankfully only a one-day stay at Queen's Medical

Center, the stay triggered an intense and lasting anxiety in Marites that

continues to the present time.  She also continues to have trouble sleeping.

E.    **Permanent Disfigurement**.

As a result of the multiple procedures Marites had to endure at Tripler

and thereafter because of the negligence, Marites's body has been riddled

with permanent scars and hyperpigmentations that cause her humiliation

and embarrassment.



Marites's Abdominal Scars



Marites's Abdominal Scars



Marites's Chest Scars

### F. Complex Medical/Psychiatric Evaluation by Robert C. Marvit, M.D.

On 6/1/16, both Marites and Rafael were evaluated by psychiatrist

Robert C. Marvit, M.D.  Dr. Marvit administered a battery of psychiatric

testing on both which confirmed the severity and depth of the mental and

emotional injury caused by Marites's ordeal at Tripler.  Dr. Marvit

summarized the test results as follows:

Marites:

The Psychological Social History report indicates that the primary
problem is her self confidence.  In addition, Marites is plagued by

difficulties with family, loneliness, moodiness, depression, anxiety, self-confidence, physical state, and work.  Retrospectively, her childhood was happy.  Mother and father were warm, overprotective, and understanding.  Parental relationships were close as a child.  She was shy, happy, confident, and emotional.  Mother was a homemaker and father worked as an unskilled laborer.  Discipline was both lenient and strict.

Marites rates her intellectual abilities as average.  She did not get into trouble in school. She had no difficulties with reading but she did have problems with math.  Marites came from a working class family.  Currently, providing enough income is an important stressor.  There is no history of drug use, but she does note her father may have had a drinking problem.  She had no serious illnesses as a child.  No family members reported with any mental impairments.  Marites has been married for more than 15 years.  She had no problems with childrearing.  She describes her husband in positive terms.  He fulfills his role well.  She eats a balanced diet and exercises limitedly.  She feels she is coping with the existing stressors well.  However, she describes her mental state as being tense, fearful, worried, angry, fearful, disappointed, regretful, irritable, scared, and nervous.

The Impact of Events Scale show a moderate to moderately severe post-traumatic syndrome.

Her fear questionnaire clearly indicates her anxiety regarding her physical, mental, and medical condition along with the people she has to deal with who treat her.

The Neuropsychological Impairment Scale indicates no response inconsistency or defensiveness.  Her affective score was elevated which is due to the anxiety and depression.  She scores high on the critical items, which is usually associated with a history of neurological trauma.  Her cognitive score showed significant impairment although this is compromised by her affective disturbance.  Similarly, her attention concentration is impaired, which may be associated with her anxiety.  Memory problems are indicated as well as lowered frustration tolerance with irritability and volatility.  All of these are consistent with her clinical state.

The Ruff Neurobehavioral Inventory indicates some cognitive problems. She is not trying to create a negative or positive impression.

The cognitive and emotional domain impairments were significantly elevated.  Her physical domain was moderately elevated.  The attention concentration, executive functions, learning, memory, speech, and language were all elevated post-morbidly.  Anger, aggression, anxiety, depression, and post-traumatic stress were all significantly elevated.  There are no problems of substance abuse, paranoia, or suspicion. Spirituality is normal.

Rafael:

Psychosocial history indicates that the primary problem deals with family and work.  Retrospectively, Rafael's childhood was happy.  Parental relationships were positive.  Rafael is also the youngest child.  He had a fear of failure and enuresis growing up.  Otherwise, he used to be shy, active happy, emotional, and self-confident.  Discipline was strict and fair.  Childhood fears included serious illness, injury, and death.

Rafael graduated college and became a physical therapist.  He grew up in a working class family.  To provide enough income is currently an important stressor.  Rafael has been in the Navy for approximately 10 1/2 years and had been in a combat zone for less than 3 months.  He has no service-connected disabilities, no drug or alcohol problems, and no family history of mental illness.  His general level of health is excellent.  He describes his marriage in positive terms. He describes his mental status as being forgetful, worried, irritable, but happy.

The Impact of Events Scale revised indicates mild to moderate scoring.

The Beck Depression Inventory did not reveal any significant depressive patterns.

The Neuropsych Impairment Observer Report completed by Rafael on his wife's neuropsychological impairment shows no response

inconsistency.  He reports some degree of defensiveness and an elevated distortion secondary to his wife's depression.  Critical item score elevation is associated with history of neurological trauma. Cognitive inefficiency and attention frustration tolerance were all elevated, but again influenced in part by her depression.  Issues may be followed up later on with the use of the functional magnetic resonance imaging.

The Ruff Neurobehavioral Inventory is valid report that indicates some elevation in the activities of daily living on problems with concentration, feeling overwhelmed, trying to do multiple things, and the ideas of feeling stuck.  He states that they don't go away.  He is seen as being organized and efficient.

He has some memory concentration problems but not of a substantial nature.  Similarly, Rafael has some with anger and aggression issues but nothing outstanding.  In a sense, Rafael likes to present himself as healthy, together, organized, and effective.

Copies of Dr. Marvit's reports regarding Marites and Rafael are attached as

Exhibits "5" and "6."

### G.   Psychiatric Evaluation and Ongoing Treatment by Danilo E. Ponce, M.D.

Marites was also evaluated by psychiatrist Danilo E. Ponce, M.D. on

July 30 and 31, 2016.  Marites went to see Dr. Ponce because she felt

more comfortable communicating with Dr. Ponce, who was capable of

conversing and understanding Marites's native language of Ilocano.

Marites has continued to treat with Dr. Ponce since the initial evaluation.

Dr. Ponce performed a full and comprehensive psychiatric evaluation

of Marites and issued a detailed report, which provides in pertinent part:

**MENTAL STATUS EXAMINATION FINDINGS:**
She came to the interview/examination accompanied by her husband (as she is still "fearful" to going out by herself), and 45 minutes late (as she "forgot" the date and time of her appointment which was 9:00 AM, **Saturday, July 30, 2016,** and her husband had to "take over" to make sure they came, albeit late).  She was neatly dressed in simple shirt and slacks, and prescription glasses.  She is a medium-framed, brown-skinned Asian-looking woman, who initially presented as a respectful, deferential, communicative, pleasant, coherent female, well-nourished and looked her stated chronological age (40 years old).  **As the interview/examination progressed however, she broke into sobbing and crying which persisted throughout, needing some time for pauses, and eventually time to compose herself as we finished, before she got out of the office and back to the waiting room where other patients were waiting for their appointments. Communication was in "Ilocano" (Filipino dialect).**

**There were no compelling evidence of any dissimulation, mendacity, malingering, symptom magnification, or secondary gains. As a matter of observation, she seemed somewhat "detached" from the current litigation process, and was more or less preoccupied with what happened to her, her near-death experiences, the harrowing medical/surgical clinical course she had to go through, and the "pain and suffering", she and her family had to go through (and still continues to go through, albeit now with "some light at the end of the tunnel"). Her overall clinical presentation (complaints/symptoms) were consistent with clinical examination findings.**

**Speech was linear, goal-directed, and was attentive/focused, and as mentioned, initially was essentially normal in tone and prosody until she started sobbing and crying when we went into her history.**  Nevertheless, she was re-directable, given some time to compose herself.  There were no thought disorders noted, no delusions, hallucinations, or gross cognitive distortions.  **Affect, as could be discerned was still indicative of ongoing distress.  She endorsed symptoms/complaints which could be construed as indicative of Post-Traumatic Stress Disorder (PTSD), Anxiety, and Depression (see "Brief Background Information", and**

**"Current Clinical Status and Subjective complaints"). There is passive suicidal ideations, but no active plans.** Intelligence, judgment and insight are commensurate with a college-educated, semi-professional class status.

EVALUATION/FORMULATION/DISCUSSION

History, review of medical records, and clinical examination findings are consistent with an ICD-10 diagnoses of: (1) **Post-Traumatic Stress Disorder (PTSD)** - F43.10; (2) **Adjustment Disorder with Mixed Anxiety and Depressed Mood** (F43.23). **On a more probable than not basis, both disorders are directly related in a causal manner to medical complications incident to her delivery of a baby daughter on July 22, 2013 at the Tripler Army Medical Center (TAMC).**

**Summary:**

1.    Diagnoses: The diagnosis of *"Post-Traumatic Stress Disorder (PTSD)"* is being made as it satisfies DSM-5 major criteria for PTSD: Life-death traumatic incident, "flashbacks" of the incident, fearfulness/hyper-vigilance, hypersensitivity to stimulus, emotional numbing.  The diagnosis of *"Adjustment Disorder with Mixed Anxiety and Depressed Mood"* describes the clinical anxiety and depression reactions consequent to *adaptations* and *adjustments* she and her family have to make for the *permanent* impairments and drastic alterations/disruptions of personal and professional lifestyles caused by the **7-22-13** medical incident.

2.    Etiology/Causation:  **Both disorders are directly related in a causal manner to the 7-22-13 medical/surgical complications following delivery of her baby daughter at TAMC.**  The PTSD, Anxiety, and Depression symptom complexes *continue* and are *continuing* throughout her clinical course, *aggravated* by, and *aggravating* the medical/surgical complications she had to undergo - multiple organ shutdown, kidney failure, kidney dialysis, kidney transplant, cholecystectomy, ovarian cyst procedure, etc. **Because some of the clinical *impairments* brought about by these medical/surgical complications are more or less "permanent", correspondingly, the aggravations caused by these complications on the psychiatric disorders are deemed to**

**be also, more or less "permanent", i.e. on a more probable than not basis, there will be some residual, permanent PTSD, Anxiety, and Depression causing ongoing impairments in her overall functioning**.

3.   Apportionment:  There are no compelling evidence or information of any pre-existing, or co-morbid but non-work related medical, surgical, or psychiatric conditions that are aggravating or being aggravated by the PTSD, Anxiety and Depression that are directly caused by the **7-22-13** medical incident that is the subject of the medical negligence litigation, hence **apportionment is not an issue in her particular case**.

4.   Formulation:  A series of traumatic and catastrophic medical complications in which she nearly died following delivery of her baby daughter on **7-22-13** (Toxic Septic Shock Syndrome, multiple organ system failure, kidney failure, right kidney transplant, kidney hemodialysis, cholesystectomy, ovarian cyst procedure, etc.) ***directly caused* the clinical psychiatric disorders of Post-Traumatic Stress Disorder, Anxiety and Depression in Mrs. Campano**. The long, arduous, and complicated recovery period took its emotional toll on both **Mrs. Campano,** her husband and immediate family members that served as support resources during these trying period (her mother, **Romana Bumanglag,** 75, and brother-in-law, **Paquito Campano).**

Aside from the physical pain and suffering, she suffered emotionally from a drastic plunge in self-esteem, with feelings of uselessness and worthlessness as a mother, wife, and provider for her family.  **The severity of her illness, the complicated and dangerous clinical course she underwent also caused *internecine* conflicts and turmoil in her family and extended family - conflicts with her elderly mother, and specially a confrontative sister-in-law who told her to her face "You're useless and worthless to my brother . . . I wish my brother would get rid of you (or words to that effect)", which needless to say, exacerbated her already faltering self-esteem, with piling on of more negative emotions of anger, bitterness, shame, guilt, and grief**.  With gradual physical recovery following the kidney transplant, which provided significant relief from the wearying and drudgery of the kidney dialysis process, her mood

began to gradually brighten up and improve, specially as it permitted her to resume, more or less, activities of daily living, which a life on dialysis severely restricted and curtailed.  Referral to a psychologist reportedly was not productive as she apparently needed more "culturally responsive psychiatric services", i.e. a psychiatrist who can speak her dialect ("Ilocano"), understands the Filipino cultural nuances as relevant to the ordeal she underwent (and continues to undergo), and who could prescribe appropriate medications as necessary and indicated.   Currently, she *reports* to have partially recovered some of her physical abilities, and her significant complaints/symptoms now revolve mostly around her psychiatric disorders.  She says she still suffers from *moderately severe* PTSD symptoms - fearfulness, emotional numbness, avoidance behaviors, hypersensitivity, hyper-vigilance, anxiety/panic "triggers" (proximity to TAMC, doctors, associative stimulus); anxiety symptoms - irritability, jitteriness, excessive worrying; depression - weeping, sobbing "for no reason", sadness, passive suicidal ideation.  She already mentioned what kind of help she would need ("culturally-responsive psychiatrist"), and estimated timeframe to recover enough psychiatrically, with treatment, so as to consider returning to work again in some capacity (one year).  This would also roughly coincide with their possible move to the mainland (San Diego?) with the reassignment of her husband.   **A more realistic and factual overall clinical appraisal of her condition however, does not point towards any kind of immediate hope for total remission of her medical/psychiatric condition, and points more towards the need for ongoing *maintenance* medical/psychiatric treatment to insure some semblance of quality of life, as prognostically (see *Prognosis),* the expectation that her kidney transplant to gradually deteriorate and fail is high within 10 years, and she could conceivably have to undergo once again another round of hemodialysis and waiting for another transplant.**

5.    Treatment:  The gold standard for the psychiatric treatment of PTSD, Anxiety and Depression is a multi-modal approach consisting of (1) Cognitive-Behavioral Psychotherapy (CBT); (2) Desensitization/Exposure Therapy; and (3) Psychopharmacology. *CBT* will address the cognitive distortions, negative self-talk, dysfunctional assumptions and belief systems that produce and translate into self-defeating and paralyzing behaviors;

*Desensitization/Exposure Therapy,* as their name implies is to expose her gradually, and in a titrated manner to her "triggers" and things/events/persons that she is avoiding, so that eventually, like in treating allergies, she becomes "desensitized" and no longer reacts to them negatively.  Desensitization should also include *relaxation* exercises (e.g. deep breathing, meditation), use of audio-tapes scripts that consists of soothing background music of her choice with super-imposed gentle instructions to relax, which she could use as she anticipates getting exposed to "triggers" (e.g. doctor's appointments, going to hospitals, undergoing procedures, etc.), and visualization techniques. *Psychopharmacology* in the form of anti-anxiety/antidepressants agents like Prozac, Lexapro, Zoloft, Celexa, etc., and neuroleptics like Abilify, Seroquel will address the biochemical substrates of her PTSD, Anxiety and Depression. Care will need to be exercised in considering psychopharmacology to insure that these do not conflict with medications she is taking for immunosuppression, as well as not posing any potential kidney functioning side effects.  Needless to say, as she has mentioned earlier, ideally psychiatric treatment ought to be provided by a culturally responsive psychiatrist.

    A.    Estimated Psychiatric Treatment Logistics:  **She will need at least weekly treatment sessions for the first year of treatment (50 sessions), and twice monthly for the second year (25 sessions), and then monthly sessions thereafter (12 sessions - indefinite), assuming that her medical course will realistically involve medical care for the rest of her natural life, factoring in future kidney failure, another round of dialysis, another kidney transplant, etc**.

    B.    Estimated Psychiatric Treatment Costs

    (1)    Office/Outpatient visit, established -:- 15 minutes (per session). CPT Code: 99213 : $90.00

    (2)    Psychotherapy with EvaluationIManagement - 45 minutes (per session).  CPT Code: 90836: $85.00

    (3) General Excise Tax (per session): $8.24.
       Cost per session: $183.24
       First Year: $9,162.00
       Second Year: $4,581.00
       Third Year and Thereafter: $2,198.88

  6. Psychiatric Stability (Maximum Medical Improvement):  **She is obviously still not psychiatrically stable, and still *moderately severe* clinically symptomatic with PTSD, Anxiety, and Depression.  She will need psychiatric treatment as soon as possible to prevent further deterioration.  Quite realistically, psychiatric treatment should be construed as a long-term, perhaps life-long basis (as with her medical condition with her kidney transplant issues) such that all things considered, I am strongly inclined to believe clinically that her hopes to be able to return to some kind of work in the future is not at all feasible (given her need to avoid infection, being on immunosuppressants, chronic PTSD, Anxiety, Depression), and that "Impairment Rating" wise, she would meet the criteria for "Permanent Total Disability."**

  7. Prognosis:  As alluded to in *Formulation,* her medical condition and medical clinical course will largely dictate her clinical psychiatric course.  That is to say, as her medical condition goes, so will her psychiatric disorders.  **Assuming that her medical condition will be *chronic,* and that medical interventions will be ongoing, and just insuring quality of life while the kidney transplant undergoes gradual deterioration (e.g. immunosuppressants, avoiding noxious/ pathogenic environments/situations, avoiding stressors, etc.), then, correspondingly, all medical and psychiatric treatment plans will need to also have in mind long-term goals/objective/ perspectives.**

(Emphasis added.)  Dr. Ponce's Complex Psychiatric Consultation Report

is attached as Exhibit "7."

In utter contrast, Defense Psychologist Eric Smith, Ph.D. on one hand acknowledges the horrific experience that Mrs. Campano went through as a result of the negligence at Tripler and the severe and profound mental and emotional effects of the incident as clearly evidenced by the results of the psychological testing he performed on her:

EMOTIONAL ASPECTS:

The examinee's score on the Peritraumatic Dissociation (PDIS) scales was **elevated and indicates clinically significant levels of peritraumatic dissociation at the time of the trauma**. . . .

Her score on the Re-experiencing scale was **elevated and suggests that she is undergoing significant posttraumatic stress**. . . . The examinee's overall Avoidance scale score indicated that she is experiencing **significant posttraumatic avoidance symptoms**. Her subscale scores suggest **significant withdrawal, apathy, and emotional numbing, as well as a tendency to avoid people, places, or situations that remind her of the index trauma.** The respondent may be reluctant to discuss her symptoms with therapists or others, and may have problems with treatment adherence. In some cases, **this avoidance pattern is associated with a more severe and chronic course.**

. . . .

Based on her Posttraumatic Stress-Total scale score **the overall severity of her posttraumatic stress symptoms is in the severe range.** Her score on the Posttraumatic-Impairment scale indicates that she reports that **the effects of the index trauma are significant, to the extent that her ability to function on an ongoing basis has been compromised.**

. . . . Her profile indicates an **over-controlled internal cohesion wherein basic intentions and interaction with others are framed within a constricted and defended mindset. A pronounced distrust typifies her behaviors and relationships, creating cognitive-affective immobilization.** Although she is typically able to

function adequately, **periods of marked emotional, cognitive, or behavioral dysfunction are likely**.

The MCMI-IV profile of this woman suggests **marked dependency needs, deep and variable moods, and impulsive, angry outbursts**.  She may anxiously seek reassurance from others and is **especially vulnerable to fear of separation from those who provide support**, despite frequently undoing their efforts to help her. **Dependency fears may compel her to be alternately overly compliant, profoundly gloomy, and irrationally argumentative and negativistic**.  Typically submissive and cooperative, **her behavior has become increasingly unpredictable, irritable, and pessimistic, often seeking to induce guilt in others for failing her**.  Repeatedly struggling to express attitudes contrary to her feelings, **she may exhibit conflicting emotions-such as love, rage, and guilt toward others.  Also notable may be her confusion over her self-image, her highly variable energy levels, easy fatigability, and her irregular sleep-wake cycle**.

**She is particularly sensitive to external pressure and demands and may vacillate between being socially agreeable, sullen self-pitying, irritably aggressive, and contrite.  She may make irrational and bitter complaints about the lack of care expressed by others and about being treated unfairly**.

Most notable is her lack of mature confidence and her tendency to act helpless and seek nurturance from others in a childlike manner. **Characteristically withdrawing from adult responsibilities, she is docile and passive, displays few functional competencies and avoids self-assertion**.  Also worthy of attention is her tendency to be petulant, obstinate, and resentful.  **She is easily annoyed and aggravated by others, and prone to withdrawing into sulky and grumpy moods.  She has a low tolerance for frustration, and she may be chronically impatient, irritable, and fidgety unless things go her way**.

Emotional Dysfunction

**Her responses indicate significant·emotional distress**.  More specifically, she reports **various negative emotional experiences**

**and is likely to be inhibited behaviorally by these emotions**.  She is also likely to be **self-critical and guilt-prone**.  She also reports feeling anxious and is **likely to experience significant anxiety and anxiety-related problems, intrusive ideation, and nightmares**.  In addition, she reports getting **easily upset, being impatient with others, becoming easily angered, and sometimes even being overcome by anger**.  She is also likely to be **stress-reactive, worry-prone,** and to engage in **obsessive rumination.**

MARITES reports feeling **sad and unhappy** and being **dissatisfied** with her current life circumstances.  She also reports feeling **hopeless** and **pessimistic.**  She is likely to feel **overwhelmed** and that life is a strain, to believe she cannot be helped, and that she gets a raw deal from life.  She reports **self-doubt** and is likely to be prone to rumination, to feel **insecure and inferior**, and to be **self disparaging and intropunitive**.  She also reports being passive, indecisive, and inefficacious, believing she is incapable of coping with current difficulties.  **She is unlikely to be self-reliant.**

Thought Dysfunction

She reports **significant persecutory ideation** such as believing that others seek to harm her.  She is likely to be **suspicious** of and **alienated** from others, to experience interpersonal difficulties as a result of suspiciousness and to lack insight.

Interpersonal Functioning Scales

The respondent reports not enjoying social events and **avoiding social situations.**  She is likely to be **introverted**, to have **difficulty forming close relationships**, and to be **emotionally restricted.** She also reports being shy, easily embarrassed and uncomfortable around others.  She is likely to be **socially inhibited** and to be **anxious and nervous in social situations**.  In addition, she reports **disliking people** and being around them, and is likely to be **asocial.**

Dr. Smith Report at 5 - 12 (emphasis added).  Yet in the very next next

breath, Dr. Smith unbelievably deems her completely cured with no

permanent injury because her states Mrs. Campano told him she feels

better after the kidney transplant and goes to church regularly:

> **This Examliner is convinced that MARITES' improved post-traumatic recovery is primarily due to her kidney transplant and her meetings with the pastor and others at the Ohana Baptist Church.**  Her family is very active in the church and she and her children sing in the choir.  **Religion and spirituality has been more substantial in reducing her stress, anxiety, depression, and worry than any therapist or medication could have done for her.** Her traumatic experience has also led to a deepening of religion and spirituality and a feeling of being closer to God.
>
> **Based upon the results of this examination, there should be no permanent psychological disability and, thus, no ongoing active psychological intervention is warranted as a direct consequence of the alleged medical negligence.**  Although this was certainly a traumatic experience for MARITES', [sic] she appears to have made a substantial recovery, at least psychologically, and now enjoys a more rewarding lifestyle by self-report.

Dr. Smith Report at 14 - 15 (emphasis added).  Dr. Smith also opines that

Dr. Ponce's ongoing treatment recommendations should be dismissed

outright because Mrs. Campano is afraid of going to places where she

might be exposed to germs, like a doctor's office:

> Given her diagnosis of PTSD, Dr. Ponce indicated that, MARITES required a multi-modal approach of therapy in combination with psychopharmacology.  He estimated that she would need weekly sessions for the first year, twice monthly for the second year, and then monthly thereafter.  He estimated the costs of her treatment to be $9,162 the first year, $4,581 the second year, and $2,198.88 the third year and thereafter depending on her medical course.  **However, it would be potentially iatrogenic to do so since MARITES has indicated that she does not want to engage in psychotherapy or go to offices where she will be exposed to**

> **other patients.  She also avoids going to any doctor unless it is absolutely necessary.**  The reason she reported going to Dr. Ponce was to get medication to help her sleep better.  She also didn't return to the first therapist she saw for treatment prior to Dr. Ponce.

Dr. Smith Report at 14 (emphasis added).  In view of Mrs. Campano's performance on the psychological testing and the continuing mental and emotional difficulties she continues to experience as a result of the incident, Dr. Smith's opinions lack credibility.

### H.   The Effect on the Family.

#### 1.   Rafael

At the time of Marites's July - August 2013 hospitalization at Tripler, Rafael was both working full time and attending school to finish his nursing degree.  Because he essentially was maintaining a constant vigil at Marites's side and then transporting and accompanying Marites to all of her medical and dialysis appointments, his work and school both suffered. Rafael experienced significant pressure from his supervisors, who often would question him regarding his intentions and dedication to his job and the military.  This also upset Marites to no end:

> A.   I feel in my position, sir, I was sick, I suffered a lot, my family suffered a lot, and then suddenly I'm expecting that my husband supervisor to -- I'm expecting that they cannot comport [sic] him --
>
> Q.   What --

A.   -- give good advice, but it's not.  **There was a time at 2014 when my husband was being pressured in his work because his supervisor told to him that -- that it seems like he can't learn to do his job in the clinic anymore, because he -- he always with me, attending my doctor's appointment, my -- my dialysis, because I have a lot of -- bunch of doctor appointment at the time.**

**Instead of giving him comport -- or support, they making him pressure.  What is his plan?  It's not right, sir.  They messed up my life, and they keep on pressuring my -- my husband that he's not doing his job good.**

Marites 110:04 -110:23 (emphasis added).  A copy of Marites's deposition

is attached as Exhibit "4."

Rafael also explained the strain Marites's ordeal placed on their

family during his deposition:

Q.   And Mrs. Campano testified earlier that put a strain on your family and your job?

A.   Oh, yes, sir.  Definitely.

Q.   And did it get easier after she was able to do home dialysis?

A.   Speaking of that home hemodialysis, sir, I mean, we made it work, but there was -- there's a lot of sacrifices that involved into that.

Q.   Okay.  Why don't you explain to me what sacrifices you're talking about.

A.   Yes, sir.  So, yeah, ever since she -- she was discharged out of the hospital, of course she needs to go to dialysis.  She goes to the center.  At that point in time she was bed-bound or wheelchair-bound.  She couldn't walk.  She couldn't care for herself.  Nothing.  She can't do anything.  She's depressed, and every time we go to the

dialysis center, she's crying.  She kept on asking how -- how much more time she can live?  How long will it take for her to go through the dialysis?

And I can't really answer that straight.  I don't have a definite answer.  I don't know how to comfort her, really.  I tried to be supporting as much as I can.

**And then there even come to a point that she wanted to kill herself.  She was so frustrated.  Every time we go there, see all the other patient suffers, and she sees herself one of the youngest.  So, yeah, every now and then I see her like that, asking me questions like that.  We couldn't be with our kids like the way we wanted it to be, so.**

Q.   And when you took her to dialysis, Mr. Campano, did you stay with her the whole time?

A.   I tried to, but not every day, because I had to go to work.  So there are times that my brother, if she -- if he is available, drop her off, or my nephews, my nieces.

And then after I got off from work, that's when I go to her directly, and she -- we choose the night shift, like the last shift, because that's when I will be available to pick her up, go to and be with her the whole time, if ever.  So that's always been the -- the case.

We've been having problems like who is going to drop her off, and then, of course, I'm going to pick her up at nighttime, because I'm already off of work.

**But she is so depressed every now and then.  That's my biggest concern.  So -- and, like -- just like what she said, we went into financial burden, but I didn't tell her.**

Q.   Okay.

A.   She wasn't aware of that.

Q.   So she testified earlier, Mr. Campano, that you owe money to your niece as a result of this?

A.   Not really owe money to my niece, sir.  Basically, what she was trying to say is that because -- you know, they have their own family too.  I just give them something for gas, for food and stuff every now and then, because they have, like I said, they have their own family.  They have their own life as well, so I tried to kind of supplement it through that way.

**And a year before that I -- I bought my car.  Everything was going all right at that time, because she's working, I'm working. So I had a brand new car.  We have a house to pay, all that needs of the family, and all of a sudden I was the only one providing all that.**

**And same thing with my kids.  I mean, if they want something, I tried to give it to them, because at that point in time I can't really be with them, or we can't really be with them all the time.  So, "Dad, we need this."  I can't even do their assignments with them, so.**

Q.   So how much, Mr. Campano, do you think you spent that you would not have spent had Mrs. Campano not had this happen to her -- renal failure?

A.   I can't really give the exact figures, but it piled up.  Like every now and then it keep on piling and using my credit card and stuff, so.

Q.   **Are you still carrying credit card debt?**

A.   **Yes, sir.**

Q.   **How much?**

A.   I **have approximately -- probably 25 to 30,000.**

MR. THOMAS:  I would like to go back to the pending question. The question was the sacrifices involved with home hemodialysis and what you had to do, the two of you, to get through that.

THE WITNESS:  So, yes, sir, like was said, so every day I -- **I saw her depressed, crying every time we go there and trying to figure out who is going to drop her off and stuff.**

So I don't know how -- how I did hear -- heard about the -- how did I hear about the home hemodialysis.  At some point I was talking to some of the staff at the dialysis clinic, and I heard about that, oh, and then said, "Really?  They have something like that?"

And then I think that's one thing that we can consider, we have to, because my wife is really depressed all the time.  She goes out -- because she couldn't walk.  She's always in a wheelchair.  I have to get -- and our house is also two story, and once she's already downstairs, she cannot really go up.

So you add to those stress that she is undergoing, so I said, "Why don't we learn about or inquire about that?"  So I did.  And the first time I talked to the dialysis nurse in charge, it's, like -- she's, like, scared me already, like, "You wanted to have the home dialysis?"  Like, "Are you sure what you're -- you're trying to do?"  Like, "I don't know, but that's why I'm inquiring."

**It -- it -- it involves, really, like, a risky thing, like, life-threatening issues if you do it at home.  You need to be trained.  Like -- that's why I'm inquiring, so we try.  I mean, I did probably try to talk to them a couple times, because they were -- they weren't convinced that I can -- I will be able to do it or we will be able to do it, but I insisted.**

And then we get to a point that, yeah, okay, "So here is how we're going to do it.  Do you think you have time to train at least five weeks with your wife, five days a week or six days a week here in the clinic?"  And, like, I will have to.  I will have to ask for my supervisor if they're going to allow me.  And so that's when I think my wife kind of talked about it.

- 203 -

**I was also being pressured at work, because my supervisor came up to me one time saying -- they ask me what's my plan in my Navy career. They -- they don't think that I am learning my job as a nurse in the clinic, because I've been always with my wife with all of this doctors' appointment, emergency stuff, issues that we need to go to the emergency every now and then.**

**So they asked me, "Do you think you can retire as a Navy?" I'm, like -- that's what I wanted to, sir. It's not that I chose to be like this right now, but my family need me. My wife needs me. So I wanted to stay in the military, especially now that I'm the only one providing the needs of my family and medical. My wife needs my medical. That's what I told him, and it was really a pressure on my side.**

**And then when I asked them I'm going to go training for this home hemodialysis, they're asking for at least five weeks, and they said, "No, you can't. If you want, we can only give you three weeks." That's what my supervisor told me.**

**And I have to compromise with the dialysis nurse who will be training me and my wife, and she finally approve. She finally agreed to get the training in three weeks, but it's at least five weeks, so.**

**But, yeah, she -- she scared me. She tried to intimidate me, because it's not an easy thing to do. You need to be trained, like, for at least five weeks. That's what is needed, but they can't let me go at my job for five weeks. So I don't know how -- how we were able to convince her.**

**And we did the training, like, really intensive training, and it was really scary, tell you the truth, but I guess at that point of time my wife needed that so that we can be with the family, we can stay together while we're doing dialysis and attend with the needs of my kids at home as well.**

BY MR. YEE:
Q.   So after you started helping Mrs. Campano with home hemodialysis, were there any problems with the dialysis?

A.   There had been some problems, sir, but it's not that really big problems that we had to, like, go to the emergency or something like that.  I was able to do the troubleshooting myself, call the technician and dialysis nurse while doing that.  There had been a couple problems, but it's not that big that we needed to stop dialysis or something.

I mean, there was some point that we need to end the dialysis earlier than what's supposed to be, but, yeah, we were able to handle that one, sir.  **It's very risky, because anything can happen, needle can be taken off or, you know, there would be, like, clogging or blood clotting.**  Anything can happen, but thank God it didn't happen within that four months that we were on home hemodialysis.

MR. THOMAS:  **And then the time involved?**

THE WITNESS:  **Oh, yeah.  I have to sacrifice too for that one, sir, because I have to be at work during the day, weekdays, but we have to do it at nighttime.**

And then my wife was trained to set up the machine.  By the time I got home from work, it's already set up that all I had to do is prime it and then hook it up to her.

Rafael (Exhibit "8") 50:24 - 58:23 (emphasis added).

Marites also expressed some of her most darkest fears and thoughts that have arisen out of her trials:  That what if her marriage fails just like her kidneys did.  How would she make it on her own?

Q.   As I understand it, Mrs. Campano, you have something to add to your deposition?

A.   Yes.

Q.   Why don't you go ahead.

A.   Regarding my husband, he mentioned to -- last Thursday about he rather prepare to do -- if just in case, he rather prepared to do the home hemodialysis.

Q.   Uh-huh.

A.   But on my part, **what if my husband change his mind or we're going to end up separate?  I can't read his mind.  I'm just thinking myself, my kids, I know that I trust him, always there for me, but I am just thinking my future if -- just in case my kidney failed again**, so I don't want to do home hemo if that things happen again.

Q.   I understand, Mrs. Campano.  Nobody is here trying to make those decisions for you, so --

. . . .

A:   **If I'm going to fight this battle alone, by myself, or if I can make -- make it -- make it through all this trials.  Hopefully, God give me a reason to understand.  Hopefully, I can help myself to understand what's going to happen in the future**. That's all that my concern right now.

Marites (Exhibit "4") 119:11 - 120:25 (emphasis added).

## 2.   R.M.B.C., R.B.B.C., and M.R.B.C.

Marites's ordeal and permanent injuries have also had significant and lasting effects on her family beyond just what happened to her.  R.M.B.C. and R.B.B.C. were 14 and 12 at the time of Marites's extended hospitalization, and were old enough to understand the severity and seriousness of the situation.  As the medical records indicated, they were

witness to how sick their mother was, the altered mental status she

endured, where she did not recognize any of them, and the long periods of

unconsciousness with great uncertainty whether she would survive.  Their

performance in school suffered, Marites expressed some of her sons'

distress during her deposition.

> My children suffered a lot.  My mom -- my mother-in-law, she
> got hit with a truck because she's always go to our house, helping my
> mom to take care of my -- my little girl, and the supervisor know --
> knows about what it, what's going on in our family, his mom, me, but
> still they keep pressuring him.
>
> My oldest son, he's a 4.0, but when things happened, he
> messed up his grade.  Even my second son, they can't focus.  They
> have a trauma.  They give up judo wrestling, church activities.  They
> keep crying.

Marites (Exhibit "4") 110:24 - 111:09.

Marites also prepared a list of ways in which the incident has affected

her life and family for presentation at her deposition.  Marites's list is

attached as Exhibit "9," but includes her son's issues such as:

1. My 2 sons always crying
2. They don't want to go to school
3. Stop all sports activities
4. School got affected
5. They were depressed that their parents cannot stay with them
6. Grandma can't really cook
7. Now my oldest boy his teacher keep telling him that he can't focus, he keeps looking outside.  He got hard time.
8. Every time I have a Dr. appointment they are scared if I will be confined again in the hospital



Marites and Her Boys Before the Incident

But one of the most heartbreaking effects of this horrific incident is

how it severed the family bonds between Marites, R.M.B.C., R.B.B.C., and

their newest addition to their family.  As mentioned in passing above,

because of the depth of the trauma that Marites suffered at Tripler after

M.R.B.C.'s birth, Marites associated that trauma with M.R.B.C. herself.

These feelings were so deeply seated that the essentially severed the

mother-baby bond and Marites even admitted to hating her newborn

daughter because M.R.B.C. was both the trigger and a constant reminder

of the life-shattering ordeal.  On Marites's deposition exhibit list of effects of

the incident (Exhibit "9"), she wrote:

*&ast; I hated my daughter at that time*

Likewise, the depth of the trauma similarly affected R.M.B.C. and

R.B.B.C.'s relationship with M.R.B.C.  Marites wrote:

*&ast; They were blaming their sister of what happened*

Marites also testified regarding her sons' reaction to the incident and its

effect on their relationship with M.R.B.C.:

> When my -- my mom and my brother-in-law took my -- my baby
> in the hospital -- in the hospital, because I need to stay in the hospital
> for a reason, **my oldest son, he told to my -- to my -- to my baby
> girl, because she is crying, my baby girl was crying at the time,
> and he told her that you're the reason why -- you're the reason
> why my mom -- our mom is in the hospital right now suffering.**

Marites (Exhibit "4") 111:10 - 111:18 (emphasis added).



(L-R) R.B.B.C., R.M.B.C., and M.R.B.C.

These uncontrollable feelings created an intense guilt and self-loathing in Marites and a conflicted outrage at her boys and her own feelings for how she felt about her own newborn daughter. Marites consciously understood that M.R.B.C. was pure and innocent and a victim herself of Tripler's negligence, but Marites's emotional distress was so profound that it overwhelmed even the most powerful bond a human being can experience, that of the love between a mother and child. And Marites felt even worse about herself and what happened to her because of it.

## VI.   ECONOMIC DAMAGES

### A.   Past Medical Expenses

The available information regarding Marites's past medical expenses

gathered to date is that Marites's past medical expenses total

**$1,838,267.03**.  The expenses break down by provider/source as follows:

| | MEDICAL EXPENSES OF MARITES CAMPANO | | |
|---|---|---|---|
| | | | |
| 1. | DSI Pearlridge Dialysis | | |
| | 8/27/13 - 8/31/13 | $31,498.64 | |
| | 9/3/13 | $8,947.91 | |
| | 10/5/13 | $9,759.93 | |
| | 10/8/13-10/12/13 | $24,592.02 | |
| | 10/15/13 - 10/19/13 | $24,640.03 | |
| | 10/22/13- 10/31/13 | $36,170.20 | |
| | 11/2/13 - 11/9/13 | $25,589.60 | |
| | 11/12/13 - 11/16/13 | $24,139.27 | |
| | 11/19/13 - 11/23/13 | $20,184.95 | |
| | 11/26/13 - 11/30/13 | $20,136.94 | |
| | 12/3/13 - 12/7/13 | $21,442.47 | |
| | 12/10/13 - 12/14/13 | $22,204.82 | |
| | 12/17/13 - 12/21/13 | $22,290.01 | |
| | 12/23/13 - 12/30/13 | $31,483.80 | |
| | 1/2/14 - 1/11/14 | $34,923.96 | |
| | 1/14/14 - 1/18/14 | $17,620.23 | |
| | 1/28/14 - 1/30/14 | $11,746.82 | |
| | 2/1/14 - 02/8/14 | $23,493.64 | |
| | 2/11/14 - 2/15/14 | $17,620.23 | |
| | 2/18/14 - 2/22/14 | $17,716.25 | |
| | 2/25/14 - 2/27/14 | $11,746.82 | |
| | 3/1/14 - 3/8/14 | $27,249.02 | |
| | 3/11/14 - 3/15/14 | $22,513.35 | |
| | 3/18/14 - 3/22/14 | $22,609.37 | |
| | 3/25/14 - 3/29/14 | $22,513.35 | |
| | 4/1/14 - 4/29/14 | $68,830.75 | |

| | | | |
|---|---|---|---|
| | 5/1/14 - 5/31/14 | $66,394.01 | |
| | 6/3/14 - 6/28/14 | $61,671.38 | |
| | 7/1/14 - 7/31/14 | $71,445.40 | |
| | 8/2/14 - 8/30/14 | $62,844.87 | |
| | 9/2/14 - 9/30/14 | $64,042.04 | |
| | 10/2/14 - 10/30/14 | $75,444.55 | |
| | 11/1/14 - 11/15/14 | $40,200.66 | |
| | 11/17/14 - 11/28/14 | $55,660.15 | |
| | 11/29/14 | $4,297.13 | |
| | 12/1/14 - 12/5/14 | $28,295.33 | |
| | 12/7/14 - 12/30/14 | $82,605.09 | |
| | 1/1/15 - 1/31/15 | $116,804.12 | |
| | 2/1/15 -2/28/15 | $103,260.67 | |
| | 3/6/15 | $4,544.66 | |
| | 3/6/15- 3/24/15 | $65,201.80 | |
| | | | $1,524,376.24 |
| | | | |
| 2. | Pali Momi Medical Center | | |
| | 12/10/13 | $843.00 | |
| | 12/25/13 - 12/26/13 | $4,225.95 | $5,068.95 |
| | | | |
| 3. | Brian C. Pien, M.D. | | |
| | 4/16/14 | $214.85 | |
| | 6/2/14 | $136.13 | $350.98 |
| | | | |
| 4. | Queen's Medical Center | | |
| | 2/28/14 | $356.00 | |
| | 4/16/14 | $1,544.00 | |
| | 2/20/15 | $1,658.00 | |
| | 3/23/15 | $598.00 | |
| | 3/25/15 - 3/30/15 | $200,020.68 | |
| | 4/5/15 | $6,616.00 | |
| | 5/1/15 | $292.00 | |
| | 4/30/15 | $5,637.60 | |
| | 6/29/15 | $127.00 | |
| | 7/7/15 | $2,514.00 | |
| | 7/31/15 | $127.00 | |

| | | | |
|---|---|---|---|
| | 8/1/15 - 8/6/15 | $43,040.30 | |
| | 8/9/15 - 8/12/15 | $18,102.60 | |
| | | | $280,633.18 |
| | | | |
| 5. | Nada, Ono Ka'anehe & Solomon, LLP | | |
| | 10/1/13 | $963.08 | |
| | 11/1/13 | $963.08 | |
| | 12/1/13 | $963.08 | |
| | 1/1/14 | $963.08 | |
| | 2/1/14 | $1,205.56 | |
| | 3/1/14 | $1,205.56 | |
| | 4/1/14 | $963.08 | |
| | 5/1/14 | $963.08 | |
| | 5/28/14 | $174.61 | |
| | 5/29/14 | $174.61 | |
| | 6/1/14 | $1,205.56 | |
| | 7/31/14 | $1,205.56 | |
| | 8/31/14 | $963.08 | |
| | 9/30/14 | $963.08 | |
| | 10/31/14 | $1,262.37 | |
| | 11/30/14 | $1,262.37 | |
| | 1/31/15 | $1,262.37 | |
| | 2/28/15 | $1,262.37 | |
| | | | $17,925.58 |
| | | | |
| 6. | Surgical Associates | | |
| | 4/1/14 | $300.00 | |
| | 4/1/14 | $14.14 | |
| | 3/25/15 | $4,966.65 | |
| | 3/25/15 | $4,142.04 | |
| | 3/30/15 | $489.27 | $9,912.10 |
| | | | |
| | | | |
| | **TOTAL MEDICAL EXPENSES:** | | **$1,838,267.03** |

## B.   **Marites's Future Prognosis and Care Needs**.

### 1.   **Nephrology – Keith L. Klein, M.D.**

In addition to explaining and discussing Marites's transplant risks as discussed above, Plaintiffs' nephrology expert Dr. Klein analyzed Mrs. Campano's prognosis given her circumstances, including Marites's transplant life, life expectancy, and hemodialysis needs and costs. Dr. Klein summarized his opinions in his detailed report, which provides in relevant part:

> Life Expectancy
> In terms of transplant function, about 90 to 95 percent of adults who receive a deceased-donor kidney transplant function for at least one year following their transplant surgery.  About 80 percent last for at least five years.  **The probability of survival of the kidney at 10 years post-transplant is approximately 50 percent.  Many patients live well on dialysis for 20 or even 30 years.  Patients who get a kidney transplant live an average of 10 to 15 years longer than if they stayed on dialysis**.
>
> **Mrs. Campano's donor kidney can be expected to function for 8 to 12 years**.  At that point, her future survivability will require a return to dialysis or qualification for another renal transplant. **Given Mrs. Campano's young age, as well as the possibility of graft rejection, she will likely undergo multiple transplant procedures**. Currently, third or fourth renal transplantations constitute a valid therapeutic option with reasonable short- and long-term patient and graft survivals.  **As such, a life-expectancy for Mrs. Campano into her 70s would not be unreasonable**.

Dr. Klein Report (Exhibit "3") at 5 (emphasis added).

### 2.   Life Care Planning - Karen L. Klemme, R.N. / Susan Riddick-Grisham, R.N.

On 7/12/16, Rehabilitation Nurse and Certified Life Care Planner Karen L. Klemme, R.N. conducted a home visit with Marites and the Campano family and, in the days and weeks surrounding, communicated with nephrologist Keith L. Klein, M.D., and psychiatrist Danilo E. Ponce, M.D.  Nurse Klemme gathered and compiled information regarding Marites's condition and prognoses to determine Marites's care needs for the rest of her life.  Of note, Nurse Klemme's Plan includes provisions for different scenarios for Marites's renal needs given the reasonable life of her kidney transplant(s), the likelihood of her receiving serial transplants, and for hemodialysis needs for the rest of Marites's life expectancy.  Because Rafael is slated for a transfer to San Diego in the Summer of 2017, Nurse Klemme has also costed out scenarios involving near- and medium-term needs based on San Diego/Southern California costs as well.  The care plan also includes provisions for chore worker support and home care needs.  Nurse Klemme's Plan provides not only a comprehensive analysis of Marites's lifetime care needs, but also sets forth in meticulous detail both the ordeal Marites endured at Tripler and the long and arduous road to adjustment to Marites's permanent injuries and life changes.  Nurse Klemme's Plan has also been reviewed and approved by Dr. Klein and

Dr. Ponce, who have both prepared and signed off on treatment plans for integration into and design of the Life Care Plan.

The Life Care Plan provides for care needs for Mrs. Campano in four areas:

1.    Nephrology;
2.    Psychiatry;
3.    Home Care Needs; and
4.    Equipment Needs.

Each will be discussed in turn.

### a.    Nephrology Needs - Keith L. Klein, M.D.

Nurse Klemme communicated with Plaintiffs' expert nephrologist Keith L. Klein, M.D. to formulate the nephrology and medical care section of Mrs. Campano's life care plan.  Dr. Klein put together a comprehensive, detailed plan for Mrs. Campano's future medical and nephrology needs, including provisions for future kidney transplants, hemodialysis, monitoring, testing, consultations, emergency room visits, hospitalizations, and medications.  Dr. Klein's treatment plan first outlines Mrs. Campano's renal injury diagnoses and attendant problems as follows:

SERVICE:      **NEPHROLOGY**

CONTACT:      Keith L. Klein MD, FACP, FASN

ADDRESS:      Cedars-Sinai Medical Center
              99 N. La Clenega Blvd., Suite 302
              Beverly Hills, CA 90211

PURPOSE:        Nephrology treatment plan.

Diagnoses/impression list:

  • Acute renal failure.
  • Chronic kidney disease stage 5.

Medical/surgical history: (from Tripler Army Medical Center records)

  • Primary Diagnosis: Septic shock secondary to Group A Strep
  (GAS) Toxic Shock Syndrome requiring pressors and
  intubation, resolved.

  • Spontaneous Vaginal Delivery, complicated by retained
  products of conception s/p D&C.

  • Acute Respiratory Distress Syndrome, hypoxic respiratory
  failure requiring intubation, resolved.

  • Disseminated Intravascular Coagulopathy requiring extensive
  transfusion support, resolved.

  • Acute Kidney Injury secondary to cortical necrosis and acute
  tubular necrosis, persistent w/hemodialysis dependence.

  • Adult onset kernicterus/bilirubinemia encephalopathy.

  • Hepatic encephalopathy.

  • Ascending cholangitis requiring ERCP and biliary stent
  placement.

  • Duodenal Ulcer

  • Acalculous cholecystitis.

  • Pituitary hemorrhage, possible.

Problem list:

<u>Related to acute renal failure on 7/23/13</u>:

      • Hemodialysis requiring long hours on dialysis each week ~12 hours/week.

      • Surgical implant of AV (arteriovenous) fistula for hemodialysis access.

      • Needle sticks (#2) to access AV fistula during hemodialysis.

      • Careful monitoring fluid intake and medications.

      • Renal related medications.

      • Post dialysis fatigue with difficulty with concentration and interdialysis leg cramps.

      • Anemia, hyper/hypotension secondary to renal disease.

      • Metabolic: hyperparathyroidism, Vit D deficiency, hypocalcemia and hyperphosphatemia.

      • Allergies: penicillin's, tazobactam, vancomycin, adhesive tape, alcohol wipes, betadine.

Nurse Klemme's Life Care Plan Report ("Klemme Report") at 55 - 56.

Nurse Klemme's Report and spreadsheets are attached as Exhibit "10."

Dr. Klein's treatment plan also details the problems and issues Mrs. Campano must deal with as a result of her renal injury and kidney transplant, including the effects of long-term immunosuppressive medications in order to prevent rejection of the transplanted kidney, and the ancillary isolative effects of living with a suppressed immune system:

<u>Current problems/post kidney transplant (3/25/15)</u>:

• Strict routine of immunosuppressant medications (Cellcept, Prograf and prednisone); phosphorus K-phos neutral, magnesium oxide.

• Side effects of immunosuppressant medication:

    o Weakens immune system.

    o Increase susceptibility to infection (upper respiratory, urinary tract, integumentary).

    o Malignancies/cancer.

        • Increased risk.

        • Would require discontinuation of immunosuppressant medication, with resultant failure of donor kidney.

        • Requires appropriate treatment of the malignancy.

        • Wait time for consideration of a repeat kidney transplant for a minimum of 5 years after she is free from the malignancy.

• Requires close medical follow up after transplantation.

    o Medical appointments: monthly nephrology.

    o Lab testing (see below).

• Avoid nephrotoxic agents such as NSAIDs (Motrin, Advil, Ibuprofen), decongestants, some antibiotics, and radio contrast media.

• Infections, flu, common cold:

o Constant threat for the rest of her life. She is at even greater risk due to exposure, as a mother with school age children.

o Required are strategies to minimize infections including: limit contact with anyone who has a cold or infection, avoid going outside barefoot, avoid contact with gardening soils because of bacteria in the soil, not touching items that have had contact with human or animal feces, avoiding crowded areas such as malls, movie theaters and airplanes. She needs to cook all foods and avoid raw foods. Hand washing. Hand gel. Keep household environment clean and sanitized.

• She has greater susceptibility for other diseases that require monitoring such as:

o Diabetes mellitus: requires screening with labs. (See below).

o Malignancies/cancer: requires routine cancer screenings with self-skin cancer exams and total body skin exams done by a dermatologist.

o Bone disease: she requires monitoring for hyperparathyroidism, Vit D deficiency, hypocalcemia and hyperphosphatemia, with Dexascan and lab testing. (See below).

Klemme Report (Ex "10") at 56 - 57.

Dr. Klein's treatment plan also addresses the future course of

Mrs. Campano's kidney transplant, the transplant survival probabilities and

transplant replacement intervals given average donor kidney wait times, the

life expectancies of transplant patients, and the care needs (including

attendant care) of transplant patients as they age.  In short, 50% of

transplanted kidneys are still functional at 10 years, and the average wait

time for another donor kidney is 5 years:

Kidney transplant discussion:

o Wait time for appropriate donor kidney 5-year average.

o Survival. 80% of transplanted kidneys last for at least 5 years. The probability of survival of the transplanted kidney at 10 years, is approximately 50% due to transplant nephropathy.

o Life expectancy:

- Patients, status-post kidney transplantation, have a life expectancy average of 10-15 years longer than if they remained on hemodialysis.

- Many patients on hemodialysis live well on dialysis for 20 or 25 years.

- Life expectancy into her 70's would not be unreasonable.

o Donor kidney:

- Expected maximum function of the donor kidney for 10 years, average.

- Mrs. Campano's survivability will require a return to hemodialysis when transplant kidney begins to fail, and/or to qualify for another kidney transplant.

  • Likely functional decline as the donor kidney begin to fail. Patients can develop diabetic neuropathy, tremors, bone disease, cancer.

• They become very debilitated, cachectic or chronically ill appearing, with loss of muscle mass, reduced energy and they have difficulty with transferring and mobilizing. She will likely want to sit more than stand, and stand more than walk. She will have difficulty climbing stairs.

- Future donor kidney transplantation, she would likely require daily personal care with ADLs (bathing, grooming, dressing, transferring) assistance, 3 months, after as she recovers physically and functionally.

• This process begins to occur a few years before the kidney fails with a slow progressive decline in her functional status.

o Option A: donor kidney fails 5 years after transplantation.

o Option B: donor kidney fails 10 years after transplantation.

o Hemodialysis resumes.

• Marital stress is very high with greater risk for separation and divorce.

- Given her young age, as well as the possibility of donor kidney graft rejection, she will likely undergo multiple transplant procedures. Medically likely 2-3 transplants over lifetime.

- Current, second or third renal transplantation constitute a valid therapeutic option with reasonable short and long term patient and graft survivals.

Dr. Klein also details the attendant risks of being an end-stage renal disease patient for the rest of Mrs. Campano's life:

> Complications and potential risks due to end stage renal disease:
>
> • Cardiovascular: Fistula thrombosis, stenosis, strokes, myocardial infarction and heart failure.
>
> • Orthopedic: Falls, as bone health influence by parathyroid health.
>
> • Respiratory: increase pneumonia, deep vein thrombosis due to reduced activity and phosphatase.
>
> • Integumentary: Poor wound healing, pruritus/uremic toxins due to increase phosphorus. Skin cancer.
>
> • Urinary: Acute infections. Obstructions and or scarring in the ureter.
>
> • Immune system: Increased risk of infection due to immune dysfunction.
>
> • Gastrointestinal: infections, hepatitis, dyspepsia, peptic/duodenal ulcers, and liver failure.
>
> • General: post-hemodialysis fatigue, intradialysis leg cramps.
>
> • Cancer/malignancies.
>
> • Psychological: depression, anxiety. Marital stress with high risk for separation and or divorce.
>
> Goals:
>
> • Optimize measures to avoid hospitalization and illness.
> • Maintain stable blood chemistry and electrolytes.

• Maintain nutrition, hydration and elimination.
• Avoid acute and chronic infections.
• Maintain stable blood pressure.
• Stabilize progression of cardiovascular, bone disease and pulmonary disease.
• Maintain intact skin.
• Prevent falls.
• Assess causes of weight loss/gain.
• Increase activity level.
• Safe and effective activities of daily living.
• Maintain at home.
• Strict compliance with routine medications.
• Psychological well-being. Effective coping of depression, anxiety, stress and marital issues.

The treatment plan also details the two primary renal care options

(and the costs of each option) that Mrs. Campano faces as an end-stage

renal disease patient:  Transplant or hemodialysis:

**Option A: Kidney Transplant needs:**

Medically likely frequency of donor kidney transplants: 2-3 over lifetime.

Nephrology follow up: Monthly.

Lab testing: for monitoring s/p kidney transplant:

Monthly: medication levels (Cellcept, Prograf), creatinine, BUN, glucose, sodium, potassium, serum bicarbonate, chloride, total calcium, phosphorus, CBC, AST/SGOT, albumin, iron, UIBC (TIBC), urinalysis and urine protein.

Medications - post renal transplant:

Valcyte 450mg daily, times 6 months, post transplant.

Routine:

- Calcium 600 mg, Vit D 800 IU daily. #30.
- Cellcept 500 mg bid. #60.
- Prenatal MVI daily. #30.
- Phosphorus K-Phos Neutral 250 mg #2, bid. #120.
- Magnesium Oxide 400 mg #2, bid. #120.
- Prograf 1 mg bid. #60.
- Prednisone 5 mg qd. #30.
- Nexium 40 mg 7 per week. # 30
- Lunesta 3 mg qd. #30

Consultations: (lifetime)

- Cardiology: 4 times per year.
- Pulmonology: 2 times per year.
- Neurology: 2 times per year.
- Endocrine: 4 times per year.
- Dermatology: 2 times per year.
- Psychological: marital and individual counseling monthly.

Diagnostic testing:

- Chest X-ray - required every year.
- EKG - required every year.
- Dental exam, x-ray, prophylaxis: twice per year.
    o Dental: antibiotic prophylaxis, example, Clindamycin 300mg. 60 minutes prior to dental work, every 6 months.
- Gynecological exam/PAP smear – required every 3 years.
- Mammogram – age 45-50 years required every 2 years, >50 years, required every year.
- Echocardiogram – required every year.
- Bone Density - every 2 years.
- Transplant Surgeon Evaluation – required as part of new donor kidney work up.

<u>Emergency room visits</u>: recommends an allowance of 4 visits per year for risks and complications.

<u>Hospitalizations</u>: recommends an allowance of 3-4 per year with a length of stay of 7-10 days for treatment of risks and complications.

**Option B: long term hemodialysis due to unavailable donor, rejection, and/or complications such as cancer/malignancies.**

New AV fistula implantation prior to re-initiating hemodialysis.

Medically likely redo's of new AV fistula implantation using other extremities secondary to complications with fistula, 4 over lifetime.

Vascular surgery: evaluate patency of the AV fistula annually.

AF fistula: fistulogram/angiogram/angioplasty. 4 over lifetime.

<u>Medications</u>: Per month, as part of hemodialysis.

- Amlodipine 5 mg QD. #30.
- Colace prn. #30
- EMLA apply to dialysis access site on dialysis days, 5 grams/month.
- Renutabs (Multivits with minerals) 1 tab QD, #30.
- Lunesta 3 mg HS prn, #30.
- Nexium 20 mg QD, #30.
- Renvela 800 mg TID, #90.
- Epogen per hemodialysis

<u>Lab testing</u>: for monitoring while on hemodialysis:
(Done as part of hemodialysis session)

- <u>Annual</u>: aluminum.
- <u>Monthly</u>: I-PTH, glucose, hemoglobin A1c, sodium, potassium, serum bicarbonate, chloride, total calcium phosphorus, calcium/phosphorus produce, CBC without

diff, platelets, total protein, creatinine, BUN, BUN post, URR calculation, AST/SGOT, alkaline Phosphate, Albumin, cholesterol, iron, UIBC (TIBC), transferrin sat calculation, hepatitis B surface antibody/antigen.
• Quarterly: ferritin.
• Weekly: CBC.

Diagnostics:

Dexascan – annual.

Home care assistance:

• Post donor kidney transplant:
Home health aide for personal care assistance and assistance with activities of daily living;
choreworker for daily household, errands and shopping assistance, for 3 months after are she recovers physically and functionally.

• Hemodialysis:
Home Health aide: 3 times per week due to postdialysis fatigue.
Choreworker: 3 times per week for household chores, errands and shopping assistance.

• End of life: 3 years before end of life she would likely require 24 hour home health aide level of care as she would likely deteriorate physically.

Transportation: to and from dialysis, direct escorted medical, avoid crowded public transport vans with long wait times.

Home medical equipment:
Shower chair, grab bars, non-skid bath mat, shower hose for shower safety.

Home BP machine and thermometer to monitor vital signs.
Walker, cane for mobility aids as needed during times of
reduced mobility.
Scooter at age 50, replace through lifetime.

Klemme Report (Ex "10") at 57 - 63.

Dr. Klein and Nurse Klemme also detailed the individual line-item

costs for each of the renal disease treatment options, including short- and

medium-term transplant options in Hawaii and two facilities in Southern

California, the Cedars-Sinai and UCLA Medical Centers:

**COSTS:**

**Option A: Kidney Transplant needs:**

Nephrology office visits = $200.00

Lab testing = $287.33 total

Medications: (per month) (generic if possible)

Valcyte (taken first 6 months after transplant) $2,464.14

<u>Routine</u>:
Calcium/Vit D $3.00
Cellcept 445.53
Prenatal MVI 5.77
Phosphorus K-Phos Neutral 30.19
Magnesium Oxide 19.61
Prograf 347.96
Prednisone 10.66
Nexium 22.67
Lunesta 338.77

Total $1,224.16

- 228 -

Dental prophylaxis: clindamycin $6.00

Consultations: (lifetime needs)

Cardiology $200.00
Pulmonology $200.00
Neurology $200.00
Endocrine $214.00
Dermatology $206.00
Transplant surgeon $314.00

Diagnostic testing:

Chest x-ray $103.00
EKG/interpretation $242.00
Dental/exam/x-rays/prophylaxis $204.00
Gynecological exam/PAP $260.00
Mammogram $177.00
Echocardiogram/interpretation $1,302.00
Dexascan $292.00

Emergency room visits: $5,493.18 average

$4,225.95 date 12/25/13
$6,616.00 date 4/5/15
$5,637.60 date 5/30/15

(Based on medical bill review)

Hospitalizations: $5,849.51 per day, average.

8/1-6/15: $43,040.30 total (6 days) or $7,173.38/day.
8/9-12/15: $18,102.60 (4 days) or $4,525.65/day.
(Based on medical bill review)

**Transplant issues**:

**The Queen's Medical Center, Honolulu:**

$200,020.68 (based on review of the medical bills), includes transplant team comprehensive multidisciplinary evaluation, including diagnostic testing, lab tests, organ acquisition, surgical implantation, hospital follow up, post-operative follow up.

$8,500.00 first year, transplant team comprehensive multidisciplinary monitoring/follow up includes nephrology, and general surgery, diagnostic testing, lab testing. (Based on discussion with transplant financial advisor)

Immunosuppressive medications, see above.

*If stable after one year, then monitoring is done by nephrologist until complications. Consultations and lab testing continue as above.

Per transplant financial advisor.

**Cedars-Sinai Medical Center**:

$500,000.00 – 800,000.00 (deceased versus live donor) range includes transplant team
comprehensive multidisciplinary evaluation, including diagnostic testing, lab tests, organ acquisition, surgical implantation, hospital follow up, post-operative follow up.

Annual follow transplant team/labs/diagnostics $7,000.00.

*If stable after one year, then monitoring is done by nephrologist until complications. Consultations and lab testing continue as above.

Immunosuppressive medications, see above.

Per transplant financial advisor.

**UCLA Medical Center:**

$500,000.00 – 600,000.00 (deceased versus live donor)
range includes transplant team
comprehensive multidisciplinary evaluation, including diagnostic
testing, lab tests, organ acquisition, surgical implantation,
hospital follow up, post-operative follow up.

Annual follow transplant team/labs/diagnostics
$7,000.00.

*If stable after one year, then monitoring is done by
nephrologist until complications. Consultations and lab testing
continue as above.

Immunosuppressive medications, see above.

Per transplant financial advisor.

**Option B: Hemodialysis needs:**

AV (arteriovenous) fistula implantation = $9,198.00

Vascular surgery to evaluate patency = $314.00

Interventional procedures:
     Fistulogram = $9,000.00
     Angioplasty = $36,653.33
Removal of catheter = not available.

Klemme Report (Ex "10") at 64 - 67.

With respect to the future outpatient hemodialysis components of the treatment plan, the average monthly costs of the hemodialysis treatments are derived from the actual charges from the medical bills for the actual hemodialysis that Mrs. Campano received over a 17-month period between October 2013 and March 2014.  The total costs for Mrs. Campano's actual hemodialysis experience is $1,524,376.24, with an average monthly cost of dialysis of $83,187.25.  The costs for the hemodialysis break down as follows:

## Outpatient Hemodialysis

COMPANY:   Liberty Dialysis

COST:       Based on review of medical bills.

| Dates of Service | Charges | Average monthly costs |
|---|---|---|
| 8/27/13 - 8/31/13 (partial month) | $31,498.64 | |
| 9/3/13 (partial month) | $8,947.91 | |
| 10/5/13 | $9,759.93 | |
| 10/8/13-10/12/13 | $24,592.02 | |
| 10/15/13 - 10/19/13 | $24,640.03 | |
| 10/22/13- 10/31/13 | $36,170.20 | $95,162.18 |
| 11/2/13 - 11/9/13 | $25,589.60 | |
| 11/12/13 - 11/16/13 | $24,139.27 | |
| 11/19/13 - 11/23/13 | $20,184.95 | |
| 11/26/13 - 11/30/13 | $20,136.94 | $90,050.76 |
| 12/3/13 - 12/7/13 | $21,442.47 | |
| 12/10/13 - 12/14/13 | $22,204.82 | |
| 12/17/13 - 12/21/13 | $22,290.01 | |
| 12/23/13 - 12/30/13 | $31,483.80 | $97,421.10 |
| 1/2/14 - 1/11/14 | $34,923.96 | |
| 1/14/14 - 1/18/14 | $17,620.23 | |
| 1/28/14 - 1/30/14 | $11,746.82 | $64,291.01 |
| 2/1/14 - 02/8/14 | $23,493.64 | |
| 2/11/14 - 2/15/14 | $17,620.23 | |
| 2/18/14 - 2/22/14 | $17,716.25 | |
| 2/25/14 - 2/27/14 | $11,746.82 | $70,576.94 |
| 3/1/14 - 3/8/14 | $27,249.02 | |
| 3/11/14 - 3/15/14 | $22,513.35 | |
| 3/18/14 - 3/22/14 | $22,609.37 | |
| 3/25/14 - 3/29/14 | $22,513.35 | $94,885.09 |
| 4/1/14 - 4/29/14 | $68,830.75 | $68,830.75 |
| 5/1/14 - 5/31/14 | $66,394.01 | $66,394.01 |
| 6/3/14 - 6/28/14 | $61,671.38 | $61,671.38 |
| 7/1/14 - 7/31/14 | $71,445.40 | $71,445.40 |
| 8/2/14 - 8/30/14 | $62,844.87 | $62,844.87 |
| 9/2/14 - 9/30/14 | $64,042.04 | $64,042.04 |
| 10/2/14 - 10/30/14 | $75,444.55 | $75,444.55 |
| 11/1/14 - 11/15/14 | $40,200.66 | |
| 11/17/14 - 11/28/14 | $55,660.15 | |
| 11/29/14 | $4,297.13 | $100,157.94 |
| 12/1/14 - 12/5/14 | $28,295.33 | |
| 12/7/14 - 12/30/14 | $82,605.09 | $110,900.42 |
| 1/1/15 - 1/31/15 | $116,804.12 | $116,804.12 |
| 2/1/15 -2/28/15 | $103,260.67 | $103,260.67 |
| 3/6/15 (partial month) | $4,544.66 | |
| 3/6/15- 3/24/15 (partial month) | $65,201.80 | |

| | |
|---|---|
| Total charges | $1,524,376.24 |
| Average monthly charges (complete months only) | $83,187.25 |

Medications: included in Hemodialysis charges.
    Except Lunesta $339.95/month.

Lab testing: included in Hemodialysis charges.

Transportation: $90.00 round trip. Escorted medical van.

Nephrology = $1,112.72 per month, average.
    (Based on medical bill review)

Diagnostic testing:
    Dexascan $292.00

Psychology: see Dr. Ponce's section.

Care needs: see the home care section.

Equipment needs: see the equipment section.

Costs provided by Dr. Klein, Queen's Medical Center, Queen's Medical Center POB II Pharmacy, Queen's Medical Center Outpatient Imaging, Walgreen's Pharmacy, CVS Pharmacy, Cedars-Sinai Medical Center, UCLA Medical Center, DSI Dialysis, Hawaii Advanced Imaging, Red Carpet Transport, and review of the medical bills.

Klemme Report (Ex "10") at 68 - 70.

## b.   <u>Psychiatry Needs - Danilo E. Ponce, M.D.</u>

Nurse Klemme also worked closely with Plaintiffs' expert psychiatrist

Danilo E. Ponce, M.D. to formulate the psychiatric care section of

Mrs. Campano's life care plan.  Dr. Ponce designed a detailed plan for

Mrs. Campano's future psychiatric needs, including a comprehensive

assessment of Mrs. Campano's diagnoses and the reasons for her

diagnoses.  Dr. Ponce's treatment plan for the Life Care Plan provides in

relevant part:

SERVICES: **PSYCHIATRY**

CONTACT: Danilo E. Ponce MD

ADDRESS: 98-211 Pali Momi Street, Suite 414, Aiea, HI 96801

PURPOSE: Independent psychiatric evaluation and life care plan recommendations

TREATMENT PLAN:

Diagnostic Impression:

• Post-traumatic Stress Disorder.
    o Life-death traumatic incident, "flashbacks" of the incident, fearfulness/hyper-vigilance, hypersensitivity to stimulus, and emotional numbing.

• Adjustment Disorder with Mixed Anxiety and Depressed Mood.
    o Mrs. Campano describes the clinical anxiety and depression reactions consequent to adaptations and adjustments she and her family have to make for the permanent impairments and drastic alterations/disruptions of personal and professional lifestyles caused by the 7/22/13 medical incident.

Etiology/causation:
    Both disorders are directly related in a causal manner to the 7/22/13 medical/surgical complications following delivery of her baby daughter.  The PTSD, Anxiety and Depression symptom complex continue and are continuing throughout her clinical

course, aggravated by the medical/surgical complications she had to undergo (multiple organ shutdown, kidney failure, kidney dialysis, kidney transplant, cholecystectomy, ovarian cyst procedure, etc.), because some of the clinical impairments brought about by these medical/surgical complications are more or less "permanent", correspondingly, the aggravations caused by these complications on the psychiatric disorders are deemed to be also, more or less "permanent" i.e. on a more probable than not basis, there will be residual, permanent PTSD, Anxiety and Depression causing ongoing impairments in her overall functioning.

Formulation:

• A series of traumatic and catastrophic medical complications in which she nearly died following delivery of her baby daughter on 7/22/13, (toxic shock syndrome, multiple organ failure, kidney failure, right kidney transplant, kidney hemodialysis, cholecystectomy, ovarian cyst procedure, etc.) directly caused the clinical psychiatric disorders of Post-Traumatic Stress Disorder, Anxiety and Depression in Mrs. Campano.

• The long, arduous, and complicated recovery period took its emotional toll on both Mrs. Campano, her husband, and immediate family members that served as support services during these trying period (her mother and brother-in-law Paquito Campano).

• She suffered emotionally from a drastic plunge in self-esteem, with feelings of uselessness and worthlessness as a mother, wife and provider for her family.

• The severity of her illness, the complicated and dangerous clinical course she underwent also caused internecine conflicts and turmoil in her family and extended family – conflicts with her elderly mother and especially a confrontative sister-in-law, which exacerbated her already faltering self-esteem, with piling on of more negative emotions of anger, bitterness, shame, guilt and grief. Her mood began to gradually brighten up and improve as a result of the physical recovery after her kidney

transplant. Life on dialysis severely restricted and curtailed her life.

• She has partially recovered some of her physical abilities but her significant complaints/symptoms now revolve around her psychiatric disorders. She still suffers from moderately severe PTSD symptoms of fearfulness, emotional numbness, avoidance behaviors, hypersensitivity, hypervigilance, anxiety/panic "triggers", anxiety symptoms, sadness and passive suicidal ideation.

• Overall clinical appraisal of her condition, does not point towards any kind of immediate hope for total remission of her medical/psychiatric condition. It points more towards the need for ongoing maintenance medical/psychiatric treatment to insure some semblance of quality of life, as the expectation that her kidney transplant will gradually deteriorate and fail is high within 10 years, and she likely will have to undergo once again another round of hemodialysis and waiting for another transplant.

<u>Current status</u>:

<u>Physical</u>:  She has recovered enough from her medical/surgical travails and is able to take care of her 3 year-old daughter, with the help of her aging mother. Activities of daily living are gradually being resumed.

<u>Emotional</u>:  continues to be "fearful" going out by herself.  She forgot the appointment and was 45 minutes late.  Her husband had to "take over" to make sure they came albeit late.

During the interview, she broke into sobbing and crying which persisted throughout, needing some time for pauses and eventually time to compose herself.  She described symptoms indicative of a Post-Traumatic Stress Disorder, Anxiety and Depression; nightmares, flashbacks, over sensitivity to stimulus (startle response), irritability, weepiness, excessive worrying about dying ("What if the kidneys don't work?" "If my husband gets tired of me, I don't know what I'll do…") anger, bitterness,

"trigger responses" of anxiety/panic if getting in proximity with anything that reminds her or is vaguely associated with doctors, hospitals, sleeplessness, forgetful of appointment, feelings of worthlessness, erratic neurovegetative system (sleep, appetite, energy, libido) passive suicidal ideation, fearfulness. This is in addition to "realistic" anxiety over having to be hypervigilant regarding potential sources of infection as a result of immunosuppressive drugs she takes following the right kidney transplant; such as avoiding crowds, going out, curtailing church activities and even getting rid of their "beloved dogs". Feels she needs to talk in her Filipino dialect to feel understood. She is still in distress.

Cognitive: complains of being "forgetful".

Dr. Ponce's treatment plan also integrates Nurse Klemme's Home

Visit assessment and Dr. Ponce's Psychiatric Examination from

Mrs. Campano's office visits with Dr. Ponce:

Home visit: (done by Nurse Klemme)

• Husband: she relies on him.  She is fearful that he will be deployed. Worried about future move to San Diego.

• Guilt:
 o Wonders how the past events over her daughter's birth would have turned out differently if she had gone to Kapiolani.
 o Unable to physically care for infant daughter.

• Mother helped to raise daughter, as she could not care for daughter initially.  Their relationship is strained.

• Sons had to stay home rather than playing sports and social activities curtailed due to client's needs at home.  "Resentful and not understanding".

• Husband sacrificed his evenings and sleep, and became certified to do home hemodialysis.  She would often have itchy skin and ask him to help her to shower in the middle of the night, as she was so uncomfortable.

• Medical care/appointments: consumed by need to be at hemodialysis 3x/week, follow up medical problems, outpatient physical therapy, follow up diagnostic testing, lab tests.

• Physical: scars on chest, right arm and abdomen from medical procedures, surgeries.  Covers right arm when out in public due to the aneurysm on her upper arm.  AV shunt in neck then arm. Had to rely on husband to walk, transfer, shower etc. during times of weakness for the first year.  Use of bedside commode for BM and vomit.  Used wheelchair initially as so weak to go to dialysis and medical appointments.  Reduced libido.  Told by lab tech veins are scarring and "difficult stick".

• Vocational: bored and misses work.

• Kidney transplant: worked very hard to meet requirements and follow transplant teams instructions.

• Dialysis meds: resulted in anorexia, nausea and vomiting.  Ate only to take meds.

• Emotional: cried at times during the home visit discussing her hospitalization events, hugged Hello Kitty stuffed animal.  Low frustration tolerance, becomes scarred easily.  Triggers: hospital, doctors, medical machines, ambulance, dogs barking. During anxiety attacks: retreats to bedroom and deep breathes.

• Cognitive: difficulty with memory, attention and concentration.

• Husband's health: recently started on high blood pressure meds and meds for gout.  He underwent a vasectomy, as future pregnancy was not recommended.  She developed a cyst that ruptured on her ovary from birth control.

• Positive: church, feels stronger and they took a vacation to Volcano.  Sons are back into sports.

• MMSE: 8/15 positive for depression.  She answered both yes/no to 3 questions and looked to her husband.

• Meds: immunosuppressant meds increase risk of infection. Tried to wean off Nexium however she experiences abdominal cramping, pain and heartburn.

Psychiatric exam:

Psychiatric/psychological: continues to experience aforementioned symptoms of PTSD, anxiety and depression on a moderately severe basis.  She is open to being helped by a culturally-responsive psychiatrist.

Preoccupied with what has happened to her, her near death experiences, the harrowing medical/surgical clinical course she went through and the "pain and suffering", she and her family had to go through (and still continues to go through, albeit now with "some light at the end of the tunnel").

Overall clinical presentation (complaints/symptoms) was consistent with clinical examination findings.

Speech was linear, goal-directed and well attentive/focused, normal in tone and prosody, until she started sobbing and crying as her medical history was discussed.  Affect, was still indicative of ongoing distress.

Potential risks: There are passive suicidal ideations, but no active plans.

Dr. Ponce's plan delineates a specific treatment plan with goals, and also sets forth the costs for the elements of the plan:

<u>Treatment</u>:

• PTSD, anxiety and depression in a multi-modal approach consisting of Cognitive-Behavioral Psychotherapy, Desensitization/Exposure Therapy and Psychopharmacology with a cultural approach.

Biological treatment:

Anti-anxiety agents:

o Lexapro 10 mg qd.

Neuroleptics for treatment of PTSD, anxiety and depression:

o Seroquel 25 mg hs.

Psychopharmacology will avoid conflict of medications for immunosuppression or nephrotoxic.

Medication: initiate now and evaluate for long term needs.

Recommended is a Filipino/Ilocano-speaking psychiatrist to provide treatment.

• Year one: weekly treatment sessions (50).
• Year two: twice monthly (25)
• Year three, thereafter: (12 sessions – indefinite) assuming that her medical course will realistically involve care for the rest of her life, factoring in future kidney failure, another round of hemodialysis, another kidney transplant, etc.

<u>Goals</u>:
• Stabilize PTSD, anxiety and depression symptoms.
• Improve sleep patterns.
• Improve psychosocial support system.
• Improve quality of life with daily purposefulness.
• Cultural considerations by treatment providers.
• Prevent isolation.
• Manage residual emotional symptoms.
• To live comfortably.

<u>Prognosis</u>: Her medical condition and medical clinical course will largely dictate her clinical psychiatric course.  As her medical condition goes, so will her psychiatric disorders.  Assuming that her medical condition will be chronic and that medical interventions will be ongoing, and just insuring quality of life while the kidney transplant

undergoes gradual deterioration, (e.g. immunosuppressants, avoiding noxious/pathogenic environments/situations, avoiding stressors, etc.) then correspondingly, all medical and psychiatric treatment plans will need to also have in mind long term goals/objective perspectives.

Psychological stability: Mrs. Campano is not psychiatrically stable and still moderately severe clinically symptomatic with PTSD, Anxiety and Depression. She will need psychiatric treatment as soon as possible to prevent further deterioration.

Return to work: Her hopes to return to some kind of work in the future are not at all feasible (given her need to avoid infection, being on immunosuppressants, chronic PTSD, Anxiety and Depression).  She meets the criteria for Permanent Total Disability.

**COSTS**:

Cost per session $183.24
Costs year one = $9,162.00
Costs year two = $4,581.00
Annual costs, year three through life time = $2,198.88

Medications: (generic)
      Lexapro = $114.99 – 127.99/month.
          $121.49 average.
      Seroquel = $99.59 – 93.99/month.
          $96.79 average.

Initiate 2016 through life expectancy.

Above costs provided by Dr. Ponce, Walgreens Pharmacy and CVS Pharmacy.

Klemme Report (Ex "10") at 71-78.

### c.    **Home Care Needs**

The Life Care Plan also anticipates and details the home care needs

and assistance that Mrs. Campano will require over the course of her life.

The Home Care Needs section of the Life Care Plan explains the purpose

and goals of home care for Mrs. Campano and provides in pertinent part:

SERVICE: **HOME CARE NEEDS**

PURPOSE: To provide for assistance with activities of daily living and instrumental activities of daily living.

GOALS:

• Maintain adequate hydration, nutrition and elimination patterns.
• Achieve and maintain an acceptable quality of life.
• Prevent acute infections.
• Prevent falls.
• Avoid skin breakdown and injury.
• Safe and effective activities of daily living.
• Insure the Mrs. Campano's specific needs are addressed during aging and with changes in health care status.
• Promote adaptation to a changed life.
• Prevent complications.
• Promote wellness.
• Community reintegration.
• Prevent caregiver burnout/burden.

Klemme Report (Ex "10") at 80.

The Home Care Needs section also goes into detail about the many

primary and secondary conditions that will affect Mrs. Campano's everyday

life for the remainder of her life, and the precautions that she must take and

endure to ensure her ongoing health:

DISCUSSION:
This section discusses the type of assistance Mrs. Campano now requires secondary to acute renal failure and current chronic kidney disease, stage 5.

Dr. Klein opined Mrs. Campano has suffered irreversible kidney damage, in addition to other multi-system injuries, as a result of prolonged, untreated group A streptococcal Toxic Shock Syndrome. After a lengthy hospitalization of 32 days, she was discharged to home on hemodialysis.  The hemodialysis access catheter was in her right neck.  She was unable to ambulate due to weakness and fatigue or care for her new infant.  She required the use of a wheelchair to be transported to hemodialysis.  Her family was transporting her to dialysis 3 times per week.  Treatments lasted 3 plus hours.  Her husband and family were doing the cooking, shopping, laundry, housework and Mr. Campano assisted her to bathe/shower.
Mrs. Campano's mother assisted with care of the new infant, their 2 sons and the household tasks.  Mrs. Campano's brother-in-law also assisted with transportation.

Mrs. Campano suffered from complications including laparoscopy/ exploratory laparotomy, cholecystectomy, IV antibiotics for treatment of bacterial peritonitis, treatment of ascites with drainage via paracentesis, duodenal ulcer, pleural effusions, intermittent nausea and vomiting, anorexia, antibiotic treatments of infections.

As part of her recovery, she participated in physical therapy.  She had difficulty holding her infant due to weakness.  She slowly progressed to ambulation using a walker.  A shower bench was used to bathe secondary to weakness.  Her husband assisted her to negotiate the steps in their home because of fatigue and shortness of breath problems.  After 5 months, her strength had improved and she was more ambulatory.  After 8 months of hemodialysis, and no return of kidney function, she underwent placement of an AV (arteriovenous) fistula in the right upper extremity to continue with hemodialysis.

Her recovery was complicated by acute abdominal pain, chest pain, shortness of breath, fevers and work ups in the emergency rooms. She continued with problems of lower extremity edema, fatigue, intermittent nausea/vomiting, multiple medications required as part of

hemodialysis for treatment of anemia, hyperparathyroidism, Vit D deficiency, hypocalcemia and hyperphosphatemia.

The right upper extremity AV fistula experienced an infection and she was evaluated for possible pseudoaneurysm.  She underwent placement of a catheter in the left neck for hemodialysis access.

She continued to experience post hemodialysis fatigue and was assisted by her family with transportation to and from hemodialysis, bathing and household activities.  Her husband underwent training for home hemodialysis and she received treatments 5 times per week at home until she underwent a kidney transplant.

On 3/25/15 Mrs. Campano underwent successful kidney transplantation.  She continues on immunosuppressant medications.  The hemodialysis AV fistula was removed.  She has slowly gained her strength and voids often.  She is currently able to participate in her own self-care and household activities.  The process of recovery was very slow.

**Dr. Klein noted during hemodialysis, Mrs. Campano required long hours in the dialysis chair at the rate of 3 times per week. He noted problems with post dialysis fatigue with weakness and leg cramping.  Since successful kidney transplantation, Mrs. Campano's current issues are a very strict routine of immunosuppressant medications.  The side effects of these medications weaken the immune system increasing her risk for infections, malignancies/cancer and failure of donor kidney. Infections, the common cold and flu are a constant threat for the rest of her life.  She is at even greater risk due to exposure as a mother with school aged children.  Required are strategies to minimize infections including hand washing, keeping the household environment clean, use of sanitizers, cooking of all foods, avoiding persons/animals due to infections, illnesses or contact with feces.**

**Dr. Klein opined the life expectancy of the donor kidney can range from 5-10 years, on average.  He noted as the donor kidney begins to fail, patient's can develop diabetic neuropathy, tremors, bone disease and cancer.  They become very**

**debilitated, cachectic or chronically ill appearing with loss of muscle mass, reduced energy, they have difficulty transferring and mobilizing.  He noted patients typically will want to sit more than stand and stand more than walk.  He noted she would have difficulty climbing stairs.  Dr. Klein opined at the time a suitable donor kidney is offered and post transplantation, Mrs. Campano would like require daily personal care assistance for 3 months, while she recovers physically and functionally. Given her young age, as well as the possibility of donor kidney graft rejection, she will likely undergo multiple transplant procedures, and it is medically likely she will undergo 2-3 transplants over her lifetime.**

**In between, when the transplanted kidney fails, Mrs. Campano will resume hemodialysis.  The AF fistula will need to be surgically implanted for access.  Due to post dialysis fatigue, a home health aide will be necessary, as this is the value of the family's assistance, at the rate of 3 times per week to assist with personal care and hygiene issues.  A choreworker is recommended at the rate of 3 times per week, for household chores, errands, and shopping assistance, as this is the value of what the family has provided.**

**Dr. Klein has opined at the end of life, 3 years prior to the end of life, Mrs. Campano would likely require a home health aide, 24 hours per day, as she would likely deteriorate physically.**

The nursing goals are to maximize her activity tolerance, manage her pain, manage her nausea/vomiting, manage her activities of daily living with the appropriate medical equipment and for her to participate in activities of daily living as she is able, prevent falls, minimize caregiver burnout and provide for a safe and effective caregiving environment.

An important issue with respect to the home care aspects of the Life

Care Plan is agency hire versus private hire, and based on many factors

and the weight of authority, the Care Plan strongly recommends agency

care over private hire:

> **Agency staff is recommended over use of private hire and family members.**  Another indication for use of agency staff, is that family members have their own lives to lead and to prevent burnout. Providing the aforementioned care on a day-to-day basis can restrict the caregiver's personal life, family care obligations, employment and vocational opportunities.  **With private hire, if the caregiver calls in sick, then the client lacks a caregiver or the responsibility falls back onto the family who have their own obligations**.

> Mr. Campano reported changes in his own health issues. He has been prescribed medication for high blood pressure and for treatment of gout.  Mr. Campano has his own vocational goals and discussed his pursuit of an advanced nursing degree, become a nurse practitioner and to have a full career as a nurse in the United Status Navy.

> **An article by Smith in MedPage Today, noted a study of how the stress of caregiving can lead to stroke.  One of the implications in the study is that the spouse looking after a disabled partner needs extra support.  The analysis noted high caregiving strain was associated with risk of stroke.  Lower stress was reported in the study by spouses who used paid help**.

> **A study that was done by Hubell and Hubell to assess the burnout risk for male caregivers in providing care to their spouses noted that male caregivers were more likely to experience the typical symptoms of burnout, namely: depersonalization, diminished personal accomplishment and emotional exhaustion.  Unfortunately, male caregivers were less inclined to seek out community services**.

> **AARP notes in an article on their website about family caregivers that respite is one of the most pressing needs of families and friends who take on a caregiving role.  Family members who live with the care recipient and who experienced**

**intensive caregiving situation were most likely to say respite services would be beneficial to them**.

**It is recommended for the aide and the choreworker to be retained from an agency versus private hire.**  The home health aide's role is to provide for activities of daily living.  The choreworker provides for daily assistance with instrumental activities of daily living such as household tasks, keeping the environment clean and sanitized, chores, errands and shopping assistance.

**The agency has the performance, history and accreditations as they are monitored by State and Federal agencies.  Staff are bonded and trained in the specialized care of persons with physical disabilities. The client's care would be supervised and monitored by a RN supervisor who would be seeing Mrs. Campano in her home and monitoring the staff.  The client's needs are assessed, caregiving issues identified, an assessment made and a plan developed utilizing the team (client, physician, RN supervisor, and therapists).  Goals and a schedule are established and also a means for routine evaluation of the plan of care.  Problems and issues are addressed and the plan of care is modified.  The client and caregivers are active participants in the plan of care.  The agency has the back up reserves to provide for continuous staffing.  Use of agency staff is commonly used by case managers with the State of Hawaii and also by private case managers, rather than using private hire to provide hands-on care needs of their clients**.

**With private hire, the client becomes the employer and supervisor. They are responsible for checking references and criminal backgrounds, insurance, payroll (state and federal payroll taxes), and Worker's Compensation Insurance.  The client becomes the employer and he has to decide if the person is qualified/ trained/ certified to provide the care needed**.

**Private hire caregivers lack appropriate medical supervision, are not required to meet any standards/qualifications or participate in ongoing training.  They are at risk for abuse and intimidation without a supervisor who is there to assess, interview, monitor**

**and intervene if necessary, the home situation through routine home supervisory visits.**

**Private hire is not recommended.**

**REFERENCES**

AARP.org. Glog.aarp.org. "Everyone Needs a Break Sometimes – Especially Family Caregivers. Posted 11/16/15.

Hubell L. Hubell K. The Burnout Risk for Male Caregivers in Providing Care to Spouses.  Journal of Health and Human Services Administration. 2002 Summer, 25(1): 115-32.

Smith, Michael. Caregiving Linked to Stroke Risk. MedPage Today, January 15, 2010.

The Care Plan also sets forth the cost of the Home Care Needs, and

includes costs for both Hawaii and San Diego to accommodate the short-

and medium-term needs, in recognition that the Campanos may be moving

to San Diego.

**COSTS: Hawaii**

COMPANY: **Care Resource Hawaii**

ADDRESS: 680 Iwihei Road, Suite 660, Honolulu, HI 96817

CONTACT: Spencer Tsui RN, Supervisor

COMPANY: **Wilson Home Care**

ADDRESS: 1221 Kapiolani Blvd., Suite 940, Honolulu, HI 96814

CONTACT: Ilene

COST: Private duty home care:

> Choreworker:
> 3-hour minimum.

> $22.50/hour, average.

> Aide:
> 3-hour minimum.

> $23.50 – 24.50/hour.
> $24.00 average.

**COSTS: San Diego, California**

COMPANY: **Love Right Home Care**

ADDRESS: 3505 Camino Del sol South, San Diego, CA 92108

CONTACT: Gerry

COMPANY: **Partners in Home Care**

CONTACT: Brenna

COST: Private duty home care assistance:

COSTS: Nurse's aide/companion:

> $21.00/hour, average.

> Average of above

> Home health aide: $22.50/hour.
> Choreworker: $21.75/hour.

Klemme Report (Ex "10") at 79-85.

### d.    Equipment Needs

The Equipment Needs section of the Life Care Plan specifies and provides cost data for the various medical and other equipment and supplies that Mrs. Campano requires for the rest of her life as a result of her injuries, including a blood pressure monitor, cane, bathing and mobility equipment, safety rails, wheelchairs, walkers, and scooters.

Nurse Klemme's Life Care Plan and spreadsheets are attached as Exhibit "10."

Unfortunately, in the months before trial Nurse Klemme fell ill and remains unable to testify.  Plaintiffs enlisted the assistance of experienced life care planner Susan Riddick-Grisham, R.N., CLCP.  Nurse Grisham detailed her qualifications in her report of April 4, 2017:

> I have been a registered nurse for 41 years.  For 36 of those years I have been a catastrophic injury case manager and a life care planner.  I participated in the development of the first national curriculum to teach other professionals how to develop Life Care Plans.  I have been a certified life care planner since it was first offered in 1996.  I have published numerous articles and book chapters in life care planning.  I edited the first and second editions of the *Pediatric Case Management and Life Care Planning*.  I chaired two professional summits for life care planners and am currently the Co-Chair of the 2017 Summit which will be held in Denver, CO in May.  I am a frequent speaker at the annual life care planning symposiums and other professional meetings.  I have prepared thousands of life care plans over the span of my career including plans for persons with multi system organ failure secondary to Strep A infections.

Nurse Grisham Report at 1.  Nurse Grisham's report and Rule 26

Disclosures are attached as Exhibit "11."

Nurse Grisham reviewed Nurse Klemme's life care plan in detail, and

fastidiously checked and confirmed that Nurse Klemme's methodology was

sound.  Nurse Grisham conferred with Nurse Klemme on three separate

occasions to confirm elements of Nurse Klemme's methodology and to

receive foundational information, spoke with Rafael and Marites on the

telephone regarding the information in Nurse Klemme's life care plan, and

reviewed all of Marites's medical records and bills.  Nurse Grisham's report

provides in pertinent part:

> You have requested that I review the opinions expressed in a
> Life Care Plan report authored by Karen Klemme, RN, BSN, CRRN,
> CNLCP. The report is dated August 12, 2016.  In addition to
> reviewing her report, I reviewed the following materials.
>
> Medical Records:
> Tripler Army Medical Center
> DSI Pearlridge Dialysis
> Pali Momi Medical Center
> Brian Pien, MD
> The Queen's Medical Center
> Surgical Associates-Queens
> Nada, Ono, Kaanehe & Solomon, LLP
> Makalapa Clinic
> Simone Overman-Starkman, Psy.D
>
> Medical Bills:
> DSI Pearlridge Dialysis
> Brian Pien, MD
> Surgical Associates

Pali Momi Medical Center
Nada, Ono, Kaanehe& Solomon, LLP
The Queen's Medical Center

Expert Reports:

Plaintiffs:
Life Care Plan authored by Karen Klemme, RN, BSN, CRRN, CNLCP
Report from Keith Klein, MD (Nephrology)
Reports from Robert C. Marvit, MD (Psychiatry)
Report from Gary Blake, MD (OB/GYN)
Report from Jose Montoya, MD (Infectious Diseases)
Report from Danilo Ponce, MD (Psychiatry)
Report from Thomas Loudat, Ph.D. (Economics)

Defense:
Report from Harold Asher and Jeffrey Meyers (Economics)
Report from Jeffrey D.S. Ching, MD (IME)
Preliminary Life Care Plan authored by John Fountaine, MA,
CRC,CCM
Report from Stuart Friedman, MD (Nephrology)
Report from Jeffrey Yeoh, MD (Radiology)

Depositions:
Keith Klein, MD
Rafael Campano
Marites Campano

        In addition to reviewing the materials, I also spoke with
Ms. Klemme on March 27, 2017, March 31, 2017, and April 3, 2017.
We discussed her methodology and she provided me with
foundational and backup information and materials for elements of
the Life Care Plan, including Dr. Klein's and Dr. Ponce's treatment
plans.  I also interviewed Mr. and Mrs. Campano on April 2, 2017.
In my conversation with Mr. and Mrs. Campano I confirmed the
information included in the Life Care Plan.  The family indicated that
although they expect that Mr. Campano will be transferred to
San Diego, CA for a period, it is their intent to return to Hawaii to live.
        . . . .

Verifying Cost information:

I reviewed the medical bills that in part, formed the basis for some of the projected cost of items identified in the LCP. I utilized Medical Fees 2017 to confirm that the pricing cited for doctor visits is reasonable and appropriate. I also confirmed the cost of kidney transplantation at Cedars-Sinai.  UCLA was also contacted and I am awaiting their response.

Nurse Grisham Report (Ex "11") at 1 – 3.

After completing her review, Nurse Grisham felt that Nurse Klemme

followed the published methodology accepted by life care planners and felt

confident that she could support her opinions.  Nurse Grisham noted:

In reviewing the methodology that Ms. Klemme utilized in developing the life care plan for Mrs. Campano, I find that she followed the published methodology that is accepted by the field of life care planning practitioners. She reviewed medical records and medical bills and she interviewed Mr. and Mrs. Campano. In addition to the medical records, she consulted with Keith Klein, MD and Danilo Ponce, MD to establish a proper medical foundation for the items identified in the LCP.  She then summarized their opinions and presented the summary to both physicians for review. They each reviewed and agreed with her summarizations (see attached MD reviews). To gather pricing information, she correctly reviewed past medical bills and contacted local medical and pharmacy providers.
. . . .
In my opinion, Karen Klemme, RN, BSN, CRRN, CNLCP followed the appropriate methodology in developing the Life Care Plan for Marites Campano. She utilized her experience, education and training as a registered nurse, case manager and life care planner to develop a plan that is reasonable and appropriate with the necessary medical foundation that was provided by Drs. Klein and Ponce.

Sadly, Ms. Klemme has developed a medical condition that will prohibit her from testifying in the near term in this matter. Based on my review, I feel confident that I can support her opinions.

Nurse Grisham Report (Ex "11") at 3.

## C. **Economic Analysis**

Plaintiffs' Economist Thomas Loudat, Ph.D. has prepared an economic analysis of Marites's life care plan, wage losses, and Plaintiffs' miscellaneous expenses.  Dr. Loudat's analysis calculates Plaintiffs' total economic damages in a range between **$8,900,000.00** and **$51,320,000.00**, depending on the various future renal care scenarios for Marites.

The three future transplant/hemodialysis scenarios posited by the life care plan and analyzed by Dr. Loudat outline the different medically probable options for Marites's future renal care, and break down as follows:

1. **Kidney Transplant Every Five Years, With No Hemodialysis:**
   $8.38M - $16.45M (assuming Hawai`i transplant costs)
   $10.92M - $20.75M (assuming Cedars-Sinai transplant costs)
   $10.36M - $19.79M (assuming UCLA transplant costs)

2. **Kidney Transplant Every Ten Years, With Hemodialysis for Five Years Between Transplants:**
   $17.92M - $30.82M (assuming Hawai`i transplant costs)
   $19.57M - $32.65M (assuming Cedars-Sinai transplant costs)
   $19.23M - $32.18M (assuming UCLA transplant costs)

**3.** **No Kidney Transplants, Hemodialysis Only**:
$20.88M - $50.80M

All future medical care calculations have been reduced to present value.

In comparison, the defense present value consultants AsherMeyers estimate the cost of Marites's future medical costs to be **$3,441,829 - $4,626,880.**

As noted above, Marites was employed as a certified nursing assistant at the Plaza at Mililani prior to the incident.  Dr. Loudat calculated Marites's wage losses as follows:

1.   **Past Wage Loss**:   $60,000.00
2.   **Future Wage Loss**:   $462,000.00 (present value)

**Total Wage Loss:**   **$522,000.00**

Dr. Loudat's full report is attached as Exhibit "12."

## VII.   RETORT TO DEFENSE DAMAGES CONSULTANTS' OPINIONS

In general, the most significant areas of conflict between Defendant's and Plaintiffs' damages consultants' opinions involve two issues:  (1) how many kidney transplants Marites will require over the course of her life expectancy; and (2) the cost of hemodialysis.  The nuances and implications informing each of these issues will be discussed in turn by consultant as follows:

## A.    Kidney Transplant Functional Life, Replacement Interval, and Costs.

The issue of how many kidney transplants Marites will require over her lifetime affects the quantum of damages because the length of the interval between transplants directly determines the total number of times Marites will require kidney transplantation over the course of her life expectancy.

### 1.    No Dispute As to Life Expectancy.

At the outset, it is important to note that the defense consultants do not disagree that Marites will live a near-normal life expectancy to at least 75 years old.  The defense consultants charged with reducing the future economic damages to present value, AsherMeyers, directly adopt Plaintiffs' economics expert Dr. Loudat's life expectancy assumption of 75 years old:

Life Expectancy

Based on the Loudat Report, we have assumed Ms. Campano has a life expectancy to 75.0 years of age.

AsherMeyers Report at 3.  Similarly, Defendant's nephrology consultant, Dr. Stuart Friedman, opines that Marites's life expectancy will be no more than 5 years less that that of a normal individual:

Ms. Campano has no comorbidities which would negatively impact her survival or the longevity of her renal transplant. Specifically, she does not have diabetes, hypertension or underlying cardiovascular disease, which are often present and common in patients with end-stage renal disease. As a result, her life expectancy would be no more than 5 years less than that of a normal individual. She will need to be maintained on lifelong immunosuppression. Based upon USRDS data the half life of her transplant (number of years that 50% of transplants would be expected to function) would be 12-14 years.

Dr. Friedman report at 1.

## 2.    Relative Agreement on Transplant Cost.

Similar to the issue of life expectancy, both Plaintiffs' and Defendants' damage consultants are relatively close in their estimates regarding transplant costs.  Plaintiffs' nurse life care planning expert Karen Klemme gathered information from several sources for kidney transplant costs, including an analysis of Marites's actual costs for her present transplant, as well as conferring with Dr. Klein for costs from Cedars-Sinai, and independent research regarding costs from UCLA:  Nurse Klemme's transplant costs as appropriately reduced to present value by Dr. Loudat break down as follows:

| Actual Costs (Hawaii) | Cedars-Sinai (Dr. Klein) | UCLA | Average |
|---|---|---|---|
| $212,211 | $660,690 | $560,690 | $477,863.66 |

Defense life care planner Mr. Fountaine apparently relied on an insurance industry actuarial firm who prepares health care cost data called Milliman, as well as consulted their defense nephrology consultant

Dr. Friedman regarding transplant costs.  Mr. Fountaine's cost estimates

break down as follows:

| Milliman | Cedars-Sinai (Dr. Friedman) | Average |
|---|---|---|
| $441,400 | $400,000-$500,000 | $420,700 - $470,700 |

However, in their present value economic report, Defense consultants

AsherMeyers utilize a cost figure of $549,000 for kidney transplant surgery:

### MARITES CAMPANO

#### SCENARIO 1 - KIDNEY TRANSPLANT AT AGE 58
LIFE CARE PLAN ANNUAL COSTS IN 2016 DOLLARS

| | | YEARS 1-11 | YEARS 12-17 | YEAR 18 | YEARS 19-31 | YEARS 32-35 |
|---|---|---|---|---|---|---|
| A | PRESCRIPTIONS & DRUGS | 11,754 | 11,754 | 11,754 | 11,754 | 11,754 |
| B | PROFESSIONAL SERVICES | 6,711 | 6,711 | 18,361 | 6,711 | 6,711 |
| C | HOSPITALIZATION COSTS | 16,271 | 16,271 | 16,271 | 16,271 | 16,271 |
| D | HOME HEALTH CARE | - | 15,288 | 1,176 | - | 39,312 |
| E | HEMODIALYSIS THERAPY COSTS | - | 89,000 | - | - | 89,000 |
| F | TRANSPLANT SURGERY | - | - | 549,000 | - | - |
| G | TOTAL DAMAGES | $ 34,737 | $ 139,025 | $ 596,563 | $ 34,737 | $ 163,049 |

AsherMeyers Report at 10 (emphasis added).

Therefore, at bottom, there is not much difference between Plaintiffs'

and Defendant's estimates of transplant costs.  In fact, the defense's

actually-utilized estimates appear to be higher than Plaintiffs' experts'

average cost.

### 3.    Disagreements on Transplant Functional Life and Replacement Interval.

The primary focus of disagreement regarding kidney transplants is on the issue of kidney transplant functional life and replacement interval.  The most pointed disagreement comes from Defendant's nephrology consultant, Dr. Friedman, who states in his report that:

> Lastly, Dr. Klein underestimates the likelihood of Ms. Campano's renal transplant survival.  She received a cadaveric transplant from a 24-year-old donor and she has no comorbidities which would negatively impact her renal transplant survival, in contrast to most patients who have end-stage renal disease and go on to need kidney transplant.

Dr. Friedman report at 2.

However, other than the fact that Marites's transplant was from a young donor and she is otherwise relatively healthy, Dr. Friedman offers no support for his disagreement with Dr. Klein.  Moreover, Dr. Friedman's ostensible reasons for disagreement with Dr. Klein are flawed for four principal reasons.

High Risk Donor Kidney:  First, although Marites's donor kidney is indeed from a young donor, the record is replete with the fact that it was from a "high risk" donor.  For example:

> RN Note (Melissa Dawson, RN):
> Called pt to inform that she is primary for imported kidney.  **Informed pt donor is classified as CDC high risk.  Both transplant surgeon**

**and primary nephrologist reviewed the donor info and believe the benefits outweigh the risks to recipient for transplant**.

QMC 282 (emphasis added).

> Plan:
> A 24 y/o brain-dead male donor kidney (KDPI 24$) became available from out of state and is being offered to pt as a primary candidate due to her high PRA.  **Donor is a CDC high risk, but probability of transmissible dz is very low because of avail serology results. Pt is aware of these, and wishes to proceed, which is transplant team's recommendation.** Final crossmatch and rpt of organ anatomy pending.  Assuming all acceptable, pt will be adm'd to undergo deceased kidney transplant.  Induction immunosuppression w/ATG will be necessary.

QMC 552-54 (emphasis added).

Ignores Post-Transplant Co-Morbidities: Second, Dr. Friedman is slightly disingenuous when touting Marites's lack of co-morbidities as a basis for his assertion that Marites's transplant life is at the maximum end of the range when, as Dr. Klein notes, transplant recipients are at higher risk for co-morbid conditions that affect their transplant life due to the use of immunosuppressive drugs after transplantation to prevent rejection of the transplant.  See Dr. Klein Report (Ex "3") at 5.

Direct Conflict with Defense IME Consultant:  Third, Dr. Friedman's transplant life estimates are directly in conflict with the defense's own IME physician consultant Dr. Jeffrey Ching (who actually calculates the transplant interval), who opines that Marites will need a new kidney

transplant or resume hemodialysis every **ten** years, which is not only in

conflict with Dr. Friedman, but is also exactly consistent with the midpoint of

Plaintiffs' nephrologist Dr. Klein's range estimate as well as the interval

utilized by Plaintiffs' economist expert Dr. Loudat in calculating the future

transplant costs.  Dr. Ching's report provides in relevant part:

**COSTS FOR FUTURE MEDICAL CARE:**

I have reviewed the plaintiffs experts, Dr. Klein, nephrology; Klemme, RN, life care; Dr. Loudat, PhD, financial analysis.

Cost for kidney care going forward is by far the most significant cost. Although cost for transplantation, hemodialysis, and maintenance care for these varies from state to state, my estimated costs are markedly less than Dr. Loudat.
. . . .
**For transplant patients: 10-year graft survival rate is approximately 50%** (It is important to note that number is increasing annually as medical advancement are made in the future).

Given the data and numbers above, the actual total cost Significantly less than the costs listed by the plaintiffs experts.

For example, if Mrs. Campano lived until age 70, had **2 transplants that each lasted 10 years**, and 10 years of hemodialysis in the interim, her lifetime costs related to renal disease would be approximately:

$2,000,000. (**Transplant surgeries at $150,000 per, X 2 [in 20 years, i.e. 10 years per transplant]** = $300,000; Annual Care for transplant patients at $30,000 per year X 20 years = $600,000;

Annual Dialysis care at $100,000 per year X 10 years = $1,000,000; Set-up fee for Dialysis equals approximately $100,000)

Cost for **30 years of transplants** without dialysis would be approximately:

$1,350,000 (Transplants surgeries at $150,000 per **X 3 [in 30 years, i.e. 10 years per transplant]** = $450,000; Annual Care for transplant patients at $30,000 per year X 30 years = $900,000); and

In the worst-case scenario, dialysis for 30 years without transplants:

$3,100,000 (Annual dialysis care at $100,000 X 30 years; Set-up fee for Dialysis at $100,000).

Dr. Ching Report at 6 - 7 (emphasis added).

Statistical Insignificance:  Finally, at bottom, Dr. Klein's and

Dr. Friedman's estimates of the functional life of Marites's transplant kidney

are essentially in agreement, with Dr. Friedman being more dogmatic in

asserting that Marites's kidney will last at least twelve years, whereas

Dr. Klein acknowledges the statistical probability of a range of transplant

life between 8-12 years.  The significance is that with the intervals spaced

within Marites's remaining life expectancy, the defense formulation limits

her to one additional transplant, where Plaintiffs' estimates allow for two.

## B. **Hemodialysis Costs.**

### 1. **Defendant's Damages Consultants Ignore the Actual Bills for the Actual Hemodialysis that Mrs. Campano Actually Received and Instead Rely on Costs Based on Collateral Sources for Their Opinions.**

The issue of the proper measure of hemodialysis costs is the single

most significant damages issue in the present case, and is ironically the

most clear-cut legal and factual issue in the case as well.  As discussed above, Marites had to endure nearly two and a half years of outpatient hemodialysis in the community before she received her first kidney transplant.  In calculating Marites's lifetime hemodialysis costs during the life care planning process, Plaintiffs' expert nurse life care planner Karen Klemme, R.N. utilized the actual experiential cost data from the bills of the dialysis center who actually dialyzed Marites in calculating Marites's future hemodialysis costs.  These actual costs average about $83,187.25 per month, or $998,247 per year.

The defendant damages consultants, IME Physician Jeffrey Ching, life care planner John Fountaine, and present value/financial consultants Harold Asher and Jeffrey Meyers, ignore this actual experiential data in favor of national statistical data that is fundamentally flawed for use in the estimation of future medical costs in a medical negligence case governed by Hawai`i law.  Both Dr. Ching and Mr. Fountaine explicitly rely on the data from the same source, the United States Renal Data System's (USRDS) annual reports, albeit they apparently rely on data from different years.  Dr. Ching's report provides:

My information and calculations for future medical care for the above costs come from NIH (National Institute of Health), specifically the National Institute of Diabetes, Digestive and Kidney Disease and the U.S. Renal Data Systems 2013 Annual Report.

Dr. Ching report at 6 (emphasis added).  Mr. Fountaine's life care plan

provides in pertinent part:

> Diego long term.  The private pay costs for dialysis in the attached care plan are based on private pay cost obtained from 3 dialysis clinics in San Diego; Fresenius Kidney Care, DaVita and Chula Vista/ US Kidney Care.  Annual average charges for kidney dialysis from the U.S. Renal Data Systems 2014 Annual report are also included in the attached care plan.

Fountaine report at 3 (emphasis added).  Nevertheless, all of the defense

consultants apparently interpret the cost data that allegedly stems from the

U.S. Renal Data Systems Annual Reports as an annualized cost of

$80,000 - $100,000.  For example, Dr. Ching's report states as follows:

**COSTS FOR FUTURE MEDICAL CARE:**

I have reviewed the plaintiff's experts, Dr. Klein, nephrology; Klemme, RN, life care; Dr. Loudat, PhD, financial analysis.

Cost for kidney care going forward is by far the most significant cost.  Although cost for transplantation, hemodialysis, and maintenance care for these varies from state to state, my estimated costs are markedly less than Dr. Loudat.

My information and calculations for future medical care for the above costs come from NIH (National Institute of Health), specifically the National Institute of Diabetes, Digestive and Kidney Disease and the U.S. Renal Data Systems 2013 Annual Report.

Annual Hemodialysis cost $80,000-$100,000 per year
Annual Transplantation Maintenance cost $25,000-$30,000 per year
Cost of Transplantation Surgery ranges from $50,000-$150,000

Dr. Ching report at 6 (emphasis added).  Mr. Fountaine's report provides:



**PRELIMINARY LIFE CARE PLAN**
NAME: Marites Campano
DOB:

| ITEM | PURPOSE | PROVIDER | AGE/INITIATED AGE/SUSPENDED | REPLACEMENT RATE | BASE COST |
|---|---|---|---|---|---|
| Dialysis Therapy (Hemodialysis) | Treat chronic kidney disease, pre kidney transplant | Fresenius Kidney Care, Chula Vista/ US Kidney Care, San Diego, CA or Local Provider | Current Age to Life Expectancy<br><br>(Per Dr. Friedman Ms. Campano's current kidney replacement will last 12 to 14 years. Ms. Compano will require 5 to 7 years of future dialysis prior to her second kidney replacement) | Average 3 treatments per week for 5 to 7 years | $500.00 per Dialysis Treatment<br><br>(Private pay cost obtained from Fresenius Kidney Care, DaVita and Chula Vista/ US Kidney Care - San Diego, CA)<br><br>(does not include labs or medications) |
| | | | | Annually for 5 to 7 years | $80,000.00.00 to $100,000.00 Annually<br><br>(per U.S. Renal Data System Annual Report, 2014)<br><br>(does not include labs or medications) |

FUTURE MEDICAL/SURGICAL CARE- Continued

Mr. Fountaine Life Care Plan at 3 (page 8 of document) (emphasis added).

As this excerpt from his report also states, Mr. Fountaine apparently also gathered cost data for hemodialysis on a "private pay" basis from some dialysis clinics in San Diego, which is expressed later in his report as $500.00 per dialysis treatment:



**PRELIMINARY LIFE CARE PLAN**
**NAME: Marites Campano**
**DOB:** ████████

| ITEM | PURPOSE | PROVIDER | AGE/INITIATED AGE/SUSPENDED | REPLACEMENT RATE | BASE COST |
|---|---|---|---|---|---|
| Dialysis Therapy (Hemodialysis) | Treat chronic kidney disease, pre kidney transplant | Fresenius Kidney Care, Chula Vista/ US Kidney Care, San Diego, CA or Local Provider | Current Age to Life Expectancy<br><br>(Per Dr. Friedman Ms. Campano's current kidney replacement will last 12 to 14 years. Ms. Compano will require 5 to 7 years of future dialysis prior to her second kidney replacement) | Average 3 treatments per week for 5 to 7 years | $500.00 per Dialysis Treatment<br><br>(Private pay cost obtained from Fresenius Kidney Care, DaVita and Chula Vista/ US Kidney Care - San Diego, CA)<br><br>(does not include labs or medications) |
| | | | | Annually for 5 to 7 years | $80,000.00 to $100,000.00 Annually<br><br>(per U.S. Renal Data System Annual Report, 2014)<br><br>(does not include labs or medications) |
| **FUTURE MEDICAL/SURGICAL CARE- Continued** | | | | | |

December 2016
Page 3

Fountaine report at 3 (page 8 of the total report) (emphasis added).

A rough calculation based on Mr. Fountaine's "private pay" unit cost yields an annual cost of approximately $78,000.00 per year (3 treatments per week x 52 weeks a year x $500.00 per treatment).

Mr. Fountaine also revealed during his deposition that he had done some additional work regarding "private pay" hemodialysis costs in both Hawaii and San Diego, and received San Diego costs confirmatory of his previous inquiries, but received higher costs in Hawaii:

Q.   Just tell me briefly so we get a sense, you've mentioned looking at Hawaii dialysis figures, I believe you've indicated.  What have you looked at specifically?

A.   I've contacted providers in Hawaii and obtained charges for dialysis.

Q.   Who have you contacted?

A.   I have them in San Diego and in Hawaii.  U.S. Renal Care, which was formerly DSI.

Q.   Anyone else?

A.   Fresenius, F-r-e-s-e-n-i-u-s, Liberty Dialysis.
. . .
Q.   When did you make those contacts?

A.   This month.
. . . .
Q.   Was the question presented to U.S. Renal and Fresenius any more specific than:  What do you charge for dialysis?

A.   Also asked any associated costs, medical fees, administration fees.  Essentially, if you came in and had your dialysis treatment, what would they charge you, what would that cost be in total.

Q.   **What cost figures did you receive?**

A.   **In Hawaii, they're a bit higher than they were in San Diego.  About 700 to $750 per session.**

Q.   That change, does that reflect the difference between U.S. Renal and Fresenius?

A.   Yes.

Q.   Which is which?

A.   700 was Fresenius, 750 was U.S. Renal Care.

Q.   Is that number inclusive, to your understanding, of medical fees and administrative fees?

A.   At the dialysis clinic, yes, not outside of the clinic.  So any other doctor visits or any other medications that would be not dealt with at the time of the dialysis.

Fountaine 10:11 - 14:09 (emphasis added).

However, when defense statistician consultants AsherMeyers performed their economic calculations for the annualized costs of Marites's future hemodialysis, they apparently eschewed Mr. Fountaine's "private pay" cost figures in favor of an annualized hemodialysis cost figure slightly below the midpoint of the range of the USRDS data, at $89,000.

## MARITES CAMPANO

### SCENARIO 1 - KIDNEY TRANSPLANT AT AGE 58
#### LIFE CARE PLAN ANNUAL COSTS IN 2016 DOLLARS

| | | YEARS 1-11 | YEARS 12-17 | YEAR 18 | YEARS 19-31 | YEARS 32-35 |
|---|---|---|---|---|---|---|
| A | PRESCRIPTIONS & DRUGS | 11,754 | 11,754 | 11,754 | 11,754 | 11,754 |
| B | PROFESSIONAL SERVICES | 6,711 | 6,711 | 18,361 | 6,711 | 6,711 |
| C | HOSPITALIZATION COSTS | 16,271 | 16,271 | 16,271 | 16,271 | 16,271 |
| D | HOME HEALTH CARE | - | 15,288 | 1,176 | - | 39,312 |
| E | HEMODIALYSIS THERAPY COSTS | - | 89,000 | - | - | 89,000 |
| F | TRANSPLANT SURGERY | - | - | 549,000 | - | - |
| G | TOTAL DAMAGES | $ 34,737 | $ 139,025 | $ 596,563 | $ 34,737 | $ 163,049 |

# MARITES CAMPANO

## SCENARIO 2 - NO KIDNEY TRANSPLANT AT AGE 58
### LIFE CARE PLAN ANNUAL COSTS IN 2016 DOLLARS

|   |   | YEARS 1-11 | YEARS 12-31 | YEARS 32-35 |
|---|---|---|---|---|
| A | PRESCRIPTIONS & DRUGS | 11,754 | 11,754 | 11,754 |
| B | PROFESSIONAL SERVICES | 6,711 | 6,711 | 6,711 |
| C | HOSPITALIZATION COSTS | 16,271 | 16,271 | 16,271 |
| D | HOME HEALTH CARE | - | 15,288 | 39,312 |
| E | HEMODIALYSIS THERAPY COSTS | - | 89,000 | 89,000 |
| F | TRANSPLANT SURGERY | - | - | - |
| G | TOTAL DAMAGES | $ 34,737 | $ 139,025 | $ 163,049 |

AsherMeyers report at Exhs 1 and 2 (pages 11 and 12 of report) (emphasis added).

Based on these assumptions, as noted above, AsherMeyers's estimate of the present value of the cost of Marites's total future medical costs is **$3,441,829 - $4,626,880.**

However, the fundamental -- and fatal -- flaw in the defense consultants' utilization of the USRDS data is that the USRDS data is based on **Medicare cost expenditures.**  For example, the 2014 USRDS Annual Report relied upon by Mr. Fountaine clearly reflects Medicare data:

# Chapter 9: Costs of ESRD

## Introduction

Since the Medicare end-stage renal disease (ESRD) entitlement was enacted by Congress in 1972, the size of the program, both in terms of number of patients served and total spending, has grown substantially. Even though the ESRD population remains less than one percent of the total Medicare population, it has accounted for about six percent of Medicare spending in recent years.

This chapter presents both recent patterns and longer-term trends in total Medicare spending, and spending by type of service. Medicare Part D prescription drug data were not available to the new USRDS Coordinating Center in time for inclusion in this Annual Data Report (ADR). In lieu, the current chapter focuses on Medicare spending for items other than outpatient prescription drugs. Please refer to the 2013 ADR for information on Part D, Medicare Health Maintenance Organizations (HMO; managed care), and private insurer spending through 2011 (USRDS, 2013). Analyses of these topics will be included in the 2015 ADR.

This report features data from 2012, the second full year under the expanded, bundled Prospective Payment System (PPS). Early research on the effects of the PPS showed substantial declines in the utilization of injectable medications and an increase in the use of peritoneal dialysis (Hirth et al., 2013; Civic Impulse, 2013). Savings from these changes, however, are not reflected in Medicare payments. Because the fixed, bundled payment rate was based on the higher utilization rates from 2007, any savings arising from lower utilization accrue to dialysis facilities. In response to these savings, Congress mandated in the American Taxpayer Relief Act of 2012 that CMS "re-base" the bundled payment rate to reflect these reductions in utilization. This action would have had the effect of transferring the savings to Medicare (and, hence, to taxpayers). To meet this mandate,

CMS proposed a 12 percent reduction in the per-dialysis session base rate. After accounting for an inflation adjustment of approximately three percent, net payments in 2014 would have fallen by about nine percent per treatment. Before the reduction could be implemented, however, it was rolled back by subsequent legislation in the Medicare Access to Rehabilitation Services Act of 2013 (Civic Impulse, 2013). That legislation also delayed the inclusion of more oral medications (primarily phosphate binders) into the bundle from the planned 2016 to no sooner than 2024. As a result, the bundled payment rate for 2014 was unchanged from 2013.

## Overall & per Person per Year Costs of ESRD

Total spending per year for Medicare paid claims, Medicare patient obligations, and non-Medicare expenditures for period prevalent patients from 1991-2012 is reported in Figure 9.1 (note that Medicare Part D spending is not included, see Reference Table K.2). Medicare spending and patient obligations represent about three quarters of all spending for the care of U.S. ESRD patients (USRDS, 2013). The non-Medicare share results from beneficiary cost-sharing for services, pre-Medicare coverage periods, legislated provisions, for Medicare as Secondary Payer, and post-Medicare entitlement periods for transplant recipients. Medicare spending and patient obligations rose 3.5 percent and 2.8 percent, respectively, in 2012 as compared to 2011, marking the second year of modest growth relative to historical trends following the implementation of the bundled payment system.

USRDS 2014 Annual Report, Chapter 9 at 183 (emphasis added).

Chapter 9 of the USRDS 2014 Annual Report is attached as Exhibit "13."

The references for the cost graphics and figures likewise reference

Medicare costs and sources:





vol 2 Figure 9.2  Costs of the Medicare & ESRD programs (excluding Part D)

Data Source: USRDS ESRD Database. Total Medicare expenditures obtained from http://CMS.gov.
Abbreviations: ESRD, end-stage renal disease.

**USRDS**
Vol 2, ESRD, Ch 9                                                      3

Powerpoint Slides for Chapter 9 of USRDS 2014 Annual Report at 2 - 3

(emphases added).  Copies of the 2014 Powerpoint slides are included in

Exhibit "13."

As is readily evident from even a cursory reading of the source

material, the USRDS data relied upon by the defense consultants is

essentially Medicare cost data.  As such, this data -- and the opinions upon

which they are based -- clearly is affected by collateral sources and is not

the proper legal measure of the reasonable value of the Marites's future

medical expenses caused by the negligence.

That collateral sources are prohibited in the estimation and calculation of damages is well recognized, even by Defendant's own life care planner, Mr. Fountaine, who detailed good reasons collateral sources should not be utilized in the preparation of life care plans:

> Q.  **Why did you exclude any reference to collateral source?**
>
> A.   Well, methodology in the work that we do, we know that many times, there are other sources of pay for medical care and rehabilitation care for the clients that we work with.
>
> But **when we look at costing out life care plans, we look at considering changes in any of those structures, if they're not available in the future, having money available in the care plan or charges that would be paid by an individual who didn't have those sources**.
>
> Q.  **Any such collateral source comes with a degree of uncertainty that makes future planning difficult.  Is that essentially the concept?**
>
> A.  **I think that's generally true, yes**.
>
> Q.  **Is that part of the accepted methodology presently for life care planning?**
>
> A.  **It is**.

Fountaine 12:11 - 13:05 (emphasis added).

It is well settled that the components and measure of damages in Federal Tort Claims Act cases such as the present case are taken from the

state where the tort occurred.  See, e.g., Shaw v. U.S., 741 F.2d 1202,

1205 (9th Cir. 1984); 28 U.S.C. § 1346(b)(1) ("[T]he district courts . . . shall

have exclusive jurisdiction of civil actions on claims against the United

States, for money damages, accruing on and after January 1, 1945, for

injury or loss of property, or personal injury or death caused by the

negligent or wrongful act or omission of any employee of the Government

while acting within the scope of his office or employment, under

circumstances where the United States, if a private person, would be liable

to the claimant **in accordance with the law of the place where the act or**

**omission occurred**.")

In Bynum v. Magno, 106 Haw. 81, 101 P.3d 1149 (2004), as

amended (Dec. 2, 2004), the Supreme Court of Hawai`i held on all fours

that the collateral source rule mandates that the proper measure of

damages for a Plaintiff seeking to recover medical expenses caused by a

defendant's negligence is the "reasonable value" of the medical services,

**specifically not reduced to the Medicaid fee schedule.**  The Bynum

court noted:

> In an action to recover medical expenses caused by a defendant's
> negligence, a plaintiff must show that the medical services obtained
> were necessary and the charges were reasonable as required for
> the injuries sustained.  *See Reinhardt v. County of Maui,* 23 Haw.
> 524, 527 (1916).  In that connection, the "reasonable value"[13] of

a plaintiff's medical services may be recovered.  *See Kometani v. Heath,* 50 Haw. 89, 95, 431 P.2d 931, 936 (1967) (affirming that it was proper for the jury to consider the "reasonable value" of future medical expenses); *Walsh v. Chan,* 80 Hawaiʻi 188, 193, 907 P.2d 774, 779 (App.) (acknowledging the lower court's jury instructions as stating that a plaintiff is entitled to damages for the "reasonable value of the medical services"), *rev'd on other grounds,* 80 Hawaiʻi 212, 218, 908 P.2d 1198, 1204 (1995).

Id. at 86–87, 101 P.3d at 1154–55.  In interpreting the term "reasonable

value," the Bynum court held:

As aptly described by the North Carolina Supreme Court, **"Medicaid is a form of insurance paid for by taxes collected from society in general. The Medicaid program is social legislation; it is the equivalent of health insurance for the needy."** *Cates v. Wilson,* 321 N.C. 1, 361 S.E.2d 734, 737–38 (1987) (citation omitted); *see also Ellsworth,* 611 N.W.2d at 768; *Suhor* 770 So.2d at 424; *Children's Hosp. & Health Ctr.,* 188 F.3d at 1093–94.  Likewise, this court has recognized that the "purpose of medicaid is to provide assistance to those whose income and resources are inadequate to meet the costs of necessary medical services."  *Barham by Barham v. Rubin,* 72 Haw. 308, 312, 816 P.2d 965, 967 (1991).  **Thus, Medicare/Medicaid payments are a "type" of social legislation benefits.**
Accordingly, we cannot agree with Magno's assertion that Medicare/Medicaid programs are simply fee "agreements between the government and healthcare providers for their mutual benefit, *independent of the interests of Medicare/ Medicaid recipients.*" (Emphasis added.)  **Although Medicare/Medicaid programs involve fee agreements that are mutually beneficial to the government and the participating healthcare providers, such accommodations appear secondary to the essential purpose of Medicare/Medicaid, which is to provide medical assistance to the needy.**

**This court has followed the same approach.**  In *Sam Teague,* this court agreed with the United States Supreme Court that unemployment benefits paid by the state to the plaintiff, "were not

made to discharge any liability or obligation of respondent, but to carry out a policy of social betterment for the benefit of the entire state," which "plainly show[s] the benefits to be collateral."  89 Hawaiʻi at 283, 971 P.2d at 1118.  **In much the same way, the Medicaid/Medicare programs provide benefits for plaintiffs "from a source wholly independent of and collateral to the tortfeasor[.]"**  *Id.* at 281, 971 P.2d at 1116 (citations omitted).  **Because the Medicare/Medicaid program prohibits "balance billing," the difference between the standard rate and the Medicare/Medicaid payment may be viewed as a part of the "benefits conferred on the injured party" within the  scope of the collateral source rule.**  Restatement § 920A(2).

**Inasmuch as Medicare/Medicaid are social legislation programs, we conclude that the collateral source rule applies to prevent the reduction of a plaintiff's award of damages to the discounted amount paid by Medicare/Medicaid.**  *See Haselden v. Davis,* 353 S.C. 481, 579 S.E.2d 293, 294 n. 3 (2003) (holding that "the collateral source rule applies to Medicaid payments"); *Brandon HMA, Inc. v. Bradshaw,* 809 So.2d 611, 619 (Miss.2001) (holding, by the Supreme Court of Mississippi, "that Medicaid payments are subject to the collateral source rule"); *Ellsworth,* 611 N.W.2d at 767 (applying the collateral source rule to medical expenses paid directly by Medicaid); *Cates,* 361 S.E.2d at 738 (explaining that Medicaid is "social legislation; it is the equivalent of health insurance for the needy" and "is an acceptable collateral source"); *Thoreson v. Milwaukee & Suburban Transp. Co.,* 56 Wis.2d 231, 201 N.W.2d 745, 752 (Wis.1972) (holding that the collateral source rule applies to Medicare, and "is not limited to paid-for benefits but applies to gratuitous medical services provided or paid for by the state"); *see also* Restatement § 920A cmt. c (explaining that "social legislation benefits" are subject to the collateral source rule); *cf. Sato,* 79 Hawaiʻi at 18, 897 P.2d at 945 (referring to the collateral source rule and HRS § 386–8 in prohibiting evidence of compensation benefits for the sole purpose of reducing the amount of the plaintiff's recovery).  **Therefore, we hold that the collateral source rule prohibits reducing a plaintiff's award of damages to reflect the discounted amount paid by Medicare/Medicaid.**

- 277 -

Id. at 88–89, 101 P.3d at 1156–57 (emphasis added).  Therefore, under the

Bynum analysis, the proper measure of Marites's hemodialysis and

transplant costs is the full billed amount for the services, not the discounted

amount paid by Medicare (and reflected in the USRDS cost data).  The

best evidence of these costs is the actually experienced cost data from the

actual providers who cared for the actual patient.  Moreover, the Campanos

consider Hawai`i their home, Hawai`i is Rafael's "home base" for purposes

of his military stationing, and they fully intend to return and stay in Hawai`i

to live.  See Riddick-Grisham Report (Ex "11") at 2.

**2.    Defendant's Statisticians' Belated Supplemental
Report Continues to Ignore the Actual Bills for the
Actual Hemodialysis that Mrs. Campano Actually
Received.**

On Friday, 5/19/17, Defendant produced a supplemental report from

its statistician consultants AsherMeyers which effectively recalculated the

future medical care costs for Mrs. Campano "based on discussions with

Mr. Fountaine."  These changes include revisions to the lifetime cost of the

prescriptions and drugs, transplant surgery, and hemodialysis, which

actually increased the high end range of their total present value economic

damages estimates from $3,441,829 - $4,626,880 to **$3,226,909 -**

**$4,835,446.**

However, the most significant revelation of the AsherMeyers

supplemental report is AsherMeyers's and Mr. Fountaine's persistence in

ignoring Mrs. Campano's actual bills for her actual past hemodialysis.  This

is particularly glaring given the fact that Mr. Fountaine relied on

Mrs. Campano's past medical bills for almost every other aspect of her

medical costs in Mr. Fountaine's care plan.  Mr. Fountaine testified:

> Q.  **In costing the services that are included in the report, for any specific category of service, did you review medical bills specific to those services?**  For example, for nephrology visits, did you review any medical bills for nephrology visits?

> A.   You know what, I think I looked at the bills that had the range for nephrology, for the visits.  They were consistent with the range that I have.

> Q.  **Why did you choose to look at those medical bills?**

> A.   **Because they were available to me**.

> Q.  **Can you identify looking through the report for which categories you looked at medical bills?**

> A.   **I know the hospitalizations.  Nephrology, hospitalizations.  Dialysis, we looked at bills**.  I looked at bills, excuse me.
> . . . .
> A.   **I think the diagnostics.  Medications were in the records and consistent, I think, over both.  And then, there's the household services**.  So your question was medical?

> Q.   Yes.

> A.   Yeah.

Fountaine 102:07 - 103:06 (emphasis added).  It is clear that Mr. Fountaine

was provided with the hemodialysis bills, that he actually reviewed and

analyzed them, and that the costs reflected in the bills were the actual

charges incurred for the hemodialysis treatments:

> Q.  **Have you been provided in this case with Mrs. Campano's actual dialysis medical bills?**
>
> A.  **I have**.
>
> Q.  **Have you reviewed them?**
>
> A.  **I have**.
>
> Q.   Have you taken those charges reflected in those billings into account in any way in your costing?
>
> A.   I'm aware of them.  I'm aware of the cost.  **I went through laboriously and added up the costs again, came up with the same totals this claim has in terms of monthly, annually, and average.  So they are what was charged by DSI**.
>
> Q.  DSI?
>
> A.  **Yeah.  Those are the charges**.

Fountaine 26:25 - 27:14 (emphasis added).  In this context, it is clear that

Mr. Fountaine's (and consequently AsherMeyers's) ignoring of the past

hemodialysis bills is selective, inconsistent, and improper, and the

reasonable measure of Mrs. Campano's future hemodialysis costs is her

past hemodialysis billed experience.

## VIII.  **<u>CONCLUSION</u>**

Thank you for your time and consideration of this matter.  We look forward to the trial set before you at 9:00 a.m. on Monday, June 5, 2017.

DATED:  Honolulu, Hawai`i, May 23, 2017.


    /s/ L. Richard Fried, Jr.
L. RICHARD FRIED, JR.
JOHN D. THOMAS, JR.
GEOFFREY K. S. KOMEYA
Attorneys for Plaintiffs