IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARITES CAMPANO and RAPHAEL CAMPANO, Individually and as the Court-Appointed *Next Friend* for the Minor Children R.M.B.C, R.B.B.C., and M.R.B.C., <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | CIVIL NO. 15-00439 KSC <br><br> FINDINGS OF FACT AND CONCLUSIONS OF LAW |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court conducted a jury-waived trial in this matter on December 5 to 8 and 11 to 12, 2017.  L. Richard Fried, Jr., Esq., John D. Thomas, Jr., Esq., and Geoffrey K.S. Komeya, Esq., appeared on behalf of Plaintiffs Marites and Rafael Campano,[1] individually and as the court-appointed next friend for the minor children R.M.B.C., R.B.B.C., and M.R.B.C. (collectively "Plaintiffs").  Assistant U.S. Attorney Harry Yee appeared on behalf of Defendant United States of America ("Defendant").  The Court has considered all the evidence presented, observed the demeanor of witnesses and evaluated their credibility and candor, considered the arguments of counsel, and considered the

---

[1] Rafael Campano's name is misspelled in the case caption.

applicable law.  Pursuant to Federal Rule of Civil Procedure 52,
the Court makes the following Findings of Fact and Conclusions
of Law, and CONCLUDES, for the reasons articulated below, that
Plaintiffs are entitled to **$24,743,668.53** in damages.  Any
finding of fact that should more properly be deemed a conclusion
of law and any conclusion of law that should more properly be
deemed a finding of fact shall be so construed.

<u>**FINDINGS OF FACT**</u>

## I.   <u>Introduction</u>

1.   This is a medical negligence case involving severe and
permanent injuries to Plaintiff Marites Campano ("Marites"),
including end-stage renal disease ("ESRD") requiring
hemodialysis, multiple renal transplants, and immunosuppressant
medication to prevent rejection of the transplant, all for the
remainder of Marites' life.

2.   Marites was severely and permanently injured as a
result of sepsis caused by a group A streptococcus ("GAS")
bacterial infection that was not timely diagnosed or treated
with antibiotic therapy by her physicians and care providers at
Tripler Army Medical Center ("Tripler" or "TAMC") ("incident").

3.   Plaintiffs initiated this action against Defendant
under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)
and 2671 <u>et seq.</u>, alleging that Marites' care and treatment at
Tripler starting on July 22, 2013, fell below the requisite

standard of care, and that as a result of this violation by Tripler of its duty of care, Marites suffered severe and permanent injuries.

4.   Plaintiffs filed their administrative claims on September 8, 2014, under the provisions of the FTCA.  The claims were received by the Department of the Army on September 10, 2014.

5.   Plaintiffs commenced the instant lawsuit on October 20, 2015, after Defendant failed to either admit or deny said administrative claims within six months of the filing thereof.

6.   Plaintiffs have complied with all jurisdictional and procedural prerequisites to suit.  They have timely and properly presented their claims under the FTCA to the appropriate Federal agency.

## II.  <u>Parties</u>

7.   At all times relevant to this action, Plaintiffs were domiciled in and citizens of the City and County of Honolulu, State of Hawaii.

### A.  <u>Marites Campano</u>

8.   Marites was born in 1976 in Ilocos Norte, a province in the Philippines.  [Testimony of Marites B. Campano in Transcript of Non-Jury Trial Before the Honorable Kevin S.C.

Chang, United States Magistrate Judge on Tuesday, December 12, 2017 ("Marites 12/12")[2] at 39:13, 14-17.]

9.    In 1993, Marites graduated from St. Joseph High School in Dingras, Ilocos Norte.  [Id. at 40:10-20.]

10.    In 1998, Marites obtained an Associate's Degree in Computer/Secretarial Science from the Divine Word College of Laoag in Laoag City, Philippines.  [Id. at 40:21-41:9.]

11.    Marites was employed as a sales clerk at a store called Fashion and Decor in Ilocos Norte and as a cashier at SM, the biggest shopping center in the Philippines, located in Manila.  [Id. at 48:1-7.]

12.    Marites also led hundreds of young people for seven to eight years as an "SK Chairman," an elected youth governmental official in her area in the Philippines.  [Id. at 48:11-49:2.]

13.    In November 2007, Marites came to the United States. [Id. at 39:19.]

14.    From 2008 to 2010, Marites was a cashier at Golden Coin restaurant.  [Id. at 43:18-21.]

15.    In 2010, Marites obtained a Certified Nursing Assistant certification from Healthcare Training and Career Consultants, Inc.  [Id. at 41:10-42:1.]

---

[2]    Future references to trial transcripts will identify the applicable witness and date.

16.  From 2010 until her injury at Tripler in July 2013, Marites was employed as a full-time Certified Nursing Assistant at The Plaza at Mililani.  [Id. at 42:13-17; 50:15-17.]

**B.   Rafael Campano**

17.  Plaintiff Rafael Castro Campano ("Rafael") was born in 1976 in Ilocos Norte.  [Rafael 12/7 at 131:6-14.]

18.  In 1993, Rafael graduated from high school in the Philippines.  [Id. at 131:17-20.]

19.  In 1996, Rafael received a Diploma of Technology in Automotive Mechanics from the Mariano Marcos State University Institute of Technology in Laoag City, Philippines.  [Id. at 131:21-132:10.]

20.  In 2001, Rafael received a Bachelor's Degree in Physical Therapy from the Mariano Marcos State University in Batac City, Ilocos Norte.  [Id. at 132:11-21.]

21.  In September 2004, Rafael moved to Hawaii.  [Id. at 135:12-14.]

22.  After arriving in Hawaii, Rafael was briefly employed as a building maintenance worker, then as a physical therapy aide.  [Id. at 135:24-136:18.]

23.  In October 2005, Rafael enlisted in the U.S. Navy, and remains in the Navy's employ.  [Id. at 136:19-24.]

24.   In December 2013, Rafael received a Bachelor of Science in Nursing from Hawaii Pacific University.  [Id. at 132:22-133:6.]

25.   In January 2014, Rafael became a licensed Registered Nurse in Hawaii.  [Id. at 135:4-7.]

26.   Rafael hopes to obtain a Master's Degree in Nursing, but Marites' injuries have prevented him from doing so.  [Id. at 133:13-20.]

27.   Had Marites not suffered the injuries from the subject incident, Rafael believes that he would have entered a Master's Degree program and possibly already obtained a degree.  [Id. at 133:18-25.]

28.   A Master's Degree in Nursing would improve Rafael's chances for promotion in the Navy because such accomplishments factor into career advancement.  [Id. at 134:3-13, 17-19.]

29.   Rafael also aspires to be an Advanced Practice Registered Nurse.  [Id. at 134:20-135:3.]

30.   Rafael's current rank is Lieutenant Junior Grade, and his promotion to full Lieutenant is expected in December 2017. [Id. at 134:14-16; 136:25-137:6.]

C.   **The Campano Family**

31.   Marites and Rafael have been together since 1998, and were married on April 8, 2005.  [Marites 12/12 at 49:21-22, 24.]

32.   Marites and Rafael's eldest son, Plaintiff R.M.B.C., was born in 1999 in the Philippines.  He came to Hawaii in 2004 with Rafael, but returned to the Philippines until 2007, at which time he moved to Hawaii with Marites and his younger brother, Plaintiff R.B.B.C.  [R.M.B.C. 12/7 at 87:23-88:8, 88:24-89:1.]

33.   R.M.B.C. attends high school in San Diego and is currently a senior with a 4.0 grade point average.  [Id. at 105:25-106:7.]

34.   R.M.B.C. plans to attend college at the University of Hawaii at Manoa, Northern Arizona University, or Washington State University.  [Id. at 106:10-13.]

35.   R.M.B.C. aspires to become a fighter pilot in the Air Force.  [Id. at 106:14-19.]

36.   Marites and Rafael's younger son, R.B.B.C., was born in 2001 in the Philippines.  He is presently attending high school in San Diego and has a 3.6 grade point average.  [R.B.B.C. 12/7 at 116:9-25, 127:1-5.]

37.   R.B.B.C. is considering majoring in mechanical engineering and would like to join the Navy as a mechanical engineer.  [Id. at 128:13-17.]

38.   Marites and Rafael's youngest child and daughter, Plaintiff M.R.B.C, was born during the incident at Tripler.

[Rafael 12/7 at 140:6-15; Ex. J-1, TAMC2 3679-81, 3838-39, 5059; Ex. J-2, TAMC 2057-59, 3054.]

39.   Rafael recently relocated to San Diego, California, to be trained at Balboa Naval Hospital.  [Rafael 12/7 at 142:1-10.]

40.   Prior to the relocation, the Campano family lived in Mililani with Rafael's brother, Paquito, and Marites' mother.  [Id. at 142:14-20.]

41.   Rafael hopes to serve in the Navy for eight more years, at which time he will be eligible for retirement.  [Id. at 145:14-25.]

42.   Following Rafael's retirement, Plaintiffs intend to return to Hawaii.  [Id. at 146:3-8.]

43.   In the event Marites requires hemodialysis again, the Campanos would return to Hawaii because of the required family support, even if it means that Rafael is forced to leave the Navy prior to his eligibility for retirement.  [Id. at 143:14-145:4.]

## III.   Stipulations

### A.   Stipulation as to Liability

44.   The parties stipulated to Defendant's sole liability for the injuries sustained by Marites in the July 22, 2013 hospitalization at Tripler.  [Doc. No. 123.]  The parties additionally stipulated that they shall not elicit any testimony or offer any proof at trial on the issue of liability.  [Id.]

### B.    Stipulation as to Expert Qualifications

45.    The parties stipulated that the knowledge, skill, experience, training and/or education of the following witnesses satisfy Federal Rule of Evidence ("FRE") 702's standards for expert qualifications in their respective fields of expertise as set out in the table below:

| No. | Expert Name | Field of Expertise | Party |
|-----|-------------|--------------------|-------|
| 1. | Ching, Jeffrey D.S., M.D. | Emergency and Internal Medicine | D |
| 2. | Fountaine, John | Life Care Planning | D |
| 3. | Friedman, Stuart | Nephrology | D |
| 4. | Klein, Keith L., M.D. | Nephrology, Internal Medicine, Life Expectancy | P |
| 5. | Loudat, Thomas A., Ph.D. | Economics | P |
| 6. | Marvit, Robert C., M.D. | Psychiatry, General Medicine | P |
| 7. | Meyers, Jeffrey E. | Economic Loss Projections and Statistics | D |
| 8. | Ponce, Danilo E., M.D. | Psychiatry | P |
| 9. | Riddick-Grisham, Susan R.N. | Life Care Planning, Case Management | P |
| 10. | Smith, Eric S., Ph.D. | Forensic Psychology | D |

The parties were not required to present oral testimony at trial regarding the qualifications of the above witnesses for purposes of establishing FRE Rule 702 qualifications.  [Doc. No. 124.]

### C.    Stipulation as to Past and Future Wage Loss Damages

46.    The parties stipulated that the incident caused Marites to suffer $538,092.00 in past and future wage loss, as reflected in the table below:

| Item | Compensation Loss | Net Income Taxes | Total Net Wage Loss |
|---|---|---|---|
| Past Wage Loss | $89,012.00 | $8,470.00 | $80,543.00 |
| Present Value Future Wage Loss | $507,202.00 | $49,652.00 | $457,549.00 |
| **TOTALS** | $596,215.00 | $58,122.00 | **$538,092.00** |

[Doc. No. 126.]

### D.   Stipulations as to Exhibits

47.   The parties stipulated to the admissibility for all purposes of all exhibits on the joint exhibit list, Exhibits J-1 through J-91, and to the authenticity of Plaintiffs' Exhibits P-56 through 71.  [Doc. No. 115.]

48.   The parties stipulated to the admissibility for all purposes of Joint Exhibits J-92A and J-92B. [Doc. No. 130.]

## IV.  The Incident

49.   Marites' estimated due date was July 24, 2013. Despite Marites' advanced maternal age, her pregnancy was uncomplicated.  There was no indication of issues with Marites or M.R.B.C., or anticipation of problems with the birth.  [Ex. J-1 at TAMC2 2523, 2533-34, 7323-24, 7380-82; Ex. J-3 at TAMC (CHRONO) 153-54; Ex. J-11 at MAKALAPA 927-28, 984-86].

50.   Marites presented to Tripler at 11:40 a.m. on July 22, 2013, and was admitted to labor and delivery.  Labor was thereafter induced.  [Ex. J-1 at TAMC2 3669, 3830; Ex. J-2 at TAMC 860-61 1888, 2049-57.]

51.  Within hours of arrival, Marites became clammy and pale, and experienced intermittent episodes of hypotensive low blood pressure and a tachycardic heart rate ranging from 120 to 150 beats per minute.  Notwithstanding the administration of multiple fluid boluses and an IV, Marites' symptoms did not improve.  [Ex. J-1 at TAMC2 3673-77, 3834-37, 4469, 5057-59; Ex. J-2 at TAMC 1117, 1888, 2049-57, 2505.]

52.  M.R.B.C. was born at 1:10 a.m. on July 23, 2013.  [Ex. J-1 at TAMC2 3679-81, 3838-39; Ex. J-2 at TAMC 2057-59.]

53.  Marites experienced repeated and increasing episodes of hypotension and tachycardia after her transfer to the postpartum unit.  [Ex. J-1 at TAMC2 3185, 3190, 3198, 3218; Ex. J-2 at TAMC 1404, 1409, 1417, 1437.]

54.  A number of measures were taken to alleviate Marites' fluctuating level of pain.  [Exs. J-1, J-2.]

55.  Marites was not producing urine due to her failing kidneys.  As a result, she was catheterized at least eight times to drain her bladder.  [Ex. J-2 at TAMC 1117, 1120-21, 3496.]

56.  At approximately 5:45 a.m. on July 24, 2013, the Tripler Rapid Response Team independently noticed Marites' condition.  [Ex. J-2 at TAMC 3477-80; Rafael 12/7 at 149:25-150:10.]

57.  By the time the Rapid Response Team intervened, Marites had been in near constant pain for approximately 48

hours and her condition deteriorated into sepsis.  [Ex. J-1 at
TAMC2 5927-28, 6885-86; Ex. J-2 at TAMC 458; Ex. J-11 at
MAKALAPA 534-35.]

58.  Despite her need for immediate escalation of care and
acute intervention, Marites' admission to the intensive care
unit ("ICU") was delayed for another two hours.  [Ex. J-1 at
TAMC2 5269.]

59.  By the time she was finally admitted to the ICU,
Marites' blood tests indicated she was in metabolic acidosis
with accompanying compensatory respiratory alkalosis.  [Ex. J-2
at TAMC 3478, 3542-44.]

60.  The respiratory alkalosis caused her respiratory rate
to increase in an effort to compensate for the increased
acidosis, which in turn led to a decreased level of carbon
dioxide in her bloodstream.  [Id. at TAMC 3477-79, 3543.]

61.  After arriving at the ICU, Marites was intubated due
to worsening respiratory distress.  [Id. at TAMC 3604.]

62.  Concerned with vaginal bleeding in the afternoon of
July 24, 2013, the OB/GYN team decided that Marites should
undergo a dilation and curettage ("D&C") procedure.  [Id. at
TAMC 3569-70.]

63.  The same day, Drs. Tamarin McCartin and Jason Patzwald
performed the D&C procedure.  Although they did not identify any
sources of bleeding or infection, they remarked that Marites'

acute renal failure and disseminated intravascular coagulation ("DIC") were presumed to be secondary to sepsis and that her condition was critical. [Ex. J-1 at TAMC2 2332-33; Ex. J-2 at TAMC 3067-68, 3460, 3599, 3581-82.]

64. Dr. Bradford Whitcomb, a gynecologic oncologist, evaluated Marites in the operating room and noted her overwhelming sepsis and renal failure. [Ex. J-2 at TAMC 3583.]

65. Dr. Jeffrey Ching described Marites' hospital stay as a "stormy ICU and hospital course" during which her condition deteriorated to "classic sepsis and disseminated intravascular coagulopathy (DIC) with markedly abnormal labs, positive blood cultures and eventually multi-organ injury." [Dr. Ching 12/11 at 102:14-18, 103:10-12; Ex. J-47 (Dr. Jeffrey Ching Report) at 2].

66. DIC further complicated Marites' condition. DIC is a complex reaction, usually from a very serious infection, where blood functions stop working, which eventually leads to multi-organ failure or multi-organ damage. [Dr. Ching 12/11 at 102:22-103:3.]

67. Marites suffered many of the typical complications of DIC including multi-organ system failure and permanent multi-organ damage of her kidneys. [Id. at 103:4-9.]

68. Marites also sustained adult respiratory distress syndrome, a complication related to DIC where the lungs fill

with fluid, making it difficult to breathe.  Marites had to be placed on a respirator as a result.  [Id. at 103:13-104:2.]

69.  Marites required multiple red blood cell and platelet transfusions as a result of the DIC.  [Id. at 102:19-21.]

70.  Dr. Nealanjon Das, a nephrologist, evaluated Marites during the night on July 24, 2013.  He opined that Marites had suffered permanent and irreversible kidney damage from the sepsis and determined that her prognosis for regaining dialysis-independent renal function was "very grim".  [Ex. J-1 at TAMC2 2993; Ex. J-2 at TAMC 454, 463-64.]

71.  Dr. Das ordered Marites to be placed on continuous renal replacement therapy ("CRRT"), or kidney dialysis.  [Ex. J-1 at TAMC2 2993, 3699; Ex. J-2 at TAMC 454, 2073.]

72.  An infectious disease consult confirmed that Marites' sepsis was related to a GAS infection leading to bacteremia, toxic shock syndrome, and puerperal sepsis.  [Ex. J-1 at TAMC2 2999-3001; Ex. J-2 TAMC 460-62.]

73.  Marites required heavy sedation while intubated.  She had an abnormal heart rhythm, her lungs were compromised by the infection, and she was agitated.  [Ex. J-1 at TAMC2 3002-06; Ex. J-2 at TAMC 463-64, 466-67.]

74.  On July 27, 2013, Marites extubated herself and oxygen was administered via mask.  [Ex. J-1 at TAMC2 4641-42; Rafael 12/7 at 153:17-154:23.]

14

75.   While off the ventilator, Marites experienced issues with oxygen saturation and her mental status declined.  She was agitated, confused, and disoriented.  [Ex. J-1 TAMC2 2557-60; Ex. J-2 TAMC 18-20].

76.   Marites had to be reintubated due to oxygen saturation issues.  [Ex. J-1 at TAMC2 2563.]

77.   On August 4, 2013, Marites was transferred to the Progressive Care Unit ("PCU").  [Ex. J-1 at TAMC2 2625.]

78.   On August 5, 2013, sonogram and ultrasound studies indicated that Marites likely had gallstones that would require surgical attention, but her compromised condition prevented her from tolerating a surgical procedure.  [Id. at TAMC2 3032-34.]

79.   Marites experienced intense pain in her abdomen related to her gallbladder and stones.  On August 6, 2013, an endoscopic retrograde cholangiopancreatography ("ERCP") procedure was performed to stent her biliary duct in an effort to relieve her pain.  [Ex. J-1 at TAMC2 3850-51; Ex. J-2 at TAMC 493-95, 502-03.]

80.   The ERCP procedure also revealed that Marites had a large duodenal ulcer, which was likely a stress ulcer from her condition at the time.  [Ex. J-1 at TAMC2 2391-92, 7651-52; Ex. J-2 at TAMC 3019-20; Ex. J-11 at MAKALAPA 1251-52; Dr. Ching 12/11 at 109:4-8.]

81.   On August 7, 2013, Marites began hallucinating and experienced increased confusion and changes to her mental status.  She was unaware of her whereabouts and could not recognize Rafael.  [Ex. J-1 TAMC2 2676, 3852-53; Ex. J-2 TAMC 504-05.]

82.   Marites' physicians contemplated transfer to Queen's Medical Center ("Queen's") due to concerns that Marites may need a liver transplant.  However, Dr. Linda Wong, a transplant surgeon at Queen's, rejected Marites because she believed that Marites' condition was merely cholestasis.  [Ex. J-1 at TAMC2 2683-87.]

83.   Marites was alert and oriented only to herself, and was uncooperative with nursing assessments.  She stated "I'm going to die," became increasingly clingy with Rafael, and had limited interaction with visitors and her sons.  The ongoing changes to Marites' mental status prevented her from identifying herself or Rafael at times.  [Id. at TAMC2 2692-93.]

84.   On August 8, 2013, Marites had to be placed in wrist restraints because she continually attempted to pull out her nasogastric feeding tube.  [Id. at TAMC2 2693-94.]

85.   Because the precise neurological cause for Marites' neurological abnormalities could not be identified, she underwent a lumbar puncture to check for causes such as meningitis.   [Id. at TAMC2 2704.]

86.   The results of the tests of Marites' cerebrospinal fluid were not consistent with meningitis.  [Id. at TAMC2 3871-72.]

87.   From August 9 to 10, 2013, Marites alternated from distant and random stares, to chattiness with repetition of certain phrases, to constantly opening her eyes, to constantly closing her eyes.  [Id. at TAMC2 2705, 2720-21, 4079-84.]

88.   Although an MRI showed increased reactivity in the pituitary gland, Marites' providers concluded that her altered mental status was most likely attributable to bilirubin encephalopathy.  [Id. at TAMC2 2728, 3881-84, 7273-77; Ex. J-11 at MAKALAPA 877-81.]

89.   Marites' mental status slowly improved in the days that followed, but she continued to suffer from multiple medical conditions, including a bleeding duodenal ulcer, gallstones, and impaired renal function.  [Ex. J-1 at TAMC2 3906-07, 7258; Ex. J-2 at TAMC 558-59; Ex. J-3 at TAMC CHRON 87; Ex. J-11 at MAKALAPA 862.]

90.   On August 15, 2013, Marites was referred for a permanent catheter placement to facilitate her hemodialysis. [Ex. J-1 at TAMC2 2421-23.]

91.   On August 17, 2013, Marites was transferred from the PCU to the Mother Baby ward.  [Id. at TAMC2 2786.]

92.   On August 24, 2013, Marites was discharged from Tripler.  [Id. at TAMC2 2791.]

## V.   Post-Discharge

93.   Marites began receiving outpatient dialysis three times a week at Pearlridge Dialysis Clinic on August 27, 2013. [Id. at TAMC2 2988-89; Ex. J-2 at TAMC 449-50.]

94.   On September 4, 2013, Marites went to the emergency department at Tripler with intense abdominal pain.  [Ex. J-1 at TAMC2 7199-7205.]

95.   Radiological studies indicated that Marites continued to have symptomatic cholecystitis (gallstones), but she also had ascites, or a large collection of fluid in the abdomen.  [Id.]

96.   Dr. Ching attributed Marites' ascites to her experience at Tripler.  [Dr. Ching 12/11 at 108:15-22.]

## VI.   Second Hospitalization

97.   Marites was admitted to the PCU and scheduled for a paracentesis procedure to drain fluid from her abdomen.  [Ex. J-1 at TAMC2 7208-10; Ex. J-3 at TAMC CHRON 36-38, 352-57; Ex. J-11 at MAKALAPA 811-15.]

98.   Blood cultures returned positive for bacterial peritonitis, but because of her acute condition, Marites' providers were reluctant to subject her to invasive procedures. [Ex. J-1 at TAMC2 208-09.]

99.  As a compromise, on September 7, 2013, a percutaneous cholecystostomy was performed, which involves the insertion of a drainage catheter into the gallbladder lumen under radiologic guidance to provide temporary relief from accumulated fluid and sludge until definitive surgical treatment can be performed. [Id. at TAMC2 222-23, 6848-51, 7644-745; Ex. J-2 TAMC 3038-39, 3285-87; Ex. J-11 at MAKALAPA 495-99.]

100. The percutaneous cholecystostomy immediately improved Marites' symptoms, but her condition deteriorated over the next ten days.  The increasing abdominal pain prompted an ultrasound on September 17, 2013, which revealed several foci of ascites. [Ex. J-1 at TAMC2 305-07.]

101. On September 18, 2013, Marites' providers recommended a full-blown diagnostic abdominal laparotomy and washout surgery, along with a surgical cholecystostomy (gallbladder removal), having determined that her condition could not be resolved with percutaneous drainage.  [Id. at TAMC2 314.]

102. Two liters of ascites fluid were drained from Marites' abdomen during the surgery.  [Id. at TAMC2 9-11, 314-16, 417, 7631-33; Ex. J-2 at TAMC 3023-25, 3094-95; Ex. J-11 at MAKALAPA 1231-33.]

103. While Marites initially showed signs of improvement, she developed an ileus in her intestine and was unable to consume food by mouth.  [Id. at TAMC2 541-42, 548-50.]

104. Upon discovery of a bile leak, Marites underwent an ERCP procedure to install a biliary stent. [Id. at TAMC2 556, 560-61, 7642-43.]

105. Post-operative attempts to return Marites to food by mouth were unsuccessful, resulting in persistent nausea and vomiting. [Id. at TAMC2 379-81.]

106. Marites was finally discharged on October 3, 2013.

**VII. Issues Following Second Hospitalization**

107. In the weeks that followed, Marites had difficulty adjusting to her condition and being a new mother to M.R.B.C. [Ex. J-13 at DSI 36-53.]

108. Marites required a wheelchair and four-wheel walker for mobility which, in a small multi-level townhouse living with six other people, proved to be especially challenging. [Id.]

109. Marites became depressed and suffered from insomnia. [Id. at DSI 50-51.]

110. On December 25, 2013, Rafael took Marites to the Pali Momi emergency department because she was experiencing intermittent severe dizziness. Marites was diagnosed with vertigo. [Ex. J-14 at PALI MOMI 8-14, 20-21, 39.]

111. On January 16, 2014, a repeat paracentesis was performed and two liters of fluid were removed. [Ex. J-1 at TAMC2 7070-72, 7584-87; Ex. J-2 at TAMC 3189-92; Ex. J-11 at MAKALAPA 674-76; Ex. J-16 at SURG ASSO 35-36.]

112. On January 17, 2014, Marites returned to the Makalapa Clinic for pain at her permacath site and was provided additional antibiotics to address community-acquired MRSA. [Ex. J-3 at TAMC CHRON 253-55; Ex. J-11 at MAKALAPA 671-73.]

113. On January 22, 2014, Marites was diagnosed with cellulitis at the catheter insertion site. [Ex. J-1 at TAMC2 7061-65; Ex. J-3 at TAMC CHRON 246-51; Ex. J-11 at MAKALAPA 665-69.]

114. On February 19, 2014, Marites underwent another paracentesis. The procedure was unsuccessful due to suspected adhesions that impaired the ability to drain fluid. [Ex. J-1 at TAMC2 7048-52; Ex. J-3 at TAMC CHRON 231-36; Ex. J-11 at MAKALAPA 652-56.]

115. Marites was referred to Queen's transplant program for evaluation of candidacy for a kidney transplant, and was accepted into the program on February 28, 2014. [Ex. J-12 at QMC 120, 131, 139-48.]

116. Marites subsequently began experiencing episodes of hypertension. [Ex. J-1 at TAMC2 7041-44; Ex. J-3 at TAMC CHRON 224-27; Ex. J-11 at MAKALAPA 645-48.]

117. Marites' nephrologist, Dr. Noah Solomon, suspected that her continuing insomnia stemmed from her depression and post-traumatic stress disorder ("PTSD") related to the incident.

He recommended psychiatric evaluation and treatment.  [Ex. J-15 at NOKS 53-54, 188-89.]

118. Dr. Solomon further recommended that Marites proceed with an AV fistula installation by a vascular surgeon due to the extended time of her need for dialysis and the lack of any indication that she would recover any appreciable renal function.  [Id. at NOKS 55, 190.]

119. On March 27, 2014, Marites consulted a psychiatrist for the first time, who provisionally diagnosed her with chronic PTSD related to the incident.  [Ex. J-2 at TAMC 3099-3100, 7016-20.]

120. Marites asked to see a psychologist who was not at Tripler because Tripler was a source of extreme anxiety.  [Ex. J-1 at TAMC2 7016-20; Ex. J-3 at TAMC CHRON 200-04.]

121. During her appointment with the psychiatrist, Marites revealed that M.R.B.C. was a source of her depression and anxiety; even looking at M.R.B.C. caused her to relive the incident.  [Id.]

122. On March 31, 2014, Dr. Jon Yamaguchi evaluated Marites for a kidney transplant and opined that she would be an excellent surgical candidate for kidney transplantation.  He recommended that she complete the standard transplant work-up. [Ex. J-16 at SURG ASSO 1-2.]

123. On April 24, 2014, Dr. Dwight Kellicut created an AV fistula in Marites' right arm at Tripler.  [Ex. J-1 at TAMC2 5996-97.]

124. On May 14, 2014, Marites was informed that she was approved for active listing status on the United Network for Organ Sharing kidney transplant waitlist.  [Ex. J-12 at QMC 236.]

125. Prior to M.R.B.C.'s birth, Marites had planned to have her tubes tied after delivery.  [Ex. J-1 at TAMC2 2532-33, 7325-27; Ex. J-11 at MAKALAPA 929-30; Rafael 12/8 at 162:25-163:11.]

126. Due to the incident and medical complications following delivery, Marites did not undergo a tubal ligation. [Rafael 12/8 at 163:12-16.]

127. Marites was advised against pregnancy because of her medical issues.  [Id. at 163:17-23].

128. To prevent pregnancy, Marites had an intrauterine contraceptive device ("IUD") inserted.  [Ex. J-1 at TAMC2 7078-79; Ex. J-11 at MAKALAPA 683.]

129. After experiencing sharp pain in her left lower abdomen, Marites went to the Pali Momi emergency department in May 2014, where radiologic studies of her abdomen revealed that she had a left ovarian cyst.  [Ex. J-1 at TAMC2 7001-02; Ex. J-3 at TAMC CHRON 185-86; Ex. J-11 at MAKALAPA 613-14.]

130. Marites' gynecologist opined that the cyst could be secondary to the IUD.  [Id.]

131. On June 10, 2014, Dr. Kellicut cleared Marites' AV fistula for use in her hemodialysis.  [Ex. J-11 at MAKALAPA 608.]

132. On June 23, 2014, Marites' hemodialysis catheter was removed and she was placed on antibiotics.  [Ex. J-1 at TAMC2 6830-31.]

133. Marites' IUD was removed on July 10, 2014, and a Nexplanon contraceptive was implanted on August 28, 2014.  [Ex. J-1 at TAMC2 6962-63; Ex. J-2 at TAMC 3409-10; Ex. J-11 at MAALAPA 574-75.]

134. In September 2014, Marites completed medical workups to prepare for a kidney transplant.  [Ex. J-12 at QMC 45-51.]

135. The ongoing dialysis sessions took a toll on Marites and her family because she was at the dialysis center three times a week for four to five hours and would not see her family.  Paquito usually dropped Marites off at DSI Pearlridge and Rafael picked her up after he finished his work day. [Rafael 12/7 at 167:8-9, 167:16-168:2.]

136. Attending dialysis sessions caused Marites distress. Most of her fellow dialysis patients were older individuals, and when she learned that some stopped showing up because they had

died, she became concerned that she would meet the same fate. [Id. at 168:11-169:12; Rafael 12/8 at 173:6-11, 174:2-7.]

137. Marites cried frequently during and after dialysis. It caused exhaustion, depression, and devastation. [Marites 12/12 at 68:25-69:7; Rafael 12/8 at 173:12-17.]

138. Marites had concerns that she would have to undergo dialysis for the remainder of her life and told Rafael that she wanted to give up. [Marites 12/12 at 69:9-14; Rafael 12/8 at 173:17-20.]

139. Marites described dialysis as a nightmare. She so dreaded it that death was preferable to enduring it. [Marites 12/12 at 68:4-16.]

140. In an effort to alleviate some of the stress caused by the dialysis, Rafael and Marites inquired about home hemodialysis, and Dr. Solomon sent them to training beginning in November 2014. [Ex. J-15 at NOKS 4-5.]

141. Home hemodialysis training ordinarily takes a minimum of one month. Because Rafael's supervisors would not grant him one month's leave, however, Rafael had to complete the training in three weeks. [Rafael 12/8 at 174:8-175:13.]

142. The Campanos started home hemodialysis on December 4, 2014. [Ex. J-12 at QMC 268-71.]

143. Because the home hemodialysis was not as comprehensive as the dialysis performed at a dialysis center, Marites had to

be dialyzed five days a week instead of three. [Marites 12/12 at 73:1-3.]

144. The home hemodialysis schedule was also taxing for Rafael because he assisted with the dialysis until 11:00 p.m. or midnight, after returning home from working a full day, then woke up at 4:30 a.m. and reported to work. [Id. at 73:1-13; Rafael 12/8 at 174:8-177:6.]

145. Not only did the home hemodialysis procedure present significant challenges for both Rafael and Marites, it was also very risky. [Rafael 12/8 at 175:20-177:6.]

146. The home hemodialysis machine required cleaning and preparation and the environment needed to be disinfected and sanitized. [Marites 12/12 at 70:12-19.]

147. Insofar as the circulating blood volume outside of Marites' body contained in the home hemodialysis machine was about 300 to 400 milliliters at a time, any issue with the machine or the home dialysis process could be life threating. [Rafael 12/8 at 176:18-25.]

148. When Marites must go through hemodialysis again, she and Rafael do not want home hemodialysis because of the associated risks and challenges. [Rafael 12/8 at 177:7-24.]

**VIII. Third Hospitalization**

149. On March 1, 2015, Marites went to the Pali Momi emergency department with a sore throat, fever, and a

yellowish/white discharge from an infection at her AV fistula site that had developed during her home hemodialysis sessions. [Ex. J-1 at TAMC2 6913-16; Ex. J-2 at TAMC 3360-63.]

150. Marites was transferred to Tripler and was admitted to the PCU.  [Ex. J-1 at TAMC2 6064-68.]

151. Marites was terrified to be at Tripler again.  [Id.]

152. Marites was discharged from Tripler on March 5, 2015. [Id. at TAMC2 6069-72.]

## IX.  Kidney Transplant

153. On March 24, 2015, Marites was informed that there was an available kidney.  [Ex. J-12 at QMC 280-81.]

154. On March 25, 2015, Dr. Makoto Ogihara performed the kidney transplant.  [Id. at QMC 676-78.]

155. The donor kidney demonstrated good function and Marites was monitored inpatient at Queen's for the next five days until Dr. Ogihara discharged her on March 30, 2015.  [Id. at QMC 490-92.]

156. The transplant, while providing Marites and Rafael with relief, has created a different set of health concerns and issues.  Marites is required to take immunosuppressant medications for the life of the transplanted kidney to prevent rejection.  [Ex. J-12 at QMC 282-88; Rafael 12/8 at 185:12-186:12.]

157. The immunosuppressant medications place Marites at high risk for acquiring and developing infections, malignancies, and other diseases due to a compromised immune system. [Ex. J-27 (Dr. Keith Klein Report) at 4.]

158. Marites takes her immunosuppressant medication daily at 7:00 a.m., 9:00 a.m., at lunch, two hours after lunch, at dinner, and two hours after dinner. These strict intervals are necessary to maximize the effectiveness of the medication and Marites structures her day around this medication schedule. [Marites 12/12 at 77:8-78:14.]

159. Because of the potential complications from the transplant, Marites' constant anxiety has shifted from kidney failure to contamination and potential infection. [Ex. J-35 (Dr. Robert Marvit Report) at 2.]

160. Marites' compromised immunity would preclude her from returning to work at The Plaza care facility, even if she were physically capable of performing the job, because of the exposure to illness and infections. [Ex. J-27 (Dr. Klein Report) at 4-5.]

161. Marites now has increased susceptibility to diseases, including diabetes mellitus, cancer, and bone disease. [Id. at 5.]

162. Marites' diet is also restricted because of the potential exposure to germs and infection. There is a list of

foods she cannot eat, including certain fruits, raw foods, street food, and leftovers after two hours.  [Marites 12/12 at 78:15-79:1.]

163. Because of her susceptibilities, cleanliness is of utmost concern for Marites and her family, both inside and outside the home.  Extensive hand washing, use of sanitizers, and inspection of restaurants for sanitary conditions are among the steps taken by Marites to maintain her health.  [Id. at 79:2-80:4.]

164. Prior to the incident, Marites loved gardening, but is now restricted so as to avoid contact with soil and fertilizer and because of physical limitations.  Currently, gardening for Marites primarily entails directing others.  [Id. at 80:6-81:9.]

165. Due to the elevated risk of skin cancer from the immunosuppressant medication, Marites must avoid sun exposure and she uses sunscreen and protective clothing when outside.  [Id. at 81:23-82:10.]

166. Although it causes her embarrassment, Marites is required to wear a face mask in crowded public areas like movie theaters, grocery stores, and airplanes.  [Id. at 81:10-22.]

167. The Campanos had five dogs before the incident, but gave them up at the advice of a doctor because of the risk of infection to Marites.  [Id. at 84:12-14; R.B.B.C. 12/7 at 117:12-118:23.]

## X.   Fourth Hospitalization

168. On August 1, 2015, Marites went to Queen's emergency department with pain in her lower abdomen.  [Ex. J-12 at QMC 1821-22.]

169. Marites was subsequently admitted.  [Id. at QMC 1855.]

170. On August 2, 2015, Dr. Donn Tokairin performed the following procedures on Marites:  diagnostic laparoscopy, exploratory laparotomy, excision of ovarian cyst, drainage of left tubo-ovarian abscess, and lysis of adhesions.  [Id. at QMC 1819, 1865-68.]

171. Marites remained at Queen's until her discharge on August 6, 2015.  [Id. at QMC 1818-21.]

172. On August 9, 2015, Marites returned to Queen's with increasing abdominal pain and a fever and was admitted.  [Id. at QMC 2842-52.]

173. Marites had a urinary tract infection that led to sepsis, as well as a painful genital rash.  [Id. at QMC 2829-35, 2871-79.]

174. Marites was discharged on August 12, 2015.  [Id. at QMC 2829-35.]

## XI.   Fifth Hospitalization

175. In October 2015, Marites' AV fistula developed an aneurysmal dilation or pseudoaneurysm and swelled larger than a golf ball.  This caused pain and limitations with her right arm,

as well as intermittent tingling.  [Ex. J-1 at TAMC2 7765-71;
Exs. P-129-30 (photos of AV fistula aneurysm).]

176. Marites consulted with Dr. Kellicut, who, after
assessing the situation, deferred to Dr. Ogihara as to how to
address the aneurysm.  [Ex. J-1 at TAMC2 7726, 7765-71; Rafael
12/8 at 181:4-13.]

177. Dr. Ogihara removed the fistula.  [Rafael 12/8 at
181:9-20.]

## XII. **Current Medical Status**

178. Following the Campanos' move to San Diego, Marites was
diagnosed with elevated ferritin levels linked to her multiple
blood transfusions from her previous incident-related procedures
and hospitalizations.  [Ex. P-117 at NMC San Diego-A.000670-73.]

179. Marites is currently seeing a hematologist in San
Diego who has recommended successive blood draw procedures
(similar to donating blood) to reduce the circulating ferritin-
rich blood volume and to induce the body to produce its own
blood to replace the withdrawn ferritin-rich blood.  [Rafael
12/8 at 182:4-184:20.]

180. Marites has been experiencing difficulty with the
blood draw procedures because her veins are scarred from all of
her previous incident-related procedures, and her care providers
in San Diego are unable to draw the requisite blood volume.
[Id. at 183:19-184:7.]

## XIII.   **Marites' Future Prognosis and Care Needs**

### A. **End-Stage Renal Disease**

181. As a result of Defendant's negligence, Marites has and will in the future suffer the injuries, complications, and damages associated with kidney transplants and hemodialysis. [Ex. J-32 (Dr. Klein Treatment Plan) at 2-3; Dr. Klein 12/5 at 44:2-6.]

182. When her transplant fails, Marites will be required, as before, to undergo hemodialysis three times per week until she has another kidney transplant.  [Dr. Klein 12/5 at 26:19-22.]

183. The risks and complications of hemodialysis are permanent for Marites and will be magnified or worsened in the future because of her advanced age and because dialysis has a cumulative effect - bone disease will be more progressive, dialysis fatigue will be greater, there will be greater risk of infection, and access sites can become clotted and unusable. [Dr. Klein 12/5 at 44:20-45:24; Dr. Friedman 12/11 at 63:22-64:12.]

184. Due to her ESRD, Marites has suffered or will suffer various complications - cardiovascular, orthopedic, respiratory, integumentary, urinary, immune system, gastrointestinal, general, cancer/malignancies, and psychological.  [Id. at 27:1-9; Ex. J-32 (Dr. Klein Treatment Plan) at 6.]

185. The most common cause of death in both dialysis and transplant patients with ESRD is cardiovascular complications. [Dr. Klein 12/5 at 27:12-13.]

186. Dialysis and kidney transplant patients are more susceptible to ulcers, and medications for kidney disease can cause diarrhea.  [Id. at 32:10-12; Dr. Ching 12/11 at 116:2-116:25.]

187. Dr. Ching testified that he expects Marites' gastrointestinal symptoms to continue and that she will likely require lifetime medications to assist with controlling those symptoms.  [Dr. Ching 12/11 at 133:23-134:7.]

188. Transplant patients often have increased acid, popularly known as gastroesophageal reflux disease ("GERD"), and often have to avoid certain types of uncooked foods because of dietary restrictions.  [Dr. Klein 12/5 at 32:14-18.]

189. At the time Marites was examined by Dr. Ching, she was actively suffering from GERD and taking medication to address it.  [Dr. Ching 12/11 at 119:15-120:14.]

190. Dialysis patients have stricter dietary limitations than transplant patients and need to watch their intake of fluids, salt, protein, potassium and phosphorous.  [Dr. Ching 12/11 at 141:16-142:11; Dr. Klein 12/5 at 32:22-25.]

191. Dialysis patients are also required to take multiple medications to handle complications resulting from their kidney

disease.  [Dr. Klein 12/5 at 39:21-23; Dr. Ching 12/11 at 111:15-20.]

### B.   Life Expectancy

192. The parties' experts all agree that Marites will live a near-normal life expectancy to at least 75 years old.  [Dr. Klein 12/5 at 72:17-25; Dr. Friedman 12/11 at 40:12-15; Dr. Loudat 12/7 at 33:6-34:10; Ex. J-50 (AsherMeyers Report) at 3.]

193. Marites' current kidney will not function for her remaining life expectancy.  [Dr. Klein 12/5 at 45:25-46:7.]

### C.   Life Care Planning

194. The Court finds, based on the testimony at trial and the evidence before it, that, except as detailed below, Karen Klemme's life care plan ("Klemme plan") reasonably provides for Marites' future medical and other needs.

#### 1.   Current Kidney and Future Transplants

195. Although Dr. Keith Klein originally opined that Marites' kidney would last for five to ten years, based on medical evidence available to him at trial, he opined that her kidney will last for approximately five years.  [Dr. Klein 12/5 at 46:1-12.]

196. Dr. Stuart Friedman testified that Marites' kidney will be viable for at least 14 years.  [Dr. Friedman 12/11 at 24:17-25:10.]

197. The estimations contained in Dr. Ching's report were based on a ten-year graft survival rate. [Dr. Ching 12/11 at 146:25-147:19.]

198. The Court finds that the evidence, taken together, supports a conclusion that Marites' kidney will likely last a total of ten years.[3]

### 2.   Transplant Waiting Time

199. Although the parties agree that the waiting time on the transplant list is five to seven years, given Marites' history and circumstances, the probable waiting time for a transplant will be seven years, during which Marites will require hemodialysis. [Dr. Friedman 12/11 at 28:3-15; Dr. Klein 12/5 at 67:20-68:6.]

### 3.   Transplant

200. As clarified at trial, Marites' life care plan relies on transplant surgery in Honolulu, Hawaii, at Queen's, with costs based directly upon the medical bills for Marites' actual transplant in Hawaii. [Grisham 12/5 at 162:23-163:2; Grisham 12/6 at 48:16-49:2.]

### 4.   Hemodialysis

201. In calculating Marites' lifetime hemodialysis costs, Ms. Klemme utilized the medical bills from DSI Pearlridge, where

---

[3] The transplant having occurred on March 25, 2015, Marites' kidney will be viable until approximately 2025.

Marites received hemodialysis from October 2013 to March 2015.
[Ex. J-29 (Karen Klemme Report) at 68-69.]

202. Marites' actual hemodialysis costs totaled
$1,524,376.24, with an average monthly cost of dialysis of
$83,187.25 ($998,247 per year).  [Id.]

203. Susan Riddick-Grisham testified that in preparing a
life care plan, it is customary and accepted methodology to use
past medical bills and billed charges to determine the cost to
be used in the life care plan for future services and items.
[Grisham 12/5 at 159:5-18; 167:14-20.]

204. The future hemodialysis monthly average cost of
$67,239.00 was based upon the most current, consistent, and
conservative charges for the billed dialysis amounts.  [Grisham
12/6 at 45:2-7.]

205. The Court finds projected costs based on actual billed
amounts to be more accurate and persuasive than "private pay"
costs and national statistical data.  Private pay costs are not
acceptable methodology in life care planning and the statistical
data relied upon by John Fountaine and Dr. Ching is based on
Medicare costs, which cannot be used to support future costs in
a life care plan.

206. Defendant relies on Bynum v. Magno, 106 Hawai`i 81,
101 P.3d 1149 (2004), for the proposition that standard rates –
in this case $500.00/dialysis session – are determinative of the

reasonable value of future hemodialysis costs.  Defendant's

reliance is misplaced.  <u>Bynum</u> addressed two certified questions:

> Where a plaintiff's healthcare expenses are paid
> by Medicare and/or Medical, does the discounted
> amount paid to a healthcare provider by
> [Medicare] and Medi-Cal constitute the amount
> that should be awarded as medical special damages
> to a plaintiff in a negligence action?  In this
> circumstance, is evidence of amounts billed in
> excess of the amount[] paid irrelevant and
> inadmissible?"

<u>Id.</u> at 82, 101 P.3d at 1150 (alterations in original).  The

Hawaii Supreme Court held that "a plaintiff, injured by the

tortious conduct of a defendant, is entitled to recover the

reasonable value of medical services and <u>is not limited</u> to the

expenditures actually paid by Medicaid/Medicare."  <u>Id.</u> at 92,

101 P.3d at 1160 (emphasis added).  Thus, because "the

collateral source rule prohibits reducing a plaintiff's award of

medical special damages to reflect the discounted amount paid by

Medicare/Medicaid," evidence of amounts billed in excess of the

amounts paid is neither irrelevant nor inadmissible.  <u>Id.</u> at 94,

101 P.3d at 1162.  Not only is <u>Bynum</u> distinguishable, it cuts

against Defendant's contention that private pay rates must

govern in estimating Marites' future hemodialysis needs.  At

issue in this case is not whether private pay costs are

admissible, but whether they, or actual billed amounts, more

appropriately address Marites' future hemodialysis costs.  Under

<u>Bynum</u>, standard rates are an acceptable measure for damages

because they do not limit a plaintiff's recovery to lesser billed amounts.  Here, Marites' actual bills reflect costs far in excess of private pay rates, the use of which are not standard in life care planning.  The Court finds unpersuasive any suggestion that actual bills should be disregarded in favor of private pay estimates.

207. Although Defendant challenges the reasonableness of the future hemodialysis costs, Medicare and Tricare paid Marites' DSI Pearlridge bills.  [Ex. J-92A (Tricare Claims Information by Date of Service for Marites B. Campano).]

208. The Court accordingly finds that Ms. Klemme's provisions for $67,239.00 in monthly dialysis costs for Marites' future care are reasonable, necessary, and appropriate.  The Klemme plan is more suitable than Mr. Fountaine's life care plan ("Fountaine plan") with respect to dialysis costs.

209. The Court further finds that the provisions in the Klemme plan for round-trip transportation to and from dialysis sessions, including the costs related thereto, are reasonable, necessary, and appropriately address Marites' future care needs.

### 5.  Nephrology Monitoring

210. Drs. Klein and Friedman agreed that dialysis patients are seen weekly by their nephrologist.  [Dr. Klein 12/5 at 7:13-19; Dr. Friedman 12/11 at 62:11-16.]

211. The Court finds that monthly nephrology monitoring is the most appropriate frequency of nephrology care for Marites during the viability of any transplanted kidney(s), when she is not on dialysis.  Her multi-organ injuries and medical course stemming from the incident support more frequent nephrology evaluation and laboratory testing than Dr. Friedman's recommendation that she be evaluated every three months.  The Court finds Dr. Klein's testimony and opinions regarding nephrology monitoring more credible than the testimony and opinions of Dr. Friedman.

212. Accordingly, the Court finds that monthly nephrology evaluation and monthly laboratory testing provided for in the Klemme plan are reasonable and necessary, and more aptly address Marites' future care needs than the Fountaine plan.

### 6.  **Medical Consultations**

213. Marites does not have a functional AV fistula.  When she resumes dialysis, she will require one.  A functioning AV fistula should be evaluated by a vascular surgeon every three to four months as preventive treatment.  [Dr. Klein 12/5 at 85:6-11.]

214. The Klemme plan provides for yearly evaluation by a transplant surgeon when Marites is on the kidney transplant list.  Dr. Klein testified that the yearly evaluation is standard so that in the event a kidney transplant becomes

available, the surgeon is not surprised by any condition making her an anesthetic or surgical risk.  [Dr. Klein 12/5 at 77:16-78:4.]

215. Dr. Friedman testified that he disagreed with the recommendation for:  annual consultation with a transplant surgeon, cardiology consultations four times a year, endocrinology consultations four times a year, and neurology consultations twice a year.  However, he offered no explanation or basis for his disagreement.  [Dr. Friedman 12/11 at 66:10-22.]

216. Dr. Ching noted, in his report, that Marites had current mild cardiac dysfunction and valvular disease, probably from pre-existing rheumatic heart disease with possible contributing factors with her toxic shock episode.  [Ex. J-47 (Dr. Ching Report) at 7.]

217. Dr. Klein's recommendation for quarterly cardiology consultations were directly related to the incident and Marites' abnormal echocardiograms.  [Dr. Klein 12/5 at 78:5-17.]

218. Dr. Klein testified that his recommendations for pulmonology, neurology, and endocrinology consultations were based on the sequelae arising from the incident.  [Id. at 78:18-25.]  Marites suffered hepatic encephalopathy at Tripler, as well as pituitary issues.  [Id. at 12:13-15:5, 19:18-20:17.]  She has also developed skin lesions as a result of the

transplant, which should be monitored by a dermatologist at least twice a year.  [Id. at 30:1-10, 79:20-80:2.]

219.  Insofar as the Court finds the testimony and opinions of Dr. Klein regarding consultations to be more credible than the testimony and opinions of Drs. Friedman and Ching, the consultations set forth in the Klemme plan, and frequency and costs related thereto, are reasonable, necessary, and appropriate with respect to Marites' future care.

### 7.   Diagnostic Testing

220.  Dr. Klein recommended annual chest x-rays, while the Fountaine plan provided for chest x-rays every three years. [Ex. J-29 (Klemme Report) at 61; Ex. J-48 (John Fountaine Report) at 6.]  Dr. Klein explained that annual chest x-ray screening is necessary to look for certain potential complications, and such complications would occur more frequently in transplant or dialysis patients.  [Dr. Klein 12/5 at 80:6-14.]

221.  The Klemme and Fountaine plans agreed upon annual EKG, annual echocardiograms and biannual bone dexascans.  [Ex. J-29 (Klemme Report) at 61; Ex. J-48 (Fountaine Report) at 6.]

222.  Dr. Klein recommended semi-annual dental exams and prophylactic antibiotics for dental work.  He further recommended gynecological exams every three years and mammograms

every three years to age 50, and annually after age 50.  [Dr. Klein 12/5 at 80:18-81:14.]

223. The parties agree that Marites requires kidney biopsies and renal ultrasounds.  Dr. Klein recommends two biopsies and two ultrasounds per transplant, while the Fountaine plan includes two biopsies and two ultrasounds in a lifetime. [Ex. J-48 (Fountaine Report) at 9; Dr. Klein 12/5 at 82:1-6.]

224. Dr. Klein testified that kidney biopsies are used to evaluate potential kidney rejection.  A second biopsy follows the first to evaluate the response to treatment.  He explained that a renal ultrasound is always part of the kidney biopsy evaluations.  [Dr. Klein 12/5 at 82:1-22.]

225. The Court finds Dr. Klein's testimony and opinions regarding diagnostic testing to be more credible than the testimony and opinions of Dr. Friedman.  As such, the Court finds that the diagnostic testing set forth in the Klemme plan, and the frequency and costs related thereto, are reasonable, necessary, and appropriate for Marites' future care.

### 8.   Future ER Visits and Hospitalizations

226. The Klemme plan provides for four annual emergency room visits and three to four annual hospitalizations, with each hospitalization lasting seven to ten days.  [Ex. J-29 (Klemme Report) at 61; Dr. Klein 12/5 at 82:23-83:1.]  Dr. Thomas Loudat's calculations are based on 29.8 days of hospitalization.

[Exs. P-114 (Dr. Loudat Updated Report); P-116 (Dr. Loudat
Alternative Scenarios Report (13-24); P-122 (Dr. Loudat
Alternative Scenarios Report (25-27)); P-136 (Dr. Loudat Amended
Additional LCP Scenarios 1-12).]  The Fountaine plan originally
provided for one annual emergency room visit and ten to 12
lifetime hospitalizations, with each hospital stay lasting five
to seven days.  [Ex. J-48 (Fountaine Report) at 7.]

227. That Marites has not recently been to the emergency
room or hospitalized has no bearing on future visits or
hospitalizations, according to Dr. Klein.  [Dr. Klein 12/5 at
83:2-21.]  The number of ER visits and hospitalizations proposed
by Dr. Klein, and relied upon by Ms. Klemme, were based on
Marites' five ER visits in a 16-month period after her
transplant and the complications associated with transplant and
dialysis patients, regardless of the condition that precipitated
the visit.  [Id.]

228. In its 2015 Annual Report, dialysis provider Fresenius
included data showing that its dialysis patients required re-
hospitalizations at a rate of 10 days per quarter, equaling four
annual hospitalizations and 40 hospital days per year.  [Grisham
12/6 at 5:8-6:2.]

229. Defendant agrees that Marites will require future ER
visits and hospitalizations due to the complications associated
with ESRD.  The number of annual hospital days proposed by

Defendant is eight, which is a blended number of hospital days for dialysis and transplant patients. [Dr. Friedman 12/11 at 23:11-24:5; Dr. Ching 12/11 at 94:12-95:6.]

230. In light of Marites' complicated and serious medical history, the Court finds that Defendant's projections for ER visits and hospitalizations understate her future needs.

231. The Court finds that in the context of Marites' past medical course, the problems and complications identified by Dr. Klein, and considering his professional knowledge and experience, Dr. Klein's testimony and opinions regarding future ER visits and hospitalizations are more credible than the testimony and opinions of Drs. Friedman and Ching. That said, the Court finds that the projected number of days of hospitalization is excessive and should be reduced by one-half.

232. For these reasons, the Court finds that four ER visits and 14.9 days of hospitalization per year are reasonable, necessary, and appropriate for Marites' future care needs.

### 9.   Psychiatry Needs

233. The treatment plan and testimony of psychiatrist Dr. Danilo Ponce provide the foundation for future psychiatric counseling and medication in the Klemme plan. [Ex. J-29 (Klemme Report) at 71-78; Ex. J-33 (Dr. Ponce Treatment Plan).]

234. Dr. Ponce testified that Marites' PTSD, anxiety and depression, along with the physical manifestation of those disorders, will be lifelong and permanent. [Dr. Ponce 12/6 at 68:20-24.]  Dr. Ponce recommended weekly psychiatric treatments in the first year of treatment, bi-monthly treatments in the second year of treatment, and monthly treatments starting in year three, for life. [Ex. J-33 (Dr. Ponce Treatment Plan) at 8-9; Dr. Ponce 12/6 at 72:7-23.]

235. While the Fountaine plan does not include psychiatric treatment, Drs. Ching and Eric Smith indicated that Marites requires psychiatric care and medication. [Ex. 47 (Dr. Ching Report) at 7-8; Dr. Ching 12/11 at 138:14-139:6; Dr. Smith 12/8 at 37:10-39:17.]  Dr. Smith agreed that a more intensive period of therapy is required for Marites at the outset due to her distrust of the medical profession and cultural/ethnic differences. [Dr. Smith 12/8 at 36:20-37:9.]  Dr. Smith also testified that the failure of Marites' kidney transplant and return to hemodialysis would cause a recurrence and magnification of Marites' PTSD symptomatology, as well as adjustment disorder or some other psychological impairment. [Id. at 45:6-18.]

236. The Court finds that the credible evidence establishes that Marites continues to suffer symptoms of PTSD, anxiety and depression.  The evidence further supports a finding that these

symptoms will continue for Marites' lifetime and will be exacerbated each time she resumes hemodialysis.

237. The Klemme and Fountaine plans agree on Marites' future medication needs except for the monthly quantity of Lunesta sleep medication.  Given the need for sleeping medications identified by the Defendant's own witnesses; the extent to which Marites is still suffering depression, anxiety, and stress; and the agreement by Drs. Ching and Smith that Marites' symptoms will increase when she resumes dialysis, the Court finds that all the medications set forth in the Klemme plan, and the related frequency and cost, are reasonable, necessary, and appropriate for Marites' future care needs.

238. The Court therefore accepts the Klemme plan's provisions for psychiatric treatment and medications.

### 10.  Home Care Needs

239. Both the Klemme and Fountaine plans provide for home care assistance following transplant surgery, during dialysis and at the end of life.  [Ex. J-29 (Klemme Report) at 79-85; J-48 (Fountaine Report) at 13.]  The Klemme plan provides for both home health aide and chore worker assistance following transplant surgery and during dialysis, with exclusive home health aide assistance at the end of life.

240. Health aides assist with daily activities such as bathing, dressing, and grooming, but are not allowed to do tasks

for the household or other members of the household.  By
contrast, chore workers assist with household tasks, which
include aiding family members and performing tasks that would
otherwise have been undertaken by Marites.  [Grisham 12/5 at
164:8-165:14.]

241. Dr. Klein cited multiple reasons for recommending help
totaling three hours/day for three months following transplant:
Marites will lack the energy to engage in the activities of
daily living, such as shopping or taking care of her family;
immunosuppression issues will preclude her from caring for sick
family members; and her baseline is lower than 99 percent of
those who get transplants because of her past medical
complications.  [Dr. Klein 12/5 at 85:21-87:1.]

242. Both the Klemme and Fountaine plans provide for
assistance during dialysis, but the Klemme plan includes a home
health aide in addition to a chore worker and recommends greater
assistance – six hours/day, three times/week versus 12
hours/week.  Dr. Klein testified that 18 hours a week of home
care assistance is more appropriate than the 12 hours a week set
forth in the Fountaine plan.  [Dr. Klein 12/5 at 87:2-14.]

243. During hemodialysis, Marites experienced significant
fatigue.  Her daily function was limited and she relied heavily
on Rafael and her family.  [Ex. J-29 (Klemme Report) at 35, 37-
40.]

244. Dr. Friedman had no disagreement with the home care needs set forth in the Klemme plan. [Dr. Friedman 12/11 at 66:5-22.]

245. Dr. Ching testified that on dialysis days, dialysis patients have difficulty performing the activities of daily living and require assistance. [Dr. Ching 12/11 at 141:5-10.] Dr. Ching suggested that family support would be desirable. [Id. at 141:11-13.] However, factoring in family assistance does not return Plaintiffs to pre-injury status.

246. The Klemme plan provides for a health aide 24/7 for end-of-life care. Dr. Ching disagreed with the need for overnight care and care during dialysis sessions and recommended three to six hours of daily care for the last three years of Marites' life. [Ex. J-47 (Dr. Ching Report) at 9; Dr. Ching 12/11 at 98:11-18.] To support his position, Dr. Ching noted that his patients at St. Francis Medical Center did not have that level of support available to them. [Dr. Ching 12/11 at 97:16-98:17.]

247. Dr. Friedman did not disagree with the provision of 24/7 end-of-life care. [Dr. Friedman 12/11 at 66:10-22.]

248. Dr. Klein testified that overnight health aide care is required because Marites could experience respiratory problems, she may need to use the bathroom, and she could become agitated.

Dr. Klein equated the 24/7 care to placing Marites in a nursing home with 24-hour care.  [Id. at 87:15-88:5.]

249. With respect to assistance during dialysis, Dr. Klein testified that at the dialysis clinic, a health aide would be helpful if the patient needs assistance with mobility or getting dressed, though an aide is not needed during the dialysis itself.  Dialysis nurses are not supposed to give custodial care.  In Dr. Klein's experience, many dialysis patients are accompanied by attendants.  [Dr. Klein 12/5 at 126:21-127:21.]

250. Ms. Riddick-Grisham testified that 24/7 end-of-life care is appropriate for Marites because she is at risk for significant other complications.  She already has existing medical conditions such as osteopenia and high cholesterol that will wear on her and will require additional assistance. [Grisham 12/5 at 165:18-166:6].

251. The Court finds that home care needs following transplant surgery, during dialysis, and at the end of life on dialysis, are nephrology-related future treatment needs.  The Court further finds that Marites' family should not be required to provide services to her for care directly resulting from her injuries.

252. The Court finds that the testimony and opinions of Dr. Klein and Ms. Riddick-Grisham are more credible regarding future

home care services than the testimony and opinions of Drs. Ching and Friedman, and Mr. Fountaine.

253. As such, the Court deems the home care needs outlined in the Klemme plan to be reasonable, necessary, and appropriate for Marites' future care, and better address her needs than the Fountaine plan.

### 11.  **Equipment Needs**

254. Marites will require the following home medical equipment during dialysis and the post-transplant period, replaced throughout her lifetime, to assist with mobility and safe transfers:  shower chair, grab bars, non-skid bath mat, shower hose, home blood pressure machine, thermometer, walker, cane, and a scooter at age 50.  [Dr. Klein 12/5 at 88:6-22; Ex. J-32 (Dr. Klein Treatment Plan) at 10; Ex. J-29 (Klemme Report) at 86-99).]

255. Neither Dr. Friedman nor Dr. Ching disagreed with equipment needs or offered suggestions to the contrary.  [Dr. Friedman 12/11 at 66:10-22; Ex. J-47 (Dr. Ching Report).]

256. Therefore, the Court finds that the provisions set forth in the Klemme plan for equipment are reasonable, necessary, and appropriate for Marites' future care.

## XIV. **Noneconomic Damages**

### A. **Permanent Disfigurement**

257. The multiple procedures that Marites endured have resulted in permanent scars and hyperpigmentation that cause her humiliation and embarrassment.  [Ex. J-29 (Klemme Report) at 43-44].

258. Marites has several scars of varying sizes on her abdomen, upper chest, and arm from the multiple incident-related surgeries and procedures, all of which bother her and have decreased her self-esteem.  [Exs. P-129-135; Dr. Ching 12/11 at 125:17-127:7.]

### B. **Marites' Mental Anguish and Emotional Distress**

259. During the incident, Marites and her family and friends believed that she would not survive.  [Paquito 12/7 at 80:1-21.]

260. Marites was convinced she was going to die, and wanted to return home to avoid dying in the hospital.  [Rafael 12/7 at 163:7-164:13.]

261. During her first hospitalization at Tripler, Marites began showing signs of an aversion toward M.R.B.C, making excuses to keep her away.  [Marites 12/12 at 59:9-60:3.]

262. Marites' aversion toward M.R.B.C. became more pronounced once she returned home after her first discharge from Tripler.  When Marites arrived at home and family members

brought M.R.B.C. to the car to greet her, Marites became agitated and was unhappy to see M.R.B.C.  In the days that followed, M.R.B.C. was a source of anxiety and Marites did not wish to see her.  [Id. at 60:4-15; Rafael 12/7 at 164:21-165:13.]

263. The incident so traumatized Marites that she hated M.R.B.C., and in fact preferred to die than see M.R.B.C., because she blamed M.R.B.C. for the events that transpired. [Rafael 12/7 at 164:21-165:13; Marites 12/12 at 69:15-70:8; Paquito 12/7 at 80:22-81:24.]

264. Due to the injuries she suffered as a result of the incident, Marites was unable to breastfeed and bond with M.R.B.C.  [Marites 12/12 at 56:21-57:07; 57:19-58:13.]

265. After the incident, Marites is distrustful of medical providers and has anxiety about medical facilities and equipment.  [Id. at 60:20-62:22; 85:19-86:19; Dr. Ching 12/11 at 117:18-24.]

266. Marites is also sensitive to stimuli that remind her of her hospitalization, like ambulance sirens, flashing lights, medical device alarms, school bells, and ringing phones. [Marites 12/12 at 62:12-22; 85:12-18.]

267. Marites experiences panic attacks and anxiety when she is exposed to stimuli that remind her of her hospitalizations. [Marites 12/12 at 62:12-22; Dr. Ching 12/11 at 117:21- 118:2.]

268. During her panic attacks, Marites experiences shortness of breath and inability to focus.  To cope, she goes to her room, drinks water, and prays.  [Marites 12/12 at 63:7-17.]

269. Marites also has nightmares about her hospitalizations.  [Id. at 62:12-22.]

270. Marites' incident-caused injuries have also affected her physical appearance, her confidence, and her self-esteem.  [Id. at 65:13-67:9; Dr. Ching 12/11 at 118:20-25.]

271. This lack of confidence and diminished self-esteem cause Marites to avoid people and isolate herself, in part because she believes that people are talking behind her back about how much of a burden she is to her family.  [Marites 12/12 at 66:17-67:25.]

272. Marites was traumatized by hemodialysis and dreads having to return to hemodialysis in the future.  [Id. at 68:1-20; 68:25-69:14; 73:21-74:17.]

273. Marites is unable to control her emotions, is more irritable, has mood swings, and has daily headaches since the incident.  [Id. at 86:20-87:21.]

274. These resultant emotional changes have affected her relationship with R.M.B.C. and R.B.B.C., especially R.M.B.C., because she angers easily and often argues with them.  [Id. at 86:20-87:12.]

275. Marites currently spends most of her days lying in her room and does not want to see anyone.  [Id. at 87:22-88:14.]

276. Since her kidney transplant, Marites sleeps for a total of five to six hours a night, but she wakes up every hour to two hours to use the bathroom.  [Id. at 88:15-89:1.]

277. Since her kidney transplant, Marites goes to the bathroom every 45 to 60 minutes during the day to avoid urinary tract infections.  [Id. at 89:2-21.]

278. Marites regrets blaming M.R.B.C. for the incident and subsequent hospitalization, particularly because she and Rafael had prayed for a baby girl for so long.  [Id. at 90:1-5.]

279. Marites feels that the incident deprived her of early bonding with and nurturing of M.R.B.C.  [Id. at 90:6-9.]

280. Marites believes that she is a burden to her family and carries guilt as a result.  [Id. at 90:13-22; Dr. Ching 12/11 at 142:23-143:14.]

281. Marites enjoyed working and intended to return to work after M.R.B.C.'s birth.  [Dr. Ching 12/11 at 132:14-22; Marites 12/12 at 43:2-14.]

282. Marites feels guilty because she is unable to work or provide financially for her immediate family after the incident. [Marites 12/12 at 44:25-45:10.]

283. M.R.B.C. wants to attend school and take piano and ballet.  It troubles and saddens Marites to inform M.R.B.C. that

54

the family cannot afford it because she is ill and unable to work. [Id. at 45:11-47:1.]

284. Prior to the incident, Marites regularly sent financial assistance to her nieces and nephews in the Philippines to help to pay for their education. [Id. at 43:25-44:24.]

285. Since the incident, Marites discontinued financial support of her relatives in the Philippines and she feels badly about her inability to assist. [Id.]

286. Since the incident, Marites is no longer a happy person. [Id. at 90:10-12).

287. Marites is most concerned about who will care for her when her kidney fails again. [Id. at 91:1-8.]

288. Marites is also concerned about whether Rafael will take care of her for the remainder of her life. [Id. at 91:10-15.]

289. Marites wishes that she could take care of her children, especially M.R.B.C. [Id. at 91:17-18.]

290. Dr. Ching testified that Marites will have a decreased ability to care for her sick children when they have mild illness, which is of particular concern with a young daughter. [Dr. Ching 12/11 at 142:12-17.]

### 1. Psychiatric Evaluation by Dr. Robert C. Marvit

291. On June 1, 2016, Dr. Robert Marvit evaluated Marites and Rafael. [Ex. J-35 (Dr. Marvit Report Marites) at 1; Ex. J-36, (Dr. Marvit Report Rafael) at 1.]

292. Dr. Marvit opined that Marites' August 8, 2013 electroencephalogram "was abnormally suggestive of a diffuse and anoxic/hypoxic injury to the cerebral cortex." [J-25 (Dr. Marvit Report Marites) at 6.] In other words, Marites suffered an organic injury to the brain as a result of the septic shock she experienced at Tripler. [Dr. Marvit 12/6 at 129:21-132:4.]

293. Drs. Marvit and Ching opined that Marites also suffered from hepatic encephalopathy as a consequence of her sepsis at Tripler. [Dr. Marvit 12/6 at 132:20-134:4; Dr. Ching 12/11 at 104:7-105:2.]

294. Manifestations of hepatic encephalopathy include confusion, decreased level of consciousness, decreased ability to have a normal thought process, decreased ability to remember, and decreased ability to calculate. [Dr. Ching 12/11 at 104:18-105:2.]

295. Marites' cognitive impairments, abnormal behavior, and altered mental status during her first hospitalization are attributable to the diffuse anoxic/hypoxic injury and the hepatic encephalopathy caused by her sepsis at Tripler. [Dr. Marvit 12/6 at 132:9-25; 133:13-134:4; 157:8-158:8; 158:17-18.]

296. When Dr. Ching examined Marites on October 6, 2016, she exhibited some memory loss and was slow on her calculations. [Dr. Ching 12/11 at 105:3-13.]

297. Dr. Ching admitted that he was not provided with any medical records or any medical history suggesting that Marites' clinical symptoms of cognitive impairment were related to any type of preexisting condition.  [Id. at 106:4-8, 128:1-129:16.]

298. As a result of the diffuse anoxic/hypoxic injury and the hepatic encephalopathy caused by Marites' sepsis at Tripler, she is at a greater risk for premature decay of brain function, early onset of cortical delay and regressive cognitive functioning as she ages than those who have not had such brain injury.  [Dr. Marvit 12/6 at 132:14-134:10; 158:12-14.]

## 2.   Psychiatric Evaluation and Treatment with Dr. Ponce

299. Dr. Ponce evaluated Marites on July 30 and 31, 2016. [Ex. J-37 (Dr. Ponce Report) at 2.]

300. Marites went to see Dr. Ponce in part because was able to communicate with him in Ilocano.  [Id. at 2; Rafael 12/8 at 168:8-22.]

301. Marites had previously seen two mental health professionals, one at Tripler and one in private practice in Mililani, but did not feel comfortable with them and did not return for further sessions.  [Rafael 12/8 at 167:3-169:9.]

302. Marites continued treatment with Dr. Ponce until she moved to San Diego. [Ex. J-37 (Dr. Ponce Report) at 10; Ex. J-91 (Dr. Ponce records).]

303. As earlier noted, Dr. Ponce diagnosed Marites with symptomatic PTSD, anxiety, and depression. He recommended weekly psychiatric treatments in the first year of treatment, bi-monthly treatments in the second year of treatment, and monthly treatments starting in year three, for life. [Ex. J-33 (Dr. Ponce Treatment Plan) at 8-9; Dr. Ponce 12/6 at 72:7-23.]

304. Dr. Ponce noted that Marites had passive suicidal ideations but no active plans - active meaning a decision to kill oneself with an active plan and method, and passive meaning a wish to die in order to terminate something that is painful or that the patient is unable to endure or continue. [Dr. Ponce 12/6 at 62:24-63:10.]

305. Dr. Ponce explained that Marites' passive suicidal ideations were the result of medical, social and psychological factors such as the uncertainty regarding the functional life of her kidney transplant, the social impacts on Rafael and her family, her role as a wife and mother, and feelings of uselessness and worthlessness compounded by internecine conflicts with family members. [Dr. Ponce 12/6 at 62:24-64:12.]

306. Dr. Ponce expects Marites' psychiatric disorders (PTSD, anxiety, depression) to be permanent because they are

related to her physical and medical conditions, which are permanent.  [Id. at 67:18-68:24.]

307. Dr. Ching agreed that Marites will require lifelong psychiatric treatment with increasing frequency when she returns to dialysis, and medications for depression, anxiety, and insomnia.  [Dr. Ching 12/11 at 138:14-139:6.]

### 3.   Psychological Evaluation by Dr. Smith

308. The Court has already determined that psychiatric treatment for Marites is necessary and appropriate.  Therefore, to the extent Dr. Smith's report opines that such treatment is unnecessary, the Court finds those opinions to be non-credible, particularly in view of Dr. Smith's shift in position at trial.

### C.   The Effect on the Family

### 1.   Rafael

309. At the time of the incident, Rafael was in the Navy's Medical Enlisted Commissioning Program ("MECP") and was attending school to complete his nursing degree.  [Rafael 12/7 at 171:4-23.]

310. The demands of staying with Marites during her hospitalizations and caring for her in the aftermath caused Rafael to struggle in school.  He was forced to complete assignments at the hospital and even used Tripler computers to do so.  He missed some labs but took final exams, passed his classes, and despite the many challenges, graduated on schedule

in December 2013.  [Id. at 169:13-171:3; Paquito 12/7 at 76:6-13.]

311. Rafael was given the option to extend his nursing education but he wanted to finish to better provide for his family.  He feared that with all that was happening, he would be expelled from the MECP program and returned to his enlisted rank.  [Rafael 12/7 at 171:2-19.]

312. Rafael remained at Marites' bedside during all of her hospitalizations, leaving for only brief periods to attend his exams at school and to visit his children.  [Paquito 12/7 at 71:18-25; Rafael 12/8 at 170:16-18.]

313. Rafael struggled emotionally with the prospect that he was going to lose his wife, and that his children would not have a mother.  However, he tried to conceal his emotions to protect his children.  [Paquito 12/7 at 80:1-21, 81:20-82:21; Rafael 12/7 at 163:17-164:3.]

314. Caring for Marites after her first two hospitalizations in 2013 was especially difficult because she was confined to the bed and/or a wheelchair, and the Campanos' townhouse in Mililani had two stories, with the bedrooms all located upstairs.  [Rafael 12/7 at 165:17-166:1.]

315. Rafael would carry Marites up and down the stairs in order to relocate her; he would carry her downstairs before he left for work in the morning, where she would remain until he

60

returned at night and carried her back upstairs again. [Id. at 165:25-166:7.]

316. Rafael also attended to all of Marites' needs following her hospitalizations, including bathing her on the couch, for over a year. [Id. at 166:8-16.] He also helped Marites to get up and sit properly. [Marites 12/12 at 64:10-12.]

317. In addition to her home care, Marites required transport to and from dialysis three times a week. Rafael and Paquito would regularly share the transportation duties - Paquito dropped Marites off at the clinic in the afternoon and Rafael went to the clinic after work to spend time with her then take her home. [Rafael 12/7 at 167:16-168:2; Paquito 12/7 at 78:9-22.]

318. The Campanos also relied heavily on their large family for support while Marites was incapacitated. Rafael's sisters traveled from Australia, Canada, and California at different intervals to assist the family. [Rafael 12/7 at 138:22-139:10; Paquito 12/7 at 74:5-75:13.]

319. The Campanos have the most family support in Hawaii. [Rafael 12/7 at 145:10-13.]

320. Rafael was heartbroken when Marites blamed M.R.B.C. for what happened to her at Tripler. [Id. at 164:17 -165:13.]

321. Because Marites was in the hospital for essentially over two months while Rafael kept vigil at her bedside, followed by outpatient dialysis and several hospitalizations, neither Rafael nor Marites was present to raise M.R.B.C. during the first months of her life.  [Rafael 12/8 at 196:16-198:24.]

322. As a result of their absence, M.R.B.C. bonded with Paquito, her primary caregiver, instead of Rafael and Marites, and this bond continues.  [Id. at 197:03-198:24.]

323. If Rafael and Paquito arrived home at the same time, M.R.B.C. would run to Paquito instead of Rafael.  [Id. at 198:4-10.]

324. According to Rafael, the biggest losses attributable to the incident are:  normal family function, quality of life, and his children's innocence.  [Id. at 199:5-20.]

325. Rafael does not complain despite the fact that this situation has prevented him from pursuing his dreams.  Marites senses that he is exhausted given the many burdens he shoulders. [Marites 12/12 at 90:16-22.]

326. Dr. Klein testified that he recommends preventive marital counseling for all patients because kidney disease affects the spouse and family.  [Dr. Klein 12/5 at 37:10-24.]

327. Dr. Ching likewise assumed that Marites' limitations due to her kidney disease affect Rafael's quality of life.  [Dr. Ching 12/11 at 145:2-5.]

328. Rafael's biggest concern for his family moving forward is the absence of peace of mind.  He worries about how long Marites' kidney will last, the return to hemodialysis, and other complications that may arise.  [Rafael 12/8 at 199:21-200:9.]

## 2. R.M.B.C., R.B.B.C., and M.R.B.C.

329. R.M.B.C. and R.B.B.C. were 14 and 11 at the time of Marites' extended hospitalization, and were old enough to understand the severity and seriousness of the situation.  [Ex. J-1 at TAMC2 4214.]  Both were devastated by what happened to Marites.  [Rafael 12/8 at 190:23-25.]

330. Prior to the incident, R.M.B.C. and R.B.B.C. participated in judo and basketball.  [R.M.B.C. 12/7 at 90:3-5; R.B.B.C. 12/7 at 117:6-8.]

331. Prior to the incident, the Campano family would go to the park and play basketball and tennis, participate in the boys' activities and competitions, go to the beach at Pupukea, have potlucks with friends and family, watch movies, hike, participate in church activities, and visit relatives on the neighbor islands.  [R.M.B.C 12/7 at 92:24-93:10; Rafael 12/8 at 192:18-193:3.]

332. Prior to the incident, R.M.B.C. typically sought Marites' assistance with his school work, but was unable to do so after the incident.  [R.M.B.C. 12/7 at 93:14-23.]

333. R.M.B.C. learned that his mother was sick from Paquito. [Id. at 94:7-18.]

334. R.M.B.C. visited his mother at Tripler and witnessed her condition in the ICU, where she was hooked up to multiple tubes and was chanting. [Id. at 94:19-95:2.]

335. During R.M.B.C.'s visit, Marites did not recognize him or other family members and she was uncommunicative. [Id. at 95:3-11.]

336. R.M.B.C. observed Marites repeatedly chanting "onakunada," a word that no one in the family recognized. [Id. at 95:12-18.]

337. At a point during Marites' first hospitalization, Rafael broke down during a car ride to Tripler and told R.M.B.C. and R.B.B.C. that Marites was not going to make it. [Id. at 96:2-14.]

338. R.M.B.C. was too afraid to answer the telephone while Marites was in the hospital because he was worried and scared to receive word about her condition. [Id. at 96:17-97:5.]

339. R.M.B.C. and R.B.B.C. became so concerned about Marites during her second hospitalization that R.M.B.C expressed his preference to be with Marites instead of attending school. When Rafael told Marites that the boys did not want to go to school, she broke from chanting and told the boys that they have to do their homework and go to school. [Id. at 98:21-99:24.]

64

340. As a result of the incident and Marites' incident-caused injuries, R.M.B.C. and R.B.B.C. were unable to continue their sports activities, as no one was available to take them to practices, games, and tournaments, and/or support them. [Id. at 100:17-101:5; Rafael 12/8 at 189:6-190:19.]

341. As a result of the incident, R.M.B.C. had to assist with M.R.B.C.'s care because Marites and Rafael were at the hospital. He also assumed a greater role in R.B.B.C.'s life, helping him with school work and other tasks ordinarily undertaken by Rafael and Marites. [R.M.B.C. 12/7 at 100:19-101:5.]

342. R.M.B.C. would also accompany Marites to her dialysis sessions, first going for two to three weeks straight, then alternating with Rafael. [Id. at 101:6-17.]

343. In May of 2014, R.M.B.C. cried and was worried and angry when he learned that Marites had an ovarian cyst that her doctors suggested might be cancerous. [Id. at 101:18-102:4.]

344. R.M.B.C. questioned his faith in God because of the many bad things that happened to Marites. [Id. at 102:21-103:1.]

345. R.M.B.C. resented M.R.B.C., blaming her for the harm that befell Marites. [Id. at 104:3-18.]

346. R.M.B.C. broke down emotionally for several minutes on the witness stand when discussing his prior feelings toward M.R.B.C. and acknowledging it was wrong.  [Id. at 104:7-105:4.]

347. R.M.B.C.'s grades suffered during Marites' illness. [Id. at 105:19-24.]

348. R.M.B.C. notices that Marites has become far more emotionally unstable, irritable, and is prone to throwing things and screaming for extended periods when she gets upset, none of which she would have done prior to the incident.  She used to be happy all the time and very caring.  R.M.B.C. described her as calm, the peacekeeper of the house, nice, and loving.  [Id. at 106:23-108:18; R.B.B.C. 12/7 at 117:3-5.]

349. After the first hospitalization, Marites was quiet and depressed and said little to R.M.B.C. and R.B.B.C.  [R.B.B.C. 12/7 at 121:18-21.]

350. After the second hospitalization, Marites remained distant and cried almost daily.  She apologized to the boys for not being there for them and for the situation.  [R.M.B.C. 12/7 at 100:2-16.]

351. A rift has developed between R.M.B.C. and Marites since the incident, which affects their connection.  Many differences have arisen between them.  [Id. at 113:19-114:1.]

352. R.M.B.C. and R.B.B.C. exercise greater caution around Marites and avoid doing things that will upset her for fear of

causing her stress and affecting her transplanted kidney.  [Id. at 108:22-109:14.]

353. R.B.B.C. recalls visiting Marites while she was at Tripler and noticing that she looked "fluffy," or a lot bigger, and her legs were bloated.  [R.B.B.C. 12/7 at 120:9-12.]

354. R.B.B.C. also remembers that Marites did not recognize him when he came to visit her and that she was chanting repetitively.  [Id. at 120:13-121:1.]

355. R.B.B.C. had difficulty focusing and his grades suffered while Marites was ill.  [Id. at 123:14-18.]

356. R.M.B.C. and R.B.B.C. bore witness to the acuteness of Marites' condition, which included periods of unconsciousness and altered mental status where she did not recognize them, and great uncertainty about her survival.  [Ex. J-1 at TAMC2 4070-75.]

357. As mentioned above, because of the severity of the trauma that Marites suffered at Tripler after M.R.B.C.'s birth, Marites associated said trauma with M.R.B.C. herself.

358. Marites admitted to hating M.R.B.C., who was both a trigger and a constant reminder of the traumatic ordeal.  [Id. at TAMC2 7016-20.]

359. The incident and aftermath cost the family their normal life.  [Id. at 90:23-25.]  Although the children wished

to go out and do things as a family, they were unable to do so
because of Marites' condition.  [Rafael 12/8 at 199:8-15.]

360. Marites wishes she could care for her children and
worries about her relationship with R.M.B.C. and R.B.B.C going
forward.  [Marites 12/12 at 91:1-18.]

361. Dr. Ching assumed that Marites' limitations due to her
kidney disease affect her children's quality of life.  [Dr.
Ching 12/11 at 145:2-5.]

## XV.  Economic Damages

### A.    Past Medical Expenses

362. Marites' past medical expenses related to the incident
total **$1,838,267.03** and are comprised of the following:  1) DSI
Pearlridge Dialysis - $1,524,376.24; 2) Pali Momi Medical Center
- $5,068.95; 3) Brian Pien, M.D. - $350.98; 4) Queen's -
$280,633.18; 5) Nada, Ono, Ka`anehe & Solomon, LLP - $17,925.58;
and 6) Surgical Associates - $9,912.10.  [Exs. J-19-25.]

363. Defendant challenges the hospitalization and emergency
room costs related to Marites' ovarian cysts from 2014 to 2015,
and the emergency room costs for Marites' vertigo on December
25, 2013.  Defendant contends that the foregoing are unrelated
to Marites' ESRD and the incident.  With respect to the ovarian
cysts, Defendant points to the IUD as the cause, and posits that
the cysts and related health issues would have been avoided if
Rafael opted to get a vasectomy.  Defendant has not adduced any

evidence to support this argument, and the record establishes otherwise.

Marites intended to have a tubal ligation following M.R.B.C.'s birth, but the incident precluded her from doing so. Marites had the IUD insertion because she was advised to avoid pregnancy. Dr. Klein testified that although the IUD caused the ovarian cysts, the resulting complications - the abscess, multiple hospital visits, and extensive surgery - were related to her immunosuppression. [Dr. Klein 12/5 at 17:25-19:11.] Dr. Ching testified that Marites' cysts were caused by, and the emergency room visits and hospitalization indirectly related to, the initial hospital complications. [Dr. Ching 12/11 at 115:19-116:13.] Moreover, the suggestion that a vasectomy, a surgical procedure, should have been elected as the form of birth control instead of an IUD is unavailing. The Court therefore finds that Marites is entitled to the requested past medical expenses.

364. Defendant is entitled to a **$342,558.00** offset for past Tricare benefits paid. [Ex. J-92A at 59.]

365. Applying the offset, Marites is entitled to **$1,495,709.03** in past medical expenses.

### B. **Past and Future Wage Loss Damages**

366. As earlier noted, the parties stipulated that Marites' past and future wage loss amounts total **$538,092.00**. [Doc. No. 126.]

C.   **Future Care Needs**

367. Dr. Loudat performed an economic analysis of Marites' incident-caused economic damages in this case.  [Ex. J-34 (Dr. Loudat Original Report) at 1.]

368. When estimating the cost of all future economic damages, Dr. Loudat has adjusted the amounts to present value in all of his reports and opinions.  [Dr. Loudat 12/7 at 15:17-24.]

369. The Court finds that Dr. Loudat's testimony and opinions regarding the present value cost of the Marites' future lifetime care needs are more credible than the opinions of AsherMeyers.

370. The Court finds that Dr. Loudat utilized the appropriate interest rates and discount rates for all items set forth in the Klemme plan in determining the present value of Marites' future life care costs.  The Court further finds that Dr. Loudat's methodology was sound.

371. Based on the testimony received in the case from the medical and other experts, the Court finds that Dr. Loudat's Alternative No. 6, Option A (Hawaii Transplant) estimate of $22,734,208.00 for the present value of Marites' future care needs is the most appropriate and credible.  [P-136 (Dr. Loudat Amended Additional LCP Scenarios 1-12).]  However, applying the reduction earlier imposed with respect to annual hospitalization, this estimate should be reduced by

$4,199,340.50.  Accordingly, the Court finds that **$18,534,867.50**
represents Marites' reasonable and necessary future care needs.

### 1.   No Offset Against Future Care Costs.

372. The Court finds there is insufficient credible
evidence in the record to support any claimed offset against
Marites' future care costs.

373. The Court finds Defendant has not proven that it is
entitled to any offset from any source against Marites' future
care costs.

### CONCLUSIONS OF LAW

1.   This Court has jurisdiction over the instant action
pursuant to the FTCA, 28 U.S.C. §§ 1346(b) and 2671, et seq.

2.   Defendant is liable to Plaintiffs "in the same manner
and to the same extent as a private individual under like
circumstances."  28 U.S.C. § 2674.

3.   Venue is proper pursuant to 28 U.S.C. § 1402(b).

4.   Jurisdiction and venue are proper because the acts and
omissions alleged in the administrative claim and in the
Complaint occurred within the State of Hawaii.

5.   The law of the state in which the alleged tort
occurred applies in FTCA actions.  Tekle v. United States, 511
F.3d 839, 853 (9th Cir. 2007) (citing Conrad v. United States,
447 F.3d 760, 767 (9th Cir. 2006)).

6.   Hawaii law governs the components and measure of damages in this action.  Shaw v. United States, 741 F.2d 1202, 1205 (9th Cir. 1984).

7.   Under Hawaii law, noneconomic damages "include damages for pain and suffering, mental anguish, disfigurement, loss of enjoyment of life, loss of consortium, and all other nonpecuniary losses or claims."  Haw. Rev. Stat. § 663-8.5(a). Pain and suffering is defined as "actual physical pain and suffering that is the proximate result of a physical injury sustained by a person."  Haw. Rev. Stat. § 663-8.5(b).  Damages for pain and suffering are limited to $375,000.00.  Haw. Rev. Stat. § 663-8.7.

8.   "Loss of consortium claims are derivative, as they are based on the underlying claim of a spouse or child who has suffered injury."  Thompson v. Saint Louis Sch., 125 Haw. 242, 257 P.3d 1219 (Haw. Ct. App. 2011) (citing Brown v. KFC Nat'l Mgmt. Co., 82 Hawai`i 226, 241, 921 P.2d 146, 161 (1996)). However, they are claims "for damages independent and separate from the spouse's claim for damages."  Brown, 82 Hawai`i at 241, 921 P.2d at 161 (citation omitted).

9.   Loss of filial consortium is a recognized cause of action under Hawaii law.  Masaki v. Gen. Motors Corp., 71 Haw. 1, 22, 780 P.2d 566, 578 (1989); Marquardt v. United Airlines, Inc., 781 F. Supp. 1487, 1492 (D. Haw. 1992); Mettias v. United

States, Civ. No. 12–00527 ACK–KSC, 2015 WL 1931082, at *35 (D. Haw. Apr. 21, 2015).

10.   This district court has recognized a cause of action for loss of parental consortium under Hawaii law.  Marquardt, 781 F. Supp. 1487, 1491 (D. Haw. 1992); Mettias, 2015 WL 1931082, at *35.   Like loss of consortium claims in the spousal context, "a claim by a child for loss of consortium is derivative of the damages to the parent."  Mettias, 2015 WL 1931082, at *35.

11.   Given the parties' stipulation to Defendant's sole liability for Marites' injuries, the Court concludes that the care providers at Tripler negligently breached the medical and/or nursing standards of care in their treatment of Marites beginning on July 22, 2013.

12.   The aforesaid care providers were all employees and/or representatives of Defendant and were acting within the course and scope of their employment while caring for and treating Marites.

13.   Defendant is therefore vicariously liable for the care providers' negligence during Marites' admission at Tripler that commenced on July 22, 2013.

14.   The care providers' negligence legally caused Marites' injuries and damages, including her ESRD and all other injuries and damages identified herein.

73

15.   As a proximate and legal result of this negligence, Marites suffered physical injury, including but not limited to ESRD requiring hemodialysis and/or kidney transplants for the remainder of her life.

16.   As a proximate and legal result of Defendant's negligence, Marites incurred past medical expenses and will continue to incur medical and other care expenses for the remainder of her life.

17.   As a proximate and legal result of Defendant's negligence, Marites is unable to work, she incurred past wage loss, and she suffered impairment to her earning capacity. Marites will incur wage loss for the remainder of her work life expectancy.

18.   As a proximate and legal result of Defendant's negligence, Marites suffered physical pain and suffering, mental anguish/emotional distress, loss of enjoyment of life, loss of consortium, and disfigurement.

19.   As a proximate and legal result of Defendant's negligence, Rafael suffered mental anguish/emotional distress, and loss of spousal consortium.

20.   As a proximate and legal result of Defendant's negligence, R.M.B.C., R.B.B.C., and M.R.B.C. suffered mental anguish/emotional distress, and loss of parental consortium.

## I.   <u>Award of Damages</u>

21.   Based on the evidence presented, Plaintiffs are

entitled to the following damages:

| Plaintiff | Damages Type | Amount |
|-----------|--------------|--------|
| Marites | Past medical and care expenses (with offset to Defendant) | $1,495,709.03 |
|  | Future medical care and expenses | $18,534,867.50 |
|  | Past and future wage loss and impairment of earning capacity | $538,092.00 |
|  | Pain and suffering | $375,000.00 |
|  | Mental anguish, disfigurement, loss of enjoyment of life, and loss of consortium | $1,500,000.00 |
| Rafael | Mental anguish and loss of spousal consortium | $950,000.00 |
| R.M.B.C. | Mental anguish and loss of parental consortium | $450,000.00 |
| R.B.B.C. | Mental anguish and loss of parental consortium | $450,000.00 |
| M.R.B.C. | Mental anguish and loss of parental consortium | $450,000.00 |
|  | **Total** | **$24,743,668.53** |

22.   Defendant has not met its burden of adducing

sufficient credible evidence to establish its entitlement to

and/or the amount of any offset against any of the costs of

Marites' future care needs.   Consequently, Defendant is not

entitled to any offset from any source against Marites' future

care costs.

23.   An award of attorneys' fees against the United States

is barred by sovereign immunity unless a statute expressly

authorizes such an award.   <u>Anderson v. United States</u>, 127 F.3d

1190, 1191 (9th Cir. 1997).   "Congress has not waived the

government's sovereign immunity for attorneys' fees and expenses under the FTCA." Id. at 1192.  Thus, Plaintiffs are not entitled to an award of attorneys' fees in the present action.

24.  Plaintiffs may, however, recover their costs. Plaintiffs shall file, within 21 days from the entry of judgment, the necessary affidavits to resolve the question of costs.

## DECISION

In accordance with the above findings of fact and conclusions of law, the Court HEREBY ORDERS that judgment enter in favor of Plaintiffs and against Defendant in the amount of **$24,743,668.53,** which represents **$22,443,668.53** to Plaintiff Marites Campano; **$950,000.00** to Plaintiff Rafael Campano; **$450,000.00** to Plaintiffs Marites and Rafael Campano as next friend of R.M.B.C.; **$450,000.00** to Plaintiffs Marites and Rafael Campano as next friend of R.B.B.C.; and **$450,000.00** to Plaintiffs Marites and Rafael Campano as next friend of M.R.B.C. Defendant is ORDERED to remit payment to Plaintiffs, through counsel, within 60 days of the entry of judgment.

IT IS SO ORDERED.

DATED:  Honolulu, March 7, 2018.



_____
Kevin S.C. Chang
United States Magistrate Judge

CIVIL NO. 15-00439 KSC; CAMPANO, ET AL. V. UNITED STATES OF AMERICA; FINDINGS
OF FACT AND CONCLUSIONS OF LAW